# No. 14-15140-C

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

**UNITED STATES OF AMERICA,**

*Plaintiff/appellee,*

v.

**ALVARO LOPEZ TARDON,**

*Defendant/appellant.*

**On Appeal from the United States District Court**
**for the Southern District of Florida**

**APPELLANT ALVARO LOPEZ TARDON'S INITIAL BRIEF**

> **RICHARD C. KLUGH, ESQ.**
> **Law Office of Richard C. Klugh**
> **Counsel for Defendant-Appellant**
> **40 N.W. 3rd Street, PH 1**
> **Miami, Florida 33128**
> **Tel. (305) 536-1191**

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

## United States v. Alvaro Lopez Tardon
## Case No. 14-15140-C

Appellant files this Certificate of Interested Persons and Corporate Disclosure

Statement as required by 11th Cir. R. 26.1.

Amster, Steven Edward

Brown, Hon. Stephen T.

Blumenfeld, Jack

Cardelle, Vincent

Collection Motor Sports of Madrid

Dube, Hon. Robert L.

Ecarius, Daniel

Frazier, Brian

Ferrer, Wifredo A.

Galler, Brandy Brentari

Golembe, Stephen J.

Gonzalez, Jr., Juan A.

Goodman, Hon. Jonathan

**Certificate of Interested Persons (cont'd)**
*United States v. Alvaro Lopez Tardon*
**Case No. 14-15140-C**

Grove, Daren

Kleiner, Ron M.

Klugh, Richard C.

Krentz, Fabiani

Lazarus, Paul D.

Lenard, Hon. Joan A.

Lopez Tardon, Alvaro

Lopez Tardon, Artemio

Matzkin, Daniel

Maxwell, Cristina

McAliley, Hon. Chris M.

MiaMark, LLC.

Moreno, Hon. Federico

Mullenhoff, Jeanne

Murano 908, LLC

Noll, Andrew

O'Sullivan, Hon. John J.

Pollack, David William

Raben, David

Rabin, Jr., Stephen J.

Salyer, Kathleen M.

Shapiro, Jacqueline E.

Sheehan, Evelyn

Srebnick, Howard

Smachetti, Emily M.

Sombunthan, Nalina

Spivak, Michael D.

Turnoff, Hon. William C.

Weisman, Kenneth

# STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully requests oral argument. Appellant received a sentence of 150 years imprisonment, of which 130 years are premised on offenses lacking a specific intent element—apparently the longest sentence ever imposed for charges of spending more than $10,000 of funds derived from criminal conduct. At trial, the district court ruled, at the government's urging, DE:533:57–58, that a jurisdictional prerequisite for conviction was proving the funds were proceeds of U.S. drug law violations. The government argued to the jury that the proceeds "certainly" were from U.S. drug crimes. DE:504:56. In post-trial filings, the government admitted no domestic criminal proceeds were implicated and no U.S. drug laws were violated. These admissions, following multiple search warrants, the original and two superseding indictments, and government closing arguments all asserting the opposite, compelled dismissal of the indictment, a finding of insufficient evidence to prove the case as tried, and alternatively a new trial based on constructive amendment and instructional error. Because foreign crimes do not serve as predicates for the relevant statutory, sentencing, or forfeiture provisions, and because multiple Fourth Amendment, due process, Confrontation Clause, and other constitutional violations and trial and sentencing errors warrant relief, oral argument will serve the interest of justice.

i

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . . C-1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . viii

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xiv

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Proceedings and Disposition in the District Court. . . . . . . . . . . . . . . . . . 2

    Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

I.    The District Court Erred in Denying Motions to Dismiss the Indictment for Failure to State a Jurisdictionally-Valid Offense, and for Judgment of Acquittal Where the Government, Post-Verdict, Retracted Both the Theory of Prosecution That U.S. Drug Proceeds Were Laundered and the Legal Argument, Adopted by the District Court at Trial, That Proof of U.S. Criminal Proceeds Was Jurisdictionally Essential to Conviction . . . . 12

    A.    18 U.S.C. § 1956(c)(7)'s "specified unlawful activity" definition requires that the unlawful activity violate U.S. law, but makes an

exception for a "financial transaction"—an element of § 1956(a)(1), but not §§ 1956(a)(2) and 1957. Nor did the government allege that the § 1956(a)(2) and § 1957 offenses involved any "financial transaction," instead relying on U.S. offense proceeds as the jurisdictional basis for conviction until after trial. The district court erred in its post-trial ruling that the foreign-crimes exception applied to all charges in Tardon's case. . . 13

B. The district court erred in denying motions for acquittal where the government failed to prove essential elements, including the requisite proceeds-sourcing and knowledge elements and the charged money-laundering design of international transfers. . . . . . . 19

    1.    The government failed to prove the domestic-crime proceeds theory it charged, urged the district court to rely on, and presented to the jury . . . . . . . . . . . . . . . . . . . . . . . . . 19

    2.    Even apart from the case-as-tried doctrine and the indictment's failure to properly invoke foreign crime proceeds as an independent basis for liability, the evidence was insufficient . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    3.    The government failed to prove anything statutorily-relevant regarding Spanish or other foreign drug laws, including proof of a felony offense as required under the "some unlawful activity" definition . . . . . . . . . . . . . . . . . . . . 21

iii

4. Under *Regalado Cuellar v. United States*, 553 U.S. 550, 557 (2008), money transfers by courier or otherwise to a drug trafficker—even if facilitated by concealment or avoidance of law enforcement—do not constitute money laundering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

5. The government failed to prove amount-of-proceeds, commercial nexus, and other elements of § 1957 charges . . . 25

6. The government's single, decade-long conspiracy theory lacked evidentiary support and conflated events, rendering a unanimous verdict impossible . . . . . . . . . . . . . . . . . . . . . . 27

II. The District Court Erroneously Denied Suppression Motions and Hearing Requests . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

A. Denial of hearing on *Franks* violation and overbroad warrant execution . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B. Warrantless seizure and search of Tardon's diary-notebook should have been suppressed where Tardon had a state-court-recognized privacy expectation, the government's voluntary-consent-of-spouse theory was refuted by her months-long confidential-informant work, including on government search requests the day of the seizure; and government access to a container of Tardon's papers did not excuse the warrant requirement for the search . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

iv

1. Warrantless search and seizure required suppression, despite government's inapposite consent and expectation-of-privacy arguments. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

2. Evidence at trial refuted the factual premises for expectation-of-privacy and consent-exception rulings, and compelled reconsideration of Tardon's suppression motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

III. The District Court Erred in Admitting Unauthenticated Spanish Wiretap Recordings; Foreign Police Report and Investigative Opinion Evidence, over Defense Objections and Mistrial Motions Asserting Unfair Prejudice, Hearsay, and Confrontation Clause Grounds; and Spanish Cocaine Evidence Unconnected to Tardon . . . . . . . . . . . . . . . . . . . . . . . . 49

A. Spanish wiretaps lacking authentication . . . . . . . . . . . . . . . . . . . . . 49

B. Improper police report hearsay and opinions, unfair restriction on cross-examination of improper Spanish police evidentiary claims, and erroneous denial of mistrial motion . . . . . . . . . . . . . . . . . . . . . . 50

C. Wrongful introduction—and provision to the jury for handling—of a large amount of Spanish cocaine imported into this country by the government despite no linkage to Tardon . . . . . . . . . 53

IV. Cumulative Trial Error and Pervasive Prejudice . . . . . . . . . . . . . . . . . . . . . . 54

A. Instructional error violated Tardon's substantial rights. . . . . . . . . . . 54

B. Prejudicial hearsay and marital communication privilege violations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

C. Improper government closing arguments—misstating the law to reduce the government's proof burden, vouching for witnesses and for Tardon's guilt, falsely imputing criminal conduct (prostitution) to Tardon's wife, and misstating her testimony and other evidence—caused substantial prejudice heightened by undue restrictions on defense argument . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

V. The District Court Erred at Sentencing By Employing a Nonexistent Base Offense Level for Foreign Crime; Imposing a Substantively-Unreasonable, Unconstitutionally Cruel 150-Year Sentence for Crimes Lacking a Wilfulness Element; and Imposing Untimely, Unsupported Forfeiture Orders Violating Fifth, Sixth, and Eighth Amendment Rights, Forfeiture Statutes, and Fed.R.Crim.P. 32.2, Including for Property the Jury Found Had No Connection to the Case . . . . . . . . . . . . . . . . . . . . . . . . 67

A. Erroneous base offense level premised on foreign conduct for which no guideline applies. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 67

B. The 150-year sentence is substantively unreasonable and unconstitutionally cruel and unusual . . . . . . . . . . . . . . . . . . . . . . . . 69

C. The district court's calculation of a $14 million laundering amount and corresponding forfeitures, including direct "involved in" forfeiture, exceeded the scope of charged laundering offenses and

relevant statutes, conflicted with jury findings on forfeiture claims, were procedurally improper, and violated Tardon's Fifth, Sixth, and Eighth Amendment and statutory rights and Fed.R.Crim.P. 32.2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 73

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 80

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT . . . . . . . . 81

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

# TABLE OF AUTHORITIES

**Cases**

*Alleyne v. United States*, 570 U.S. 99 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 77

*Berger v. United States*, 295 U.S. 78 (1935) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*Ciminelli v. United States*, 143 S.Ct. 1121 (2023). . . . . . . . . . . . . . . . . . . . . . . . . 20

*Franks v. Delaware,* 438 U.S. 154 (1978) . . . . . . . . 2, 19, 29, 31, 33, 34, 35, 36, 37

*Hutchins v. Wainwright*, 715 F.2d 512 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . 65

*Kennedy v. Dugger*, 933 F.2d 905 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . 65

*Klay v. United Healthgroup, Inc.,* 376 F.3d 1092 (11th Cir. 2004). . . . . . . . . . . . . 8

*Libretti v. United States*,  516 U.S. 29 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Lightbourne v. Dugger*, 829 F.2d 1012 (11thCir. 1987) . . . . . . . . . . . . . . . . . . . 47

*McIntosh v. United States*, 144 S.Ct. 980 (2024). . . . . . . . . . . . . . . . . . . . . . . . . . 76

*Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009). . . . . . . . . . . . . . . . . . . . 51

*Mullican v. United States*, 252 F.2d 398 (5th Cir. 1958). . . . . . . . . . . . . . . . . . . . 50

*Ratzlaf v. United States*, 510 U.S. 135 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

*Regalado Cuellar v. United States*, 553 U.S. 550 (2008) . . . . . . . 15, 23, 24, 25, 56

*RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325 (2016) . . . . . . . . . . . . . . . . . . . . . 16

*Russello v. United States*, 464 U.S. 16 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

*Skilling v. United States*, 561 U.S. 358 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . 54

*Southern Union Co. v. United States*, 567 U.S. 343 (2012). . . . . . . . . . . . . . . . . . 77

*Strickland v. Washington*, 466 U.S. 668 (1984). . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Adefehinti*, 510 F.3d 319 (D.C. Cir. 2007). . . . . . . . . . . . . . . . . 25

*United States v. Adkinson*, 135 F.3d 1363 (11th Cir. 1998). . . . . . . . . . . . . . . . . 17

*United States v. Aguirre–Arsate*, 651 Fed.Appx. 918 (11th Cir. 2016). . . . . . 72, 73

*United States v. Bajakajian*, 524 U.S. 321 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Baker*, 432 F.3d 1189 (11th Cir. 2005) . . . . . . . . . . . . . . . . . 66, 67

*United States v. Carrasco*, 381 F.3d 1237 (11th Cir. 2004) . . . . . . . . . . . . . . . . 8

*United States v. DeFalco*, 509 F.Supp. 127 (S.D. Fla. 1981) . . . . . . . . . . . . . . 39

*United States v. Elbeblawy*, 899 F.3d 925 (11th Cir. 2018). . . . . . . . . . . . . . . 9, 76

*United States v. Elkins*, 885 F.2d 775 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . 20

*United States v. Epps*, 613 F.3d 1093 (11th Cir. 2010) . . . . . . . . . . . . . . . . . . . 64

*United States v. Eyster*, 948 F.2d 1196 (11th Cir. 1991) . . . . . . . . . . . . . . 8, 64, 65

*United States v. Farias*, 836 F.3d 1315 (11th Cir. 2016). . . . . . . . . . . . . . . . . . 78

*United States v. Faulkenberry*, 614 F.3d 573 (6th Cir. 2010) . . . . . . . . . . . . . . 24

*United States v. Frazier*, 387 F.3d 1244 (11th Cir. 2004) . . . . . . . . . . . . . . . . . 8

*United States v. Garcia*, 587 F.3d 509 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . 23

*United States v. Gonzalez*, 550 F.3d 1319 (11th Cir. 2008). . . . . . . . . . . . . . . 73

*United States v. Granderson*, 511 U.S. 39 (1994) . . . . . . . . . . . . . . . . . . . . . . . 79

*United States v. Grimon*, 923 F.3d 1302 (11th Cir. 2019). . . . . . . . . . . . . . . . . 7

*United States v. Hanley*, 190 F.3d 1017 (9th Cir. 1999) . . . . . . . . . . . . . . . . . . 25

*United States v. Ignasiak*, 667 F.3d 1217 (11th Cir. 2012) . . . . . . . . . . . . . . 8, 51

*United States v. Izurieta*, 710 F.3d 1176 (11th Cir. 2013). . . . . . . . . . . . . . . . . 17

*United States v. Jaras*, 86 F.3d 383 (5th Cir. 1996). . . . . . . . . . . . . . . . . . . . . 49

*United States v. Jenkins*, 779 F.2d 606 (11th Cir. 1986). . . . . . . . . . . . . . . . . . 28

*United States v. Jenkins*, 901 F.2d 1075 (11th Cir. 1990) . . . . . . . . . . . . . . . . . 34

*United States v. Johnson*, 440 F.3d 1286 (11th Cir. 2006) . . . . . . . . . . . . . . . 25, 74

*United States v. Keller*, 916 F.2d 628 (11th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . 64

*United States v. Ladson*, 643 F.3d 1335 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . 67

*United States v. Lee*, 972 F. Supp. 1330 (D. Kan. 1997) . . . . . . . . . . . . . . . . . . . 47

*United States v. Lee*, 77 F.4th 565 (7th Cir. 2023) . . . . . . . . . . . . . . . . . . . . . . . . 78

*United States v. Lewis*, 674 F.3d 1298 (11th Cir. 2012) . . . . . . . . . . . . . . . . . . . . 8

*United States v. Lopez-Vanegas*, 493 F.3d 1305 (11th Cir. 2007) . . . . . . . . . . . . 20

*United States v. Maddox*, 803 F.3d 1215 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . 8

*United States v. McKay*, 506 F.Supp.2d 1206 (S.D. Fla. 2007) . . . . . . . . . . . . . 80

*United States v. Mekjian*, 505 F. 2d 1320 (5th Cir. 1975) . . . . . . . . . . . . . . . . . 47

*United States v. Moran*, 778 F.3d 942 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . . 8

*United States v. Morin*, 33 F.3d 1351 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 8

*United States v. Ness*, 565 F.3d 73 (2d Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . 24

*United States v. Newton*, 44 F.3d 913 (11th Cir. 1994) . . . . . . . . . . . . . . . . . . . . 28

*United States v. Pearson*, 746 F.2d 787 (11th Cir. 1984) . . . . . . . . . . . . . . . . . . . 64

*United States v. Ross*, 131 F.3d 970 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Seher*, 562 F.3d 1344 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . . . 79

*United States v. Singleton*, 260 F.3d 1295 (11th Cir. 2001) . . . . . . . . . . . . . . . . 59

*United States v. Small*, 544 U.S. 385 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

*United States v. Spence*, 923 F.3d 929 (11th Cir. 2019) . . . . . . . . . . . . . . . . . . . 69

*United States v. Steele*, 178 F.3d 1230 (11th Cir. 1999) . . . . . . . . . . . . . . . . . . . . 8

*United States v. Steiger*, 318 F.3d 1039 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . 47

*United States v. Vera*, 701 F.2d 1349 (11th Cir. 1983) . . . . . . . . . . . . . . . . . . . . 65

*United States v. Williams*, 954 F.2d 668 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . 41

*United States v. Willner*, 795 F.3d 1297 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . 20

*United States v. Young*, 470 U.S. 1 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

*United States v. Young*, 330 F.Supp.3d 424 (D.D.C. 2018) . . . . . . . . . . . . . . . . 80

*Williams v. Kemp*, 846 F.2d 1276 (11th Cir.1988). . . . . . . . . . . . . . . . . . . . . . . 65

*Wolfle v. United States*, 291 U.S. 7 (1934). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 59

*Yates v. United States*, 354 U.S. 298 (1957) . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

**Other Authorities**

U.S. Const., amend. V (Due Process Clause). . . . . . . . . . . . 1, 11, 53, 65, 67, 73, 79

U.S. Const., amend. VI (Jury Trial Clause) . . . . . . . . . . . . . . . . . . . . . 67, 73, 76, 77

U.S. Const., amend. VI (Confrontation Clause). . . . . . . . 1, 8, 10, 49, 51, 52, 52, 61

U.S. Const., amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 11, 67, 69, 70, 73

18 U.S.C. § 922(g) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

18 U.S.C. § 982(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 79

18 U.S.C. § 1956. . . . . . . . . . . . . . . . . . . . . . . . 9, 15, 16, 23, 26, 27, 55, 68, 70

18 U.S.C. § 1956(a)(1)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1956(a)(1)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 37

18 U.S.C. § 1956(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . 1, 13, 14, 15, 26, 56, 75

18 U.S.C. § 1956(a)(2)(B)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1956(a)(2)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 37

18 U.S.C. § 1956(b)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

18 U.S.C. § 1956(c)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 19, 22

18 U.S.C. § 1956(c)(4) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

18 U.S.C. § 1956(c)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 22

18 U.S.C. § 1956(c)(7)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 21

18 U.S.C. § 1956(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15

18 U.S.C. § 1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, *passim*

18 U.S.C. § 1957(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 75

18 U.S.C. § 1957(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

21 U.S.C. § 885 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53, 54

FED. R. CRIM. P. 12(b)(3)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

FED. R. CRIM. P. 29(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

FED. R. CRIM. P. 32 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

FED. R. CRIM. P. 32.2(b)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

FED. R. CRIM. P. 32.2(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

FED. R. CRIM. P. 32.2(b)(4)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

FED. R. EVID. 803(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

FED. R. EVID. 901 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

FED. R. EVID. 1002 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

U.S.S.G. Ch. 1, Pt. A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

U.S.S.G. § 2S1.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

U.S.S.G. § 2S1.1(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

U.S.S.G. § 2S1.1(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68, 69

U.S.S.G. § 2S1.1(a)(2)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

U.S.S.G. § 2S1.1(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

U.S.S.G. § 2S1.1(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

U.S.S.G. Ch. 5, Pt. A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 68

**STATEMENT OF JURISDICTION**

The district court's jurisdiction arose under 18 U.S.C. § 3231 because Alvaro Tardon was charged with offenses against laws of the United States. This Court has jurisdiction over the appeal under 28 U.S.C. § 1291, which gives courts of appeals jurisdiction over all final decisions of district courts of the United States, and 18 U.S.C. § 3742, which affords jurisdiction to review criminal sentencing judgments. The appellant timely appealed, on November 12, 2014 (DE:614), from the judgment and commitment order entered on October 28, 2014 (DE:611), resolving the claims in his case.

## ISSUES

I.      The district court erred in denying motions for dismissal and acquittal where: the government's proceeds theory premised on U.S. drug violations was unfounded; foreign crimes are not "specified unlawful activity" predicates under 18 U.S.C. §§ 1956(a)(2) and 1957; and the evidence was otherwise insufficient.

II.      The district court erroneously denied motions to suppress where hearings were required on issues of material affidavit falsity and trial evidence refuting government consent and expectation-of-privacy arguments.

III.     The district court erred in admitting unauthenticated Spanish wiretap recordings; foreign police report and investigative opinion evidence, over defense objections and mistrial motions asserting unfair prejudice, hearsay, and Confrontation Clause grounds; and Spanish cocaine evidence unconnected to Tardon.

IV.     Cumulative trial error—including instructional error; impermissible vouching, burden shifting, and other improper government argument, including constructively amending the charges; prejudicial restriction of defense cross-examination and case presentation; and improper admission and misuse of privileged communications and hearsay—compels a new trial.

V.      The district court erred by employing a nonexistent sentencing-guideline base offense level for foreign crimes; imposing a substantively unreasonable and unconstitutionally cruel and unusual 150-year sentence for crimes lacking any willfulness or specific intent element; and imposing legally- and factually-

1

unsupported laundering-amount calculations and forfeiture orders, including as to property and transactions the jury found unconnected to the charges.

## STATEMENT OF THE CASE

### Proceedings and Disposition in the District Court

Appellant Alvaro Tardon was charged, in Count 1, with conspiring, in violation of 18 U.S.C. § 1956(h), from 2001 to 2012, to violate multiple money laundering provisions: 18 U.S.C. §§ 1956(a)(1)(B)(i), (ii) ("financial" transactions designed to conceal the proceeds' derivation and evade transaction-reporting requirements, respectively), 1956(a)(2)(B)(i), (ii) (international transmission/transportation of funds in order to conceal the proceeds' derivation and evade transaction-reporting requirements, respectively), and 1957 ("monetary" transactions, i.e., spending more than $10,000 of criminal proceeds). DE:203. Counts 2–14 charged substantive money-spending violations of § 1957, from September 2009 to June 2011. *Id.* The government alleged the funds involved were proceeds of specified unlawful activity violating drug laws of the United States and foreign countries. DE:3, 106, 203.

Prior to trial, Tardon moved to suppress his marital communications, warrantlessly-seized personal papers, and effects and data obtained via search warrants premised on false claims of U.S. drug and other crimes. DE:75, 145, 285, 343. An evidentiary hearing was held on warrantless search claims, but not Tardon's *Franks v. Delaware,* 438 U.S. 154 (1978), and overbroad warrant execution claims; the district court denied the suppression motions. DE:207, 253, 301, 384, 408. The

2

motions and hearing requests were renewed at trial, including based on newly-disclosed evidence, DE:474; the district court again denied relief.  DE:585.

Tardon proceeded to a jury trial, moving for a judgment of acquittal when the government's case-in-chief concluded; the district court reserved ruling at that stage of the case, DE:530:164, but denied the motion at the close of all evidence. DE:533:80.  The evidence was closely disputed, and the jury, during deliberations, expressed division in its note following the second day of deliberations.  DE:534:11. The jury ultimately returned guilty verdicts on all counts after three days of deliberations.  DE:713:3; DE:484 (verdict).

In the trial's forfeiture phase, the jury, applying a preponderance-of-the-evidence standard, found only two of six real-estate properties and five of seven cars the government sought to forfeit were subject to forfeiture.  DE:487 (jury verdict of forfeiture, relying on "involved in" theory of 18 U.S.C. § 982(a)(1) forfeiture).  As to the remaining property in the indictment's forfeiture section, the jury concluded all the jewelry, nine wristwatches, two automobiles, and four real properties lacked any nexus to the offenses.  DE:487; DE:536:124.

Tardon's post-trial motions for new trial, DE:498, and judgment of acquittal, DE:500, were denied, DE:586, 587, as was Tardon's motion, DE:589, to dismiss the indictment based on post-trial government concessions of the impropriety of the charged theory that nonexistent U.S. drug crimes constituted specified unlawful activity.  *See* DE:599 (post-sentencing order elaborating on ore tenus ruling at

3

sentencing, DE:606:101, denying motion to dismiss indictment for lack of jurisdiction and failure to state an offense based on government's post-trial admission that indictment's assertion of U.S. drug violation proceeds was unfounded).

Pursuant to Fed.R.Crim.P. 32, Tardon timely objected to the presentence report. DE:546-2. The government thereafter moved for a $14,358,639.64 forfeiture money judgment, including substitute-asset forfeiture of property the jury found untainted. DE:550. Over objection, the district court granted the money judgment motion at sentencing, DE:608:6, and later entered a preliminary forfeiture order including the substitute-asset component the government requested. DE:601.

On September 29, 2014, the district court sentenced Tardon to 150 years imprisonment, consisting of consecutive statutory-maximum sentences for each count, with a $2,000,000 fine. *See* DE:611. On October 22, 2014, the district court entered its preliminary forfeiture order imposing a money judgment and substitute-asset forfeiture of property the jury found untainted. DE:601.

### Statement of Facts

The government sought to prove Tardon was involved in drug trafficking throughout the 2001–2012 period of the indictment and that drug proceeds—rather than revenue from the high-end car sales company, The Collection Motor Sports of Madrid ("CMSM"), Tardon established in Spain with his brother Artemio Tardon ("Artemio")—were sent to the United States. To prove Tardon's involvement in conspiracy to transport drugs from Peru to Spain, the government presented alleged

co-conspirator David Pollack, who claimed he worked with Tardon beginning while CMSM was operating until 2010 and was involved in three 2,500-kilogram shipments of cocaine to Spain from Peru. DE:519:127.[1] For the period from 2001 to 2006, when Pollack claimed he was not involved with Tardon, the government offered evidence of (undated) notations in a personal address book attributed to Ana Cameno, whom Spain arrested, containing possible references to Tardon and Artemio. DE:521:35–44. Over multiple objections, the government provided for the jury's handling a kilogram of cocaine the government imported into this country to use against Tardon; the government argued the cocaine—although lacking any connection to Tardon—was found on premises associated with Cameno. DE:521:57; Govt-Ex:138–39.

Over objection and a defense mistrial motion, the government introduced Spanish police officer hearsay and opinion evidence attributing drug-trafficking offenses to Cameno and suggesting Tardon's relationship with her. DE:521:12–21, DE:522:27–28; DE:526:104–48; DE:527:5–27. To link Tardon to the address book purportedly seized from Cameno, the government introduced a diary-notebook warrantlessly seized from Tardon's home. DE:523:90; *see* DE523:123 (also using notebook to claim poem by Tardon proved he was a "drug dealer"). The government

---

[1] Pollack later recanted his testimony when prosecuted in Spain. *See Ministerio Fiscal v. David William Pollack*, No. 00028/2023, Audiencia Nacional, Sala Penal, Sección 4, Sentencia Nº 28/2023, Rollo de Sala: SUMARIO (PRC. ORDINARIO) 0000009/2017 (Oct. 3, 2023). Pollack's cross-examination at Tardon's trial, DE:520:39–172, focused on his false statements to law enforcement and the uncorroborated nature of his allegations.

otherwise relied on what it asserted was unexplained wealth, including unlaundered currency hidden in Artemio's Madrid home. DE:526:104; DE:527:5–7 (Spanish police opine, over hearsay objection, that €19,000,000 were found in Artemio's home).

The government also presented the testimony of Tardon's ex-wife, Sharon Cohen, and others who had assisted him in accessing funds from Spain, including openly exchanging euros for dollars. DE:524:45. Cohen had no knowledge of any drug dealing by Tardon. DE:523:12.

Over objection, the government introduced evidence that Tardon's mother told Cohen that Tardon's father once stated to Spanish authorities that Tardon was a drug trafficker. DE:523:165–66. Over objection, the district court admitted this testimony, and evidence of Tardon-Cohen marital communications, under the theory that Cohen and Tardon's mother were co-conspirators. DE:523:149.

The government introduced, over objection, Spanish wiretaps of Tardon's Miami cellular telephone to show requests to Artemio and others in Spain to send money. DE:518:109–40. The government introduced additional non-drug evidence that Tardon breached Spanish tax-law requirements regarding income from Spanish businesses and failed to properly file U.S. income tax forms, DE:526:11, and evidence that Tardon used money his family sent to Miami to make purchases for himself, the car business, or his family—including, through family real estate partnerships, rental-income apartments and high-end automobiles. Regarding the rental real estate

(condominium apartments) purchased in Miami, Tardon paid expenses and taxes through rental revenue Cohen and an established Miami real estate company helped manage, while he maintained the position of LLC manager (nominally, "managing member") of his family's LLC real estate entities that owned the properties. DE:524:66. Ultimately, the jury found in the forfeiture phase that *none of the rental properties purchased with Spanish monies had the requisite nexus to the money laundering charges*. DE:487.

Tardon presented a defense case, including testimony by Patricia Scheel, who managed CMSM's car-sales business in Madrid and communicated regularly with Tardon. DE:503:49. Scheel testified to multi-million-dollar car-sales revenue, DE:503:91–93, and noted CMSM's luxury car business had been, during her tenure, featured in a nationally-televised Spanish broadcast that displayed the car dealership and described its car-sales business. DE:523:95. On direct and cross-examination, Scheel acknowledged that on multiple occasions she facilitated the transfer of money from CMSM to Tardon in Miami. DE:531:36, 56, 73.

### Standards of Review

This Court reviews *de novo* whether an indictment states an offense and establishes jurisdiction, and whether evidence is sufficient to sustain a conviction. *United States v. Grimon*, 923 F.3d 1302, 1305 (11th Cir. 2019); *United States v.*

*Steele*, 178 F.3d 1230, 1233 (11th Cir. 1999); *United States v. Morin*, 33 F.3d 1351, 1352 (11th Cir. 1994). Suppression rulings present mixed questions of law and fact. *United States v. Lewis*, 674 F.3d 1298, 1302 (11th Cir. 2012). A Sixth Amendment Confrontation Clause claim ruling is reviewed *de novo*. *United States v. Ignasiak*, 667 F.3d 1217, 1227, 1235 (11th Cir. 2012) (confrontation error requires reversal unless harmless beyond reasonable doubt). Review of prosecutorial vouching "is plenary because improper vouching is a mixed question of law and fact." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991). Generally, review of trial errors, including instructional and evidentiary and closing argument improprieties, is for abuse of discretion. *United States v. Carrasco*, 381 F.3d 1237, 1242 (11th Cir. 2004) (instructional); *United States v. Frazier*, 387 F.3d 1244, 1276 (11th Cir. 2004) (evidentiary); *United States v. Moran*, 778 F.3d 942, 969 (11th Cir. 2015) (closing argument); *see also Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1096 (11th Cir. 2004) (abuse of discretion where district court "applies an incorrect legal standard, follows improper procedures in making the determination," "makes findings of fact that are clearly erroneous," or "appl[ies] the law in an unreasonable or incorrect manner").

Sentencing guideline interpretation and related constitutional errors are reviewed *de novo*, *United States v. Maddox*, 803 F.3d 1215, 1220 (11th Cir. 2015), as

are legal conclusions regarding forfeiture.  *United States v. Elbeblawy*, 899 F.3d 925, 933 (11th Cir. 2018); *United States v. Bajakajian*, 524 U.S. 321, 336 (1998).

## SUMMARY OF THE ARGUMENT

1.     Post-trial, the district court reversed its charge-conference ruling that the government was required to prove U.S. drug law violations produced the proceeds underlying the money laundering charges.  At trial, the government expressly relied on the U.S. drug-violation theory to satisfy jurisdictional requirements of 18 U.S.C. §§ 1956 and 1957 charges, and the district court overruled defense objections that the government's indicted premise of U.S. drug crimes was unfounded, instead ruling that sourcing the proceeds to U.S. drug-law violations was a *jurisdictional and elemental prerequisite* to the prosecution.

The government's admitted after trial that there were no U.S. drug law violations—and thus no basis for its arguments on which the district court relied in overruling defense objections.  The indictment's failure to meet pleading and jurisdictional requirements for foreign-crime-proceeds prosecution compelled granting defendant's pre-sentencing motions for judgment of acquittal or to dismiss the indictment.  The government also failed to prove other offense elements, including specific intent, "design," and other components of the money laundering charges.

9

2. The district court erred in denying motions to suppress warrantless seizure of Tardon's papers as well as searches premised on materially false affidavits, including unfounded claims of U.S. drug crimes, and overbroad searches. The district court erroneously denied evidentiary hearings on the *Franks v. Delaware*, 438 U.S. 154 (1978), and overbroad warrant execution claims, and in failing to reopen suppression proceedings when trial evidence confirmed the affidavits' material falsity and refuted the government's consent and expectation-of-privacy arguments (and confirmed that the participation of an FBI informant assisting the government in pre-indictment investigations and searches did not disassociate the government from the warrantless seizure and search).

3. Admission at trial of Spanish police officer hearsay and opinion testimony and related exhibits violated Tardon's Confrontation Clause rights, was unfairly prejudicial, and precluded adversarial testing of the foreign evidence. Unauthenticated Spanish wiretap evidence and evidence violating the marital communications privilege unfairly prejudiced Tardon. Admission and presentation for jury handling of a kilogram of cocaine and other drug evidence unconnected to Tardon was improper (including under 21 U.S.C. § 855), inflammatory, and unfairly prejudicial. The evidentiary errors warrant reversal.

4. Cumulative trial error—including instructional error; prejudicial restriction of the defense case and arguments; and improper government argument without curative instruction, including vouching, prejudicial disparagement of Cohen as a prostitute and misuse of impeachment evidence, constructively amending the prosecution theory to reduce the government's burden—unfairly prejudiced Tardon, warranting a new trial in light of defense objections and mistrial motions.

5. Tardon was wrongly sentenced on the basis of a nonexistent base offense level for unspecified Spanish statutory violations. The district court imposed a substantively-unreasonable and unconstitutionally cruel and unusual 150-year statutory maximum sentence—130 years of which was for offenses lacking any specific intent element. The district court erred in failing to correct the presentence report's wrongful inclusion of unsubstantiated foreign police allegations where any dispute was resolved by the government disclaiming any supporting evidence. The district court's money-laundering amount and forfeiture determinations were procedurally and substantively erroneous and punitively double-punished defendant following the jury's defense-favorable forfeiture verdict. The rulings violated defendant's due process and jury trial rights. The district court's denial of a hearing to resolve the government's untimely forfeiture motion at sentencing violated Rule 32.2.

## ARGUMENT

**I. THE DISTRICT COURT ERRED IN DENYING MOTIONS TO DISMISS THE INDICTMENT FOR FAILURE TO STATE A JURISDICTIONALLY-VALID OFFENSE, AND FOR JUDGMENT OF ACQUITTAL WHERE THE GOVERNMENT, POST-VERDICT, RETRACTED BOTH THE THEORY OF PROSECUTION THAT U.S. DRUG PROCEEDS WERE LAUNDERED AND THE LEGAL ARGUMENT, ADOPTED BY THE DISTRICT COURT AT TRIAL, THAT PROOF OF U.S. CRIMINAL PROCEEDS WAS JURISDICTIONALLY ESSENTIAL TO CONVICTION.**

The district court overruled Tardon's charge conference objection and denied his related motion for judgment of acquittal arguing that the government failed to prove the indicted allegation of U.S. drug-law violations as a specified unlawful activity predicate for money laundering charges. The district court ruled—in agreement with the government—that the indictment's allegation of such U.S. crimes was a *jurisdictional prerequisite* and that the government presented sufficient evidence to prove U.S. drug-crime proceeds. DE:533:58 ("[PROSECUTOR]: [Y]ou have to have the United States law in order to capture the definition portion of it and, also, based on the evidence in this case. THE COURT: It has to be punishable under the laws of the United States because that's how the statute reads. It has to be a violation of the Controlled Substance Act, and there's the extraterritorial jurisdiction.").

Despite these rulings setting the terms of the case as tried, the government—in responding to Tardon's post-trial motion for judgment of acquittal—reversed its position, and the district court likewise reversed its prior rulings and concluded that the failure of proof of the indicted U.S. criminal proceeds did not have the jurisdictional effect the court ruled it had when the case was presented to the jury. DE:541:13 (government, post-trial, concedes no proof of U.S. drug crimes); DE:586:32 (district court, post-trial, rules government "was not required to prove domestic drug trafficking"); DE:594 at 3 (government asserts indictment "no longer serves a purpose" at sentencing); DE:599:14 (district court rules pre-sentencing indictment challenges were untimely, notwithstanding altered post-trial positions taken by court and government); DE:606:101–06 (ore tenus ruling denying motion on waiver grounds).

The district court erred in denying Tardon's motion to dismiss premised on the government's post-trial admission that its indicted theory of proceeds of U.S. drug-law violations—which the government vouched for in closing argument, DE:504:56—was unfounded.

A. *18 U.S.C. § 1956(c)(7)'s "specified unlawful activity" definition requires that the unlawful activity violate U.S. law, but makes an exception for a "financial transaction"—an element of § 1956(a)(1), but not §§ 1956(a)(2) and 1957. Nor did the government allege that the § 1956(a)(2) and § 1957 offenses involved any "financial transaction," instead relying on U.S. offense*

*proceeds as the jurisdictional basis for conviction until after trial. The district court erred in its post-trial ruling that the foreign-crimes exception applied to all charges in Tardon's case.*

Tardon's pre-sentencing motion (DE:589) to dismiss the indictment for failure to state an offense and jurisdictional insufficiency relied on the district court's jury-instruction ruling *and* the relevant statutory text that excludes foreign crimes from *both* the "criminally derived property" and "monetary transaction" elements of § 1957, and the transportation/transmission element of § 1956(a)(2).

Tardon's dismissal motion properly requested relief before sentencing based on pleading defects, statutory requirements, and related trial rulings. DE:589. The district court's denial of the motion, DE:599, rested on *waiver* theories, but did not explain the court's post-trial reversal of its rulings at trial that proof of U.S. crime proceeds was required and that the government had proven that element. The government relied on the falsely-premised indictment for more than three years, in multiple search warrant applications, and in each of three iterations of the indictment. DE:3, 106, 203. The government successfully argued in opposition to defense jury instruction objections on the issue, DE:533:57, and then presented to the jury (over objection) its closing argument assurance that it had proven the proceeds element because the underlying drug conduct "certainly" violated U.S. drug laws. DE:504:56.

Whether viewed categorically as a matter of statutory interpretation or under the case as indicted and tried, foreign crimes did not serve as predicates for relevant

14

statutory, sentencing, or forfeiture provisions.  Foreign crimes are reached only by a limited set of § 1956(a)(1) offenses, involving what § 1956 defines as the "financial transaction" element, where, under § 1956(c)(4), the indictment charges the "financial transaction" occurred in the United States.  "Financial transaction" is a § 1956(a)(1) and (a)(3) term that Congress distinguished from the § 1957 res gestae element of "monetary transaction" as well as transportation/transmission under § 1956(a)(2). *See Regalado Cuellar v. United States*, 553 U.S. 550, 557 (2008) ("18 U.S.C. § 1956 prohibits specified transfers of money derived from unlawful activities.  Subsection (a)(1) makes it unlawful to engage in certain financial transactions, while subsection (a)(2) criminalizes certain kinds of transportation.").

Even as to the "financial transaction" objects of Count 1's § 1956(h) conspiracy charge, the government's stipulation at trial—adopted by the district court—that its sole jurisdictional predicate was U.S. crimes is consistent with its failure to allege in Count 1 the type of "financial transaction" crime (i.e., a U.S. transaction, at least in part) for which some foreign felonies may be predicates.

Section 1956(a)(1) prohibits any "financial transaction" in proceeds of "specified unlawful activity" if the defendant knew "some unlawful activity" produced the proceeds.  In the money laundering statutes, only the § 1956 elements of "some unlawful activity" and "specified unlawful activity" in relation to a U.S. "financial transaction" are defined to include foreign crimes.  *See* § 1956(c)(1)

15

(defining "some unlawful activity" to include "activity that constitutes a felony under ... *foreign law*") (emphasis added); § 1956(c)(7)(b) (explaining that "specified unlawful activity" includes "an offense against a foreign nation" only as to a "financial transaction").

In contrast to § 1956, the relevant provisions of § 1957 do not incorporate foreign crimes under *either* the "criminally derived property" (and related mens rea) or "specified unlawful activity" elements; nor was a "financial transaction" charged in Counts 2–14. Unlike § 1956's "some unlawful activity" definition, the § 1957(f)(2) "criminally derived property" definition *does not include foreign crimes. See United States v. Small*, 544 U.S. 385, 388–90 (2005) (holding the term "convicted in any court" in 18 U.S.C. § 922(g) was presumed to apply only to domestic crimes, despite use of term "any"); *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) ("Absent clearly expressed congressional intent to the contrary, federal laws will be construed to have only domestic application."). Most importantly, "monetary transaction," the core element of § 1957, is distinct from the "financial transaction" element of § 1956(a)(1).

The government and district court's recognition *at trial* of the indictment's jurisdictional limitations comported with the statute and the indictment.[2] Upon the

---

[2] Nor did the government charge "financial transactions" in any manner regarding parts (b) and (c) of Count 1.

16

district court's post-trial Rule 29 ruling, DE:586, that effectively struck the indictment's allegations of domestic drug trafficking and reversed the court's prior ruling that the government was required to prove a U.S. drug crime, Tardon moved for dismissal based on the absence of jurisdiction and failure of the constructively-amended indictment to state an offense.  DE:589.

The district court denied the pre-sentencing motion to dismiss as untimely. DE:599:6–14.  But that untimeliness ruling was clearly erroneous, particularly given the reversal of relevant trial rulings, and contradicts the applicable rules.  In August 2014 when the dismissal motion was filed, Rule 12 of the Federal Rules of Criminal Procedure expressly provided that the motion is timely if filed before sentencing.  *See United States v. Izurieta*, 710 F.3d 1176, 1179 (11th Cir. 2013) ("Fed.R.Crim.P. 12(b)(3)(B) permits a court, 'at any time while the case is pending ... to hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense.'").

The district court improperly relied, DE:599:6, 12, on a then-prospective December 1, 2014 change in Rule 12(b)(3)(B) to limit its applicability to jurisdictional defects.  *See United States v. Adkinson*, 135 F.3d 1363, 1372 (11th Cir. 1998) (courts must apply the law as it exists when ruling is made rather than anticipating changes in the law).  A motion that was timely when filed and resolved cannot become untimely simply because a different motion deadline is created for subsequent cases.

And the district court's unfounded claim that defense counsel's rote assertion at sentencing that there was no legal cause barring sentencing waived challenges to the conviction is entirely without support in statutory or case law, particularly where Tardon's dismissal motion was *announced at the commencement of sentencing* and the district court expressly recognized the continued pendency of the motion long after the formal legal-cause question was posed. DE:606:101. .

Finally, even if a court could ignore governing rules and apply rules not yet in effect, the then-future version of Fed.R.Crim.P. 12(b)(3)(B) preserved the right to challenge jurisdiction over offenses at any time. The defect went to a jurisdictional issue—as the district court expressly ruled at trial. DE:533:58.

Upon the district court's post-trial ruling effectively excising domestic drug-trafficking proceeds from the case, there was no longer a basis to assert jurisdiction for Counts 2–14. The government's perfunctory post-trial argument that "[t]he term financial transaction ... includes the transportation, transmission or transfer of funds and monetary transaction," DE:594:6, was not adopted by the district court. DE:599:16–17; DE:606:101–06.

The district court agreed with the government at trial that U.S. drug crimes were essential to jurisdiction for all charges. The district court's abrupt change of position when the government admitted it had failed to prove U.S. crimes unduly reduced the

government's burden.  Tardon, who preserved the issue by objections and motions at trial, waived nothing, least of all regarding the jurisdictional defects of using non-U.S. drug violations.  The indictment should be dismissed.

**B.** ***The district court erred in denying motions for acquittal where the government failed to prove essential elements, including the requisite proceeds-sourcing and knowledge elements and the charged money-laundering design of international transfers.***

Under Fed.R.Crim.P. 29(a), review of evidentiary sufficiency is limited to the government's case-in-chief because the district court reserved ruling on Tardon's motion for judgment of acquittal at that point in the case.  DE:530:164.  The government, as explained above, failed to satisfy the burden it and the district court recognized it had to prove U.S. drug crime proceeds.  DE:533:58.  The government also failed to prove that any "felony" offense resulted in proceeds as required under § 1956(c)(1), and as to Count 1, that any concealment in during money transfers to a purported drug trafficker met § 1956's specific intent requirements, or that a business's car sales revenue from cars acquired with lawful funds constituted criminal proceeds if the business failed to show lawful funds covered overhead costs.

    1.    <u>The government failed to prove the domestic-crime proceeds theory it charged, urged the district court to rely on, and presented to the jury.</u>

The government failed to prove U.S. drug-crime proceeds despite vouching to the jury—over Tardon's objection and motion for mistrial—that the government had

"certainly" done so, DE:504:56, and despite winning the district court's agreement that proof of such proceeds was a jurisdictional and elemental requirement satisfying the government's burden. DE:533:58. A criminal case indicted and tried to the jury on the prosecutorial theory the evidence fails to support must be reversed. *See Ciminelli v. United States*, 143 S.Ct. 1121, 1129 (2023) (declining "to cherry-pick facts presented to a jury charged on the right-to-control theory and apply them to the elements of a different wire fraud theory in the first instance"); *United States v. Ross*, 131 F.3d 970, 980 (11th Cir. 1997) ("Having identified the government's theory of prosecution, we must next discuss the sufficiency of the evidence of a conspiracy."); *accord United States v. Elkins*, 885 F.2d 775, 782 (11th Cir. 1989); *United States v. Willner*, 795 F.3d 1297, 1310 (11th Cir. 2015) (conviction vacated where based on theory of guilt at odds with premise on which case was given to jury).

The government fundamentally misapprehended the scope of United States drug laws, ignoring that under *United States v. Lopez-Vanegas*, 493 F.3d 1305 (11th Cir. 2007), U.S. drug laws do not reach "a conspiracy to possess controlled substances *outside* the territorial jurisdiction of the United States, with intent to *distribute* those controlled substances *outside* of the territorial jurisdiction of the United States." *Id.* at 1313 (emphasis in original). The government insisted to the jury that Tardon's conduct violated United States laws, in order to meet the jurisdictional burden it

assumed and the district court required. The failure of proof on the proceeds theory the government urged and argued, and which the district court ordered, requires vacating the convictions.

2. <u>Even apart from the case-as-tried doctrine and the indictment's failure to properly invoke foreign crime proceeds as an independent basis for liability, the evidence was insufficient.</u>

Section 1956(c)(7)(B), relating to foreign drug crimes, has applicability only "with respect to a financial transaction" (i.e., an element of § 1956(a)(1), (3)). There was no statutory basis for treating foreign drug crimes as specified unlawful activity for Counts 2–14 and Count 1's non-"financial transaction"objects. Thus, in addition to the case-as-tried principle, the evidence would still be insufficient as to Counts 2–14 and objects (b) and (c) of Count 1. A "monetary transaction" under § 1957 is a distinct element and more expansive than § 1956(a)(1)'s "financial transaction" element. Congress's failure to criminalize mere money spending (§ 1957) of foreign-offense proceeds reflects a jurisdictional limitation corresponding to the lesser degree of criminality involved in money-spending offenses.

3. <u>The government failed to prove anything statutorily-relevant regarding Spanish or other foreign drug laws, including proof of a felony offense as required under the "some unlawful activity" definition.</u>

The government, which ultimately relied on the U.S. drug source premise and convinced the district court to so rule, introduced no evidence identifying, stating the

elements of, or establishing the status of any foreign drug offense.  The government was required to prove Tardon's knowledge that funds were produced by a offense constituting a felony.  While the felony status of U.S. drug crimes was undisputed, the same was not the case for foreign drug crimes, yet the government failed to address its obligation to prove such a felony offense under § 1956.  *See* 18 U.S.C. § 1956(c)(1) (defendant must know he was transacting proceeds of "*activity that constitutes a felony* under State, Federal, or foreign law") (emphasis added).

The government failed to prove anything more than generalities about Spanish or other foreign drug prohibitions, making no attempt to bring them within the scope of either § 1956(c)(1) or § 1956(c)(7).  The government offered no evidence to establish the *felony* element, despite presenting numerous Spanish law enforcement witnesses at trial and additional Spanish judicial witness testimony at a pretrial hearing as well as including Spanish police hearsay in its search warrant applications. Nor did Pollack's testimony explain how the specific conduct he related fell within Spanish jurisdiction.  The government sought after trial to discount its failure to prove the "felony" element, but failure of proof of an element requires acquittal.  Nor is there any basis to believe Congress sought to punish with a potential 10-year sentence under § 1957 a person who deals in proceeds of a misdemeanor offense.  The government having failed to show any evidence concerning the status of the law of

*any* country during the indictment period of 2001–2011, which corresponded with its failure to seek jury instructions on the elements of any drug offense given its reliance on, and the district court's ruling regarding, U.S. drug proceeds, the jury could resolve the criminal proceeds element only with the mistaken U.S. drug proceeds theory, failing to satisfy the government's proof burden.

4. Under *Regalado Cuellar v. United States*, 553 U.S. 550, 557 (2008), money transfers by courier or otherwise to a drug trafficker—even if facilitated by concealment or avoidance of law enforcement—do not constitute money laundering.

To satisfy the elements of the § 1956 offense objects—specifically, design-to-avoid-concealment and transaction-reporting requirements—the government was required to prove the transfers were conducted not merely in a concealed or evasive manner, but instead *were conducted for the purpose* of concealing the source or ownership of the proceeds or otherwise avoiding a transaction reporting requirement. *See United States v. Garcia*, 587 F.3d 509, 517 (2d Cir. 2009) (holding that transfers "done with the purpose of compensating the leaders of the drug operation" are insufficient even if "the funds were packaged so as to hide them during transport") (applying *Regalado Cuellar*).

The government's concealment/evasion design theory failed. The vast majority of the money involved—more than $11,000,000—was wired directly to Tardon or related accounts. DE:550-5. The overwhelming majority of the currency

23

dealings—more than $1,400,000—were reported on currency transaction forms with American Express. DE:550-4. The purchases, including those charged in Counts 2–14, were done in a way that did not hide Tardon's or Artemio's involvement in relation to all properties.

The prosecution lacked even the facilitation-concealment elements found insufficient in *Regalado Cuellar*, and involved almost entirely-reported movements of money to Tardon or family companies with which he was clearly identified. *See Regalado Cuellar*, 533 U.S. at 566 (concealment provision directs courts to examine not *how* one moves the money, but *why* one moves the money at all). "There is a difference between concealing something to transport it, and transporting something to conceal it." *Id.* The Tardon money transfers and expenditures showed no design of concealment. *See id*. at 563 ("[M]erely *hiding funds during transportation* is not sufficient to violate the statute, *even if substantial efforts have been expended to conceal the money*.") (emphasis added). *See also United States v. Faulkenberry*, 614 F.3d 573, 586 (6th Cir. 2010) ("Concealment, even deliberate concealment, as mere facilitation of some other purpose, is not enough to convict"); *United States v. Ness*, 565 F.3d 73, 77–78 (2d Cir. 2009) (same).

Clearly, as to wire transfers directly into Tardon's accounts, "[t]he money laundering statute criminalizes behavior that masks the relationship between an

individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds." *United States v. Adefehinti*, 510 F.3d 319, 322 (D.C. Cir. 2007) (internal quotation marks omitted). And as this Court explained even before *Regalado Cuellar*, an "important consideration is whether the money is better concealed or concealable after the transaction than before." *United States v. Johnson*, 440 F.3d 1286, 1291 (11th Cir. 2006) (internal quotation omitted).

The government's theory, in its opening statement, that Tardon was just a "very, very, very bad money launderer," DE:518:38, betrayed the lack of substantial evidence to prove the design elements of Count 1.

5. The government failed to prove amount-of-proceeds, commercial nexus, and other elements of § 1957 charges.

The government failed to prove that Tardon or his family members who made the purchases identified in Counts 2–14 lacked sufficient untainted funds to cover the amounts involved. *See* DE:504:90 (government sales calculations showing over $20,000,000 in Tardon car-sales business revenue). There also was overwhelming evidence of rental income from real estate, including numerous properties the jury found had no nexus to money laundering and even more properties the government abandoned without seeking forfeiture. *Cf. United States v. Hanley*, 190 F.3d 1017, 1024, 1025–26 (9th Cir. 1999) (rejecting government argument that tracing

25

requirement satisfied where government proved only great majority of account funds criminally-derived).

The most extreme example of the government's proceeding on speculation regarding qualifying specified unlawful activity proceeds was Count 10, where the government argued that $10,700 spent for car repairs included more than $10,000 of proceeds of specified unlawful activity. In light of the competing evidence, the speculation regarding amounts of any criminal proceeds in the § 1957 counts was insufficient.

The government proved no interstate commercial effect of paying for car service (Count 10) or a car purchase (Count 14). The use of a fungible currency did not prove an interstate commerce effect. Nor did foreign-bank wires conducted in foreign countries, in Counts 3 and 4, come within the scope of § 1957. Unlike § 1956(a)(2), which covers international transfers, there is no similar provision of § 1957, which instead addresses only transactions that take place inside the United States. *See* § 1957(d)(1) (for non-U.S. persons—such as Tardon—statute applies where transaction "takes place in the United States"); *see also* § 1956(b)(2)(A) (extending reach of § 1956 to foreign persons conducting transactions occurring "in whole or in part in the United States"). The more limited scope of § 1957 prevents ensnaring foreign persons sending funds openly to the United States where they have no concealment or other

ulterior purpose. Because § 1957 lacks these mens rea components, extending its reach to foreign-initiated fund transfers would unduly affect foreign commerce, and Congress has therefore chosen, in § 1957, not to match the reach of § 1956.

6. <u>The government's single, decade-long conspiracy theory lacked evidentiary support and conflated events, rendering a unanimous verdict impossible.</u>

Count 1's allegation of a single laundering conspiracy—rather than sporadic transfers and investments—went unproven. Tardon's history of investments and spending did not establish the charged conspiracy. Instead, each juror remained free to pursue a separate configuration of the conspiracy. Again, the government sought to deal with this defect by calling Tardon a "very, very, very bad money launderer," DE:518:38, who just slipped up by initiating and creating an overabundance of governmental and private records in his own name, as well as in formal reports to the Treasury Department, and formal records made with private money service companies and reputable U.S. vendors and banks (transactions conducted openly, rather than in a concealed manner).

The government wrongly told jurors that conduct clearly outside the scope of § 1956 was criminal and particularly did so to disparage CMSM manager Scheel's testimony, asking the jury to deem her a conspirator if she ever did anything that failed to follow all requirements of a *foreign* MoneyGram office, whether or not any such

27

deviation from protocol was material and whether or not anything material was concealed. The government's struggles at trial to fit into the money laundering statutes conduct that was not shown to be unlawful or material precluded the government's overarching conspiracy theory. *See United States v. Newton*, 44 F.3d 913, 921–22 (11th Cir. 1994) (defendant's acts of association and accommodation with drug kingpin insufficient to show membership in or conspiracy to aid drug conspiracy; evidence defendant executed apartment lease to conceal identity of true lessee (drug kingpin) insufficient to prove money laundering where source of rental payments not concealed and defendant's actions appeared designed to facilitate drug kingpin's relationship with his girlfriend); *see also United States v. Jenkins*, 779 F.2d 606, 615–16 (11th Cir. 1986) (reversing conspiracy conviction where hypothesis of guilt rested on conjecture, family relationship, and hearsay).

The government failed to prove the offenses charged and failed to adhere to statutory requirements. The convictions should be vacated.

## II. THE DISTRICT COURT ERRONEOUSLY DENIED SUPPRESSION MOTIONS AND HEARING REQUESTS.

The district court erred in denying Tardon's motions to suppress physical evidence, requests for an evidentiary hearing regarding material false statements and omissions in search warrant affidavits and resulting overbroad searches, and motion

to reopen suppression proceedings and reconsider suppression rulings where later testimony and exhibits undermined the rulings' factual foundations.

The district court conducted no *Franks v. Delaware,* 438 U.S. 154 (1978), evidentiary hearing despite search affidavits falsely alleging domestic drug crimes and warrants authorizing largely-unbounded searches for evidence of those nonexistent domestic offenses.

The district court also erroneously denied suppression of the warrantless seizure of Tardon's personal papers—his diary-notebook the government claimed was its most powerful evidence. Government confidential informant Cohen—violating state-court restrictions regarding Tardon's papers—assisted government search-and-seizure efforts by collecting them; agents then took possession of the container of Tardon's papers, failing to obtain a warrant to search them.

The factual and procedural timeline relevent to suppression is as follows:

| Feb. 2010 | FBI investigation commences; Tardon, his then-wife (Cohen), and her minor child live as family unit in marital home Tardon owns. |
|---|---|
| Feb. 2011 | Cohen leaves home for two weeks for out-of-town surgery, leaving child and Tardon at marital home; Cohen returns Feb. 10, DE:524:80; Tardon's personal items—including religious and other items used daily—remain at marital home that he occupies daily. |

| | |
|---|---|
| 3/1/2011 | Domestic dispute at marital home; stay-away order entered. |
| 3/2/2011 | FBI agent, posing as domestic counselor, interrogates Cohen; she denies knowing Tardon drug-trafficking involvement; FBI searches marital home, seizes no personal papers.  DE:374:71. |
| April 2011 | Cohen signs use-immunity letter, begins assisting FBI.  DE:374:7. |
| May 2011 *through* July 2011 | Tardon initiates divorce proceedings; Cohen continues to deny knowledge of drug trafficking/money laundering by Tardon; she begins work as FBI undercover informant—secretly recording targets in Tardon-related investigations, including for Counts 1 and 11. |
| 6/21/2011 | Tardon files emergency motion in state-court divorce case seeking access to marital home to retrieve property and papers.  DE:384:5. |
| 7/7/2011 | State court grants Tardon's access/retrieval motion, orders Tardon allowed to enter marital home July 8, 2011 to retrieve personal items, setting evidentiary hearing to determine papers Tardon may retrieve. DE:384:6–7. |
| 7/7/2011 | FBI meets with Cohen to further her cooperation regarding warrants and searches for Tardon's papers, property, and effects; Cohen must provide truthful, complete information. DE:374:7, 54. |
| 7/7/2011 | Following FBI meeting, Cohen concludes "it was necessary" to provide FBI Tardon's papers, DE:374:54; defying state-court order, Cohen gathers Tardon's papers, including diary-notebook (Govt-Exh:149) she never previously accessed, packs them for agents who come to marital home and seize bag of Tardon's papers. |

| 7/8/2011 | FBI agents prepare warrant affidavits, DE:75-1, falsely stating Tardon committed federal drug crimes, DE:207:11; falsely stating an unnamed source—actually Cohen during divorce proceedings—claimed intimate awareness of, and witnessed, Tardon crimes; omitting reference to document searches from day before; omitting divorce court and bias information affecting unnamed source's credibility; omitting marital communication privilege issues in Cohen's purported statements (which derived directly from a conversation with Tardon, DE:523:125); falsely representing Spanish investigational hearsay as verified facts, where FBI neither obtained nor reviewed underlying reports; falsely claiming Tardon's car business lacked sales revenue and that Tardon's property dealings were concealed. |
|---|---|
| 7/14/2011 | Cohen continues informant role, assisting search/seizure efforts, working with FBI to pursue searches in Spain. DE:374:52. Search warrants executed; computers, phones, and data seized from apartment Tardon used during stay-away order; no warrant for marital home. |
| 11/13/2012 | District court denies motion to suppress search warrants, without conducting *Franks* hearing.  DE:253. |

| | |
|---|---|
| 8/9/2013 | Hearing conducted (DE:374) on warrantless search of diary-notebook: government/Cohen conceals her May-July 2011 role as undercover informant and her FBI fieldwork; government conceals related FBI reports and Cohen's undercover recordings, falsely claiming Cohen was mere witness; Cohen confirms diary-notebook exclusively Tardon's; Cohen reiterates pre-warrant FBI interview denials of knowledge of drug/laundering crimes by Tardon. |
| 2/18/2014 | District court denies suppression of warrantlessly-seized diary-notebook, ruling Tardon lacked privacy expectation and that his property interest was nullified by Cohen's private-citizen action and "unfettered" right to dispose of his property. DE:408:28. |
| 5/1/2014 *through* 6/12/2014 | Tardon's jury trial: government reveals Cohen was proactive confidential informant—not merely a witness—when 7/7/2011 warrantless seizure occurred and also participated with agents in FBI fieldwork to investigate Tardon's case (DE:523:13); Cohen's testimony confirms her informant role and Tardon's continued unrestricted activities, stays at marital home prior to stay-away order; evidence shows police knowledge of Tardon's substantial car sales revenue; Tardon moves to reopen suppression based on trial evidence and government reports. |
| 9/11/2014 | District court denies reconsideration of suppression rulings. DE:585. |

**A.** *Denial of hearing on <u>Franks</u> violation and overbroad warrant execution.*

The district court misinterpreted and misapplied *Franks*. A hearing was required where false claims about drug trafficking wrongly led to issuance of a warrant to search for evidence of nonexistent U.S. drug crimes and where the district court made unwarranted assumptions on unresolved factual questions about material falsities. *See* DE:213:2–10. The district court's theory—that despite the warrants' drug-search defect, there was probable cause to search for evidence of other crimes, consisting of unspecified, undated money laundering offenses linked to unspecified drug crimes about which Spanish police expressed suspicions—was insufficient to overcome the *Franks* hearing requirement. Nor did the district court correctly analyze the totality of false affidavit statements, including misstatements regarding open and lawful financial dealings, failure to disclose foreign hearsay/opinion premises for Spanish police claims, failure to identify any money laundering offenses, and false representations concealing Cohen's exculpatory statements, where the same false representations led to false conclusions by Spanish police.

*Franks* requires an evidentiary hearing where there is "a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause." 438 U.S. at 155–56;

33

*United States v. Jenkins*, 901 F.2d 1075, 1080 (11th Cir. 1990) (evidentiary hearing required if falsity/omission affected "a finding of probable cause"). The district court simply discounted the warrants' authorization to search for falsely-claimed U.S. drug crimes, despite recognizing that falsities and omissions regarding a supposed confidential source with *intimate* knowledge of such drug dealing required evaluation of the affidavits without reliance on uncorroborated claims attributed to her, the sole eyewitness referenced in the affidavits. DE:207:32 (finding that "[w]hen the police officers asked Ms. Cohen directly if [Tardon] was involved in drug smuggling, Ms. Cohen denied it").

Under *Franks*, given the failure of probable cause on the *drug* search the agents executed and the falsities and omissions regarding the sole referenced witness, an evidentiary hearing was required. The district court's probable-cause-for-another-crime theory for disregarding the *Franks* hearing mandate was both a legally-erroneous misapplication of *Franks* and a factual misreading of the affidavits, which lacked truthful probable cause of any crime and rested largely on decade-old real estate purchases and money transfers Cohen explained were anything but smuggling, contrary to the false statement in the affidavits.

The district court compounded the error in denying a hearing by accepting an self-serving mea culpa declaration from the affiant in lieu of the requisite *Franks* hearing. DE:207:9–10.

The district court cited numerous affidavit paragraphs that state—without attribution of sources, much less personal knowledge—that Tardon was *believed* by Spanish police to have engaged in drug crimes in Spain on *unknown* occasions and in *unknown* quantities. DE:207:10–11. Such conclusory reference to investigational opinions or preliminary findings by unnamed Spanish police sources (including about undated notations in an address book, without any linkage to actual drug activity) is insufficient to establish probable cause, nor did the district court cite any authority for reliance on foreign police opinions as grounds for a warrant. Instead, the district court relied on further *hearsay not referenced in the affidavits* (a report by Spanish police) as being reliable. *Id.* But the report—never made known to the *issuing* magistrate—had no relevance to probable cause under *Franks*. And its only relevance was showing Spanish police reported on the hypothecation of Tardon's possible drug trafficker role only after receiving "transcendent information" from Tardon's FBI search affiant—information that *falsely* represented Cohen had inculpated Tardon in drug trafficking where instead she consistently denied having such knowledge. DE:207:13. (The government identified Cohen's identity to Spanish police, but not to the issuing magistrate.) The actual Spanish reports appear to show Tardon was under surveillance in Spain through 2011 with no evidence shown of drug trafficking, despite wiretaps and other means of investigation.

After denial of the *Franks* hearing, Cohen testified as a government witness at another hearing, DE:374:45, 47, where she reiterated that she—the source identified in the affidavits as intimately familiar with Tardon's drug activities—knew *nothing* of either drug trafficking or money laundering by Tardon and had insistently explained that to the FBI, including in the very interview the affiant falsely described to Spain to assuage their hesitancy in opining about unspecified Tardon drug crimes for which there was no witness in Spain. *See* DE:144:Exh.A:18–20 (Mar. 22, 2011 interview; Cohen states the assertion of Tardon's connection to drugs is "speculat[ive]" and she has no evidence of his involvement with drugs). Cohen did have years-long intimate knowledge of Tardon, but could do nothing more than speculate—just as Spanish police did—regarding his drug involvement and she denied money laundering claims.

Falsities in the search affidavits went well beyond merely falsely manufacturing allegations of domestic drug crimes and that a proven-reliable confidential source with intimate knowledge revealed those crimes. Instead, it was Cohen who conducted relevant financial dealings from 2006–2009—when Tardon was in Spain; and she denied any impropriety or concealment in those financial dealings (undermining any potential claim of a violation of § 1956). And the stale real estate dealings from years earlier, cited in the affidavits, in no way proved probable cause for a 2011 search warrant. Nor was there any facial illegality in Tardon money transfers alleged in the affidavits; instead, the affidavits' reference to the filing of appropriate currency

36

transaction reports *in every single instance* defy any possible allegation of a violation of §§ 1956(a)(1)(B)(ii), 1956(a)(2)(B)(ii). The remaining real estate dealings referenced in the indictment (from 2001–2003) followed not just a legal pattern—where a U.S. representative acted for the Tardon family while they were in Spain—but a commonly-accepted practice of purchasing *rental* real estate through LLC partnerships, with Tardon prominently named manager on all public documents, the opposite of concealment.

The district court's new exception to the requisite showing for a *Franks* hearing was also contradicted by the district court's failure to conduct a hearing to determine what the FBI seized based on the falsely-obtained warrant authorization for evidence of federal drug crimes and how searching agents dealt with the lack of specification of money laundering offenses in conducting unlimited searches. The district court's speculation that a different warrant might have produced similar results unduly expanded the *Franks* exception and ignored that the absence of any predicate domestic drug crimes severely limited the scope of any potential laundering crimes, and that neither the targeted laundering offenses nor any *foreign* crimes were specified.

Further, by discounting allegations (falsely) attributed to Cohen, the district court erroneously discounted the failure to advise the issuing magistrate regarding violations of the marital communications privilege in using statements by the source, including by Spanish police. DE:207:52. The affidavits did not inculpate Cohen and

offered no exception to the privilege, where she indicated no effort to conceal involvement by Tardon or his family in purchases of rental property; and the FBI knew from Spanish police that there was a fully-valid basis—a thriving car sales business—to explain funding for the normal, lawyer-conducted purchases of rental property by the Tardon family. Absent any allegation of criminal conduct by Cohen, privilege issues were substantial and tainted the affidavits.

The government need not conceal an informant's identity from a magistrate judge; it may make such a disclosure ex parte. DE:551:8 n. 6 (acknowledging as to warrantless seizures, agents' "reports [about Cohen's informant role] could have been disclosed to the Magistrate Judge ex parte"). However, the FBI concealed from Spain and the issuing magistrate Cohen's significant bias against Tardon, with fierce ongoing divorce disputes about Tardon's property, including an order entered in Tardon's favor the day before the affidavits were signed, which the FBI evaded by warrantlessly searching his papers the same evening the court order was entered. The affiants should have related that Tardon's papers had been seized before claiming probable cause to search for the papers in other locations.

The warrants, if they provided non-stale probable cause for anything, did not impose meaningful search limits, and the general-search execution of the warrants required an evidentiary hearing. The communication searches were unbounded, covering "[c]ommunications between or among [unnamed] co-conspirators regarding

38

the above-listed crimes," including the nonexistent U.S. drug crime and unspecified laundering offenses. DE:75-1. The searches extended to all communications with anyone (possibly on the false drug-crime premise) and any electronic data or expressions of any kind. *See United States v. DeFalco*, 509 F.Supp. 127, 133–35 (S.D. Fla. 1981) (agents may not simply assert a criminal scheme and then be granted leave to search for any unspecified items that "reflect" the commission of the offense).[3]

Resolution of the suppression motion without a hearing, based on analyses that rest on predetermination of unresolved factual questions, *see* DE:213:2–10, was erroneous. The case should be remanded for an evidentiary hearing.

**B.** ***Warrantless seizure and search of Tardon's diary-notebook should have been suppressed where Tardon had a state-court-recognized privacy expectation, the government's voluntary-consent-of-spouse theory was refuted by her months-long confidential-informant work, including on government search requests the day of the seizure; and government access to a container of Tardon's papers did not excuse the warrant requirement for the search.***

Cohen's assistance to the FBI in seizing Tardon's diary-notebook did not serve as a consent exception to the warrant requirement. And the district court incorrectly concluded that Tardon had no protectable expectation of privacy or property interest in his home or diary, even though he continuously used his home—including for *daily*

---

[3] *See*, *e.g.*, DE:519:24, 26 (admitting, over objection, evidence taken from the searches, including documents, financial information, photographs, e-mail, iPad, computer and related files, and business records); DE:522:77–104 (FBI agent testimony describing cache of evidence seized from one of the searches).

religious activity—and successfully exercised legal remedies authorizing him to access and retrieve personal effects. At trial, the evidence corrected misleading information and evidentiary hearing representations the district court had relied on, further undermining expectation-of-privacy and consent rulings. Suppression should have been ordered, or alternatively, suppression proceedings should have been reopened based on trial disclosures.

1. *Warrantless search and seizure required suppression, despite government's inapposite consent and expectation-of-privacy arguments.*

Tardon continuously engaged in unrestricted, extensive, daily occupancy of the marital home he individually owned; always maintained his keys along with access to the homeowners-association compound for the home; and kept most of his possessions and papers there—including religious items he used daily, *see* DE:384:3 (discussing Tardon's key to the home, possessions there, and going there "on a daily basis"). And in the month preceding the entry of a domestic stay-away order on March 1, 2011, he lived in the home with not only Cohen, but also—during Cohen's foreign trip for surgery—her minor child, Murphy, for whom he was guardian. The district court's ruling that Tardon abandoned all protectable interests in his papers because, for little more than two weeks prior to the stay-away order that Miami police, working with the FBI, caused Cohen to obtain,[4] he spent some evenings in a nearby apartment his family

---

[4] *See* DE:144-1:11–12.

40

owned, was unreasonable. *See* DE:384:11; DE:823:80–81. At trial, the government sought, but failed, to have Cohen say Tardon fully moved out of the house before the stay-away order. DE:523:84 ("Q. Let me be a little clearer with my question. Before the date of the domestic incident, had he moved out of the [marital home] into the Continuum? A. No.").

Tardon's papers—which were in a container (a bag) when FBI agents seized them—were, weeks later, warrantlessly searched in violation of Tardon's Fourth Amendment rights. Unlike cases where there is no evidence of restrictions on a joint occupant's actions concerning mutual-use property, the facts here show Tardon, through legal proceedings over which a state court had jurisdiction, obtained an order that rendered any action by Cohen to dispose of his non-mutual-use papers (including the diary Cohen never accessed) improper. Tardon had filed an emergency motion for access to and retrieval of his papers and property; Cohen, two weeks before the seizure, responded to the motion, acknowledging Tardon's claim to his papers. The state court, in the hours before the warrantless seizure, ordered that disputes about the paperwork Tardon could retrieve would be resolved at an evidentiary hearing, and that Tardon would have *access* to the home on July 8. These actions, in divorce proceedings of which the FBI was aware, placed reasonable restrictions on any effort by Cohen to divest Tardon of his papers. *See* DE:384:6–7 (order citing divorce court proceedings: DE:378-8—"Wife's [June 21, 2011] Motion to Dismiss or in the Alternative to Deny

41

the Husband's Emergency Motion to Access Marital Residence"; DE:378-9—July 7, 2011 "Order on Husband's Emergency Motion to Access Marital Residence...requir[ing] Ms. Cohen to permit the defendant access with a police escort...on July 8, 2011"; state court "order further stated that an evidentiary hearing was required to determine ownership of the items in certain affidavits executed by the defendant's brother '*and to determine what paperwork [the defendant sought] to remove*...to assist him in the discovery process....'") (emphasis added).

Unlike the unfettered-access authorities cited by the district court, DE:408:28, there was every understanding of a judicial obligation—imposed by the divorce court—barring Cohen from unilaterally disposing of the very papers. Even if the strained theory that Cohen—who admitted she believed, through her search and informant cooperation relationship with the government that it was *necessary* to provide the FBI all of Tardon's papers—was acting independently of government influence and acquiescence, the judicially-controlled litigation posture regarding Tardon's papers fettered any attempt by Cohen to unilaterally dispose of them *absent government authorization*. Instead, Cohen, while fulfilling her informant and search-assistance role for the government, understood the necessity of providing a container of Tardon's papers because the house was not targeted for a search warrant.

Tardon's seized diary-notebook—which the government characterized as "arguably the single most important piece of evidence tying the Defendant" to drug

trafficking, DE:354:4, including what the government characterized as a drug ledger, and statements made by Tardon the government claimed amounted to a confession that he was a drug dealer,[5] compels reversal. *See* Govt-Ex:149 (diary-notebook, with loose pages inside it, multiple parts of which government linked to drug trafficking).

The totality of the circumstances—including the confluence of events, requests, orders, and continued assertion of property and privacy rights—distinguish this case from uncontested joint-occupant searches of mutually-accessed items. The limited action Cohen took—without expressly consenting to *warrantlessly* search the container full of papers (where withholding such consent might have been sufficient to avoid or limit sanctions by the state divorce court)—does not excuse violation of the warrant requirement.

> 2. *Evidence at trial refuted the factual premises for expectation-of-privacy and consent-exception rulings, and compelled reconsideration of Tardon's suppression motion.*

Expectation of privacy. The jury trial proved Tardon's continued occupancy and use of his home and disproved the government's misconceived expectation-of-privacy argument. Cohen corrected her hearing testimony and admitted Tardon was still living

---

[5] Over defense objection, the government introduced—from the diary-notebook, Govt-Exh:149—a poem/song attributed to Tardon, the main protagonist of which is a drug dealer, DE:523:96, 123, which the government wrongly treated as a form of confession.

there the month before the stay-away order. DE:523:81 ("Q. And Alvaro continued to reside there until the domestic event on March 1st of 2011? A. Yes. Q. And after the domestic event on March 1st, 2011, from that point forward, Alvaro no longer resided at the villa. He then permanently relocated to the Continuum. Correct? A. Correct.").

Cohen's trial testimony refuted the evidentiary hearing testimony that Tardon moved out of the marital home "about a month before" the stay-away order. The false "moved out" testimony had been the foundation of the government argument that Tardon lacked an expectation of privacy in his diary. *See* DE:374:117 (government argues: "Because he moved out. He moved out."). The district court's ruling relied on the false moved-out theory to conclude Tardon lacked standing. DE:384:3, 11 (ruling that "on or about February 1, 2011, [Tardon] moved out of the" marital home; citing "testimony at the evidentiary hearing" that Tardon moved out "one month before the March 1, 2011 domestic dispute").

Cohen's informant role. Also revealed at trial was Cohen's confidential-informant status, a multi-faceted role she performed from May 2011 through at least July 14, 2011, including wearing a wire to secretly record targets in the investigation relating to Tardon's money exchanges (a key component of Count 1) and events concerning one substantive count, Count 11, charging Tardon's purchase of a safe.

44

DE:524:15–17. Cohen admitted at trial she was an undercover FBI cooperator, wearing a wire pre-indictment in the money laundering investigation—on May 12 and June 15, 2011, shortly before seizure of Tardon's diary—and thereafter continued her undercover role in July 2011 as to another target of the investigation, for which debriefing reports were not disclosed at trial. *See also* DE:507:9 (just five days before warrantless seizure, Cohen coordinated with agents regarding her communications with "individuals willing to exchange euros for dollars"). This evidence contradicted Cohen's hearing testimony that her only government/FBI interactions were "just meetings" with agents, "with [her] attorney" at government offices. DE:374:30, 48.

The government successfully opposed Tardon's evidentiary-hearing requests for debriefing reports showing any cooperation by Cohen, DE:374:54, 67, denying such reports existed. *Id.*; *see also* DE:374:62 (FBI hearing testimony omits Cohen's informant work/status/role); DE:374:115–16 (at suppression hearing, government mocks Tardon's attempt to "make [Cohen] a junior FBI agent"; falsely claiming Cohen simply "signed a *Kastigar* letter"; denying Cohen ever received "a direction by the FBI" to produce incriminating evidence); *see* DE:384:5 (district court erroneously rules Cohen had no pre-search agreement or cooperation with government other than *Kastigar* letter for counseled interviews); DE:408:20–21 (district court erroneously accepts government's "just meetings" version and denials that "government representatives encourage[d] [her] to cooperate").

At trial, Cohen admitted she gave "law enforcement whatever recordings were made" of her FBI undercover work. DE:524:10. Tardon's counsel received no access to that evidence, despite requesting to reopen suppression proceedings. Apart from her undercover work, Cohen admitted at trial additional pre-search fieldwork for the FBI, "travel[ing] around the South Florida area to identify different locations" involved in suspected money laundering activities. DE:524:8.

Given Cohen's FBI undercover relationship, she could not reasonably allow Tardon to access papers and property in the marital home on July 8, 2011 (as the state court made possible) to retrieve his diary, much less revoke the stay-away order, without undermining her ongoing undercover confidential-informant role and field cooperation. In support of his mid-trial motion to reopen suppression, DE:474, Tardon explained—and the district court acknowledged—trial testimony "establishes the relationship between Ms. Cohen and the FBI and her efforts to curry favor with the Government, that she wore a wire, she became an undercover agent and all of that." DE:523:13 ("THE COURT: You've done that.").

The significant retractions at trial warranted reopening suppression rulings, where the district court had previously ruled that "the government acknowledge[d] that the purpose of Ms. Cohen's search was to aid law enforcement." DE:384:14. The trial evidence showed plainly that the government fully acquiesced, both specifically and generally, in Cohen's search assistance. DE:384:13 (district court erroneously

states acquiescence by government not shown, citing *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003)). Cohen believed her search efforts and call to the FBI were "necessary." DE:374:54. She well understood the government's acquiescence in her informant-level work in the Tardon investigation, especially regarding help with the searches that the government asked for earlier that very day. Cohen had worked with government agencies in the case, including FBI, Customs, IRS, Spanish National Police, and the United States Attorney's Office, to assist the prosecution; she actively participated in assisting the government's application for warrants to ensure Tardon's properties were searched; and she received immunity[6] from prosecution, free rent at a forfeitable property, a Mercedes-Benz otherwise subject to forfeiture, all in light of her cooperation—continuing even after her divorce from Tardon in 2012. She was an informant induced by *quid pro quo* to cooperate, including making available Tardon's diary. *See United States v. Lee*, 972 F. Supp. 1330, 1343 (D. Kan. 1997) (defining compensated informant).

Government officials "were aware, or should have been aware, that" Cohen "was removing...records for their use," and thus "they will not be permitted to stand by or blink their eyes and accept the benefit of her activities." *United States v. Mekjian*, 505 F. 2d 1320, 1327 (5th Cir. 1975); *see also Lightbourne v. Dugger*, 829 F.2d 1012, 1020

---

[6] *See* DE:374:45 (Cohen feared she "might be facing incarceration"); DE:374:47–48 (government encouraged Cohen "to be available"; her goal was "to avoid prosecution" and "incarceration altogether").

(11th Cir. 1987) (agency depends upon existence of agreement between informant and government at time of informant's investigative actions) (emphasis added).

In combination with Cohen's hearing testimony, DE:374:54, that she "felt it was necessary" to gather and turn over to the government Tardon's papers because of the pre-search meeting with the FBI, treating Cohen as a private actor lacking government approval and acquiescence misses the mark. At a minimum, granting Tardon's motion to reopen suppression proceedings to enable questioning directed to the agency and expectation-of-privacy issues in light of trial revelations was necessary to a fair determination of the Fourth Amendment issue. DE:533:82 (defense explains government "did not disclose to anybody that [Cohen] had been wearing a wire for the Government during the period of time preceding ... when she provided the [diary] notebook and other evidence").

Finally, Cohen's bagging-up Tardon's papers and leaving it for the FBI to seize—so that she could maintain that she had not violated the divorce court restraining order—did not permit the FBI to warrantlessly seize the container, open it, or review and read Tardon's personal papers. Cohen told the FBI the container contents were Tardon's papers. DE:374:56. Even when it appears two people have *unfettered* joint control over potential evidence, the government cannot rely on third-party consent if there is *actual* notice that the evidence belongs to the other person. *United States v. Jaras*, 86 F.3d 383, 389 (5th Cir. 1996).

**III. THE DISTRICT COURT ERRED IN ADMITTING UNAUTHENTICATED SPANISH WIRETAP RECORDINGS; FOREIGN POLICE REPORT AND INVESTIGATIVE OPINION EVIDENCE, OVER DEFENSE OBJECTIONS AND MISTRIAL MOTIONS ASSERTING UNFAIR PREJUDICE, HEARSAY, AND CONFRONTATION CLAUSE GROUNDS; AND SPANISH COCAINE EVIDENCE UNCONNECTED TO TARDON.**

To overcome the temporal and credibility limitations of the Pollack testimony and in order to provide linkage with the diary-notebook, the government presented overwhelmingly-prejudicial hearsay, opinion, and other evidence from Spanish police sources to link Tardon to Cameno, whom the officers declared a drug trafficker, and to substitute for the lack of hard evidence tying Tardon to drug transactions.

**A.      *Spanish wiretaps lacking authentication.***

Government's Exhibit 100 and 101 consisted of transcripts and recordings of telephone calls purportedly showing Tardon in conversations surveilled by Spanish police. Their admission in evidence was improper because they were not authenticated. No witness who had listened to the original recordings or reviewed the data captures testified that the purported copies offered by the government were accurate or complete. Spanish police agent Gismero testified that he assumed copies brought with him from Spain were correct. DE:518:109, 116, 140. At most, however, he verified that media files existed in the Spanish system. DE:518:116 ("THE WITNESS: I did not listen to the full, complete conversations."). Absent confirmation of the content of the original foreign recordings, admitting purported copies was error.

49

Fed.R.Evid. 901, 1002; *Mullican v. United States*, 252 F.2d 398, 402 (5th Cir. 1958) (reversing conviction where evidence failed to prove documents "were true copies of the originals" possessed by government).

**B.** ***Improper police report hearsay and opinions, unfair restriction on cross-examination of improper Spanish police evidentiary claims, and erroneous denial of mistrial motion.***

The government, without prior notice to the defense, offered Spanish police investigative opinion and hearsay evidence that left the defense unable to effectively cross-examine and test the underlying hearsay. All of the evidence that purported to establish Cameno's drug-trafficking involvement came from investigative opinions and hearsay investigative summaries presented through Spanish police witnesses, including substantial hearsay and improper opinion evidence from Spanish police sources who relied on conclusory findings of other Spanish police officers. The evidence, which the defense could not effectively confront, was severely prejudicial, allowing the government to dictate the jury's view of otherwise ambiguous Spanish investigations. *See* 521:12–14 (Spanish police supervisor Lujan Huerta testifies to conclusions and findings made by his investigative officers regarding drug crimes by Cameno); DE:521:15 ("Well, according to our investigations, that led us to a conclusion, which was that, undoubtedly, they were involved in the distribution of large amounts of cocaine ... The most significant conclusion that we came to is that they had suppliers of the narcotics and that they were distributing them."); DE:521:16–20 (Tardon

50

reserves mistrial motion; "what the Government's doing is putting up a police officer to summarize the evidence and then give an opinion that people are guilty"; raising hearsay objections to the summary introduction of police report evidence in violation of Fed.R.Evid. 803(8), which provides police investigative reports are not excepted from hearsay rule); DE:521:21 (defense counsel: "This is the single most fundamental ... error. It violates confrontation. It violates the hearsay rule."). *See Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 309 (2009) (barring admission of even reliable police reports); *United States v. Ignasiak*, 667 F.3d 1217, 1235 (11th Cir. 2012) (constitutional error harmless only where government shows beyond a reasonable doubt it did not contribute to the verdict).

The district court's ruling denying the motion for mistrial acknowledged exactly what the government was doing: proving its case through police opinions from police reports and investigations. DE:521:22 (regarding testimony of Spanish officer Lujan Huerta: "THE COURT: As I understood his testimony, based upon what they observed in the various residences, including the 276 kilograms of cocaine, as well as his review of the calls, that *they determined that Ana Cameno was involved in large-scale drug distribution*.") (emphasis added).

The defense objected that the Spanish officer's verbal presentation of Spanish investigative reports about Cameno and Tardon gave the jurors—who took copious notes—handwritten summaries of police investigative reports. DE:521:23 ("[Defense

51

counsel]: Yes. The jurors have notes. They'll have a handwritten record of what he said with them."). The impermissible testimony continued with Spanish police witness after witness. *See* DE:521:147 (Spanish officer Salgado permitted to testify about documentary evidence against Cameno despite lack of authentication or personal knowledge); DE:522:27–28 (Spanish officer Asencio provides hearsay evidence about drug seizure, other evidence in house he attributed to Cameno).

The hearsay/confrontation violation continued with Spanish officer Ibanez who testified as to how much money was recovered from Artemio's home, by referring to what he was told, not what he knew. DE:526:104; *see* DE:527:5-7 (defense motion to strike testimony about amount seized denied, despite Ibanez's admission to having no personal knowledge); *see also* DE:527:25 (over objection, Ibanez improperly states he "arrested Javier Jimenez Solis [unindicted coconspirator] in Spain").

Yet when the defense sought to counteract this by asking for the specific investigative results as to Tardon himself, the defense was precluded from doing so. *See* DE:526:147–48 (government successfully objects on hearsay grounds to examination of officer Ibanez to show that the Spanish investigation into Tardon's Madrid home yielded no incriminating evidence).

The improper trial tactic of using Spanish police investigative results and reports, introduced with the imprimatur of visiting Spanish police officers authoritatively dictating findings of guilt on underlying drug accusations, violated the

hearsay rule, the limitation on the use of police opinions of guilt, and Tardon's Fifth and Sixth Amendment rights. The district court erred in admitting the evidence and in denying motions for mistrial including based on denial of the Sixth Amendment right of confrontation.

**C.** ***Wrongful introduction—and provision to the jury for handling—of a large amount of Spanish cocaine imported into this country by the government despite no linkage to Tardon.***

The government's hearsay drug-seizure evidence regarding Cameno was not linked to Tardon. But the government exponentially heightened the prejudice and shock value of the evidence by presenting to the jurors to pass around in open court a kilogram of cocaine, Govt-Exh:138, that the government imported into the United States (without any apparent lawful authority under 21 U.S.C. § 885, which limits immunity for government use of contraband drug evidence). *See* DE:521:57 (government hands cocaine to jurors to pass around); *see also* Govt-Exh:139 (photograph of additional cocaine unrelated to Tardon); DE:521:55 (photo and actual cocaine admitted); DE:538:28 (defense counsel objects: "those kilos ... have no place in this money laundering trial and so we move for mistrial").

The government conceded, "You can't say this particular kilo of cocaine came from the Defendant. But it is being brought in to show that, in fact, [Cameno] is a distributor of cocaine." DE:521:35; DE:521:34 (same concession); DE:521:45 (same). The improper—and as to the imported cocaine, unauthorized under 21 U.S.C. §

885—use of cocaine passed around among the jurors with photographs of large amounts of cocaine was unfairly prejudicial, particularly given its lack of connection to Tardon, such that the government used it to give the jury something tangible to believe Tardon himself was a drug trafficker. The evidence was both irrelevant and unfairly prejudicial and it was used as a physical block to abundant reasonable doubt regarding Tardon's involvement in and profits from any prior drug activity.

## IV. CUMULATIVE TRIAL ERROR AND PERVASIVE PREJUDICE.

Cumulative error rendered Tardon's trial unfair, including instructional errors, improper closing argument, and hearsay and privileged marital communications.

### A. *Instructional error violated Tardon's substantial rights.*

A federal conspiracy conviction cannot be upheld when the conspiratorial objects submitted for the jury's verdict rests on not only actual offenses, but offenses that fall outside the scope of federal jurisdiction, affording the jury a legally-unfounded basis for conviction. *See Skilling v. United States*, 561 U.S. 358, 414 (2010) (constitutional error occurs even when a jury is instructed on alternative theories of guilt and returns a general verdict that *may* rest on a legally invalid theory) (citing *Yates v. United States*, 354 U.S. 298 (1957)). The jury was urged to convict on the invalid theory of U.S. drug proceeds, which the district court held was required. Post-verdict, the government hypothesized that jurors could have discounted the U.S. drug-

crime premise, despite the lack of any instructions explaining foreign laws. Permitting the jury to convict on a jurisdictionally-invalid theory compels granting a new trial.

The district court also erroneously denied defense requests, DE:465:11, to distinguish a conspiracy to violate Spanish currency-reporting and related regulations from U.S. law requirements and to instruct jurors Spanish tax violations cannot be predicate offenses. DE:465:3. The government's introduction of such evidence created a risk the jury would conflate the underlying criminal allegations, where jurors were not required to specify the relevant unlawful activity, given the district court's holding that a conviction must rest on U.S. drug-crime proceeds.

The district court erroneously denied the defense request for the willfulness instruction applicable to failure to comply with specific regulations in currency-reporting and similar matters as required for a conviction under the money laundering statutes. DE:465:11. Count 1's § 1956 conspiracy objects required actual knowledge of regulations and the intent to conceal specific crimes. The defense request, for the heightened willfulness instruction (11th Cir. Crim. Pattern Basic Inst. No. B9.1(b), rather than B9.1(a)) was supported by case law. *See Ratzlaf v. United States*, 510 U.S. 135, 146 (1994) ("[W]e are unpersuaded by the argument that structuring is so obviously 'evil' or inherently 'bad' that the 'willfulness' requirement is satisfied irrespective of the defendant's knowledge of the illegality of structuring."); DE:530:125 (defense argues for instruction; district court denies request).

The district court erroneously denied defense requests for: an instruction that "deposit of funds in Spanish banks and the transfer of funds entirely between Spanish banks do not violate any law of the United States," *see* DE:465:6; an instruction explaining the "design" intent element of § 1956(a)(2) charges consistently with *Regalado Cuellar*, *see* DE:465:8, DE:530:96–100, 140, DE:533:71; an instruction regarding non-criminality of car shipment and titling allegations, DE:533:71; and an instruction distinguishing transactional conduct from storing or hoarding of funds (evidence the government focused on at trial), DE:465:12, DE:533:52.

The district court's erroneous jury instructions, and denials of essential defense-requested instructions needed in the context of confusing evidence of foreign transactions and possession of funds that does not implicate the violation of any U.S. law, deprived Tardon of a fair trial.

**B.  *Prejudicial hearsay and marital communication privilege violations.***

Cohen knew nothing about how Tardon came into money before she met him. She did not know him until several years into the indictment period, after Tardon started his luxury car business. And thereafter she had no knowledge as to his obtaining drug proceeds. But on cross-examination, she related that Tardon had purchased substantial amounts of jewelry from Cameno, who sold jewelry in Spain. DE:524:111–12.

Faced with Cohen's truthful testimony about jewelry purchases, the government, on redirect examination, asked Cohen whether Cameno ever *sold* "anything that belonged to" Tardon. DE:524:109. Cohen answered, "No." *Id*. The government sought and received permission, over defense objection, to purportedly impeach Cohen's testimony about sales of items belonging to Tardon, asking Cohen whether she told a "counselor" that two kilograms of cocaine purportedly seized from Cameno had come from Tardon. DE:524:114; *see* DE:524:117 (government misstates purported inconsistent statement, failing to limit it to speculation about two unsold kilograms). When Cohen confirmed making that statement, the defense sought leave to place that statement in context to show it was speculative and that Cohen had repeatedly stated to the FBI in the same interview that she did not *know* whether Tardon was involved with drugs and simply could not say one way or the other. DE:524:127–35; *see* DE:207:32 (district court's prior finding that "[w]hen the police officers asked Ms. Cohen directly if the defendant was involved in drug smuggling, Ms. Cohen denied it").[7] The district court barred the requested recross examination, ruling that if the defense wanted any further testimony from Cohen, the defense would have to include her in its case-in-chief (even as the defense maintained its marital privilege objections). DE:524:130.

---

[7] In fact, after speculating about it, Cohen made it clear that she did not know. DE:175-1:7 (Officer: "Does she sell, does she distribute cocaine for him in Spain." Cohen: "**I have no idea**.") (emphasis added).

The misleading "impeachment" did not directly contradict the "sale" question the government introduced improperly on redirect examination. The government stipulated, and the district court ruled, it could not be used as substantive evidence, but rather only to address Cohen's credibility in denying whether Cameno sold anything for Tardon. DE:524:131–35. However, the government proceeded to use the impeachment as substantive evidence in closing argument to falsely claim Cohen was aware of and confirmed Tardon's drug dealing with Cameno.

The impeachment was improper. The denial of recross examination to explain and place in context the misleading questioning and speculative nature of Cohen's prior statement, and the government's direct violation of the limited-purpose ruling so as to prove the allegation that Cameno dealt drugs Tardon supplied, were all substantially-prejudicial components of the speculative, hearsay nature of the government's case. DE:524:114–17; DE:504:49–50.

The statements that the government had elicited from Cohen, including the purported inconsistent statement, derived from Cohen's conversations with Cohen, all of which was introduced over defense objection to violation of the marital communications privilege. The district court ruled that Cohen became—at some unspecified time and in some unspecified way—a coconspirator in either the alleged drug conduct or some aspect of the money laundering allegations. DE:170. However, the government never specified such criminal conduct, and the premise employed by

58

the district court to reach that conclusion was chronologically undefined and rested on facially-lawful conduct, including compliance with currency-reporting requirements and openly assisting in rental real estate management. Cohen, never charged with any offense, was not a conspirator, and the wholesale admission of information derived from conversations with her husband, including in the improperly-introduced and improperly-used "inconsistent" statement, constituted error. Information privately disclosed between husband and wife is privileged. *Wolfle v. United States*, 291 U.S. 7, 14 (1934); *United States v. Singleton*, 260 F.3d 1295, 1297-98 (11th Cir. 2001). The privilege survives the termination of marriage. *Id.* at 1297-98 & n.2. Violation of the privilege in this case was error.

The government relied on additional components of hearsay to bridge the evidentiary gaps in the case. Impermissible use of hearsay under theories of the co-conspirator exception, police investigations, and impeachment of the government's own witness led the jury to accept out-of-court statements, and largely opinion assertions, of guilt of Tardon or unindicted co-conspirators, including through direct use of hearsay related by Cohen (that misstated her prior statement to police when she was being encouraged to make adverse judgments about her husband); indirect opinion hearsay from Tardon's father (as to which no prior notice alerted Tardon so that an investigation could be done regarding circumstances of any prior claim by his father or his or Cohen's general or specific credibility on that matter, including his mother's

mental health issues); opinion hearsay as to the amount of money found buried in Artemio Tardon's bedroom; opinion hearsay regarding whether Ana Cameno was a drug importer or whether she was a drug distributor who relied on other suppliers (i.e., implicating Tardon), and other opinion, speculation, and hearsay evidence.

The government's use of a supposed comment to Cohen by Tardon's mother, that the mother was "upset" that her ex-husband had once accused Tardon of being a drug trafficker, was employed by the government even though there was no basis to determine that either the mother or Cohen was then a member of a conspiracy or that the comment had any conspiratorial purpose. *See* DE:523:30 ("Q. And did she ever have any conversations with you concerning Mr. Tardon's father? A. Yes. Q. Was she upset when she was having this conversation with you about Mr. Tardon's father? A. Yes."); DE:523:165 ("Q. And what did she tell you that Mr. Tardon's father had said and to whom? A. She said that Alvaro's father said to a Spanish judge that he was a narcotraficante.").

The government added the conspiratorial theory only in closing argument when vouching for the timing and function of the statement in a manner not supported by the testimony. In closing argument, the government recharacterized the evidence to state that the mother had made this statement to Cohen in anticipation of Cohen's supposed intention to visit Tardon's father. DE:504:66 ("When [Cohen] went on that first trip to Spain, she told you and she testified that she had gone with the sister to see Alvaro's

60

father. And what was her testimony from what the mother told her before going to see the father? The mother relayed to her a story about something the father had told a Spanish judge, and that was to warn her to basically keep your mouth shut in front of the estranged father.") (emphasis added). DE:524:169-70 (motion for mistrial based on double hearsay and Confrontation Clause as to defendant's father's assertion that defendant is drug dealer).

This characterization of the evidence, and its context, from an unavailable witness served as a Confrontation Clause violation. The surprise nature of the evidence heightened the prejudice. Other discovery-related factors warrant granting a new trial in this case, including the government's failure to disclose whether a forfeiture-sharing arrangement had been reached with the Spanish government, so as to gauge the full extent of the bias and interest of the Spanish witnesses and the officers on whose findings they relied. *See United States v. Williams*, 954 F.2d 668, 672 (11th Cir. 1992) ("The jury has the right to know what may be motivating a witness ... .").

**C.** ***Improper government closing arguments—misstating the law to reduce the government's proof burden, vouching for witnesses and for Tardon's guilt, falsely imputing criminal conduct (prostitution) to Tardon's wife, and misstating her testimony and other evidence—caused substantial prejudice heightened by undue restrictions on defense argument.***

The government's improper closing argument reflected the concern the government had that the jury would not believe David Pollack, where even government witness Cohen, married to Tardon during the Pollack period, disputed learning of any

drug dealing. Countering Cohen's exculpatory testimony required the government to attack her personally and to misstate her testimony. The government improperly assured the jury that Cohen was really a prostitute covering for her ex-husband and claimed that inconsistent-statement impeachment should be treated as substantive evidence proving the government's case, even as the government's closing argument falsified Cohen's actual testimony and the actual prior statement. The government abused Cohen and the truth to link Tardon to Spanish drug dealing: "The defendant's drug trafficking with Ana Cameno. You heard the testimony of Sharon Cohen. Sharon Cohen is what she is, okay? You can be polite and you can call it an escort ... . And when she was talking to the FBI in a moment when she had her guard down, she slipped and she told the FBI ... that the cocaine that Ana had been arrested with belonged to the defendant." DE:504:49-50.

The district court overruled defense objections and motion for mistrial. The government's claim completely violated the limited-use ruling on the alleged inconsistent statement obtained through false pretenses of a counselor-spouse interaction, and unfairly vouched for an aspersion attacking Cohen's moral character. *See* DE:504:50 (defense mistrial motion based on government use of hearsay by Cohen as substantive evidence of guilt).

The government's closing argument was rife with vouching and false representations regarding the record evidence. DE:504:39 (government falsely

vouches that Tardon's Spanish luxury car business was not legitimate: "Again, legitimate car dealership?  I don't think so.  I don't think so at all."); DE:504:42 (vouching for weight and credibility of the evidence: "The evidence in this case I think is overwhelming."), DE:504:33–35 (vouching, over objection, that unlike how "the little drug dealer acts," Tardon acted the way "the big drug dealer, is always going to [regarding] his money"), DE:504:74 ("I think your decision on this one frankly is easy."); DE:504:43 (falsely vouching that government cooperator Fabiani Krentz told Pollack that Tardon "deals in cocaine"); DE:504:51 (falsely vouching that Cohen hid "19 million euros"); DE:504:77–78 (falsely vouching for evidence to support improper use of double hearsay accusations against Tardon—regarding Tardon's father); DE:504:53–54 (misstating the law, arguing any purchase by someone who accumulated $10,000 in criminal proceeds "is a money laundering transaction and that is what has been charged here"); DE:504:151 (misstating the law as to criminally-derived proceeds by advising jury that notwithstanding the untainted purchase of a vehicle and later resale of the vehicle, proceeds from sale are tainted because "from [the car sales] you have to start subtracting overhead"); DE:504:55–56 (falsely accusing Tardon of violating U.S. drug laws:  "[T]here's no doubt about it, selling cocaine [is] certainly in violation of the laws of the United States.").  The district court denied requests for mistrial, *see* DE:504:77–78, and curative instruction.  DE:504:80.  The district court also overruled defense objections to the government's misstatement

of the willfulness element and lowering of the government mens rea burden on the conspiracy count, where the government wrongly contended "willfully" means only to act other than "by mistake." DE:504:158.

It is clearly improper to "indicat[e] that information not presented to the jury supports the testimony." *United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991); *id.* at 1207 (vouching for additional evidence "severely impairs the likelihood of a fair trial"). It also is reversible error to constructively amend the basis for the prosecution, which the government did in Tardon's case by flatly contradicting in closing argument the government's opening statement assurance that there was no U.S. drug law violation. *Compare* DE:518:24 *with* DE:504:56. *See United States v. Keller*, 916 F.2d 628, 633-34 (11th Cir. 1990) (constructive amendment is per se reversible error). Particularly where the jury was not limited in its view of the scope of U.S. drug laws, the constructive amendment in itself warrants a new trial.

"[A] prosecutor may not seek to obtain a conviction by going beyond the evidence before the jury." *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir. 1984) (internal quotation marks omitted); *accord United States v. Epps*, 613 F.3d 1093, 1100 (11th Cir. 2010) (same); *Hutchins v. Wainwright*, 715 F.2d 512, 516 (11th Cir. 1983) (same; characterizing closing argument limitation as a "fundamental principle").

A prosecutor's comments in closing argument warrant the granting of a new trial if the remarks were improper and prejudicially affected the defendant's substantive

rights. *United States v. Vera*, 701 F.2d 1349, 1361 (11th Cir. 1983). Tardon's prosecutor's remarks were improper and prejudicially affected Tardon's substantial rights. *See Eyster*, 948 F.2d at 1206–07 (11th Cir. 1991) ("As we recently made clear in *Kennedy v. Dugger*, 933 F.2d 905 (11th Cir. 1991), improper argument rises to the level of a denial of due process when 'there is a 'reasonable probability' that, but for the prosecutor's offending remarks, the outcome of the ... [proceeding] would have been different.' *Id.* at 914 (quoting *Williams v. Kemp*, 846 F.2d 1276, 1283 (11th Cir. 1988) ...). '[A] reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Id.* (quoting *Williams*, 846 F.2d at 1283 (quoting *Strickland v. Washington*, 466 U.S. 668 ... (1984))."); *accord Berger v. United States*, 295 U.S. 78, 88–89 (1935) (citing impact of *prosecutorial* vouching); *United States v. Young*, 470 U.S. 1 (1985) (same).

The uncured excesses of the government's closing and rebuttal closing arguments were not overcome by defense counter-argument. Instead, the district court erroneously foreclosed defense closing argument on the failures and lack of resolution in the Spanish police investigation, the speculative hearsay and inadequate pursuit of evidence that left no substantial evidence against Tardon. DE:504:95, 97–99. And the district court sustained an objection to argument that the conclusory, inquisitorial system of investigation offered as evidence was foreign to the U.S. justice system and need not be credited. DE:504:142. The district court also undermined the defense's

effort to refocus the jury on the core concealment money laundering allegation of Count 1, sustaining a government objection that the defense misstated the elements of the offense by arguing that Tardon acted openly in his financial dealings. DE:504:110–11. The district court also erroneously sustained the government objection to defense argument that the single, decade-long conspiracy charge was inconsistent with the record. DE:504:135. The district court continued its restrictions on defense argument by sustaining the unfounded government objection to the defense closing thesis that the primary showing of money and transactions was in Spain and beyond the scope of any U.S. money laundering charge. DE:504:122 (defense impeded from arguing money unspent or unused in Spain not part of a laundering violation).

The cumulative error doctrine protects a defendant from the prejudice of a multiplicity of errors upending the constitutional right to a fair trial, because "the cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error." *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005). Thus, the prejudice of cumulative errors may require reversal, even if individual errors do not. *Id.* at 1203; *United States v. Ladson*, 643 F.3d 1335, 1342 (11th Cir. 2011) (same). This Court considers several factors, including "the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the district court dealt with the errors as they arose (including

the efficacy—or lack of efficacy—of any remedial efforts); the strength of the government's case, and the length of trial." *Baker*, 432 F.3d at 1223 (internal quotation marks and bracket omitted).

The multiple errors that occurred at trial combined to result in substantial, pervasive prejudice; the prejudice caused by the totality of the individual errors was unduly prejudicial because the errors were interrelated and whittled away at Tardon's right to a fair adversarial testing of the government's case. Considered cumulatively, the totality of trial errors violated Tardon's constitutional right to a fair trial, compelling the vacation of his convictions.

**V. THE DISTRICT COURT ERRED AT SENTENCING BY EMPLOYING A NONEXISTENT BASE OFFENSE LEVEL FOR FOREIGN CRIME; IMPOSING A SUBSTANTIVELY-UNREASONABLE, UNCONSTITUTIONALLY CRUEL 150-YEAR SENTENCE FOR CRIMES LACKING A WILLFULNESS ELEMENT; AND IMPOSING UNTIMELY, UNSUPPORTED FORFEITURE ORDERS VIOLATING FIFTH, SIXTH, AND EIGHTH AMENDMENT RIGHTS, FORFEITURE STATUTES, AND FED.R.CRIM.P. 32.2, INCLUDING FOR PROPERTY THE JURY FOUND HAD NO CONNECTION TO THE CASE.**

**A. *Erroneous base offense level premised on foreign conduct for which no guideline applies.***

The district court erroneously premised Tardon's *base offense level* on uncharged foreign conduct for which no guideline applies. DE:608:9–12; DE:606:6–30 (defense argument against using foreign uncharged offense); DE:546-2:4–5 (objection to presentence report).

Calculation of the base offense level begins with Appendix A to the Guidelines Manual, which correlates guidelines to offenses. U.S.S.G. Ch. 1, Pt. A (guideline charge offense system addresses "statutory provisions that make up the federal criminal law"). For money laundering of proceeds of offenses not covered by the federal sentencing guidelines, U.S.S.G. § 2S1.1(a)(2) determines the base offense level. For Tardon, that base level was 8 plus a 20-level increase (using the table in § 2B1.1(b)(1)) for the laundered amount of $14,358,639.64 found by the district court. The resulting base offense level is 28. With enhancements for the § 1956 conviction (2 levels: § 2S1.1(b)(2)(B)), sophisticated laundering (2 levels: § 2S1.1(b)(3)), and role-in-the-offense (4 levels: § 3B1.1(a)), the total offense level should have been set no higher than level 36. Because Tardon had no criminal history points, his guideline range would be 188–235 months. U.S.S.G. Ch. 5, Pt. A (sentencing table).[8]

Instead, the district court treated Tardon as having committed a drug offense for which "the offense level for that offense can be determined," under § 2S1.1(a)(1)(B). The district court erred. Base offense levels—unlike relevant conduct and enhancements—are determined by a specific guideline methodology that rests on offenses of actual or potential prosecution and conviction, as charted in Appendix A.

---

[8] Tardon's objections to the involved-in amount are addressed *infra* at 73–77. Also, even if § 2S1.1(b)(1)'s relevant conduct provision included non-prosecutable foreign offenses, the enhancement would still yield a lower, 360-life guideline range.

The critical distinction between § 2S1.1(a)'s limited cross-reference and the more expansive guideline enhancements for relevant conduct, *see, e.g., United States v. Spence*, 923 F.3d 929, 932 (11th Cir. 2019) (applying relevant-conduct analysis under U.S.S.G. § 1B1.3), is that § 2S1.1(a)(1)(B) permits use of the underlying conduct to set the base offense level only if the guidelines provide an "offense level" for that offense: an offense-of-conviction analysis requiring the use of Appendix A. Entirely apart from whether the doctrine against extraterritorial application applies to "relevant conduct"—a separate consideration addressed only in § 2S1.1(a)(1)(A)—the absence of any guideline applicable under § 2S1.1(a)(1)(B) (via Appendix A) denoting a base offense level premised solely on foreign conduct bars application of § 2S1.1(a)(1) and requires employing § 2S1.1(a)(2).

**B.**    ***The 150-year sentence is substantively unreasonable and unconstitutionally cruel and unusual.***

Despite setting the life-imprisonment guideline range based on foreign drug conduct not affecting the United States, the district court justified the imposition of a life sentence in this case based solely on the U.S. financial of money laundering, not any drug-trafficking harm in Spain or elsewhere.  Under any view of the record, a departure from that guideline range to a life sentence would be unreasonable.  And yet, in discounting the drug conduct as reasons for imposing the sentence, the district court effectively made the non-willful conduct the premise for the extreme sentence.

There is no other reported sentence in which a defendant received a life sentence for non-victim, non-willful conduct. Tardon's 150-year sentence consists of a 20-year sentence for willful money laundering conduct (Count 1) and a ***130-year sentence*** for non-willful (non-laundering) money spending. Section 1957 has no element of any action or intended action taken with knowledge of wrongfulness, evasion, or concealment of misconduct. Section 1957 is, in that sense, a strict liability crime, of which no person is a victim. Although the defendant must know funds derived in part from even long-prior criminal activity, he need not know of anything wrong with spending such funds, much less contemplate any harm. The offense can be violated by buying land to donate to a church.

"The concept of proportionality is central to the Eighth Amendment." *Graham v. Florida*, 560 U.S. 48, 59 (2010). The statutory-maximum sentence of 10 years for § 1957 offenses reflects Congress's view that it is much less serious than actually *laundering* money, which requires, under § 1956, specific wrongful intent for imposition of a 20-year sentence. The district court stacked thirteen charges of money spending under § 1957 to reach a life sentence totaling 150 years. In doing so, district court inaptly compared Tardon to defendants convicted of multiple willful felonies carrying far greater statutory-maximum sentences. *See* DE:608:10–11 (citing willful crimes involving grave harms to the U.S. by Colombian and American drug

70

traffickers); DE:608:27 (defense objection that the money laundering comparator sentence cited by the district court was premised on the "willfulness" of the offenses).

Tardon, charged with no willful conduct at all in the United States, was treated more harshly than any other comparable defendant in reported case law. His sentence of life imprisonment for non-willful conduct has no parallel and is facially disproportionate.

The sentence was also substantively unreasonable. To the extent that the district court used Tardon's domestic life as a basis for the life sentence, DE:608:9, the testimony of Tardon's stepdaughter Murphy Cohen, "who indicated that he was a loving, supportive parent to her," *id.*, showed such harsh treatment was plainly unwarranted. *See* DE:605:22 (on cross-examination by government, Murphy testifies that Tardon "made me feel like there doesn't need to be a blood relation for someone to love you like their own child"). Tardon was not convicted of any domestic incident, and state charges had long since been dismissed.

The district court's reliance on foreign criminal conduct allegations against Tardon was also substantively unreasonable where untethered to any level of punishment contemplated in those countries for the conduct. If an offense treated in Spain as a misdemeanor, or even a 5-year felony, were used to impose a life sentence in a federal court, the balance and proportionality contemplated by the Sentencing Guidelines would evaporate.

71

Finally, the district court noted that investment in real estate using foreign criminal proceeds caused an economic and cultural effect in South Florida. DE:608:12 ("Defendant's laundering of over $14 million in Miami affected Miami's economy in certain ways. And certainly the accumulation of property and goods and cars affects the culture of Miami."). But the district court had no basis for the assumption of even a de minimis effect on luxury condominium prices. Only two of the purchases made in this case by Tardon family LLCs were in such luxury buildings: the Continuum unit purchased in 2003 (for just over $1,000,000, including mortgage) and the $600,000 purchase of the Murano unit. The jury's forfeiture verdict found that the Murano purchase had no nexus to the criminal conduct. DE:487; *see also* https://www.ussc.gov/guidelines/amendments/proposed-2024-amendments-federal-sentencing-guidelines (Sentencing Commission's proposal to diminish punishment effect of acquitted conduct). The district court also failed to weigh the more than $16 million financial penalties imposed, DE:611, that compensated for any adverse impact on the affordability of condominiums that the district court appeared to address.

This Court frequently looks to whether the sentence reached the statutory maximum to gauge substantive reasonableness. "[A] sentence imposed well below the statutory maximum penalty is another indicator of reasonableness." *United States v. Aguirre–Arsate*, 651 Fed.Appx. 918, 920 (11th Cir. 2016) (citing *United States v.*

*Gonzalez,* 550 F.3d 1319, 1324 (11th Cir. 2008) (finding sentence reasonable in part because it was well below statutory maximum)).

For Tardon, the district court imposed the statutory maximum consecutively for each of the fourteen counts. Tardon's life sentence (150 years) represents an intensely disproportionate punishment (and combined with uncorrected false allegations in the presentence report, *see* DE:602:21–45, can reasonably be viewed as leading to a prison assignment where Tardon recently suffered severe, permanent injuries as the victim of a brutal stabbing/beating incident, *see* Doc. 163:6). Tardon's case is a real-world example of how disproportionate sentencing—divesting a defendant of freedom for life—can have a dramatically cruel impact. Notably, all the defendants in the Spanish investigation are free, with at most de minimis jail time. Pollack was found not liable in Spain. The Tardon sentence was unreasonable, cruel, and unusual, and this Court should remand for resentencing.

**C.** ***The district court's calculation of a $14 million laundering amount and corresponding forfeitures, including direct "involved in" forfeiture, exceeded the scope of charged laundering offenses and relevant statutes, conflicted with jury findings on forfeiture claims, were procedurally improper, and violated Tardon's Fifth, Sixth, and Eighth Amendment and statutory rights and Fed.R.Crim.P. 32.2.***

The district court erroneously concluded that the amount of funds involved in the offenses of conviction included all funds received by Tardon or his family in the U.S. The laundered-amount figure—applicable for guideline-calculation and forfeiture

73

purposes—was much lower, because merely transferring criminal proceeds to the U.S. is not unlawful and because the government failed to determine the source of much of the funds. Tardon opposed the government's laundered-amount figure and its attempt to expand its forfeiture judgment by adding a money judgment that duplicated or contradicted nexus decisions made by the jury. DE:580 (opposing DE:550). Nor did the terms of the relevant statutes reasonably apply to open-and-obvious, fully-reported transactions identified by the government. DE:550 (government presentation of all monies entering the U.S. pertaining to Tardon).

At sentencing, the district court merged the laundered-amount calculation with analysis of the government's forfeiture money judgment motion filed on the eve of sentencing, only after Tardon filed his objections to the presentence report. DE:546-2, 550. The district court accepted, DE:602:88, the government's calculations of amounts going to Tardon family accounts or purchases or to Tardon himself. DE:602:51–79; Govt-Exh:180, 550-2. Adding up all the money that came to the U.S., the figure of $14,358,639.64 was achieved. However, the government failed to show money-laundering offenses as to all of those funds, or for uncharged transactions. *See United States v. Johnson*, 440 F.3d 1286, 1293 (11th Cir. 2006) (designed-to-conceal element requires more than simple transfer of funds between two accounts).

Because the government relied on transfers of less than $10,000 without showing concealment or evasion, *see, e.g.,* DE:550-2 (MoneyGram transfers of

$490,766), there was no basis to find money laundering.[9]  And the government wrongly relied on the theory that any transfer of $10,000 to the U.S. violated § 1957, *see, e.g.,* DE:550-5 (wire transfers, only some involving more than $10,000, amounting to $11,426,101 from 2002–2001), where the statute does not support that premise. Section 1957(d)(1), as applicable to Spanish citizen Tardon, is limited to conduct that "takes place in the United States."  Unlike § 1956(a)(2), international transfers to the U.S. effected in a foreign country do not violate § 1957.  *See generally RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. at 335 (absent clear expression of intent to reach foreign conduct, criminal statute must be read as limited to domestic offenses).

The government's funds-transfers charts failed to source the monies, many of which came from entities or persons outside the scope of the indictment.  *See* DE:550; DE:602:75 (FBI agent testifies government lacks "any information as to the source of" $2,910,073 attributed to laundering in DE:550-6); DE:603:84 (regarding $9,520,898 wire-transfer figure in DE:550-5 and Govt-Exh:180, government "didn't do any analysis of the sourcing of any of these monies, other than they came from Spain").

Speculative calculations untethered to relevant criminal statutory provisions cannot form the basis for a guideline or forfeiture calculation, nor were those

---

[9]    DE:532:160–61 ($3,384,112 before Nov. 30, 2006: American Express—$443,599; MoneyGram/Western Union—$132,954; wires to third parties—$676,403; wires to Bank of America—$1,463,494; wires to BankAtlantic—$676,662).

calculations consistent with the jury verdict on forfeiture issues where the same sourcing issues were litigated and the jury found most of the property had no nexus to the money laundering charges. "[T]he Government must ... 'establis[h] the requisite nexus between the property and the offense'" of conviction. *McIntosh v. United States*, 144 S.Ct. 980, 991 (2024) (quoting Fed.R.Crim.P. 32.2(b)(1)(A)).

The district court's forfeiture orders proceeded in two phases: (1) jury resolution of indicted forfeiture claims as to identified property, and (2) sentencing and post-sentencing determination of the government's money judgment and substitute asset claims. At trial (following the guilty verdict), the government presented to the jury forfeiture claims identified in paragraphs 3(b)-(e) of the indictment's forfeiture provision (DE:203:5–11). The district court erroneously overruled Tardon's objection that *all* indicted forfeiture claims, not merely money and property specified in the indictment, should go to the jury. DE:538:63 (Tardon has "demanded forfeiture ... be determined by the jury on both specific properties and judgments"); *see also* DE:538:105 (overruling Tardon's contention that "there needs to be a finding beyond a reasonable doubt" regarding forfeiture nexus).

Although this Court, relying on *Libretti v. United States*, 516 U.S. 29, 49 (1995), has held the Sixth Amendment does not apply to forfeitures, *see United States v. Elbeblawy*, 899 F.3d 925, 940–41 (11th Cir. 2018), Tardon's case presents a different procedural background, where the jury was called upon to resolve all forfeiture nexus

issues arising from the indictment. In this context, the jury's resolution of all forfeiture issues arising from the charges should have been dispositive. The government should not have two bites at the nexus apple by first losing in the forfeiture trial and then going around the verdict to seek forfeiture either on the same transfers based on renewed or revised claims it could have presented to the jury on the sourcing and nexus issues. *See also Southern Union Co. v. United States*, 567 U.S. 343, 349 (2012) (Sixth Amendment jury trial right applies to criminal fines, because there is no "principled basis" for distinguishing among different types of criminal penalties); *Alleyne v. United States*, 570 U.S. 99, 103 (2013) (jury must make factual findings that increase mandatory-minimum penalty). Notably, the statutory fine provisions are tied to the factual determination of the amount involved, or otherwise limited to $500,000 under 18 U.S.C. § 1956 and $250,000 under § 1957.

The jury verdict on government forfeiture requests found no criminal nexus to four of the six real estate parcels, two automobiles, nine watches, and all jewelry, *see* DE:495, but found a nexus as to two real properties and six cars under the "involved in" theory argued by the government (failing to grant forfeiture on the "traceable" to criminal proceeds theory). DE:487. The district court erroneously denied Tardon's motions, made before and after the jury's forfeiture verdict, *see* DE:499, to deny forfeiture because the government failed to offer the jury sufficient evidence to support the "involved in" theory. *See* DE:558:6 (concluding "involved in" jury finding valid).

Following sentencing, the district court erroneously entered the preliminary forfeiture order imposing substitute asset forfeiture, without conducting the hearing contemplated by the parties at sentencing; the preliminary forfeiture order included the properties the jury exonerated from any transactional nexus. DE:601. The district court's failure to fully resolve all preliminary forfeiture issues at sentencing, as required by Rule 32.2(b)(4)(B), compels reversal. Forfeiture, if it is imposed, must be imposed at sentencing. *United States v. Lee*, 77 F.4th 565, 582 (7th Cir. 2023) ("requirement that [a final order] must be included in the oral judgment of the court has the character of a claims-processing rule"); *United States v. Farias*, 836 F.3d 1315, 1330 (11th Cir. 2016) (Rule 32.2(b)(2)(B) error—failing to resolve forfeiture order issues *before* sentencing—harmless *if* forfeiture fully and fairly resolved at sentencing under Rule 32.2(b)(4)(B)).

The forfeiture orders should be vacated, including the jury's involved-in forfeiture verdict for residential property and vehicles. The forfeiture proceedings diverted from the requirements of Rules 32.2(b)(2)(B) and 32.2(b)(4)(B) and resulted in substantial prejudice. The district court's failure to resolve all of the interconnected forfeiture issues at sentencing deprived Tardon of procedural fairness, where the jury's verdict on asset forfeiture resolved any claim by the government that monies involved in purchasing the assets were separately forfeitable.

The jury's forfeiture verdict—finding the "involved in" forfeiture theory applied to certain cars and real estate—was not supported by the evidence, *see* DE:499 (Tardon's motion to vacate forfeiture verdict), where items purchased in violation of § 1957 are not "involved in" the laundering, and the jury rejected any other theory for forfeiture. *See United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009) (defining "involved in" property, under 18 U.S.C. § 982(a)(1), as "money or property which was actually laundered" or used to facilitate the crime); DE:464:6 (government-requested forfeiture jury instruction on "involved in" theory, employing definition from *Seher*). Where Congress uses language that refers to different concepts—such as "involved in" and "traceable to"—the different words used must be given effect. *Russello v. United States*, 464 U.S. 16, 23 (1983). Due process compels strict construction of criminal punishment provisions, avoidance of constitutional doubt, and the rule of lenity. *See United States v. Granderson*, 511 U.S. 39, 54 (1994).

Nor was the government's money-judgment theory otherwise valid where it directly conflicts with the jury verdict on the money-sourcing and nexus questions, resulting in double counting assets the jury forfeiture verdict resolved. *See* DE:602:88 (district court overrules defense objections regarding double counting, unsourced funds, lack of back-up for calculations, and failure to adhere to and respect jury forfeiture verdict). Thus, even if in other contexts not involving purchases, money judgments as to funds may be warranted—despite the lack of a statutory basis for such

a criminal penalty—the money judgment was improperly imposed. The money-judgment concept is not a device to double count—i.e., obtain (or, with the jury verdict here, fail to obtain)—specific property and the funds spent to acquire it. *See*, *e.g.*, *United States v. McKay*, 506 F.Supp.2d 1206, 1211 (S.D. Fla. 2007) ("[T]he Court concurs that double counting of proceeds is prohibited in calculating the amount to be forfeited."), *aff'd*, 285 Fed.Appx. 637 (11th Cir. 2008); *United States v. Young*, 330 F.Supp.3d 424 (D.D.C. 2018) ("[D]ouble counting is flatly prohibited in the context of criminal forfeiture."). The forfeiture orders should be reconsidered on remand.

### <u>CONCLUSION</u>

WHEREFORE, Appellant requests that this Court vacate the judgment, remand for dismissal or judgment of acquittal, or alternatively, resentencing or other relief.

Respectfully submitted,

 s/ Richard C. Klugh
RICHARD C. KLUGH, ESQ.
Attorney for Appellant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Tel. (305) 536-1191
Fax: (305) 536-2170

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the numbered pages of this brief contain 17,997 words.

 s/ Richard C. Klugh
Richard C. Klugh

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this  28th  day of May, 2024, the foregoing was filed electronically and thereby served upon counsel of record.

 s/ Richard C. Klugh
Richard C. Klugh