**Nos. 14-15140-C, 16-12218-C, 20-13971-C, 21-11311-C**

# In the United States Court of Appeals for the Eleventh Circuit

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

V.

ALVARO LOPEZ TARDON,

*Defendant-Appellant,*

THE COLLECTION MOTOR SPORTS OF MADRID, a Spanish Corporation,
ARTEMIO LOPEZ TARDON, MIAMARK LLC, MURANO 908 LLC, KYTE
SCHOOLL, and MARIA TARDON TORREGO,

*Petitioners-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA, No. 1:11-cr-20470 (Lenard, J.)

_____

## CONSOLIDATED ANSWERING BRIEF FOR THE UNITED STATES

_____

HAYDEN O'BYRNE
United States Attorney

DANIEL MATZKIN
Chief, Appellate Division

JUAN ANTONIO GONZALEZ, JR.
DAREN GROVE
Assistant United States Attorneys
Southern District of Florida

ANTOINETTE T. BACON
Supervisory Official
Criminal Division

ANDREW C. NOLL
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 307-1982
Andrew.Noll@usdoj.gov

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

In compliance with Fed. R. App. P. 26.1, 11th Cir. R. 26.1-1, and 11th Cir. R. 26.1-3, the undersigned hereby certifies that, in addition to the persons and entities identified in the certificates of interested persons filed by Appellants and in the certificate of interested persons previously filed by the United States, the following have an interest in the outcome of this case:

Bacon, Antoinette T.

Cohen, Alix I.

Dion, Scott

Noll, Andrew C.

O'Byrne, Hayden

Rubio, Lisa Tobin

/s/ Andrew C. Noll
ANDREW C. NOLL

*Counsel for the United States*

C-1 of 1

## STATEMENT REGARDING ORAL ARGUMENT

Given the record-intensive nature of the claims raised by Defendant-Appellant Tardon and by Petitioners-Appellants, oral argument may assist the Court's decisional process in this case. Accordingly, the government does not oppose Appellants' respective requests for oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ........................................................ C-1

STATEMENT REGARDING ORAL ARGUMENT ...................................................... i

TABLE OF CONTENTS ............................................................................................ ii

TABLE OF AUTHORITIES ...................................................................................... vi

STATEMENT OF JURISDICTION ........................................................................... 1

STATEMENT OF THE ISSUES ................................................................................ 2

STATEMENT OF THE CASE ................................................................................... 2

    I.      Procedural History ................................................................................. 2

    II.     Statement Of Facts................................................................................. 3

          A.      Tardon's Drug Trafficking And Money Laundering........................ 3

                 1.      At Tardon's Direction, His Associates Transport Thousands Of Kilograms Of Cocaine From South America To Spain.................................................................. 4

                 2.      Tardon Accumulates Significant Wealth, Which He Transfers To The United States .............................................. 6

                 3.      Tardon Purchases Real Estate, Luxury Cars, And Other Items With The Drug Proceeds.............................. 11

                 4.      Authorities Investigate And Arrest Tardon And His Confederates ........................................................................ 13

          B.      Trial Proceedings And Sentencing.................................................. 15

          C.      Ancillary-Forfeiture Proceedings ................................................... 17

    III.    Rulings Under Review And Standards Of Review.................................. 18

SUMMARY OF ARGUMENT .................................................................................. 20

ARGUMENT ............................................................................................................... 24

I.    The District Court Appropriately Denied Tardon's Post-Trial Motions .......................................................................................................... 24

A.    Background .......................................................................................... 24

B.    The District Court Correctly Denied Tardon's Motion To Dismiss The Indictment .................................................................... 29

1.    The Motion Did Not Implicate Subject-Matter Jurisdiction, And Was Untimely ........................................... 29

2.    Regardless, The Motion Lacked Merit ................................ 33

a.    Tardon's Foreign Drug Crimes Qualify As "Specified Unlawful Activity" For Each Charged Offense .......................................................... 33

b.    Tardon's Counterarguments Lack Merit .................. 38

C.    Tardon's Motion For Acquittal Likewise Lacked Merit ............... 39

1.    The Government Was Not Required To Prove Domestic Drug Trafficking .................................................... 40

2.    Sufficient Evidence Established The Underlying Foreign Drug Offense .......................................................... 41

3.    There Was Sufficient Evidence Of A Design To Conceal ...................................................................................... 46

4.    The Evidence Established The Elements Of The Substantive Money-Laundering Counts ............................. 48

5.    The Evidence Established A Single Conspiracy ................. 55

II.   The District Court Appropriately Denied Tardon's Motion To Suppress .................................................................................................... 56

A.    Background .......................................................................................... 56

B.    The District Court Acted Within Its Discretion In Denying A *Franks* Hearing ................................................... 67

C.    Tardon's Motion To Suppress Lacked Merit ................................ 76

    1.    Tardon Lacked Any Expectation Of Privacy .................... 76

    2.    Tardon's Then-Wife Validly Consented To The Search ................................................................................ 79

    3.    The Trial Evidence Did Not Support Tardon's Untimely Mid-Trial Motion To Suppress ........................... 81

    4.    Any Error Was Harmless ..................................................... 84

III.    The District Court Correctly Resolved Tardon's Evidentiary Objections ................................................................................. 85

A.    The Spanish Wiretaps Were Properly Authenticated .................... 85

B.    Testimony of Spanish Police Officers Was Admissible ................ 89

C.    The Kilogram Of Cocaine Was Admissible ................................... 92

IV.    There Was No Cumulative Trial Error ......................................... 94

A.    The Jury Instructions Were Appropriate ....................................... 94

B.    The District Court's Other Evidentiary Rulings Were Correct ............................................................................................. 97

C.    The Government's Closing Was Proper .......................................... 102

V.    Tardon's Sentence Should Be Affirmed ..................................... 106

A.    Background ....................................................................................... 106

B.    The District Court Correctly Calculated The Base Offense Level ................................................................................................. 111

C.    Tardon's Sentence Is Neither Substantively Unreasonable Nor Cruel and Unusual ................................................................... 114

iv

D.    Tardon's Challenges To The Forfeiture Judgment Lack Merit ........................................................................ 118

VI.   The District Court Correctly Dismissed Petitioners' Ancillary-Forfeiture Petitions ................................................. 124

A.    Legal Background ........................................................ 124

B.    Factual Background ...................................................... 127

C.    The District Court Correctly Dismissed The Collection's And Artemio's Petitions For Pleading Deficiencies .................... 130

1.    The Collection Failed To Adequately Plead An Interest In The Watches ........................................ 130

2.    Petitioners Do Not Contest That Artemio Failed To Adequately Plead An Interest In The Mercedes .............. 133

D.    The District Court Committed No Clear Error In Dismissing The Remaining Petitions For Lack Of Standing ..... 134

1.    Bare Title To Property Is Not Conclusive Of A Petitioner's Article III Or Statutory Standing ................... 134

2.    Tardon Exercised Dominion And Control Over The Condominium Units ............................................ 139

3.    Petitioners Served As Mere Nominees For The Vehicles ................................................................ 146

E.    Petitioners' Remaining Contentions Were Waived And Lack Merit ........................................................................ 150

CONCLUSION ............................................................................. 154

CERTIFICATE OF SERVICE ...................................................... 155

CERTIFICATE OF COMPLIANCE .............................................. 156

# TABLE OF AUTHORITIES

### CASES

*Ashe v. Swenson,*
   397 U.S. 436 (1970).................................................................................. 121

*Clark v. Poulton,*
   963 F.2d 1361 (10th Cir. 1992)................................................................ 152

*Cuellar v. United States,*
   553 U.S. 550 (2008).............................................................................38, 48

*District of Columbia v. Wesby,*
   583 U.S. 48 (2018)..............................................................................69, 75

*Ewing v. California,*
   538 U.S. 11 (2003).................................................................................. 117

*Fakhuri v. Garland,*
   28 F.4th 623 (5th Cir. 2022)..................................................................... 35

*\*Franks v. Delaware,*
   438 U.S. 154 (1978)......................................................... 2, 62, 68, 69, 72

*Harmelin v. Michigan,*
   501 U.S. 957 (1991)................................................................................ 117

*Harrison v. United States,*
   577 F. App'x 911 (11th Cir. 2014) ........................................................... 99

*Illinois v. Gates,*
   462 U.S. 213 (1983)..............................................................................69, 72

*In re Bryson,*
   406 F.3d 284 (4th Cir. 2005)................................................................... 135

*Johnson v. City of Atlanta,*
   107 F.4th 1292 (11th Cir. 2024) ............................................................. 132

---

\* Authorities upon which the government primarily relies are marked with an asterisk.

*Knezevich v. Ptomey*,
    761 F. App'x 904 (11th Cir. 2019) .......................................................................... 19, 150

*Lodge v. Kondaur Capital Corp.*,
    750 F.3d 1263 (11th Cir. 2014) .............................................................................. 146, 152

*McIntosh v. United States*,
    601 U.S. 330 (2024) .......................................................................................................... 123

*Mellouli v. Lynch*,
    575 U.S. 798 (2015) ............................................................................................................ 38

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010) ............................................................................................................ 29

*NLRB v. McClain of Georgia, Inc.*,
    138 F.3d 1418 (11th Cir. 1998) ............................. 20, 41, 49, 75, 80, 97, 100, 117, 133

*Pitch v. United States*,
    953 F.3d 1226 (11th Cir. 2020) (en banc) ..................................................................... 31

*Puckett v. United States*,
    556 U.S. 129 (2009) ............................................................................................................ 18

*Rakas v. Illinois*,
    439 U.S. 128 (1978) ............................................................................................................ 93

*Ratzlaf v. United States*,
    510 U.S. 135 (1994) ............................................................................................................ 96

*Roell v. Withrow*,
    538 U.S. 580 (2003) .......................................................................................................... 153

*Swinford v. Santos*,
    121 F.4th 179 (11th Cir. 2024) ......................................................................................... 20

*United States v. $100,348.00 in U.S. Currency*,
    354 F.3d 1110 (9th Cir. 2004) ......................................................................................... 151

*United States v. $38,000.00 in U.S. Currency*,
    816 F.2d 1538 (11th Cir. 1987) ................................................................................. 126, 127

*United States v. 526 Liscum Drive*,
    866 F.2d 213 (6th Cir. 1989) ........................................................................................... 135

*United States v. 900 Rio Vista Boulevard*,
   803 F.2d 625 (11th Cir. 1986) ................................................................... 135

*United States v. Abbell*,
   271 F.3d 1286 (11th Cir. 2001) .................................................................. 49

*United States v. Abram*,
   171 F. App'x 304 (11th Cir. 2006) ............................................................ 99

*United States v. Adams*,
   74 F.3d 1093 (11th Cir. 1996) ................................................................... 49

*United States v. Alghazouli*,
   517 F.3d 1179 (9th Cir. 2008) ................................................................... 46

*United States v. Amodeo*,
   916 F.3d 967 (11th Cir. 2019) ................................................................... 124

*United States v. Andres*,
   960 F.3d 1310 (11th Cir. 2020) ............................................................. 82, 83

*United States v. Arbolaez*,
   450 F.3d 1283 (11th Cir. 2006) ................................................................. 68

*United States v. Awan*,
   966 F.2d 1415 (11th Cir. 1992) ................................................................. 44

*United States v. Baker*,
   19 F.3d 605 (11th Cir. 1994) ..................................................................... 117

*United States v. Barsoum*,
   763 F.3d 1321 (11th Cir. 2014) ................................................................. 68

*United States v. Benjamin*,
   252 F.3d 1 (1st Cir. 2001) ......................................................................... 54

*United States v. Bennett*,
   836 F.2d 1314 (11th Cir. 1988) ................................................................. 121

*United States v. Bernal-Benitez*,
   594 F.3d 1303 (11th Cir. 2010) ................................................................. 103

*United States v. Bikundi*,
   926 F.3d 761 (D.C. Cir. 2019) ................................................................... 120

*United States v. Blake*,
   868 F.3d 960 (11th Cir. 2017) ............................................................. 75

*United States v. Blasingame*,
   219 F. App'x 934 (11th Cir. 2007) ...................................................... 91

*United States v. Bowers*,
   811 F.3d 412 (11th Cir. 2016) ............................................................ 117

*United States v. Brown*,
   752 F.3d 1344 (11th Cir. 2014) ........................................................... 29

*United States v. Bruce*,
   977 F.3d 1112 (11th Cir. 2020) ........................................................... 71

*United States v. Burgos*,
   254 F.3d 8 (1st Cir. 2001) ................................................................... 54

*United States v. Caldwell*,
   81 F.4th 1160 (11th Cir. 2023) .......................................................... 105

*United States v. Cambio Exacto, S.A.*,
   166 F.3d 522 (2d Cir. 1999) ........................................................ 135, 137

*United States v. Cancelliere*,
   69 F.3d 1116 (11th Cir. 1995) ............................................................. 96

*United States v. Carcione*,
   272 F.3d 1297 (11th Cir. 2001) ........................................................... 36

*United States v. Carrell*,
   252 F.3d 1193 (11th Cir. 2001) ......................................................... 135

*United States v. Caruthers*,
   765 F.3d 843 (8th Cir. 2014) ....................................................... 125, 131

*United States v. Certain Funds on Deposit in Account No. 01-0-71417*,
   769 F. Supp. 80 (E.D.N.Y. 1991) ...................................................... 119

*United States v. Cessa*,
   872 F.3d 267 (5th Cir. 2017) ............................................................. 120

*United States v. Chalker*,
   966 F.3d 1177 (11th Cir. 2020) ........................................................... 18

*United States v. Chi*,
  936 F.3d 888 (9th Cir. 2019)................................................. 38

*United States v. Coffman*,
  612 F. App'x 278 (6th Cir. 2015) ........................................ 137

*United States v. Cone*,
  627 F.3d 1356 (11th Cir. 2010)........................................... 125

*United States v. Cotton*,
  535 U.S. 625 (2002)...................................................... 29, 30

*United States v. Crozier*,
  640 F. App'x 100 (2d Cir. 2016)............................................ 47

*United States v. Daugerdas*,
  892 F.3d 545 (2d Cir. 2018) ............................................. 126

*United States v. Davenport*,
  668 F.3d 1316 (11th Cir. 2012)...................................... 124, 125

*United States v. De Parias*,
  805 F.2d 1447 (11th Cir. 1986)............................................ 77

*United States v. Diamond*,
  102 F.4th 1347 (11th Cir. 2024) .......................................... 19

*United States v. Diggles*,
  928 F.3d 380 (5th Cir. 2019)............................................... 44

*United States v. Dohan*,
  508 F.3d 989 (11th Cir. 2007)............................................. 97

*United States v. Edouard*,
  485 F.3d 1324 (11th Cir. 2007)........................................ 50, 55

*United States v. Elbeblawy*,
  899 F.3d 925 (11th Cir. 2018)........................................... 123

*United States v. Elso*,
  422 F.3d 1305 (11th Cir. 2005)............................................ 47

*United States v. Fabian*,
  764 F.3d 636 (6th Cir. 2014)............................................. 131

x

*United States v. Felts*,
  579 F.3d 1341 (11th Cir. 2009)..................................................................... 25

*United States v. Flanders*,
  752 F.3d 1317 (11th Cir. 2014)..................................................................... 20

*United States v. Fleet*,
  498 F.3d 1225 (11th Cir. 2007)...............................................................134, 137

*United States v. Ford*,
  765 F.2d 1088 (11th Cir. 1985)..................................................................... 80

*United States v. Frazier*,
  605 F.3d 1271 (11th Cir. 2010)..................................................................... 49

*United States v. Garcia-Munguia*,
  850 F. App'x 552 (9th Cir. 2021) .................................................................. 54

*United States v. Gilbert*,
  244 F.3d 888 (11th Cir. 2001)...................................................................... 126

*United States v. Gladden*,
  78 F.4th 1232 (11th Cir. 2023) ..............................................................20, 142

*United States v. Golb*,
  69 F.3d 1417 (9th Cir. 1995)....................................................................46, 96

*United States v. Goldstein*,
  989 F.3d 1178 (11th Cir. 2021)................................................... 19, 102, 105

*United States v. Goodwin*,
  141 F.3d 394 (2d Cir. 1997) ........................................................................ 54

*United States v. Gotti*,
  459 F.3d 296 (2d Cir. 2006) ........................................................................ 36

*United States v. Graham*,
  123 F.4th 1197 (11th Cir. 2024) ...........................................................19, 111

*United States v. Green*,
  296 F. App'x 811 (11th Cir. 2008) .............................................................. 116

*United States v. Green*,
  818 F.3d 1258 (11th Cir. 2016)..................................................................... 50

xi

*United States v. Grimon,*
923 F.3d 1302 (11th Cir. 2019)................................................................39

*United States v. Grushko,*
50 F.4th 1 (11th Cir. 2022)......................................................................98

*United States v. Gutierrez,*
810 F. App'x 761 (11th Cir. 2020) .........................................................102

*United States v. Haimowitz,*
706 F.2d 1549 (11th Cir. 1983)................................................................68

*United States v. Hamaker,*
455 F.3d 1316 (11th Cir. 2006)................................................................52

*United States v. Harris,*
526 F.3d 1334 (11th Cir. 2008)..........................................................79, 81

*United States v. Harriston,*
329 F.3d 779 (11th Cir. 2003)..................................................................93

*United States v. Hassan,*
411 F. Supp. 3d 1302 (M.D. Fla. 2019) .................................................125

*United States v. Henry,*
325 F.3d 93 (2d Cir. 2003) .......................................................................36

*United States v. Herron,*
97 F.3d 234 (8th Cir. 1996)......................................................................36

*United States v. Hill,*
119 F.4th 862 (11th Cir. 2024) .....................................................18, 39, 40

*\*United States v. Hill,*
167 F.3d 1055 (6th Cir. 1999)..................................................................43

*United States v. Holt,*
777 F.3d 1234 (11th Cir. 2015)................................................................55

*United States v. Hunter,*
770 F.3d 740 (8th Cir. 2014)..................................................................103

*United States v. Hurtado,*
89 F.4th 881 (11th Cir. 2023)..................................................................18

*United States v. Irey*,
    612 F.3d 1160 (11th Cir. 2010) (en banc) ................................................ 115

*\*United States v. Iriele*,
    977 F.3d 1155 (11th Cir. 2020) ....................................................... 24, 25, 37, 40

*United States v. Jaras*,
    86 F.3d 383 (5th Cir. 1996) ....................................................................... 81

*United States v. Jayyousi*,
    657 F.3d 1085 (11th Cir. 2011) ............................................................. 90, 92

*United States v. Jenkins*,
    633 F.3d 788 (9th Cir. 2011) ..................................................................... 36

*United States v. Jiminez*,
    564 F.3d 1280 (11th Cir. 2009) ............................................................... 102

*United States v. Jones*,
    241 F. App'x 676 (11th Cir. 2007) ........................................................... 83

*United States v. Kapordelis*,
    569 F.3d 1291 (11th Cir. 2009) ................................................................. 73

*United States v. King*,
    509 F.3d 1338 (11th Cir. 2007) ................................................................. 76

*United States v. Kramer*,
    25 F.4th 509 (7th Cir. 2022) ................................................................... 119

*United States v. Kramer*,
    73 F.3d 1067 (11th Cir. 1996) ................................................................... 36

*United States v. Langford*,
    647 F.3d 1309 (11th Cir. 2011) ........................................................... 20, 100

*United States v. Lazare Kaplan International Inc.*,
    849 F. App'x 906 (11th Cir. 2021) ......................................................... 127

*United States v. Lebowitz*,
    676 F.3d 1000 (11th Cir. 2012) ................................................................. 86

*United States v. Lopez-Vanegas*,
    493 F.3d 1305 (11th Cir. 2005) ................................................................. 41

*United States v. Magluta*,
  313 F. App'x 201 (11th Cir. 2008) ................................................. 116

*United States v. Maher*,
  108 F.3d 1513 (2d Cir. 1997) ................................................... 42, 43

*United States v. Malekzadeh*,
  855 F.2d 1492 (11th Cir. 1988)...................................................... 99

*United States v. Marion*,
  562 F.3d 1330 (11th Cir. 2009)..................................................... 126

*United States v. Maritime Life Caribbean Ltd.*,
  913 F.3d 1027 (11th Cir. 2019)...................................................... 20

*United States v. Martinelli*,
  454 F.3d 1300 (11th Cir. 2006)............................................44, 45, 46

*United States v. Maxwell*,
  579 F.3d 1282 (11th Cir. 2009)...................................................... 95

*United States v. McKennon*,
  814 F.2d 1539 (11th Cir. 1987)............................................76, 77, 78

*United States v. Menendez*,
  600 F.3d 263 (2d Cir. 2010) ....................................................... 114

*United States v. Miller*,
  No. 20-10194, 2023 WL 155212 (11th Cir. Jan. 11, 2023)........................................ 83

*United States v. Molina*,
  413 F. App'x 210 (11th Cir. 2011) .................................................. 40

*United States v. Moran*,
  778 F.3d 942 (11th Cir. 2015)....................................................... 46

*United States v. Morgan*,
  224 F.3d 339 (4th Cir. 2000)....................................................... 137

*United States v. Naranjo*,
  634 F.3d 1198 (11th Cir. 2011)...................................................... 47

*United States v. Nava*,
  404 F.3d 1119 (9th Cir. 2005)............................................ 138, 139, 143

xiv

*United States v. Nicholson*,
  24 F.4th 1341 (11th Cir. 2022) ......................................................84, 85

*United States v. Novaton*,
  271 F.3d 968 (11th Cir. 2001)........................................................69, 70

*United States v. Olano*,
  507 U.S. 725 (1993).............................................................................. 31

*United States v. Olguin*,
  643 F.3d 384 (5th Cir. 2011)............................................................. 119

*United States v. Oliveros*,
  275 F.3d 1299 (11th Cir. 2001).............................................35, 36, 54

*United States v. One 1990 Beechcraft*,
  619 F.3d 1275 (11th Cir. 2010)........................................................ 136

*United States v. Papajohn*,
  212 F.3d 1112 (8th Cir. 2000)........................................................... 104

*\*United States v. Parenteau*,
  647 F. App'x 593 (6th Cir. 2016) ..................................................... 136

*United States v. Perkins*,
  787 F.3d 1329 (11th Cir. 2015)................................................ 75, 114, 115

*United States v. Puche*,
  350 F.3d 1137 (11th Cir. 2003)................................................ 118, 119, 120

*United States v. Rackley*,
  742 F.2d 1266 (11th Cir. 1984).......................................................... 78

*United States v. Rafoi*,
  60 F.4th 982 (5th Cir. 2023).............................................................. 30

*United States v. Ramirez*,
  324 F.3d 1225 (11th Cir. 2003)......................................................... 18

*United States v. Ramos*,
  12 F.3d 1019 (11th Cir. 1994)........................................................... 79

*United States v. Reeves*,
  742 F.3d 487 (11th Cir. 2014).............................................86, 102, 103, 105

*United States v. Reliford,*
  58 F.3d 247 (6th Cir. 1995) ............................................................................. 103

*United States v. Richardson,*
  764 F.2d 1514 (11th Cir. 1985) .................................................................... 86, 87

*United States v. Rivera,*
  780 F.3d 1084 (11th Cir. 2015) ...................................................................... 102

*United States v. Rivera,*
  884 F.2d 544 (11th Cir. 1989) ........................................................................ 151

*United States v. Rodgers,*
  461 U.S. 677 (1983) .......................................................................................... 31

*United States v. Rogers,*
  989 F.3d 1255 (11th Cir. 2021) ...................................................................... 114

*United States v. Rolle,*
  491 F. App'x 63 (11th Cir. 2012) ..................................................................... 30

*United States v. Ross,*
  33 F.3d 1507 (11th Cir. 1994) .......................................................................... 98

*United States v. Sanchez,*
  No. 22-11923, 2023 WL 5844958 (11th Cir. Sept. 11, 2023) ...................... 127

*United States v. Santos,*
  20 F.3d 280 (7th Cir. 1994) .............................................................................. 96

*United States v. Sarras,*
  575 F.3d 1191 (11th Cir. 2009) ........................................................................ 70

*United States v. Sarro,*
  742 F.2d 1286 (11th Cir. 1984) ........................................................................ 88

*United States v. Seher,*
  562 F.3d 1344 (11th Cir. 2009) ................................................................118, 119

*United States v. Shabazz,*
  724 F.2d 1536 (11th Cir. 1984) ........................................................................ 88

*United States v. Shefton,*
  548 F.3d 1360 (11th Cir. 2008) ...................................................................... 134

*United States v. Silva*,
  No. 15-20727, 2018 WL 5847348 (S.D. Fla. Nov. 8, 2018) ..................................... 138

*United States v. Silver*,
  864 F.3d 102 (2d Cir. 2017) ....................................................................................... 50

*United States v. Silvestri*,
  409 F.3d 1311 (11th Cir. 2005) .................................................................................. 40

*United States v. Singleton*,
  260 F.3d 1295 (11th Cir. 2001) .................................................................................. 99

*United States v. Singleton*,
  455 F. App'x 914 (11th Cir. 2012) ............................................................................. 88

*United States v. Smith*,
  918 F.2d 1501 (11th Cir. 1990) .................................................................................. 82

*United States v. Sosa*,
  777 F.3d 1279 (11th Cir. 2015) ................................................................. 19, 102, 103

*United States v. Sparks*,
  806 F.3d 1323 (11th Cir. 2015) .................................................................................. 80

*\*United States v. Spence*,
  923 F.3d 929 (11th Cir. 2019) ........................................................................... 111, 112

*United States v. Sperrazza*,
  804 F.3d 1113 (11th Cir. 2015) ............................................................................ 31, 81

*United States v. Starke*,
  62 F.3d 1374 (11th Cir. 1995) .................................................................................... 47

*United States v. Steiger*,
  318 F.3d 1039 (11th Cir. 2003) .................................................................................. 80

*United States v. Svete*,
  556 F.3d 1157 (11th Cir. 2009) (en banc) ................................................................. 95

*United States v. Swartz Family Trust*,
  67 F.4th 505 (2d Cir. 2023) ...................................................................................... 127

*United States v. Terzado-Madruga*,
  897 F.2d 1099 (11th Cir. 1990) .................................................................................. 49

*United States v. Timley*,
  507 F.3d 1125 (8th Cir. 2007)............................................................. 126, 134, 136

*United States v. Turley*,
  352 U.S. 407 (1957).......................................................................................... 135

*United States v. Vega*,
  813 F.3d 386 (1st Cir. 2016)............................................................................... 54

*United States v. Waked Hatum*,
  969 F.3d 1156 (11th Cir. 2020)...................................................................118, 119

*United States v. Ward*,
  197 F.3d 1076 (11th Cir. 1999)..................................................................... 50, 52

*United States v. Watkins*,
  760 F.3d 1271 (11th Cir. 2014).......................................................................... 79

*United States v. Weiss*,
  467 F.3d 1300 (11th Cir. 2006)...................................................................137, 138

*United States v. Whyte*,
  928 F.3d 1317 (11th Cir. 2019)..................................................................... 68, 69

*United States v. Williams*,
  643 F. App'x 933 (11th Cir. 2016) ..................................................................... 90

*United States v. Winchester*,
  916 F.2d 601 (11th Cir. 1990)............................................................................ 77

*United States v. Zvi*,
  168 F.3d 49 (2d Cir. 1999) ................................................................................ 36

*Via Mat International South America Ltd. v. United States*,
  446 F.3d 1258 (11th Cir. 2006)................................................................ 135, 137, 138

## STATUTES

18 U.S.C. § 982................................................................................................ 1

18 U.S.C. § 982(a)(1) .................................................................................106, 118

*18 U.S.C. § 1956 ............................................................................................ 59

18 U.S.C. § 1956(a)(1) ...............................................................42, 44, 109

18 U.S.C. § 1956(a)(1)(B)(i) ....................................................... 34

18 U.S.C. § 1956(a)(1)(B)(ii) ...................................................... 34

18 U.S.C. § 1956(a)(2) ................................................................. 109

18 U.S.C. § 1956(a)(2)(B) ..........................................................25, 42

18 U.S.C. § 1956(a)(2)(B)(i) ....................................................... 34

18 U.S.C. § 1956(a)(2)(B)(ii) ...................................................... 34

18 U.S.C. § 1956(c)(1) ................................................................34, 42, 43

18 U.S.C. § 1956(c)(4) ................................................................35, 36, 37

18 U.S.C. § 1956(c)(7)(B) ...........................................................35, 39

18 U.S.C. § 1956(c)(7)(B)(i) .......................................................24, 35, 37

18 U.S.C. § 1956(h).................................................................... 3, 15, 24, 109

*18 U.S.C. § 1957 ...................................................................... 3, 15, 24, 59

18 U.S.C. § 1957(a)....................................................................33, 44, 49

18 U.S.C. § 1957(b).................................................................... 109

18 U.S.C. § 1957(d).................................................................... 54

18 U.S.C. § 1957(f)(1).................................................................37, 53, 55

18 U.S.C. § 1957(f)(3)................................................................. 24

18 U.S.C. § 3231 ........................................................................ 1, 29

18 U.S.C. § 3661 ........................................................................ 111

18 U.S.C. § 3742(a) .................................................................... 1

21 U.S.C. § 841............................................................................59, 73, 116

21 U.S.C. § 846............................................................................59, 73

*21 U.S.C. § 853 ........................................................................................... 1

21 U.S.C. § 853(a) ................................................................................... 135

21 U.S.C. § 853(n)(2) ............................................................125, 127, 136, 137

21 U.S.C. § 853(n)(3) ..................................................................... 125, 130, 131

21 U.S.C. § 853(n)(5) ................................................................................ 126

21 U.S.C. § 853(n)(6) ....................................................................... 126, 136, 137

21 U.S.C. § 853(*o*) ................................................................................... 150

21 U.S.C. § 853(p) ................................................................................... 107

28 U.S.C. § 636(b)(1) ............................................................................... 153

28 U.S.C. § 1291 ........................................................................................ 1

Florida Statutes § 608.423(1) (eff. Oct. 1, 2002) ....................................... 145

**RULES**

Federal Rule of Criminal Procedure 12 ............................................... 31, 81

Federal Rule of Criminal Procedure 12 (eff. Dec. 1, 2002) ............... 30, 31, 81

Federal Rule of Criminal Procedure 12 (eff. Dec. 1, 2014) .......................... 32

Federal Rule of Criminal Procedure 32.2 ........................................... 122, 123

Federal Rule of Criminal Procedure 32.2(b)(5) ..................................... 123

Federal Rule of Criminal Procedure 32.2(c)(1)(A) ................................ 125

Federal Rule of Evidence 401(a) ............................................................ 93

Federal Rule of Evidence 403 ................................................................ 93

Federal Rule of Evidence 602 ................................................................ 90

Federal Rule of Evidence 701 ................................................................ 90

Federal Rule of Evidence 801(d)(2)(E) ................................................. 100

Federal Rule of Evidence 901(a)................................................................. 86

Federal Rule of Evidence 1002................................................................. 88

Federal Rule of Evidence 1003................................................................. 88

## SENTENCING GUIDELINES

Sentencing Guidelines Appendix C, Amendment 634 (Nov. 1, 2001)........................ 114

U.S.S.G. § 1B1.1 ................................................................................. 113

U.S.S.G. § 1B1.3(a)(1)(A)....................................................................... 112

U.S.S.G. § 2D1.1(c) (2014 ed.).................................................................. 109

U.S.S.G. § 2S1.1 ................................................................................. 113

U.S.S.G. § 2S1.1(a)(1)............................................................... 108, 112, 113

U.S.S.G. § 2S1.1(a)(1)(B) ........................................................................ 112

U.S.S.G. § 2S1.1(a)(2)............................................................................ 109

U.S.S.G. § 2X5.1 ................................................................................. 113

## LEGISLATIVE MATERIALS

Senate Report No. 99-433 (1986)...........................................................35, 37, 43

## OTHER AUTHORITIES

11th Circuit Pattern Jury Instructions (Criminal Cases) (2010 ed.)...........................96, 97

## STATEMENT OF JURISDICTION

Defendant-Appellant Alvaro Lopez Tardon appeals his convictions and sentence. The district court entered judgment on October 28, 2014, DE.611,[1] and Tardon timely appealed on November 12, 2014, DE.614. The district court had jurisdiction under 18 U.S.C. § 3231, and this Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a).

Petitioners-Appellants The Collection Motor Sports of Madrid, Artemio Lopez Tardon, Miamark LLC, Murano 908 LLC, Kyte Schooll, and Maria Tardon Torrego (collectively, "Petitioners") appeal from the orders dismissing their respective third-party ancillary-forfeiture petitions, entered on April 21, 2016, and October 8, 2020. DE.761; DE.762; DE.920. The district court entered final orders of forfeiture on April 26, 2016, and March 3, 2021. DE.764; DE.935. Petitioners timely appealed on May 5, 2016, April 19, 2021, and May 3, 2021. DE.766; DE.939; DE.945. The district court had jurisdiction under 18 U.S.C. §§ 3231 and 982 and 21 U.S.C. § 853. This Court has jurisdiction under 28 U.S.C. § 1291.

---

[1] The record is cited as "DE.[docket entry number]:[page number(s)]." "Def.Br." refers to Tardon's opening brief and "Pet.Br." refers to Petitioners' opening brief. Because Tardon shares a last name with his brother, Petitioner-Appellant Artemio Lopez Tardon, and his mother, Petitioner-Appellant Maria Tardon Torrego, the government refers to them as "Artemio" and "Maria."

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly denied the defendant's post-trial motions to dismiss the indictment and for judgment of acquittal.

2.      Whether the district court correctly denied the defendant's motions for a hearing under *Franks v. Delaware*, 438 U.S. 154 (1978), and to suppress.

3.      Whether the district court acted within its discretion in resolving the defendant's evidentiary objections by: (a) finding recorded telephone calls properly authenticated; (b) admitting testimony by Spanish National Police officers describing their investigation; and (c) admitting a physical kilogram of cocaine.

4.      Whether other claimed trial errors—including alleged instructional, evidentiary, and closing-argument errors—cumulatively warrant a new trial.

5.      Whether the district court (a) correctly calculated the defendant's base offense level at sentencing; (b) imposed a substantively reasonable and constitutionally proportionate sentence; and (c) appropriately ordered more than $14 million forfeited to the United States.

6.      Whether the district court correctly dismissed Petitioners' third-party ancillary-forfeiture petitions.

## STATEMENT OF THE CASE

### I.    Procedural History

Following a jury trial in the United States District Court for the Southern District of Florida, Tardon was convicted on one count of conspiracy to commit money

2

laundering, in violation of 18 U.S.C. § 1956(h), and 13 substantive money-laundering counts, in violation of 18 U.S.C. § 1957. DE.611:1-2. The district court sentenced Tardon to 1,800 months of imprisonment, to be followed by three years of supervised release. DE.611:3-4. The court also imposed a $14,358,639.64 forfeiture money judgment and ordered the forfeiture of certain substitute assets in partial satisfaction of the judgment. DE.601:27-28; DE.611:7; DE.613:1-4. Following ancillary-forfeiture proceedings, the court dismissed third-party petitions asserting an interest in the forfeited property, DE.761; DE.762; DE.920; and entered final orders of forfeiture, DE.764; DE.935.

## II.    Statement Of Facts

This appeal arises from Tardon's convictions for laundering the proceeds of his significant drug trafficking into the U.S.

### A.    Tardon's Drug Trafficking And Money Laundering

Until his arrest in 2011, Tardon led an international drug-trafficking operation that transported thousands of kilograms of cocaine from South America to Spain. DE.519:62-63, 113. Tardon laundered more than $14.3 million of the trafficking proceeds into Southern Florida. DE.550:9. Viewed in the light most favorable to the government, the evidence showed the following:

### 1. At Tardon's Direction, His Associates Transport Thousands Of Kilograms Of Cocaine From South America To Spain

Tardon, a Spanish national who spent significant time in Miami, transported thousands of kilograms of cocaine from South America to Spain.  DE.519:62-63, 84, 127, 135; DE.528:103-112.  Among those who assisted Tardon was David Pollack, who met Tardon around 2001 and eventually traveled to South America at Tardon's direction to prepare shipments of cocaine.  DE.519:62-63.

Pollack met Tardon through Fabiani Krentz, who was dating Tardon at the time.  DE.519:66-68.  Krentz suggested that Tardon could help Pollack sell cocaine, and Tardon later told Pollack that he could obtain around 500 kilograms for sale in the U.S.  DE.519:69-71.  That proposal did not come to fruition, but the men became closer over the following years.  DE.519:70-72, 75.  Pollack observed that Tardon lived a luxurious lifestyle: he drove a Hummer SUV, wore luxury brands and expensive watches, and owned several condo units, including one on the upper floors of the Continuum building on South Beach in Miami.  DE.519:75-77; *see* DE.518:77-78.  Despite this apparent wealth, Tardon never went to or talked about work around Pollack.  DE.519:77.

Pollack eventually asked to become involved with Tardon's cocaine trafficking.  DE.519:82.  Tardon initially declined, but around 2006 he invited Pollack to invest $30,000.  DE.519:82-83.  Later that year, Tardon invited Pollack to Spain, where

4

Tardon's brother, Artemio, gave Pollack a bag containing around €250,000—representing the return on Pollack's investment.  DE.519:83-88, 90-91.

In May 2007, Pollack traveled to Peru at Tardon's direction to assist with packaging 2,500 kilograms of cocaine—worth around €75 million—for transport to Spain.  DE.519:111-113, 139.  With several others, Pollack spent three weeks packaging the cocaine into 8-kilogram bundles that were secreted into burlap sacks of dried peppers for transportation by container ship.  DE.519:112-115, 120-121.

A month later, Pollack traveled to Spain to unload the cocaine.  DE.519:121.  At a warehouse outside of Madrid, Pollack helped remove the cocaine from the sacks and arrange them into 25-kilogram boxes.  DE.519:122-123.  The cocaine was placed—in hundreds-of-kilogram quantities—into vans for distribution.  DE.519:123.  Several hundred kilograms were segregated for delivery to a woman named Ana Cameno and her husband, who were large-scale distributors.[2]   DE.519:107-108, 124; DE.521:11.

For his work during the 2007 trip to Peru and Spain, Pollack received €500,000, some of which he spent while in Madrid, and some of which he smuggled back to the U.S.  DE.519:126.  Pollack made similar trips in 2009 and 2010—each time, assisting with packaging and transporting 2,500 kilograms of cocaine from Peru to Spain.  DE.519:126-128, 138-139.  In total, Pollack moved about 7,500 kilograms during the

---

[2] Cameno is occasionally referred to as Ana Cameno Antolin.  *E.g.*, DE.523:21.  The government refers to "Ana Cameno" throughout this brief.

trips, worth around $325 million.  DE.520:162.  And the men with whom Pollack worked reported doing the same work on at least two prior occasions.  DE.519:118.

Tardon also smuggled cocaine to Spain using a private yacht.  At Tardon's direction, Pollack once met the yacht's captain in Trinidad to provide latitude and longitude coordinates.  DE.519:197-198; DE.520:8-14.  Pollack estimated that he personally made around $3 million working with Tardon.  DE.520:16.

### 2. Tardon Accumulates Significant Wealth, Which He Transfers To The United States

a.    Tardon accumulated significant wealth from his drug-trafficking activity. Between 2001 and 2010, nearly €15 million in cash was deposited in Spain into bank accounts that Tardon controlled.  DE.526:94-97.  During that period, however, Tardon declared just €75,000 in income to Spanish tax authorities.  DE.526:12.

Tardon's wealth was apparent not only to Pollack, but also to others, including Tardon's wife, Sharon Cohen, whom Tardon met in 2006.[3]  DE.523:7-12; *see also* DE.523:109-111 (former girlfriend describing Tardon's wealth).  When Cohen began seeing Tardon, he gave her money (around $2,000 to $5,000 at a time) and continued to do so throughout their relationship.  DE.523:10-12.  At one point in 2007, Tardon told Cohen that he "won $25 million" and expected "to win another 50 million" the following year. DE.523:37-38.  And during a trip to Spain, Tardon asked Cohen to help

---

[3] Cohen is occasionally referred to by her married name, Sharon Lopez, *e.g.*, DE.189-1:1, but the government refers to "Sharon Cohen" throughout this brief.

him move money following a fight with his brother. DE.523:24-25. Cohen helped move bundles of euros, wrapped in rubber bands, from about 16 duffle bags to a large hole under a floor tile in Tardon's basement. DE.523:25-29.

b. Tardon transported at least $14,358,639.64 into the U.S. by several means. DE.550:9. First, Tardon and his associates carried thousands of euros in cash when traveling from Spain, without declaring it at customs, and exchanged them for dollars or traveler's checks in the U.S. DE.523:39-43, 49-51; DE.525:66-67. Cohen carried cash on Tardon's behalf, as did Artemio (Tardon's brother), Maria (Tardon's mother), and others. DE.523:41-43; DE.527:151-152.

For example, in March 2006, Pedro Hernandez (who assisted in distributing cocaine by van once it arrived in Spain), flew from Madrid to Maimi. DE.519:12, 109-110; DE.527:153. The next day, Hernandez exchanged €58,000 at American Express, listing his occupation as a wrestling school teacher or owner. DE.527:153-154. Hernandez received $66,500, including 131 $500 traveler's checks. DE.527:153-154. Less than a week later, $6,000 worth of those traveler's checks were signed by Tardon and used to purchase items at a furniture store. DE.527:154-156. The remaining traveler's checks—worth $59,500—were deposited into two of Tardon's bank accounts. DE.527:155-158.

Other travelers similarly provided fictitious occupations when trading currency: Artemio represented that he owned a wood manufacturing company or was a surfing instructor; Cohen said she was in real estate sales or leasing; Tardon's mother

7

represented that she was a fruit wholesaler; another of Tardon's associates claimed he was a Spanish sports agent; and Jose Panadero Fernandez (an Iberian Airlines flight attendant who moved cash for Tardon) claimed he was a pilot. DE.519:11-12, 165; DE.527:146-154, 162, 172-173. As in the case of Hernandez's 2006 trip, although travelers provided their own names, the cash or traveler's checks they received often were deposited into accounts controlled by Tardon or were negotiated by Tardon to purchase items. *See, e.g.*, DE.527:147-148, 167-169.

Between 2005 and 2009, Tardon and his associates exchanged €1,110,745 at American Express locations for $1,436,901.82—which included the issuance of at least 1,703 traveler's checks. DE.528:77-78; DE.550-1:2; DE.550-2:1; DE.550-4:1. During that period, none of the travelers filed a Currency and Monetary Instrument Report ("CMIR")—a customs form used to declare more than $10,000 in currency. DE.527:142-144.

Second, Tardon wired money through MoneyGram or Western Union. DE.519:174; DE.523:45. Because those services limit the number of transactions a customer can complete, Tardon had to identify multiple individuals as senders or recipients—and sometimes struggled to find individuals through whom to send money. DE.523:45, 162-164; DE.524:34; DE.527:107-115. Cohen, Artemio, Maria, Krentz, Pollack, and others were listed as senders and recipients. DE.527:119-133. As Cohen explained, however, the money was Tardon's. DE.523:46-47; *see also* DE.523:104-105 (former girlfriend explaining same). Between 2005 and 2011, €383,223.22 (representing

8

$490,766.06) was transferred to the U.S. by MoneyGram or Western Union. DE.527:133; DE.550-1:2; DE.550-3:1.

Third, money was wired directly to the U.S. under Tardon's direction. DE.523:53-54. Funds were often wired to bank accounts that Tardon or his associates controlled. For example, in September 2009, Tardon wired $275,980 from an account he maintained in Spain to a U.S. account at Bank of America. DE.525:40-41. Two days later, Tardon withdrew $243,000 from that account, in the form of a cashier's check, to purchase a Mercedes Maybach. DE.525:38, 41-43. Similarly, between June and October 2010, a total of $2,596,882.38 was wired into the same Bank of America account and then used to purchase three luxury vehicles—a Range Rover, a Bugatti Veyron, and a Ferrari Enzo—for a total of $2.3 million. DE.525:46-60.

On some occasions, individuals opened bank accounts in Spain for which Tardon or his associates supplied the initial deposit and then withdrew money in or made transfers to the U.S. DE.528:79, 88-95. In one instance in 2009, Maria Justiniano, a woman who previously had a relationship with Tardon, traveled to Madrid with Krentz. DE.524:143-144. Justiniano and Krentz were asked to open bank accounts at La Ciaxa bank; they did not provide the initial deposit and Artemio's address was provided as the address to which the accounts' ATM cards would be sent. DE.524:144-146. Cash, in the amount of €9,500, was deposited into Justiniano's account, and she did not deposit additional funds. DE.524:147-148. Nevertheless, additional funds were

9

deposited (for which Justiniano did not provide permission), and transfers were made to, among others, Cohen and a real estate agent.  DE.524:149-150.

In total, between February 2002 and April 2011, $9,520,898.71 was wired from Spain into U.S. bank accounts associated with Tardon, and an additional $1,905,202.65 in cash was deposited into those accounts—representing a total of $11,426,101.36 flowing into those accounts.  DE.529:77; *see* DE.529:63-64, 73-77; DE.550-1:2; DE.550-5:1.  Not a penny from those accounts was ever transferred back to Spain. DE.529:78; DE.550-5:1.

Tardon or his associates also wired funds directly to third parties in the U.S. to purchase real or personal property.  For example, in September 2005, Artemio originated two wires in Spain, each in excess of $20,000, as escrow payments for a villa Tardon purchased in Miami.  DE.524:175-178.  And in February 2010, Tardon wired more than $130,000 to a car dealership in Miami for the purchase of a Mercedes. DE.525:44-45.  In total, $2,910,073.05 was sent by wire transfer to third parties between 2005 and 2009.  DE.550-1:2-3; DE.550-6:1-3.

c.    Despite this accumulation of wealth in the U.S., Tardon and Cohen declared virtually no income to the Internal Revenue Service.  Although Tardon was required to file a tax return at least as early as 2005, he filed no returns (and thus declared no income) in 2005, 2006, 2007, 2009, and 2010.  DE.528:110-112.  In 2008, he filed a joint return with Cohen that reported just $29,299 in income.  DE.528:112.  Cohen herself filed tax returns in 2004, 2006, and 2007, declaring $12,603, $0, and $65,520,

10

respectively.  DE.528:113-114.  Between 2001 and 2010, Tardon and Cohen declared an aggregate of just $107,422 in income.  DE.528:98, 114.

### 3.  Tardon Purchases Real Estate, Luxury Cars, And Other Items With The Drug Proceeds

With the money he amassed, Tardon purchased condominiums, apartments, and a villa.  DE.518:83-86.  In total, $4,471,640 in real estate was paid in full.  DE.529:78-79.  Tardon created several LLCs for which he was the managing member, including Miamark LLC ("Miamark") and Murano 908 LLC ("Murano"), to hold many of the properties.  DE.523:78-79; DE.528:101-102.  Through a series of transactions over multiple years, for example, Tardon's condo at the Continuum was held by Krentz or other third parties before being transferred to an LLC Tardon controlled.  DE.525:11-38; *see* DE.586:11-15 (district court describing same).  Tardon claimed to rent out some of the properties, but the LLCs filed no tax returns and declared no income (nor was any LLC income captured on Tardon's personal returns), and some individuals who lived in the apartments reported paying no rent.  DE.524:66; DE.520:21; DE.523:110-111; DE.528:101-102; DE.529:25-26.

Tardon also purchased luxury vehicles in the names of himself and others, including Krentz, Cohen, Artemio, and Pollack.  DE.529:67-73.  In total, Tardon paid $4,468,090.19 for the vehicles.  DE.529:73.  And Tardon purchased more than $1.3 million in other luxury goods and services, including watches, clothing, art, and plastic surgery.  DE.529:82-84.

11

On several occasions, payments for real estate, vehicles, and other goods were made from accounts Tardon held in Spain or in the U.S. relating to supposed businesses. *See, e.g.*, DE.524:186-187; DE.525:36-37, 42. One business, The Collection Motor Sports of Madrid ("The Collection"), was established in December 2006. DE.526:13. Pollack recalled Tardon showing him a location for a car business, in November 2006, and Pollack accompanied Tardon to a bank where Tardon deposited €600,000 in cash to establish the business. DE.519:96-101. A few months later, however, the bank informed Tardon that it was not interested in keeping the money. DE.519:101-102. During its operation, The Collection reported just €375,240 in income to Spanish taxing authorities. DE.526:13-14. Vehicles were purchased and registered, without permission, in the name of individuals who had not purchased them, including Pollack and Cohen. DE.519:182-190; DE.523:80-82. Seventy percent of the vehicles sold by The Collection were paid for entirely in cash, and not a single car was financed. DE.525:110. And Tardon deposited millions of euros into The Collection's bank accounts during its existence; in 2007, for example, he deposited €2 million in a year in which he declared just €22,347 in income to Spanish authorities. DE.526:19-24.

Tardon and Artemio established another company, Vanaklum, which purportedly imported vehicles that were sold to The Collection, and eventually merged with (and subsumed) The Collection. DE.525:90-91. For the first three years of its existence, Vanaklum reported losses—even as the company wired large sums to the

12

U.S.  DE.524:186-187; DE.526:14.  The company reported €2.3 million in income in 2010; Tardon had deposited €1.18 million in its accounts that year.  DE.526:14, 24.  Artemio and others (including Tardon's mother and sister) also established Kyte Schooll, a real estate holding company that owned the building housing The Collection's showroom.  DE.525:91-92.

In the U.S., Tardon and Cohen established The Collection Motor Sports of Miami at the suggestion of their immigration attorney and as a means to establish a joint bank account.  DE.523:85-87.  Although wires from Spain flowed through that business' account, DE.525:39, it declared less than $100,000 in income between 2007 and 2010, never had an automobile dealer's license, never sold any cars, and never conducted any business, DE.523:85-87; DE.524:126; DE.528:102-103.

### 4.  Authorities Investigate And Arrest Tardon And His Confederates

By 2008, Tardon's illicit activities, along with those of Ana Cameno, had come to Spanish authorities' attention.  That year, the Spanish National Police ("SNP") began intercepting Tardon's phones.  DE.518:120.  The Federal Bureau of Investigation ("FBI") learned of Tardon's activity in 2010, when the SNP requested assistance from U.S. authorities.  DE.518:59-60.

Cameno and her husband were arrested in Spain in January 2011.  DE.521:13.  A search of one of their homes recovered 276 kilograms of cocaine—worth more than €8 million (or $11 million)—bundled with tape and cellophane in one-kilogram bricks

13

(packaging common for imported cocaine). DE.521:13-14, 81-85, 117-118. Authorities also found more than 350 cell phones and more than €1.1 million in cash. DE.521:116, 133.

There were also items linking Cameno to Tardon and his associates. Receipts for Western Union transfers to Miami listed as recipients Krentz and Jose Panadero Fernandez (the flight attendant). DE.521:153-156. Authorities had previously intercepted telephone calls and text messages in which Cameno's husband sent her Artemio's phone number, DE.521:69-72, 77-78, and numbers for Tardon, Artemio, Tardon's mother, and Krentz were found written in various phone books and agendas, as was the address of one of Tardon's Miami condos. DE.521:78, 145-146, 150-152; DE.522:36-39.

Authorities arrested Tardon in the U.S. on July 14, 2011, and searched his homes in the U.S. and Spain. DE.519:55. Authorities found €4.5 million in cash throughout his home in Spain (including in an elevator shaft and in a false ceiling), most of which was in vacuum-sealed packaging. DE.526:112-113, 127-128. They found nearly €19 million more in cash secreted in a compartment below the floor of the basement bedroom where Cohen had helped Tardon hide money. DE.526:114-117, 149-150. In total, authorities found more than €23 million in cash. DE.526:117.

Authorities also recovered items linking Tardon to Ana Cameno; in his U.S. condominium were photographs of Cameno, including with Tardon, DE.519:24-25, and in Spain was a Post-it note with Cameno's phone number, DE.526:109. Authorities

14

eventually compared figures written in a notebook found in Tardon's home with a set of numbers contained in notebooks seized from Cameno and discovered that approximately 46 numerical entries matched between the ledgers. DE.529:47-49, 52-60.

### B.    Trial Proceedings And Sentencing

1.    Tardon was indicted on one count of conspiring to commit money laundering, in violation of 18 U.S.C. § 1956(h), and 13 substantive money-laundering counts, in violation of 18 U.S.C. § 1957. DE.203.

During a 23-day trial, the jury heard testimony from 19 witnesses, including Pollack, Cohen, several Spanish police officers, a Spanish tax official, FBI agents, and IRS officials.

In his defense, Tardon primarily contended that his wealth represented the proceeds of legitimate businesses in Spain. *See, e.g.*, DE.504:89-94 (closing argument). He claimed to have amassed significant revenue from The Collection, in particular. But the Collection was not opened until December 2006, which Pollack testified was "[w]ell after" Tardon began transporting cocaine from South America to Spain, DE.519:182, and the evidence further showed that Tardon brought nearly $3.4 million into the U.S. before The Collection even began operating, DE.532:160-161. The evidence also showed that vehicles were purchased and registered in the name of individuals who did not purchase them, that The Collection declared little income, that a significant number of vehicles were paid for in cash, and that none were financed. *Supra* at 12.

15

Although a defense witness claimed that The Collection had invoices showing the sale of at least 250 vehicles, DE.503:91, cross examination demonstrated that a significant number of the 214 invoices that witness provided were duplicative; represented vehicles sold to Cohen, Pollack or, Vanaklum; or did not relate to vehicle sales, such that the invoices collectively showed the sale of only 161 vehicles. DE.532:16-31. Even then, the vehicles were frequently sold at a loss, DE.531:86-87 (referencing 13 invoices showing sales at a total loss of €177,053), and the vast majority of vehicles (at least 135 of the 161) were, in any event, valued at less than €100,000, DE.532:35-36. The Collection sold only three cars for more than €300,000. DE.532:35.

With respect to a Tardon-family-run butcher shop, Castello 22, the evidence showed that the shop was incorporated in January 2001 and closed in January 2004. DE.524:170; DE.525:104-105. As an SNP Inspector testified, bank records reflected that the business deposited only €714,000 throughout its operation. DE.527:50. And although the average cash deposit was less than €1,000, the Inspector observed that there were several instances of significantly larger deposits, which "did not really" "correspond" to the activities of a butcher shop. DE.525:106-107. In February 2003, for example, Artemio deposited €115,000 in cash in his personal account, before voiding that transaction and instead depositing €114,200 in cash into Castello 22's account. DE.525:140-141. Artemio then transferred most of that money *back* to his personal account (where he had initially deposited it) and, after adding smaller

16

additional deposits, wired €114,485 (representing more than $122,000) to Krentz in the U.S., with a notation that the wire was related to a "Porsche 996." DE.525:140-143; DE.526:72-74. Krentz subsequently wrote a $135,720.38 check from that account for the closing on the Continuum condo—leaving less than $2,000 in the account. DE.525:23-24.

The jury returned a guilty verdict on all counts, DE.484:1-4, as well as a special verdict finding that certain specified property was involved in or traceable to the money-laundering offenses, DE.487:1-20. The court subsequently entered a preliminary order of forfeiture for that property. DE.496.

2.      Following additional proceedings, the court imposed a forfeiture money judgment of $14,358,639.64 and ordered the forfeiture of additional property as substitute assets in partial satisfaction of the judgment. DE.601:27-28; *see* DE.613 (amended order). The district court sentenced Tardon to a guidelines sentence of 1,800 months (150 years) of imprisonment—representing a 240-month term on the conspiracy count followed by 13 consecutive 120-month terms on the substantive money-laundering counts. DE.611:3-4. Tardon appealed his convictions and sentence. This Court stayed Tardon's appeal (No. 14-15140) pending resolution of ancillary-forfeiture proceedings.

### C.    Ancillary-Forfeiture Proceedings

The district court subsequently resolved several third-party claims to the forfeited assets and entered a final order of forfeiture on March 3, 2021. Petitioners

filed separate appeals (Nos. 16-12218, 20-13971, and 21-11311) from the district court's various forfeiture orders, which were consolidated with Tardon's appeal of his convictions and sentence.

### III.  Rulings Under Review And Standards Of Review

A.  Tardon challenges (Def.Br.12-28) the denial of his post-trial motions to dismiss the indictment and for judgment of acquittal.  This Court reviews for abuse of discretion the denial of a motion as untimely, *United States v. Ramirez*, 324 F.3d 1225, 1226 (11th Cir. 2003) (per curiam), and reviews de novo whether the indictment sufficiently states an offense or establishes subject-matter jurisdiction, *United States v. Hurtado*, 89 F.4th 881, 891 (11th Cir. 2023) (per curiam); *United States v. Chalker*, 966 F.3d 1177, 1190 (11th Cir. 2020).  The denial of a motion for acquittal is reviewed de novo.  *United States v. Hill*, 119 F.4th 862, 865 (11th Cir. 2024).

Where the defendant fails to object or raise an argument below, the claim is reviewed only for plain error.  To establish reversible plain error, a defendant must show (1) an error, that (2) was "clear or obvious, rather than subject to reasonable dispute," (3) "affected [his] substantial rights, which in the ordinary case means he must demonstrate that it affected the outcome of the district court proceedings," and (4) "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quotations omitted).  "Meeting all four prongs is difficult, as it should be." *Id.* (quotations omitted).

B.    Tardon also challenges (Def.Br.28-48) the denial of his motion to suppress, which this Court reviews "under a mixed standard," reviewing "factual findings for clear error and the application of the law to those facts *de novo*." *United States v. Graham*, 123 F.4th 1197, 1238 (11th Cir. 2024). Denial of a *Franks* hearing is reviewed for abuse of discretion. *United States v. Goldstein*, 989 F.3d 1178, 1197 (11th Cir. 2021). Objections to a magistrate judge's report and recommendation "must be 'specific' and 'clear enough to permit the district court to effectively review the magistrate judge's ruling,'" and a party that "fails to raise a proper objection" thereby "waives its right to review findings of facts and legal conclusions on appeal unless there was plain error." *Knezevich v. Ptomey*, 761 F. App'x 904, 906 (11th Cir. 2019) (per curiam) (quoting *United States v. Schultz*, 565 F.3d 1353, 1360 (11th Cir. 2009) (per curiam)).

C.    Tardon contends (Def.Br.49-67) that the district court erred in certain evidentiary and other trial ruling. Preserved evidentiary rulings are reviewed for abuse of discretion, as is the district court's refusal to give a requested jury instruction. *United States v. Diamond*, 102 F.4th 1347, 1353 (11th Cir. 2024). A preserved claim of misconduct during closing argument "is a mixed question of law and fact," which the Court reviews de novo. *United States v. Sosa*, 777 F.3d 1279, 1294 (11th Cir. 2015).

D.    Tardon also contests (Def.Br.67-80) aspects of his sentence. This Court reviews "the application or interpretation of the Sentencing Guidelines *de novo* and findings of fact for clear error." *Graham*, 123 F.4th at 1283. The substantive reasonableness of a sentence is reviewed for abuse of discretion, and a preserved

19

Eighth-Amendment challenge is reviewed de novo. *United States v. Flanders*, 752 F.3d 1317, 1338-39, 1342 (11th Cir. 2014). When reviewing forfeiture orders this Court "review[s] findings of fact for clear error and legal conclusions *de novo*." *United States v. Gladden*, 78 F.4th 1232, 1242 (11th Cir. 2023) (quotations omitted).

E.     Petitioners challenge (Pet.Br.23-61) the dismissal of their respective ancillary-forfeiture petitions. The Court "review[s] a district court's legal conclusions regarding third-party claims to criminally forfeited property *de novo* and its factual findings for clear error." *United States v. Maritime Life Caribbean Ltd.*, 913 F.3d 1027, 1032 (11th Cir. 2019) (quotations omitted). The grant of a motion to dismiss is reviewed *de novo. Swinford v. Santos*, 121 F.4th 179, 186 (11th Cir. 2024).

F.     Issues raised in a party's brief "in a perfunctory manner, without supporting arguments and citation to authorities, are generally deemed to be waived." *NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998). This Court rejects "the practice of incorporating by reference arguments made to district courts." *United States v. Langford*, 647 F.3d 1309, 1331 (11th Cir. 2011) (quotations omitted).

## SUMMARY OF ARGUMENT

The Court should affirm Tardon's convictions and sentence, as well as the dismissal of Petitioners' ancillary-forfeiture petitions.

I.     The district court correctly denied Tardon's post-trial motions to dismiss and for judgment of acquittal. Tardon's motion to dismiss, which argued that the money-laundering statutes do not apply to the proceeds of his foreign drug crimes, did

not implicate the district court's subject-matter jurisdiction, and the district court acted within its discretion in dismissing that motion as untimely. Although the operative indictment and the trial proceedings provided Tardon with ample notice of the government's theory, he did not move to dismiss the indictment until nearly three months after trial concluded. The district court, in any event, correctly found that the relevant subsections of Sections 1956 and 1957 reach money-laundering offenses in which the property or funds constitute the proceeds of foreign drug trafficking.

Nor did the district court err in denying Tardon's motion for judgment of acquittal. The record evidence demonstrated that Tardon engaged in large-scale drug trafficking in Spain and funneled the resulting proceeds into the U.S. through multiple methods that obscured the funds' nature and origin, as well as Tardon's ownership. That evidence sufficed for the jury to find each element of the offenses satisfied beyond a reasonable doubt.

II.    The district court correctly denied Tardon's motion to suppress. Although Tardon challenged an affidavit submitted in support of search warrants for his properties, the district court acted within its discretion in finding that Tardon failed to make the necessary substantial preliminary showing under *Franks* to demonstrate entitlement to an evidentiary hearing. Without identifying the representations that he claims were false, Tardon asserts that the affidavit included misstatements. But Tardon cannot show that any representations were false or misleading—much less that the affiant acted deliberately or recklessly in an effort to mislead the issuing magistrate.

21

The district court also correctly denied Tardon's motion to suppress documents his then-wife, Cohen, turned over to law enforcement officers entirely of her own accord. The district court did not clearly err in finding that Tardon lacked any reasonable expectation of privacy in the documents or, in the alternative, that Cohen consented to the search by willingly providing the items to the government. Although Tardon renewed certain arguments during trial, he does not acknowledge, much less address, the district court's threshold determination that his mid-trial motion was untimely. His motion was appropriately denied on that basis and, regardless, the trial testimony supplied no reason for revisiting the denial of Tardon's motion.

III.    The district court acted within its discretion in resolving Tardon's evidentiary objections. The record substantiated the authenticity of wiretapped telephone recordings provided by Spanish authorities. Officers from the Spanish National Police permissibly testified about their investigation of Tardon and Ana Cameno, including offering a lay opinion about Cameno's drug-trafficking conduct that was rationally based on what officers learned during their investigation. And a single, physical kilogram of cocaine recovered from Cameno's home was admissible to show that Cameno was trafficking cocaine, which supported an inference that Tardon was involved in the trafficking as well, given the considerable evidence connecting him to Cameno.

IV.    Tardon's claim of cumulative prejudice from additional trial errors also lacks merit. The district court acted within its discretion in denying Tardon's requested

jury instructions because they were adequately covered by other instructions or misstated the law. The court appropriately permitted the government to impeach Tardon's ex-wife; correctly denied Tardon's vague effort to exclude testimony under the marital-communications privilege; and permissibly allowed testimony concerning non-hearsay co-conspirator statements by Tardon's mother. And the government did not present improper closing argument. There is no basis for finding any cumulative trial error.

V.    Nor did the district court err at sentencing. The court correctly calculated Tardon's base offense level by cross-referencing the sentencing guideline relevant to Tardon's underlying drug offenses. Tardon's 150-year guidelines sentence, while unquestionably severe, is neither substantively unreasonable nor cruel and unusual. And Tardon cannot show any error in the district court's forfeiture judgment.

VI.    Finally, the district court correctly dismissed Petitioners' ancillary-forfeiture petitions. The court correctly found that The Collection and Artemio (with respect to one of the vehicles) failed to adequately plead an interest in the relevant property. Nor did the court clearly err in finding that Petitioners could not establish Article III or statutory standing on their remaining claims. Instead, the record amply supports the court's finding that Tardon exercised dominion and control over the property and that Petitioners are mere nominees that hold bare legal title. The forfeiture judgments should be affirmed.

## ARGUMENT

## I.    The District Court Appropriately Denied Tardon's Post-Trial Motions

Tardon first challenges (Def.Br.12-28) the denial of his post-trial motions to dismiss and for judgment of acquittal.  The district court correctly denied those motions.

### A.    Background

1.    The government charged Tardon with one count of conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), and 13 substantive money-laundering counts, in violation of 18 U.S.C. § 1957.  DE.203:1-4.

With respect to the substantive "[f]inancial transaction money laundering" counts, *United States v. Iriele*, 977 F.3d 1155, 1173 (11th Cir. 2020), Section 1957 makes it a crime to "knowingly engage[ ] or attempt[ ] to engage in a monetary transaction in criminally derived property of a value greater than $10,000" that "is derived from specified unlawful activity."  "[S]pecified unlawful activity" includes, as relevant here, an "offense against a foreign nation involving … the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes of the Controlled Substances Act)."  18 U.S.C. § 1956(c)(7)(B)(i); *see id.* § 1957(f)(3) (cross-referencing definition).  The indictment alleged that the relevant "specified unlawful activity" for those counts was "the manufacture, importation, sale and distribution of a

24

controlled substance, punishable under the laws of the United States, Spain and Colombia."[4]  DE.203:4.

On the conspiracy count, the indictment alleged a conspiracy to commit financial transaction money laundering under Section 1957, but also alleged four additional objects to violate specified subsections of Section 1956.  DE.203:2-3.  First, it alleged a conspiracy to commit "[c]oncealment money laundering," *Iriele*, 977 F.3d at 1173-74, under Section 1956(a)(1)(B)(i), by conducting financial transactions with the proceeds of specified unlawful activity designed to conceal and disguise the proceeds' nature, location, source, ownership, or control.  Second, it alleged a conspiracy to commit "structuring money laundering," *Iriele*, 977 F.3d at 1174, under Section 1956(a)(1)(B)(ii), by conducting financial transactions designed to avoid a transaction reporting requirement under state or federal law.  Finally, the indictment alleged a conspiracy to commit two types of "transportation money laundering," *United States v. Felts*, 579 F.3d 1341, 1343 (11th Cir. 2009) (per curiam), under 18 U.S.C. § 1956(a)(2)(B): first, by transporting funds into the U.S. in a way designed to conceal the funds' nature, location, source, ownership, or control, in violation of subsection (a)(2)(B)(i); and, second, by transporting funds into the U.S. in a way designed to avoid a state or federal reporting requirement, in violation of subsection (a)(2)(B)(ii).  DE.203:2.

---

[4] The indictment added Peru for purposes of the conspiracy offense.  DE.203:3. Because the government elected not to present certain evidence, DE.274, additional references to Italy and the Dominican Republic were struck from the indictment, DE.282 (paperless order).

25

Tardon did not move to dismiss the indictment under Federal Rule of Criminal Procedure 12 before trial.

2.     During opening statements at trial, the government maintained that Tardon was "very careful" to "make sure that not one flake of cocaine ever came to the United States" and represented: "I'm going to tell you right now, ladies and gentlemen, he did not drug-traffic in the United States." DE.518:24. Instead, the government explained, the charged offenses resulted from the fact that Tardon brought to the U.S. his "drug money," which he obtained by "traffic[king] in drugs outside of the United States." DE.518:24-25.

Following the close of the government's case-in-chief, Tardon moved for a judgment of acquittal on all counts. *See* DE.530:34. During argument on the motion, the government reiterated its theory that Tardon's funds were "generated in Spain from the sale of narcotics." DE.530:103-104. The district court reserved ruling on the motion, DE.530:164, but denied the motion (and a renewed motion) following the defense and rebuttal cases, DE.533:4-22, 80-81.

During the instructional conference, Tardon proposed that the jury be instructed that "evidence of drug trafficking activity by David Pollack in the United States is not the specified unlawful activity alleged in the indictment" and that "a violation of United States drug laws is not shown by the distribution of drugs from one foreign country to another." DE.473:3; *see* DE.533:53-55. Tardon's counsel observed that the indictment referred "to violation of the US drug laws," argued there was "no proof" that Tardon

26

violated those laws, and maintained that the "violation[s] of the drug laws" alleged in Tardon's case are "the drug laws exclusively of foreign countries." DE.533:53-55. The government objected to the proposed instruction as argumentative and too narrowly restricting the jury's use of evidence concerning Pollack's drug activity. DE.533:54. But the government maintained that it did not "plan to argue" that Tardon violated U.S. drug laws. DE.533:56. In denying the requested instruction as unnecessary, the district court reiterated that the evidence showed that Tardon "was trafficking drugs in Europe and Spain," and acknowledged the government was "not going to argue that [Tardon] was violating drug laws here." DE.533:57.

Tardon then requested that the reference to violations of U.S. law be omitted from the instructions. DE.533:57. The district court observed, however, that Section 1956(c)(7)(B)(1) itself references U.S. law when defining relevant foreign crimes, by providing that the statute reaches crimes relating to controlled substances "as such term is defined for the purposes of the Controlled Substance[s] Act." DE.533:57-58. Accordingly, the court explained, a qualifying foreign crime must relate to conduct that would also be "punishable under the laws of the United States." DE.533:58. The government agreed that the instructions referenced U.S. law "to capture" the statute's "definition portion." DE.533:58.

Consistent with the government's representations about its theory, Tardon's counsel maintained during closing arguments that the government "has to concede" that Tardon "did not violate the United States drug laws." DE.504:86.

27

The jury found Tardon guilty on all counts. DE.713:6-8. Following trial, Tardon again moved for acquittal. DE.500. The district court denied the motion. DE.586.

3.      Five days later, on the evening before the fifth day of Tardon's sentencing hearing, Tardon moved to continue sentencing to allow time to "review and research the appropriateness and legal viability" of moving to dismiss the indictment for lack of jurisdiction. DE.588:1. Tardon questioned whether "exclusive reliance on foreign drug conduct" could establish "specified unlawful activity" or provide federal criminal jurisdiction. DE.588:2.

The next morning, the district court denied the motion, finding no good cause for a continuance and observing that the issues Tardon sought to raise "have been available to the defense since the filing of the indictment." DE.606:4. Tardon's counsel nevertheless filed a motion to dismiss. DE.606:4-5. The district court orally denied the motion the same day. DE.606:101-106. The court first explained that it would deny the motion in its discretion because the issues "could have been raised before trial," and it observed that an alleged defect in the indictment does not deprive the court of jurisdiction. DE.606:101-104. Regardless, the court went on to deny the motion on the merits, finding that the money-laundering statutes "clearly establish" jurisdiction over the charged offenses. DE.606:104-106. The district court subsequently issued a written order memorializing its rulings. DE.599.

28

**B.    The District Court Correctly Denied Tardon's Motion To Dismiss The Indictment**

The district court correctly denied Tardon's post-trial motion to dismiss.

**1.    The Motion Did Not Implicate Subject-Matter Jurisdiction, And Was Untimely**

As a threshold matter, the district court acted within its discretion in denying Tardon's motion—which did not implicate subject-matter jurisdiction—as untimely.

a.    Tardon describes his motion to dismiss as implicating a "jurisdictional" issue. DE.589:1; Def.Br.13-19. If intended to suggest that his claims implicated subject-matter jurisdiction, he is incorrect.

A district court has "original jurisdiction … of all offenses against the laws of the United States." 18 U.S.C. § 3231. Accordingly, "[s]o long as the indictment charges the defendant with violating a valid federal statute as enacted in the United States Code, it alleges an offense against the laws of the United States and, thereby, invokes the district court's subject-matter jurisdiction." *United States v. Brown*, 752 F.3d 1344, 1354 (11th Cir. 2014) (quotations omitted). Not even a failure to allege an element of the offense—which Tardon does not suggest here—deprives the district court of subject-matter jurisdiction. *See United States v. Cotton*, 535 U.S. 625, 630-31 (2002).

The potential extraterritorial reach of a federal statute, moreover, presents a "merits question," not an issue of subject-matter jurisdiction, *i.e.*, "a tribunal's power to hear a case." *Morrison v. Nat'l Australia Bank Ltd.*, 561 U.S. 247, 254 (2010) (quotations omitted). The question "whether a statute reaches extraterritorial acts is not a challenge

29

to the district court's subject-matter jurisdiction." *United States v. Rafoi*, 60 F.4th 982, 992 (5th Cir. 2023); *see also United States v. Rolle*, 491 F. App'x 63, 64-65 (11th Cir. 2012) (per curiam) (whether statute applies "extraterritorially addresses only the 'merits question' of whether the statute prohibits [defendant's] conduct" and not jurisdiction).

Here, because the relevant transactions and transportation took place in the U.S. Tardon's offenses involve a domestic application of the money-laundering statutes, even though the funds are proceeds of "specified unlawful activity" that involve a foreign offense. But even if construed as an "extraterritorial" application, whether the government adequately alleged (and ultimately proved) that Tardon's conduct qualifies as "specified unlawful activity" is a merits question, not a jurisdictional limitation.

b. Because Tardon's claim does not implicate subject-matter jurisdiction (and thus was not a claim the district court was obligated to resolve, *see Cotton*, 535 U.S. at 630), the court acted within its discretion in denying Tardon's post-trial motion as untimely. *See* DE.599:9-13; DE.606:101-104.

The then-governing version of Rule 12 generally required that "a motion alleging a defect in the indictment or information" be "raised before trial," and provided that a party generally "waives" defenses "not raised by the deadline the court sets." Fed. R. Crim. P. 12(b)(3)(B), (c), (e) (eff. Dec. 1, 2002). But the rule specified that "the court may hear a claim that the indictment" fails "to invoke the court's jurisdiction or to state

30

an offense" "at any time while the case is pending."[5]  Fed. R. Crim. P. 12(b)(3)(B) (eff. Dec. 1, 2002).  The rule's use of the term "may" unambiguously affords the district court authority to "exercise a degree of discretion" in deciding whether to entertain a post-trial motion, including "discretion to deny the request."  *Pitch v. United States*, 953 F.3d 1226, 1237-38 (11th Cir. 2020) (en banc) (construing "may" in Rule 6(e)(3)); *see United States v. Olano*, 507 U.S. 725, 732, 735 (1993) (Rule 52(b)'s reference to plain errors that "'may be noticed'" is "permissive") *cf. United States v. Rodgers*, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion.").

The district court acted within its discretion in denying Tardon's motion.  Tardon failed to move to dismiss until nearly three months *after* trial had concluded.  As the district court observed, the operative indictment, which referred to violations of foreign laws, was filed nearly two years before trial began.  DE.599:10.  Tardon was long on notice of the government's theory that his offenses were predicated exclusively on underlying foreign crimes.  Indeed, his own motion to suppress was premised on his claim that the government had not investigated him for "violation of U.S. drug laws." DE.96:4.  The government's opening statement stressed that Tardon did not bring

---

[5] Rule 12(b), as amended effective December 2014, eliminated the failure to state an offense as a ground that may be raised at any time.  *See* Fed. R. Crim. P. 12, advisory committee's note (2014 Amendments).  Nevertheless, when assessing a claimed error on appeal, this Court applies the version of Rule 12 that was in effect at the time the district court ruled.  *See United States v. Sperrazza*, 804 F.3d 1113, 1121 (11th Cir. 2015).

cocaine into the U.S. DE.518:24-25. The government reiterated that theory throughout trial. DE.530:103-104; DE.533:57. And Tardon's closing argument maintained that the government "has to concede" that he "did not violate the United States drug laws." DE.504:86.

Tardon's sole response is to claim that the district court acknowledged a "jurisdictional limitation" (a predicate U.S. crime) in the statute or the government's theory during trial, but later "revers[ed]" that ruling when finding that the charged offenses did not require proof that the laundered funds were proceeds of U.S. drug crimes. Def.Br.9, 12-14, 16-17. That claim mischaracterizes the district court's rulings, DE.533:57-58, and is flatly inconsistent with the court's and the government's contemporaneous representations and Tardon's *own* closing argument. There was no unfair surprise in the district court's post-trial confirmation that the statutes reach proceeds of Tardon's wholly foreign crimes.

Tardon also invokes the district court's reference (in its oral ruling, but not its written analysis, *compare* DE.606:102-04, *with* DE.599:9-13) to then-forthcoming, but not yet effective, amendments to Rule 12(b), claiming that the court believed it could only consider a jurisdictional defect. Def.Br.17-18; *see* Fed. R. Crim. P. 12(b)(2) (eff. Dec. 1, 2014). That is incorrect. The district court's orders reflect that the court carefully analyzed whether Tardon's claim was jurisdictional—and thus one the court was *required* to consider—and viewed the 2014 amendment as informative on that question. DE.606:103-104; *see* 599:12-13. But the court did not suggest that the

amendments applied of their own force, much less that the court was precluded from considering Tardon's claim altogether. Having found that the motion did not implicate subject-matter jurisdiction, the court acted within its discretion in denying it.

### 2. Regardless, The Motion Lacked Merit

Even if the motion was timely, the district court correctly denied it.

### a. Tardon's Foreign Drug Crimes Qualify As "Specified Unlawful Activity" For Each Charged Offense

Each of the subsections of Section 1956 and Section 1957 with which Tardon was charged (as an object of the conspiracy count or as a substantive offense) reaches money-laundering offenses in which the property or funds constitute the proceeds of foreign drug trafficking. Tardon claims that only those subsections that expressly reference a "financial transaction" can reach foreign crimes. He is wrong.

i. Tardon was charged with 13 substantive counts of financial-transaction money laundering, in violation of Section 1957, and with a conspiracy alleging, as five separate objects: (1) financial-transaction money laundering; (2) concealment money laundering, in violation of Section 1956(a)(1)(B)(i); (3) structuring money laundering, in violation of Section 1956(a)(1)(B)(ii); and (4) two types of transportation money laundering, in violation of Section 1956(a)(2)(B)(i) and (a)(2)(B)(ii). *See supra* at 24-25.

Section 1957 makes it a crime to "knowingly engage[ ] or attempt[ ] to engage in a monetary transaction in criminally derived property of a value greater than $10,000" that "is derived from specified unlawful activity." 18 U.S.C. § 1957(a). Section

1956(a)(1) makes it a crime to conduct a financial transaction involving "the proceeds of specified unlawful activity" knowing that the transaction is designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of the specified unlawful activity," *id.* § 1956(a)(1)(B)(i), or "to avoid a transaction reporting requirement under State or Federal law," *id.* § 1956(a)(1)(B)(ii). And Section 1956(a)(2) makes it a crime to transport, transmit, or transfer funds "to a place in the United States from … a place outside the United States" knowing the funds "represent the proceeds of some form of unlawful activity" and that the transportation, transmission, or transfer is designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity," *id.* § 1956(a)(2)(B)(i), or "to avoid a transaction reporting requirement under State or Federal law," *id.* § 1956(a)(2)(B)(ii).

All but one of those provisions apply to the proceeds of, or property derived from, "specified unlawful activity."[6] The term "specified unlawful activity" includes, "with respect to a financial transaction occurring in whole or in part in the United States," an "offense against a foreign nation involving … the manufacture, importation, sale, or distribution of a controlled substance (as such term is defined for the purposes

---

[6] Transportation money laundering conducted to avoid a transaction reporting requirement, in violation of Section 1956(a)(2)(B)(ii), is not limited to the proceeds of specified unlawful activity. That provision requires that the defendant know that funds "represent the proceeds of *some form* of unlawful activity," 18 U.S.C. § 1956(a)(2)(B)(ii) (emphasis added), but does not require knowledge that the funds represent proceeds of specified unlawful activity as "specified in [subsection (c)](7)," *id.* § 1956(c)(1).

of the Controlled Substances Act).” *Id.* § 1956(c)(7)(B)(i). Accordingly, the provisions under which Tardon was convicted reach the proceeds of, or property derived from, foreign controlled-substance offenses so long as (a) the financial transaction occurred in whole or in part in the U.S. and (b) the foreign offense involves substances that fall within the Controlled Substances Act’s definition.

While subsection (c)(7)(B) specifies that the statute reaches offenses against a foreign nation only “with respect to a financial transaction occurring in whole or in part in the United States,” *id.* § 1956(c)(7)(B), the term “financial transaction” encompasses a broad array of conduct. That breadth is reflected in the term’s statutory definition, which includes: (1) a transaction involving “the movement of funds by wire or other means,” “one or more monetary instruments,” or “the transfer of title to any real property, vehicle, vessel, or aircraft,” and “which *in any way or degree* affects interstate or foreign commerce”; or (2) a “transaction involving the use of a financial institution which is engaged in, or the activities of which affect, interstate or foreign commerce *in any way or degree.*” *Id.* § 1956(c)(4) (emphasis added). Because “the money-laundering statute reaches the full extent of Congress’ Commerce Clause power,” *United States v. Oliveros*, 275 F.3d 1299, 1303 (11th Cir. 2001), statutory references to a “financial transaction” are “merely a roundabout way of requiring that the crime affect interstate commerce,” *Fakhuri v. Garland*, 28 F.4th 623, 629 (5th Cir. 2022).

Because the statute “defines the term ‘financial transaction’ very broadly,” that term reaches “all forms of commercial activity.” S. Rep. No. 99-433, at 13 (1986).

Accordingly, the term encompasses various types of financial, monetary, or property-based activity, including the transportation of funds by wire transfer, *United States v. Jenkins*, 633 F.3d 788, 804 (9th Cir. 2011); the transfer of money through Western Union, *United States v. Herron*, 97 F.3d 234, 237 (8th Cir. 1996); the delivery or transfer of cash, *United States v. Gotti*, 459 F.3d 296, 335-36 (2d Cir. 2006); the exchange of cash for a cashier's check or the purchase of a vehicle with a monetary instrument, *United States v. Henry*, 325 F.3d 93, 104 (2d Cir. 2003); the exchange of funds to purchase a good and its subsequent movement in interstate commerce, *United States v. Carcione*, 272 F.3d 1297, 1302-03 (11th Cir. 2001); and the withdrawal of cash or deposit of checks in a financial institution, *Oliveros*, 275 F.3d at 1304.

For that reason, although Section 1956(a)(2) (transportation money laundering) does not directly reference the term "financial transaction," it prohibits conduct that is encompassed by that broad term. The transportation, transmission, or transfer of a monetary instrument or funds to the U.S. is a "financial transaction," because it involves "one or more monetary instruments" or "the movement of funds by wire or other means." 18 U.S.C. § 1956(c)(4). "[I]nternational transfers are simply species of financial transactions." *United States v. Zvi*, 168 F.3d 49, 57 (2d Cir. 1999) (finding charges under subsections (a)(1) and (a)(2) multiplicitous, if based on identical transaction); *see United States v. Kramer*, 73 F.3d 1067, 1073 n.11 (11th Cir. 1996) (observing that although "section (a)(2) … does not explicitly refer to 'a financial transaction' as the crime," the statutory language nevertheless "manifests the intent by Congress to make each

transaction or transfer a separate crime").  Indeed, the relevant Senate Report confirms that, by specifically addressing the transportation of funds from *outside* the U.S., Section 1956(a)(2) was designed "to prevent the United States from becoming a haven in which *foreign drug traffickers* can keep or invest their earnings" and to "mak[e] illegal the receipt of the proceeds of *foreign drug offenses*."  S. Rep. No. 99-433, at 11 (emphasis added).  It would be irrational to conclude that Congress defeated that very purpose by referring to the "transfer" of funds rather than broadly to "financial transactions."

Section 1957, which prohibits certain monetary transactions, operates in the same way.  This Court's description of that offense as "[f]inancial transaction money laundering" reflects that view.  *Iriele*, 977 F.3d at 1173.  The deposit, withdrawal, transfer, or exchange of funds or a monetary instrument naturally represents the "movement of funds by wire or other means" or the use of a "monetary instrument[ ]."  18 U.S.C. § 1956(c)(4).  Indeed, Section 1957 expressly equates a "money transaction" with a "financial transaction" by defining the former to "includ[e] any transaction that *would be a financial transaction* under section 1956(c)(4)(B)."  18 U.S.C. § 1957(f)(1) (emphasis added).

ii.      Nor does the statute's reference to the Controlled Substances Act when defining "an offense against a foreign nation" to include those that relate to "a controlled substance (as such term is defined for the purposes of the Controlled Substances Act)," 18 U.S.C. § 1956(c)(7)(B)(i), circuitously transform the provision into one that reaches only domestic U.S. offenses.  Instead, the reference ensures that the

37

statute reaches only foreign offenses that relate to substances that *are also* unlawful under U.S. law. This is similar to provisions of federal law that define relevant state offenses with a cross-reference to the Controlled Substances Act. *See Mellouli v. Lynch*, 575 U.S. 798, 811 (2015). As the district court correctly observed, the offense must be one that, in that sense, would also be "punishable under the laws of the United States." DE.533:58. In other words, the "reference[ ] to [a] specific federal statute"—here the Controlled Substances Act—clarifies that the controlled substance encompassed by the defendant's foreign offense must "track[ ]" a substance controlled under federal law. *United States v. Chi*, 936 F.3d 888, 896 (9th Cir. 2019) (quotations omitted).

### b.     Tardon's Counterarguments Lack Merit

Tardon's contrary arguments fail.

Tardon suggests (Def.Br.15-16) that only those provisions of the money-laundering statutes that explicitly use the term "financial transaction"—specifically, Section 1956(a)(1)—can reach foreign crimes. As just explained, Tardon misunderstands the relationship between the specific conduct captured by Sections 1956(a)(2) and 1957 and the broadly applicable term "financial transaction." Nor does Tardon cite any case that has accepted his view of the statute. The only marginally relevant decision he cites, *Cuellar v. United States*, 553 U.S. 550 (2008), tracks the statutory language in generally describing the conduct that subsections 1956(a)(1) and (a)(2) reach. *Id.* at 557. But the Supreme Court did not purport to analyze whether that conduct represents a form of financial transaction.

Apparently recognizing that the conspiracy count alleged, and the jury found that he committed, DE.484:1, two objects under subsection (a)(1)—which *does* expressly refer to "financial transactions"—Tardon perfunctorily suggests (Def.Br.15) that the indictment also failed to allege a financial transaction that "occur[ed] in whole or in part in the United States," 18 U.S.C. § 1956(c)(7)(B). But the indictment specifically alleged that the transactions involved the proceeds of "specified unlawful activity," which naturally incorporates that term's definitional limitation. DE.203:2; *see, e.g.*, *United States v. Grimon*, 923 F.3d 1302, 1306-07 (11th Cir. 2019) (finding indictment sufficient where it "tracked the statutory language" and noting that any challenge to the "interstate nexus is merely a non-jurisdictional challenge to the sufficiency of the evidence as to that element of the offense"). And the trial evidence substantiated overwhelming instances of financial transactions that occurred in whole or in part in the U.S. *Supra* at 7-10.

### C.     Tardon's Motion For Acquittal Likewise Lacked Merit

The district court also properly denied Tardon's motion for acquittal. This Court reviews de novo challenges to the sufficiency of the evidence or the denial of a motion for acquittal. *United States v. Hill*, 119 F.4th 862, 865 (11th Cir. 2024). The Court views "the evidence in the light most favorable to the government, with all inferences and credibility choices made in the government's favor," and will affirm if "a reasonable jury could have found the defendant guilty beyond a reasonable doubt." *Id.* at 865-66. It "is not necessary" that the trial evidence exclude "every reasonable hypothesis of

innocence" or be "wholly inconsistent with every conclusion except that of a defendant's guilt." *Id.* at 866.

Count 1 charged Tardon with a money-laundering conspiracy, which required proof of "(1) an agreement between two or more persons to commit a money-laundering offense; and (2) knowing and voluntary participation in that agreement by the defendant." *Iriele*, 977 F.3d at 1174 (quotations omitted).  The government may prove a conspiracy "using circumstantial evidence, including inferences from the conduct of the alleged participants or from circumstantial evidence of a scheme." *Id.* (quotations omitted).  Where, as here, the indictment "lists more than one object of the conspiracy," the evidence "need only be sufficient for any one of the charged objects to sustain a conviction." *Id.* (quotations omitted).

Counts 2 through 14 charged Tardon with financial transaction money laundering, which required proof "(1) that the defendant knowingly engaged or attempted to engage in a monetary transaction in criminally derived property of a value greater than $10,000, and (2) that the property is derived from specified unlawful activity." *United States v. Molina*, 413 F. App'x 210, 213 (11th Cir. 2011) (per curiam); *see United States v. Silvestri*, 409 F.3d 1311, 1332-33 (11th Cir. 2005).

### 1. The Government Was Not Required To Prove Domestic Drug Trafficking

Tardon's first two arguments reprise his contention (Def.Br.19-21) that the government was required to prove a domestic-crime predicate.  As explained, that

contention misunderstands the government's theory, the district court's rulings, and the relevant statutes. As the district court observed, Sections 1956 and 1957 "specifically provide for extraterritorial application," and Tardon's invocation of *United States v. Lopez-Vanegas*, 493 F.3d 1305 (11th Cir. 2005), "is inapposite" because the government "was not required to prove domestic drug trafficking."[7] DE.586:31-32.

### 2. Sufficient Evidence Established The Underlying Foreign Drug Offense

Tardon next argues (Def.Br.21-23) that the government failed to prove the underlying foreign drug offense that qualified as specified unlawful activity. By failing to cite any relevant case law—much less address any of the district court's grounds for rejecting those arguments, *see* DE.586:25-30—Tardon has waived this argument for failure to develop it on appeal. *NLRB v. McClain of Ga., Inc.*, 138 F.3d 1418, 1422 (11th Cir. 1998). Even if the Court considers the argument, it fails.

a. Tardon primarily maintains that the government failed to prove that he knew his underlying Spanish offense was a felony. That argument (which would not

---

[7] Tardon cherry-picks (Def.Br.19-20) a statement from the government's closing that he claims "vouch[ed]" that the government had proven U.S. drug crimes. As the government explained below, however, Tardon's objection cut the government off midsentence, and Tardon misconstrues the partial statement. DE.542:8-9. Context demonstrates that the government represented that it was "certainly in violation" of U.S. laws to use "$10,000 in drug money" to "conduct [a] transaction" or "buy something at a financial institution," DE.504:55-56—*not* that Tardon's trafficking, itself, violated U.S. law.

warrant reversal, because it relates only to the conspiracy's Section 1956 objects) misconstrues the relevant statutory text.

Concealment and structuring money laundering under Section 1956(a)(1)(B) require that the defendant conduct a financial transaction that "in fact involves the proceeds of specified unlawful activity," "knowing that the property involved … represents the proceeds of some form of unlawful activity." 18 U.S.C. § 1956(a)(1). Transportation money laundering under Section 1956(a)(2)(B) requires similar knowledge. 18 U.S.C. § 1956(a)(2)(B) ("knowing that the monetary instrument or funds involved in the transportation, transmission, or transfer represent the proceeds of some form of unlawful activity"). The knowledge requirement is defined in Section 1956(c)(1) to mean "that the person knew the property involved in the transaction represented proceeds from some form, *though not necessarily which form*, of activity that constitutes a felony under State, Federal, or foreign law, regardless of whether or not such activity is" specified unlawful activity. *Id.* § 1956(c)(1) (emphasis added). By specifying that the defendant need not know the precise form of unlawful activity from which the funds were derived, the statute "is plainly crafted to distinguish between the actual source of laundered money and the defendant's knowledge as to the source of that money." *United States v. Maher*, 108 F.3d 1513, 1526 (2d Cir. 1997). A requirement that the defendant know the precise "nature of the specified unlawful activity" would "nullify" the statute's "careful wording." *Id.*

Legislative history confirms the statute's "clear intent to reach a person who knows that he is dealing with the proceeds of 'some' crime even if he does not know precisely which crime." *Id.* The relevant congressional report explains that Congress rejected a requirement that the defendant "know that the property involved in the transaction represents the proceeds of 'specified unlawful activity' … in order to prevent a defendant from escaping conviction by merely alleging that he or she thought the property involved represented the proceeds of a crime not covered in the term 'specified unlawful activity'"—a defense that had "been successfully raised in other countries whose statutes do not draw" the distinction. S. Rep. No. 99-433, at 10-11.

As the Sixth Circuit has explained, Section 1956(a) therefore "does not require the government to prove that the defendant knew that the alleged unlawful activity was a felony"—"*i.e.*, that he knew it was felonious as opposed to misdemeanor activity." *United States v. Hill*, 167 F.3d 1055, 1065-67 (6th Cir. 1999). The statutory language was "intended to eviscerate [a] 'but I thought the crime was only a misdemeanor' defense." *Id.* at 1067. And subsection (c)(1)'s subsequent language requiring that the activity "constitute[ ] a felony under State, Federal, or foreign law," 18 U.S.C. § 1956(c)(1), merely requires a factual showing—divorced from the defendant's particularized knowledge—that "the unlawful activity at issue was in fact a felony under state, federal or foreign law," *Hill*, 167 F.3d at 1066-67.

Here, the record contained ample evidence from which the jury could find that Tardon engaged in large-scale drug trafficking (rather than, say, possession of small

amounts of drugs), and "felony laws obviously include[ ] all those prohibiting drug trafficking." *United States v. Awan*, 966 F.2d 1415, 1424 (11th Cir. 1992). Nor can Tardon credibly claim that he lacked knowledge that the funds were derived from some form of crime. Given his "involvement in, indeed leadership of" the trafficking, "the jury could find that" Tardon "was not oblivious to the unlawful source of these funds." *United States v. Diggles*, 928 F.3d 380, 389 (5th Cir. 2019), *reh'g granted on other grounds*, 957 F.3d 551 (5th Cir. 2020) (en banc). As the district court observed, to suggest that Tardon "did not <u>know</u> that trafficking in thousands of kilos of cocaine from South America to Europe was a felony offense (or the federal equivalent thereof) … approaches absurdity and does not warrant discussion." DE.586:28.

b.      In passing, Tardon also suggests that the government failed to introduce evidence "stating the elements of" the foreign offense or "to seek jury instructions on the elements of any drug offense." Def.Br.21-23. This Court has unambiguously held, however, that where a defendant "was not charged with" the specified unlawful activity, "the government did not have to prove any of th[e] elements" of the unlawful activity to prove money laundering. *United States v. Martinelli*, 454 F.3d 1300, 1311-12 (11th Cir. 2006). The statutes merely require that the government provide sufficient evidence from which the jury can infer that the property *represents* "the proceeds of specified unlawful activity," 18 U.S.C. § 1956(a)(1), or is "derived from specified unlawful activity," *id.* § 1957(a).

Here, the jury was instructed that "specified unlawful activity" "in this case means only the manufacture, importation, sale or distribution of a controlled substance, punishable under the laws of the United States, Spain, Colombia, or Peru," and that the transactions must involve the proceeds of or have been derived from that activity. DE.538:41-42, 46. As the district court found, DE.586:29-30, there was ample evidence from which the jury could find that the underlying drug-trafficking offenses were punishable under foreign law. A SNP inspector testified that cocaine trafficking is illegal in Spain, DE.518:90-91, and the inspectors generally testified about the SNP's years-long investigation into Tardon's operation, which included extensive wiretapping of Tardon's and others' calls, and eventual charges against Tardon, *see, e.g.*, DE.518:105; DE.521:9-16; DE.526:129-130; DE.527:43. David Pollack testified that drug charges were pending against him for which Spain was seeking his extradition. DE.520:55-56. And the jury could infer from Pollack's and the Spanish police's testimony concerning the significant volume of cocaine trafficked from Peru and located in Cameno's home that the offenses were severe (and thus felony-equivalent). DE.520:162; DE.521:50-53.

To the extent Tardon raises an instructional (rather than a sufficiency) claim concerning any failure to instruct the jury on the elements of foreign drug offenses, he never requested such an instruction, and that claim would be reviewed only for plain error. *See Martinelli*, 454 F.3d at 1310. It also fails because this Court has rejected on plain-error review a claim that the jury must be instructed of the elements of the underlying specified unlawful activity. *Id.* at 1312 (explaining the Court was "unable to

45

find *any* money laundering conspiracy case that required jury instructions on the elements of the specified unlawful activity"). As the Ninth Circuit has explained, the "jury must be informed, in some manner, of the criterion or criteria for determining the illegality of the conduct from which the money is derived," but "full explanation of every element of the underlying crime that produced the money will not always be necessary." *United States v. Alghazouli*, 517 F.3d 1179, 1191 (9th Cir. 2008). That court has upheld, on plain-error review, an instruction informing the jury "as a matter of law that the manufacture, importation, and distribution of controlled substances is a specified unlawful activity," finding that "the jury did not need to be further instructed." *United States v. Golb*, 69 F.3d 1417, 1429 (9th Cir. 1995) (quotations omitted). The jury was given a substantively similar instruction here. DE.538:46. And given the overwhelming evidence of Tardon's unlawful drug trafficking, any omission in the instructions did not affect his substantial rights. *Martinelli*, 454 F.3d at 1312.

### 3.    There Was Sufficient Evidence Of A Design To Conceal

Tardon further claims (Def.Br.23-25) that the government failed to show a design to conceal the funds' nature, location, source, ownership, or control. Accepting that argument would not require reversing any of Tardon's convictions, however, because concealment is not an element for three of the conspiracy's five objects (under Sections 1956(a)(1)(B)(ii), 1956(a)(2)(B)(ii), and 1957(a)) or for the substantive counts. *See United States v. Moran*, 778 F.3d 942, 963 (11th Cir. 2015).

46

Regardless, as the district court found, Tardon's argument is frivolous. DE.586:10-17. Where Section 1956 requires concealment, it "requires only that proceeds be concealed, not that they be concealed well." *United States v. Naranjo*, 634 F.3d 1198, 1210 (11th Cir. 2011). It "is irrelevant" that the defendant "left enough evidence to allow a novice investigator to trace" the transactions back to the defendant. *Id.* Nor does the government have to prove that a defendant concealed *each* of the listed statutory attributes. *See United States v. Elso*, 422 F.3d 1305, 1309 n.7 (11th Cir. 2005) (sufficient evidence where defendant concealed money's location, but not nature); *see also United States v. Crozier*, 640 F. App'x 100, 104 (2d Cir. 2016) (per curiam) ("Section 1956 requires only that the transaction be designed to conceal or disguise *one* of the specified attributes of the proceeds, not *all* attributes."). Thus, this Court has rejected the claim that transactions must "conceal the identity of the participants." *United States v. Starke*, 62 F.3d 1374, 1384 (11th Cir. 1995).

Tardon emphasizes (Def.Br.23-24) that the wiring of funds and conducting of bulk currency exchanges led to the creation of records, like Currency Transaction Reports (CTRs), which sometimes identified Tardon's involvement. But the evidence demonstrated that those records frequently concealed the funds' ownership (and thus its nature, source, and control). Couriers carried bulk cash, claiming ownership in their own (not Tardon's) name and providing fictitious employment. *Supra* at 7-8. The transfers made to third parties through MoneyGram and Western Union obscured Tardon's ultimate control over the funds. *Supra* at 8-9. And, as the district court

recounted, Tardon's purchase of the Continuum, during which closing and mortgage payments were funneled through Kretz, LLCs, and others, obscured Tardon's ownership and control of that property.  DE.586:10-15.  More generally, the transfer of funds through accounts held by the family butcher shop (Castello 22) and Tardon's Spanish car dealership demonstrated an effort to conceal the funds' source, nature, and ownership.  DE.586:14-15.

In asserting that his "money transfers and expenditures showed no design of concealment," Tardon ignores that evidence.  Def.Br.24.  His reliance on *Cuellar* is misplaced.  There, the Supreme Court found the simple fact that funds were "concealed … *during their transport*" insufficient to show that the transportation was *designed* to conceal its attributes, although noting that such evidence remains "probative of an underlying goal" to conceal.  553 U.S. at 565-66, 568 (emphasis added).  Here, the evidence showed further efforts—like the use of third parties and the provision of fictitious occupations—that substantiate a design to conceal.

### 4.    The Evidence Established The Elements Of The Substantive Money-Laundering Counts

Tardon also claims (Def.Br.25-27) the evidence was insufficient to establish certain elements of the substantive money-laundering counts.  His brief contains no relevant citations to the record, caselaw, or legal authority, and he again fails to address the district court's extensive analysis rejecting his arguments.  DE.586:17-25, 32-40.

Tardon has waived these claims. *McClain*, 138 F.3d at 1422. But even if considered, they fail.

a.　　Tardon first claims (Def.Br.25-26) there was insufficient evidence to establish that the substantive counts involved monetary transactions "in criminally derived property of a value greater than $10,000," 18 U.S.C. § 1957(a).

As the statutory language reflects, "at least $10,000 worth of" a transaction "must be derived from the criminal activity." *United States v. Adams*, 74 F.3d 1093, 1101 (11th Cir. 1996). Proof that funds represented "drug proceeds" or were otherwise criminally derived "may be established by circumstantial evidence." *United States v. Frazier*, 605 F.3d 1271, 1282 (11th Cir. 2010). A jury may infer that funds are criminally derived where there is "no evidence" that the defendant "had a source of income other than" his unlawful activity. *Id.* The government can show that a defendant's "expenditures exceeded his reported earnings by introducing into evidence his tax returns" and thereby "create a permissible inference that such wealth was derived from illicit activities." *United States v. Terzado-Madruga*, 897 F.2d 1099, 1120 (11th Cir. 1990). And this Court has found funds criminally derived, notwithstanding the defendant's claim to have engaged in "'legitimate' business interests" with "legitimate" funds, where evidence of the "allegedly legitimate business interests" is "slight" and the evidence establishes "that all of the businesses were established with narcotics proceeds," *United States v. Abbell*, 271 F.3d 1286, 1296-97 (11th Cir. 2001) (per curiam), or where the business generated only "modest profits" despite the defendant acquiring "millions of

49

dollars in residential and commercial real estate" and "deposit[ing] millions of dollars" into "bank accounts," *United States v. Edouard*, 485 F.3d 1324, 1349 (11th Cir. 2007).

When criminally derived funds are "comingled with legitimate funds," moreover, "the Government is not required to trace [the] criminal funds" to prove a Section 1957 violation. *United States v. Silver*, 864 F.3d 102, 115 (2d Cir. 2017). "Because money is fungible, once funds obtained from illegal activity are combined with funds from lawful activity in a single account, the 'dirty' and 'clean' funds cannot be distinguished from each other." *Id.* "Congress did not intend for participants in unlawful activities to escape conviction for money laundering simply by commingling funds derived from both specified unlawful activities and other activities." *United States v. Ward*, 197 F.3d 1076, 1083 (11th Cir. 1999) (quotations omitted) (discussing Section 1956). For that reason, the evidence is sufficient to substantiate the $10,000 threshold where the jury can infer, based on the ratio of tainted funds in a bank account, that criminally derived funds sufficed to establish "the statutory dollar amount minimum on the … occasions covered by the indictment." *United States v. Green*, 818 F.3d 1258, 1280 (11th Cir. 2016).

Here, the jury could find that at least $10,000 relating to each of the charged transactions was criminally derived. Tardon had no legitimate source of income, and largely did not file tax returns or declare any significant income to U.S. or Spanish authorities. DE.528:110-114; DE.526:12. Pollack testified that Tardon had no discernable job or source of income. DE.519:77. Yet he funneled more than $14 million to the U.S. between 2000 and 2011. DE.550-2:1. With respect to each

50

substantive count, FBI Agent Daniel Gaitan and SNP Inspector Alvaro Ibanez Alfaro walked the jury through records tracing the funds used in each transaction to their source in Spain.  DE.524:162-188; DE.525:10-71, 132-143; DE.526:74-88.

Tardon does not meaningfully engage with any of that evidence.  He suggests the evidence showed that he earned the money through car sales and rental income, but neither claim withstands scrutiny.  As the district court found, "if there was a 'dearth of evidence' as to anything it was as to any legitimate source of income for [Tardon]."  DE.586:21.

Tardon cites nothing to support his assertion about rental income.  The evidence showed that none of the LLCs Tardon created to hold the properties filed tax returns or reported any income.  DE.528:101-103.  Both Pollack and one of Tardon's ex-girlfriends testified to living in apartments Tardon owned without paying rent.  DE.520:21; DE.523:110-111.  And any income made in the U.S. would not undermine the evidence showing that money transported *from Spain* was drug proceeds because not a penny was transferred from Tardon's U.S. accounts back to Spain (and thus the money transferred from Spain could not have constituted rental income).  DE.529:78.

As for Tardon's supposed car businesses, Cohen testified that Tardon's U.S. business was proposed by the couple's immigration attorney and never sold any cars or conducted any business.  DE.523:85-87.  The Collection in Spain, moreover, was established in 2006 (well after several million dollars were moved to the U.S.) with funds that the jury could infer were criminal proceeds, tainting the entire enterprise.

51

DE.519:96-102; *see Ward*, 197 F.3d at 1083.  The operation often sold cars for a loss, purported to sell cars to individuals who did not purchase them, did not finance a single car, frequently accepted cash payments for cars' full value, and sold just three cars for more than €300,000.  *Supra* at 12, 15-16.  The district court, moreover, gave a theory-of-defense instruction informing the jury that Tardon "asserts that the transactions charged in the indictment, and particularly those listed in Counts 2 through 14, were derived from the earnings of his car dealership and other investment and business activities."  DE.538:38.  The guilty verdict demonstrates that "the jury simply rejected that theory."  *United States v. Hamaker*, 455 F.3d 1316, 1326 (11th Cir. 2006).

Tardon invokes a calculation of revenue, DE.504:90, which was drawn from the testimony of a Spanish tax official regarding revenues The Collection reported in its own internal books, *see* DE.526:44-45.  But that official detailed significant inconsistencies in The Collection's records, DE.526:54-57, including the fact that Tardon deposited more than €2 million into The Collection's accounts in 2007, alone, in a year in which he declared just €22,347 in income, DE.526:19.  She further offered that, if the books were accurate, The Collection should have reported significantly more income on its tax returns.  DE.526:68-69.  The Collection reported just €375,240 during its operation.  DE.526:13-14.  The jury could discount Tardon's contention that The Collection made millions of dollars in legitimate revenue.

The only count for which Tardon specifically challenges the evidence's sufficiency is Count 10, which involved a $10,720.54 cash payment to service Tardon's

52

Bugatti. DE.525:52-57. The government traced the money for that payment to more than $2.5 million that was transferred from The Collection's accounts in Spain during the several-month period between June and October 2010—$2.3 million of which was then spent in just three months on the vehicles represented in Counts 8, 9, 10, 12, and 13. DE.525:46-49, 60. The jury could conclude that funds flowing through The Collection were criminally derived, and thus could find that Count 10 involved criminal proceeds.

b.     Tardon also asserts (Def.Br.26), again without citing caselaw, that the government failed to prove an interstate nexus or U.S.-based transaction for certain counts.

Counts 10 and 14 both involved cash transactions. Count 10, as noted, involved a payment to service Tardon's Bugatti. Count 14 involved Tardon's purchase of a Mercedes Benz with $131,860 in cash days after three exchanges of cash euros for dollars (totaling more than $280,000) were made under a third party's name—receipts for which were recovered in Tardon's residence. DE.525:65-70.

Both transactions affected interstate commerce. Section 1957 defines a "monetary transaction" as "the deposit, withdrawal, transfer, or exchange, in or affecting interstate or foreign commerce, of funds or a monetary instrument … by, through, or to a financial institution," including "any transaction that would be a financial transaction under section 1956(c)(4)(B)." 18 U.S.C. § 1957(f)(1). Given the statutory cross-reference to Section 1956(c)(4)(B), the interstate commerce element in

53

both statutes are interpreted similarly. *See United States v. Benjamin*, 252 F.3d 1, 9 n.5 (1st Cir. 2001). And, as this Court has explained, the money-laundering statute "reaches the full extent of Congress' Commerce Clause power," and requires only "[i]ncidental involvement or use" in interstate commerce. *Oliveros*, 275 F.3d at 1303; *see United States v. Vega*, 813 F.3d 386, 400 (1st Cir. 2016) ("Section 1957 requires only a *de minimis* effect on interstate commerce.").

Accordingly, a cash transaction involves interstate commerce where a "withdrawal from the bank occurred before the transaction that formed the basis" of the conviction. *Oliveros*, 275 F.3d at 1304. Where cash is the product of drug trafficking, it also necessarily affects interstate or foreign commerce. *United States v. Burgos*, 254 F.3d 8, 11 (1st Cir. 2001) ("It is well-settled that drug trafficking is an activity that affects interstate commerce."); *see, e.g.*, *United States v. Goodwin*, 141 F.3d 394, 399 (2d Cir. 1997); *United States v. Garcia-Munguia*, 850 F. App'x 552, 553 (9th Cir. 2021) (per curiam). The Bugatti, moreover, traveled in interstate commerce because it was manufactured in France and had to be transported to California to perform the service Tardon purchased. DE.528:25, 54. And the payment for Count 14 was preceded by the exchange of cash at several currency exchanges. DE.525:65-70. On any of these grounds, the evidence sufficed to show that the transactions affected interstate commerce.

Section 1957 also requires that the offense "take[ ] place," as relevant here, "in the United States." 18 U.S.C. § 1957(d). Tardon challenges Counts 3 and 4, which

involved wires from a Spanish bank directly to a Bank of America mortgage servicer. DE.525:36-37. But those "deposit[s]" or "transfer[s]"—made "to a financial institution" in the U.S.—necessarily took place here. 18 U.S.C. § 1957(f)(1).

### 5. The Evidence Established A Single Conspiracy

Finally, Tardon disputes (Def.Br.27-28) that there existed a single money-laundering conspiracy. Whether "evidence establishes a single conspiracy is a question of fact for the jury." *United States v. Holt*, 777 F.3d 1234, 1262 (11th Cir. 2015). To determine "whether a jury reasonably could have found a single conspiracy," the Court considers "(1) whether a common goal existed; (2) the nature of the underlying scheme; and (3) the overlap of participants." *Id.* at 1262-63 (quotations omitted). "Separate transactions … are not necessarily separate conspiracies, so long as the conspirators act in *concert* to further a common goal," and a jury can find a single conspiracy "where a key man directs and coordinates the activities and individual efforts of various combinations of people." *Edouard*, 485 F.3d at 1347 (quotations omitted).

Here, there was "overwhelming evidence" of a single conspiracy, led by Tardon and involving the same participants, to launder drug-trafficking proceeds to the U.S. DE.586:41. The jury was expressly instructed that "[p]roof of several separate conspiracies isn't proof of the single, overall conspiracy charged in the indictment" and that it must "decide whether the single overall conspiracy charged existed." DE.538:47. There is no basis to disturb the jury's conclusion.

**II.    The District Court Appropriately Denied Tardon's Motion To Suppress**

Tardon next challenges (Def.Br.28-48) the denial of his motion to suppress and for an evidentiary hearing.  His claims lack merit.

**A.    Background**

1.    Tardon's claims relate to his relationship with Cohen and the warrants the government obtained to search certain properties.

a.    During much of Tardon's and Cohen's marriage they lived at a home in the Coconut Grove neighborhood of Miami (referred to as "the Villa").  DE.374:4.  In early February 2011, after Tardon and Cohen began experiencing marital problems, Tardon moved out of the Villa and into his condominium at the Continuum.  DE.374:21-23.  Although Tardon continued to visit the Villa daily, including to perform Santeria rituals, he relocated much of his clothing, a computer, and other personal items to the Continuum.  DE.374:22-24.

During a domestic dispute on March 1, Tardon threatened Cohen with a knife and was arrested.  DE.374:4-5, 21-25.  Later that day, Pollack and another man visited the Villa, pressured Cohen to deny the attack occurred, and took items from the home's safe (including watches, money, jewelry, and some loose diamonds).  DE.374:25-28.  The next day, a Florida court issued a stay-away order, prohibiting Tardon from visiting the Villa.  DE.374:5-7.  That day, Cohen was visited by City of Miami domestic violence investigators.  DE.374:5-6, 28.  By then, Tardon was under investigation, and FBI

Special Agent Madeline Albrecht accompanied the investigators, posing as a domestic violence investigator.  DE.374:5-6, 28-29.

Cohen's discussion with the investigators focused primarily on the domestic incident, but also turned to Tardon's source of money and potential involvement in drug trafficking.  *See generally* DE.144-1 (interview transcript).  Asked how Tardon made his money, for example, Cohen responded that she "hope[d]" he did so by "[s]elling cars."  DE.144-1:18.  But she offered that—although she did not know for sure— Tardon might be making his money through drugs.  DE.144-1:18.  She explained that she "never really saw the profit" from the cars, was told that none of the cars sold, and represented that Tardon had "been to Colombia way too many times."  DE.144-4:18-19.  Cohen also explained that Tardon often had money wired to him (sometimes "a million dollars at a time") and that friends traveled "[e]very three months" from Spain to "bring him money" to exchange for dollars at American Express.  DE.144-1:34-35, 69, 85-92.  The largest amount of money Cohen could recall was $1 million, which was carried in a suitcase.  DE.144-1:88-91.  Asked directly if Tardon was involved in "drug smuggling" or she had seen him with "bulk" cocaine "here," Cohen said no.  DE.144-1:95-96.  But Cohen offered that Tardon told her that a woman, Ana, was arrested in Spain after cocaine was found in her apartment, and Cohen said that Ana was moving that cocaine for Tardon.  DE.144-1:100-102.

Over a month later, on April 12, 2011, Cohen met with federal officials and was offered limited-use immunity in exchange for her cooperation.  DE.189-1:1.  During

that meeting, Cohen elaborated on Tardon's drug-related activities and the movement of money. She represented, for example, that "between five to seven guys" smuggled euros to the U.S. for Tardon; that Tardon was "involved in the drug trafficking business and that he import[ed] the illicit drugs from Colombia into Spain"; that Cohen suspected the cocaine seized from Cameno belonged to Tardon; and that Tardon's car dealership was not legitimate. DE.189-1:1-15.

By the end of March, Tardon filed for divorce in state court. *See* DE.378-1. On April 25, Tardon moved to compel Cohen to provide an opportunity for Tardon to retrieve his belonging from the Villa—representing that he needed to "properly respond to discovery requests" and sought "certain of his belongings that hold special meaning to him." DE.378-5:2. Tardon later filed emergency motions for access to the Villa. *See* DE.378-6; DE.378-7. On July 7, 2011, the state court issued an order requiring Cohen to permit Tardon access, with a police escort, on July 8. DE.378-9:2. The only property the order specified Tardon could remove were his clothing and religious items. DE.378-9:2. The order provided that Tardon "shall not remove anything other than" those items and stated that an evidentiary hearing was necessary to determine the ownership of other items and "what paperwork [Tardon] seeks to remove … to assist him in the discovery process." DE.378-9:2.

Also on July 7, Cohen met with the FBI in preparation for the government's impending request for search warrants for certain of Tardon's properties. DE.374:30, 69. When she returned from the meeting—and without discussion or direction from

58

the FBI—Cohen gathered documents from the Villa that she believed could relate to her discussions with the FBI. DE.374:30-31, 53-54. Among the items was a spiral notebook with Mickey Mouse on the cover, which Cohen recalled first seeing around 2006 while Tardon was incarcerated in Spain and which Tardon gave to Cohen and his mother to take to his home. DE.374:32-34. Cohen first observed the notebook in the Villa sometime between 2007 and 2008, and Tardon never restricted her access to it. DE.374:34-35. Cohen collected the items in a garbage bag and informed the FBI that she had documents she wished to provide. DE.374:53-57. The government retrieved the bag, but did not review those items until weeks later—around July 20. DE.374:14-15, 63-64.

b.      On July 8, 2011, the government sought warrants to search eleven properties (not including the Villa), and a magistrate judge issued warrants for four. *See* DE.85-2:2-3; DE.85-3:2-24. The applications were supported by a 15-page affidavit, signed by Agent Albrecht, asserting probable cause to believe that evidence of money laundering, in violation of 18 U.S.C. §§ 1956 and 1957, and drug trafficking, in violation of 21 U.S.C. §§ 841 and 846, would be located at the properties. DE.75-1:10-24.

The affidavit described Agent Albrecht's training and experience investigating money-laundering and narcotics-trafficking offenses, and it represented (among other things) that: (1) drug traffickers and money launderers often place assets in nominee names (corporate entities or third parties) to avoid detection; (2) they often "attempt to legitimize" controlled-substance profits by funneling them through bank accounts, shell

59

corporations, or "purported legitimate businesses"; and (3) unexplained wealth can be "probative" of drug trafficking or money laundering.  DE.75-1:10-12.  The affidavit further explained that Tardon and his associates arranged to smuggle multi-hundred-kilogram quantities of cocaine from Colombia to Spain, where it was processed and distributed by a group led by Cameno, and that the proceeds were sent "by courier or via wire transfers" to the U.S. and then laundered "through the purchase of real estate and high-end exotic automobiles." DE.75-1:13.  Although Tardon had lived in the U.S. since 2002, there was "no record of him being gainfully employed throughout this time," nor any record of his associates, other than Krentz, having "a legitimate job." DE.75-1:21.  The affidavit stated a belief that Tardon's "real properties and automobiles" were "purchased with" "narcotics trafficking proceeds."  DE.75-1:21.

The affidavit detailed the SNP's investigation of Tardon and Artemio.  DE.75-1:13-14.  In February 2010, after determining Tardon was laundering drug proceeds into the U.S., the SNP contacted the FBI for assistance.  DE.75-1:14.  Consistent with the SNP's own determination, the affidavit represented that "[p]reliminary intelligence gathered by" several U.S. agencies, including the FBI, DEA, and IRS, "revealed numerous occasions" where Tardon or his associates had wired a total of "several million dollars" from Spain to the U.S.  DE.75-1:15.  That "[a]dditional research" revealed Tardon had "established and managed" six LLCs, operated from Tardon's "previous home address," to which ownership of several of Tardon's properties had been transferred.  DE.75-1:15-16.  Law enforcement also had verified the travel of

60

several couriers who allegedly brought euros from Spain to Miami, where they were exchanged for dollars. DE.75-1:18. American Express Currency Transaction Reports (CTRs) showed that between 2005 and 2008 (and despite no person declaring "any inbound currency") there were "at least 33 instances where [Tardon], or persons associated with [him]" converted amounts into more than $10,000—in ten instances the very day after travel. DE.75-1:18.

The affidavit also detailed Krentz's and Pollack's roles in the enterprise, noting that Krentz had purchased luxury cars, made "mortgage payments on properties far in excess of her monthly income," and made "large numbers of cash deposits" into her accounts. DE.75-1:16. The affidavit represented that there were "numerous instances" in which Tardon and Pollack traveled together to Spain, Colombia, or Amsterdam, and that while Pollack "conducts no known business in Spain," he had received wire transfers in Spain and wired money from Spain to Cohen and Tardon in the U.S. DE.75-1:16. Pollack also purchased several luxury cars in Spain, although it was "unknown where" he obtained the money for the purchases, as he never "declared having any currency" when traveling from the U.S. and maintained no Spanish bank accounts. DE.75-1:16-17. The affidavit stated a belief "that Artemio provided Pollack with the cash in Spain and directed him to buy the cars, and that this cash was proceeds from the sale of drugs." DE.75-1:17.

Finally, the affidavit explained that in January 2011, the SNP raided a cocaine lab operated by Cameno and recovered 276 kilograms of cocaine and "various drug

61

ledgers." DE.75-1:17. An analysis of the ledgers "reveal[ed] that 18,326,300 [e]uros have been delivered to 'Arli' and 'Arti,'" which, through wiretaps, the SNP determined were nicknames for Tardon and Artemio. DE.75-1:17. The ledgers listed seven telephone numbers associated with those nicknames, five of which were known to be associated with Tardon and Artemio, as well as a prior address and telephone number for Krentz. DE.75-1:17.

The affidavit included information provided by a confidential source (referred to as "CS#1"), which the affidavit represented had "been corroborated and proven to be reliable." DE.75-1:14. Although not named in the affidavit, CS#1 referred to Cohen. *See* DE.158:3. The affidavit stated, for example, that CS#1 revealed that Krentz acted as a straw purchaser of real estate and vehicles for Tardon, that Pollack had been sent to Colombia to meet with Tardon's associates, and that Tardon had euros smuggled to the U.S. by couriers. DE.75-1:16-18.

2. a. Before trial, Tardon moved to suppress the evidence seized during execution of the search warrants and for an evidentiary hearing under *Franks v. Delaware*, 438 U.S. 154 (1978). DE.75. Among other things, he contended that the affidavit falsely represented that the government was investigating substantive drug-trafficking offenses; was "premised on hearsay from unspecified foreign police sources"; and failed to disclose CS#1's identity as Cohen or to note Cohen's purported bias and conflicting statements. *See, e.g.*, DE.75:1-10.

Tardon subsequently filed a transcript of Cohen's initial interview with Agent Albrecht in March 2011—which he claimed contradicted the affidavit's representations, DE.144:1; *see* DE.144-1—and the government filed a redacted version of the FBI report from Cohen's April 2011 interview, *see* DE.189:1; DE.189-1.  Tardon also filed a Spanish-language report, and a "rough, uncertified" English translation, that the SNP had provided the FBI, dated March 21, 2011.  DE.202:1; DE.202-1.  That report detailed the SNP's investigation and featured photographs of the pages from Cameno's ledger that the SNP believed referred to Tardon and Artemio.  *See* DE.202-1:35-63.

b.    A magistrate judge recommended that Tardon's motion be denied, concluding that Tardon failed to make a substantial preliminary showing that the affiant deliberately or recklessly included false statements or omitted material information.  *See* DE.207:8-73.

Relevant here, the magistrate found that Tardon failed to show that "the factual representations attributed to the SNP in the affidavits were false" or that misrepresentations or omissions, if any, "were intentional or reckless and not merely negligent."  DE.207:9.  The magistrate rejected Tardon's claim that the information could "properly be characterized as preliminary conclusions or suspicions," and found that it "was not unreasonable" for Agent Albrecht to rely on the SNP report, "particularly when the government corroborated much of" it.  DE.207:10-12 (quotations omitted).

The magistrate also rejected Tardon's claim that the failure to disclose CS#1's identity or to disclose alleged inconsistencies in Cohen's statements were material omissions that warranted a *Franks* hearing. DE.207:16-56. After extensively cataloging Cohen's statements in March, and comparing them to her statements in April, DE.207:26-40, the magistrate found that, "at best," Cohen "provided more details concerning [Tardon]'s illegal activities"—which was "not surprising" because, at the time of the March interview, Cohen "had recently been assaulted at knife-point" and Tardon "had threatened to hire a hit man to have her killed," DE.207:38-39.

Finally, the magistrate found that Tardon offered no proof to support any claim regarding other alleged misstatements. DE.207:56. In particular, the magistrate concluded that Tardon had made no offer of proof to support his contention that the government was not investigating him for substantive drug crimes, explaining that the fact he ultimately "was not charged with a drug offense is not evidence that the government was not investigating" him for such offenses. DE.207:57-58. And even if the affidavit lacked probable cause for drug offenses, the magistrate found, the warrants still established probable cause for money laundering. DE.207:71.

c.      The district court adopted the report and recommendation and denied Tardon's motion. DE.253:8-13. The court found that, aside from two statements the court agreed were immaterial,[8] Tardon "failed to show that Agent Albrecht made any

---

[8] Tardon had challenged as contradictory with other statements CS#1's (Cohen's) representations that €2 million had been given to an associate of Tardon's (a then-co-

misrepresentations or omissions in her affidavit." DE.253:8. The court agreed with the magistrate judge that, although Cohen initially said she was not certain of the source of Tardon's income in March (hesitation that was unsurprising given the then-recent assault), Cohen nevertheless made "numerous statements indicating that [Tardon] earned his money from drugs rather than from a legitimate source." DE.253:9. And Cohen's representations at the subsequent April interview "provided additional details." DE.253:9. The court also rejected Tardon's challenge to reliance on the SNP report, noting that the government "corroborated much of the information … with information obtained from Cohen or its own independent investigation" and that Tardon failed to put forth any "evidence showing" that the report contained false information. DE.253:10.

3.    Tardon later filed a supplemental motion to suppress the physical evidence (including the "Mickey Mouse" notebook) that Cohen provided to authorities in July 2011. DE.343:1.

Following an evidentiary hearing, the magistrate judge recommended the motion be denied. DE.384. The magistrate found that Tardon established no reasonable expectation of privacy in the items, which he left behind in the Villa when he moved out, did not seek to retrieve thereafter, and did not prevent Cohen's access to while she

---

defendant) and that Tardon carried two firearms on his person. *See* DE.207:40, 51-52. Assuming *arguendo* that Tardon could show any falsehood was made deliberately, the magistrate found those statements immaterial. DE.207:40-43, 64-65. Tardon does not reference those statements or challenge that determination on appeal.

lived there.  DE.384:11-12.  The magistrate found it "unreasonable for [Tardon] to believe" Cohen "would not share incriminating documents" with the FBI.  DE.384:12.  Even assuming Tardon possessed an expectation of privacy, the magistrate found that Cohen was not acting as a government agent when she gathered and turned over the documents and the government "was not required to obtain a warrant" to review the documents.  DE.384:14.  The district court adopted the report and recommendation.  DE.408:1-29.

4.    At trial, Cohen testified for the government.  Before trial, the government disclosed to the defense *Jencks* material that showed Cohen cooperated with the investigation of a money-services vendor who the government believed was involved in money laundering.  DE.507:3, 8.  Tardon's counsel questioned Cohen concerning that cooperation.  Cohen explained that on two occasions before July 7, 2011, she wore a wire and visited a currency exchange at a mall.  DE.524:8-12; *see* DE.507:8.  Cohen had not previously done financial transactions at that location, but had interacted with the vendor when the vendor previously worked at American Express.  DE.529:10-11.  Agent Albrecht's testimony confirmed that Cohen's assistance was part of "a separate investigation."  DE.524:138.

Cohen also briefly testified about her and Tardon's living arrangements, explaining that after she and Tardon started having marital problems in 2011, Tardon completely moved out of the Villa and that the domestic altercation took place later, while Tardon continued visiting the Villa.  DE.523:124-127.  During cross-examination,

however, Cohen responded "Yes" to Tardon's counsel's questioning whether Tardon "continued to reside" at the Villa "until the domestic event," and, during redirect, responded "No" when asked whether Tardon "had moved out of the [V]illa"— although she reaffirmed Tardon was spending "[s]ome of the nights" at the Continuum. DE.524:81-82.

After the close of evidence, Tardon filed what he styled as a "renewed" motion to dismiss, contending that the trial testimony warranted reopening the suppression hearing. DE.474:3-4. The district court denied the motion, finding it untimely because it was not made before trial and because Tardon, by his "own admission," was provided with "notice of Ms. Cohen's work with law enforcement" before trial. DE.585:13. Regardless, the court determined that the motion "fails on its merits." DE.585:14. The court reasoned that Cohen's testimony did not undermine the "primary basis" for denying Tardon's prior motion: that he "did not enjoy a reasonable expectation of privacy in the documents." DE.585:16. And even if the government "had disclosed at the suppression hearing that Ms. Cohen was assisting the FBI in its investigation of the money services vendor," the court found that it would not put the testimony of her cooperation in "a different light." DE.585:22 (quotations omitted).

## B.    The District Court Acted Within Its Discretion In Denying A *Franks* Hearing

Tardon first contends (Def.Br.33-39) that the district court erred in denying a *Franks* hearing. The district court acted within its discretion.

1.      "An affidavit supporting a search warrant is presumed valid." *United States v. Whyte*, 928 F.3d 1317, 1333 (11th Cir. 2019). In *Franks v. Delaware*, 438 U.S. 154 (1978), the Supreme Court addressed the circumstances in which a defendant may challenge the veracity of the affidavit on which a search warrant was based. Under *Franks*, a defendant is entitled to an evidentiary hearing if he "'makes a substantial preliminary showing'" that: (1) "an affiant made intentionally false or recklessly misleading statements (or omissions)," and (2) that "those statements are 'necessary to the finding of probable cause.'" *United States v. Barsoum*, 763 F.3d 1321, 1328 (11th Cir. 2014) (quoting *Franks*, 438 U.S. at 155-56).

"[T]he substantiality requirement is not lightly met," *United States v. Arbolaez*, 450 F.3d 1283, 1294 (11th Cir. 2006) (per curiam), and a defendant must "point out specifically the portion of the warrant affidavit that is claimed to be false" and provide "a statement of supporting reasons," *Franks*, 438 U.S. at 171. The contentions "must be more than conclusory" and "must be accompanied by an offer of proof." *Id.* A "barebones assertion" that law enforcement acted deliberately or with reckless disregard is insufficient. *Whyte*, 928 F.3d at 1333; *see United States v. Haimowitz*, 706 F.2d 1549, 1556 (11th Cir. 1983) (rejecting claim based on "conclusory allegations, unsupported by an offer of proof").

"[D]eliberateness" under *Franks* refers to "something akin to bad faith"—not the mere purposeful inclusion of information that turns out to be false or the mere failure to include information of which the affiant is aware. *Whyte*, 928 F.3d at 1334.

"In other words," a statement or omission "must have been made with the *purpose of* misleading the judge issuing the warrant." *Id.* (emphasis added). And a defendant must make a substantial preliminary showing on both *Franks* prongs to warrant a hearing; "materiality is essential no matter how deliberate or reckless the misrepresentations were." *United States v. Novaton*, 271 F.3d 968, 987 (11th Cir. 2001).

A search warrant establishes probable cause where the issuing magistrate concludes that, "given all the circumstances set forth in the affidavit," there is "a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). Probable cause is "not a high bar," and "does not require officers to rule out" an "innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 583 U.S. 48, 57, 61 (2018) (quotations omitted).

2.　　Without citing particular statements or otherwise identifying "specifically the portion of the warrant affidavit that is claimed to be false," *Franks*, 438 U.S. at 171, Tardon generally asserts (Def.Br.33-39) that the affidavit included misstatements. With respect to each category of statements (so far as they can be identified from his brief), Tardon fails to show that the representations were false or misleading—much less that Agent Albrecht acted deliberately or recklessly.

a.　　<u>Representations Regarding CS#1 (Cohen):</u> Tardon claims that Agent Albrecht deliberately or recklessly failed to identify CS#1 as Cohen and disclose her

alleged bias.[9]  Def.Br.33, 38.  As the magistrate correctly found, the government's anonymization of Cohen was appropriate given Tardon's recent assault and concerns for her safety.  DE.207:18-19.  This Court has explained, moreover, that judges are "well aware that" informants' information "is often obtained in the context of personal rancor and mixed motives," and thus has rejected arguments that officers must include "information concerning possible animus" particularly where "agents had corroborated much of the information."  *Novaton*, 271 F.3d at 988 (quotations omitted).  The affidavit detailed at length the government's corroboration of the assertions attributed to CS#1—by, for example, identifying instances of travel that correlated with likely movement of bulk currency; identifying wire transfers from Tardon and others from Spain; describing Krentz's assets and mortgage obligations "far in excess" of her monthly income; and confirming there was no record of Tardon or others having legitimate jobs.  DE.75-1:16, 18, 21.

Tardon also asserts that the affidavit falsely represented that Cohen had intimate awareness of Tardon's crimes and omitted allegedly exculpatory statements.  Def.Br.33-34.  Those claims are "selective characterizations and exaggerations" of Cohen's statements.  *United States v. Sarras*, 575 F.3d 1191, 1218 (11th Cir. 2009) (affirming denial

---

[9] Tardon vaguely refers to an order entered in the divorce proceedings "the day before the affidavits were signed," which he claims the FBI "evaded" by searching his papers.  Because that order only involved access to the Villa, Tardon cannot show that it was material to the affidavit, which sought authorization to search properties *other than* the Villa.  Regardless, as the magistrate judge found and is plain from the face of the order, that order did not restrict access to Tardon's papers.  *Supra* at 58; *infra* at 78.

of *Franks* hearing).  Even a cursory review of the March transcript and the summary of Cohen's April interview demonstrate that Cohen provided detailed information—including about Tardon's wire transfers, bulk currency exchanges, and other matters—based on her personal observations of Tardon's activities.  *See supra* at 57-58.  As the magistrate found and the district court affirmed, the record "at best" shows that Cohen provided additional details about Tardon's activities, such that any equivocation during the initial March interview was explained by Tardon's recent assault and threats.  DE.207:39; DE.253:9-10.

Tardon claims that Cohen later admitted that she knew nothing of Tardon's crimes.  Def.Br.36.  Tardon failed to renew his request for a *Franks* hearing following that testimony, so any claim is reviewable only for plain error.  *United States v. Bruce*, 977 F.3d 1112, 1116 (11th Cir. 2020).  And Tardon exaggerates the testimony.  Cohen merely agreed with defense counsel's assertions that she (1) was truthful in her statements to law enforcement, and (2) "felt that" she had not *personally* committed money laundering because she "did not know that the monies that were the subject of transactions [she was] involved in were derived from drug trafficking."  DE.374:45-47.

Tardon also alludes to "violations of the marital communications privilege" which, as explained below, is inapplicable here.  *Infra* at 99-100.  Regardless, the information Cohen relayed was based predominately on her *observations*, and Tardon does not identify with particularity any statement that would have been covered by the privilege.  The magistrate identified just two statements that might conceivably fall

71

within the privilege but held that, even if excised, their exclusion would not materially affect probable cause.  DE.207:52-56.

b.    Representations Concerning the Spanish National Police:  Next, and again without identifying particular statements, Tardon asserts that the affidavit was based on "hearsay" and "conclusory reference[s]" to the SNP's "preliminary" findings.  Def.Br.35.  The affidavit and the SNP report belie those characterizations.  Because an affidavit may be based on hearsay, Tardon's objection to the information's veracity on that ground fails.  *Gates*, 462 U.S. at 241-42; *Franks*, 438 U.S. at 165.  The SNP report, moreover, described the SNP's investigation, disclosing its monitoring of Tardon's telephone calls and providing a detailed explanation for its belief that Cameno's ledger referred to him.  DE.202-1:35-63.  And Agent Albrecht's affidavit, in turn, detailed the government's success in corroborating much of the information the government learned from the SNP.[10]  *Supra* at 60-61.  Tardon put forth no evidence "showing that the SNP Report contained false information" or that "Albrecht included false information" in the affidavit.  DE.253:10.

Tardon perfunctorily asserts that the SNP (and thus, presumably, the FBI) "knew" that Tardon operated a "thriving car sales business."  Def.Br.38.  But neither

---

[10] Tardon alludes (Def.Br.34) to a single-page declaration the government filed, which confirmed that the FBI had received only one SNP report—the March 2011 report that Tardon filed with the court—before Agent Albrecht prepared the affidavit.  DE.196-1:1.  Tardon does not explain how that factual representation demonstrates that any statements in the affidavit were false or misleading.

below nor in his appellate brief does Tardon make any offer of proof on that score. Instead, as Cohen's conversation with officers indicated, DE.144-1:18-19, 33-34, and as the affidavit explained by referencing the car business's unusual transactions, DE.75-1:17, Agent Albrecht had every basis to believe that business was not legitimate.

This Court has previously declined a defendant's contention, "[w]ithout citation to any legal authority to support [the] position," that a *Franks* hearing was necessary to explore claims of "misrepresentations or omissions which were the result of flawed information provided to American agents by [foreign] law enforcement agents." *United States v. Kapordelis*, 569 F.3d 1291, 1309 (11th Cir. 2009). There is no basis to accept Tardon's similar effort here.

c.      References to 21 U.S.C. §§ 841 and 846:  Tardon also contends in passing that the affidavit referenced "falsely-claimed" and "nonexistent U.S. drug crimes," Def.Br.33-34, presumably referencing the affidavit's citation to Sections 841 and 846. As the magistrate found, even though the government ultimately charged Tardon only with money-laundering offenses, Tardon made no offer of proof to establish that officers did not believe that they might find drug-trafficking evidence when they sought the warrants. DE.207:58 & n.20. Indeed, the affidavit sought authorization to search for and seize "all controlled substances and narcotics paraphernalia" in addition to myriad record-keeping and other money-laundering-related evidence. DE.75-1:8. Nor does Tardon make any showing that Agent Albrecht deliberately or recklessly referenced those statutes in an effort to mislead the magistrate judge.

73

Regardless, even if the affidavit did not establish probable cause for drug offenses—and even if those references were stricken—the affidavit established probable cause for money laundering. DE.207:71 & n.25. Tardon mischaracterizes the affidavit by suggesting (*e.g.*, Def.Br.34) it was premised predominantly on establishing probable cause for drug trafficking. The affidavit is replete with references to officers' belief that Tardon was laundering money derived from his drug-trafficking activities into the U.S. *Supra* at 59-62.

d.      <u>Other Representations and Probable Cause:</u>  Tardon invokes certain other representations from the affidavit—seemingly not to claim they are false but, instead, to suggest that they could not support a finding of probable cause. He contends that Cohen denied impropriety or concealment in certain financial dealings, that other transactions took place years earlier and were "stale," and that that the filing of CTRs and the use of LLCs for transactions defies a conclusion that those transactions were conducted to conceal. Def.Br.36-37.

As the government has explained, *supra* at 46, concealment is not an element of every money-laundering offense. The fact that certain reports were filed or that LLCs claimed ownership of assets, moreover, does not itself establish that those transactions were legitimate or that funds' *ownership* or *source* were not concealed. The affidavit explained that money launderers often attempt to give transactions a veneer of legitimacy. DE.75-1:11-12. And it detailed, among other things, instances in which assets were eventually transferred to Tardon, reasons to believe Kretz was a straw

74

purchaser, the correlation of couriers' travel from Spain with currency exchanges (suggesting an effort to conceal source and ownership), and Tardon's and his associates' apparent lack of legitimate employment.  DE.75-1:15-18, 21.  The affidavit established ample reason to reject any "innocent explanation" for Tardon's activities.  *Wesby*, 583 U.S. at 61.

3.     In a perfunctory paragraph, Tardon contends (Def.Br.38-39) that the "communication searches" the warrants authorized "did not impose meaningful search limits."   That contention—which, read generously, contends the warrants were overbroad or lacked particularity—has no relevance to a *Franks* claim.  It also is doubly waived.  As the government explained below, and the district court observed, Tardon did not object to the magistrate's report and recommendation on similar grounds.  *See* DE.253:6; *United States v. Perkins*, 787 F.3d 1329, 1343 (11th Cir. 2015) (failure to object results in waiver).  Nor does Tardon's appellate brief sufficiently develop any claim.  *See McClain*, 138 F.3d at 1422.

Regardless, the warrants specifically limited the communications that could be seized from Tardon's properties to: "[c]ommunications between or among co-conspirators regarding the above-listed crimes, including instant messaging chat logs, e-mails, SMS text messaging, and cell phone call logs."  DE.75-1:9.  Even if overbroad or lacking particularity, the warrants satisfy the exclusionary rule's good-faith exception.  *See United States v. Blake*, 868 F.3d 960, 974 (11th Cir. 2017) (warrant for Facebook account upheld on good-faith grounds).  And any error would be harmless because, at

trial, the government introduced few exhibits (a few emails) that could be described as "communications." *See* DE.519:14-21. The other items Tardon references recovered from the searches (Def.Br.39 n.3) were not such "communications."

## C.    Tardon's Motion To Suppress Lacked Merit

The district court also correctly denied Tardon's motion to suppress the evidence Cohen turned over to the government. *See* DE.408; DE.585.

### 1.    Tardon Lacked Any Expectation Of Privacy

First, the district court did not clearly err in finding that Tardon lacked an expectation of privacy in the documents. On that basis alone the district court's order should be affirmed.

"The Fourth Amendment's prohibition against unreasonable searches and seizures protects an individual in those places where he can demonstrate a reasonable expectation of privacy against government intrusion." *United States v. King*, 509 F.3d 1338, 1341 (11th Cir. 2007) (per curiam) (brackets and quotations omitted). A defendant alleging an unconstitutional search "must establish both a subjective and an objective expectation of privacy." *Id.* (quotations omitted). Assessing the "legitimacy of a privacy expectation necessarily entails a balancing of interests," and "[n]o single factor is determinative." *United States v. McKennon*, 814 F.2d 1539, 1543 (11th Cir. 1987) (per curiam) (quotations omitted). Accordingly, "the mere presence of an ownership or financial interest in the item seized is not sufficient to create a legitimate expectation

of privacy." *Id.* Whether a defendant has established a subjective expectation of privacy "is a factual determination" reviewed for clear error. *Id.*

The district court did not clearly err in finding that Tardon lacked a reasonable expectation of privacy in the documents Cohen turned over to the government. DE.408:17; *see* DE.384:10-12. Tardon moved out of the Villa in early February 2011. DE.374:22-23. Although he took certain personal items, he left behind the documents. DE.384:11. Tardon never restricted Cohen's access to those documents; indeed, he had given the Mickey Mouse notebook to her in Spain for safekeeping. DE.384:11; DE.374:32-34. Although Tardon visited the Villa during the month after he had moved out, he never removed the documents. DE.384:11. Similarly, when Pollack visited the Villa on March 1 following the domestic altercation and took certain items, he left the documents. DE.384:11. And although Tardon later sought access to certain documents relevant to his divorce proceedings, nothing in the record suggested those papers included the documents Cohen turned over. DE.384:11.

Tardon's move to the Continuum with some property, and abandonment of other property at the Villa, is strong evidence that he lacked any continued expectation of privacy in the items he left behind. *See, e.g.*, *United States v. Winchester*, 916 F.2d 601, 603-04 (11th Cir. 1990) (defendant abandoned cottage "and all property contained in it" when he left); *United States v. De Parias*, 805 F.2d 1447, 1458 (11th Cir. 1986) (no expectation of privacy in apartment defendant shared with girlfriend after he represented he "was leaving for Houston and not coming back"), *overruled on other grounds*

*by United States v. Kaplan*, 171 F.3d 1351 (11th Cir. 1999); *cf. United States v. Rackley*, 742 F.2d 1266, 1270 (11th Cir. 1984) (guests lacked general expectation of privacy in home).

At a minimum, Tardon's conduct through July 2011 confirms that he retained no subjective expectation of privacy over the documents, which he never sought to recover or otherwise shield from Cohen's unrestricted access. DE.384:11-12. Given the ongoing divorce proceedings, "it was unreasonable for" Tardon "to believe" that Cohen "would not share incriminating documents" that he left behind. DE.384:12.

Tardon fails to show any clear error. He contends (Def.Br.40) that he owned the Villa and continued to use it for some purposes. But "the mere presence of an ownership or financial interest" in property is insufficient. *McKennon*, 814 F.2d at 1543. Tardon also claims (Def.Br.41-42) that orders issued in the divorce proceedings established his legal right to the papers and barred Cohen from seizing them. But he does not acknowledge, much less refute, the district court's factual finding that those orders did not encompass the relevant documents. DE.384:5-7, 11. Those limitations are clear on the face of the orders themselves, particularly the July 7, 2011 order, which Tardon primarily invokes, which was limited to permitting Tardon to remove his clothing and religious items. *See* DE.378-9:2.

Nor is there controlling relevance to Tardon's claim (Def.Br.40) that he lived in the home more permanently before March 2011. The relevant inquiry is whether Tardon had "relinquished his interest" and "no longer retain[ed] a reasonable expectation" of privacy "*at the time of*" the subsequent search. *United States v. Ramos*, 12

78

F.3d 1019, 1024 (11th Cir. 1994).  By July, when Cohen collected and provided the papers to the government, Tardon had both moved out of the Villa *and* made no effort to collect the papers, despite efforts to access other specific property.

### 2.    Tardon's Then-Wife Validly Consented To The Search

Second—and independently—Cohen validly consented to the search.  *See United States v. Harris*, 526 F.3d 1334, 1339 (11th Cir. 2008) (per curiam) (declining to resolve defendant's expectation of privacy where officers received valid consent for search).

A "third party who has 'common authority over or other sufficient relationship to the premises or effects sought to be inspected'"—including one who "has mutual use of the property, with joint access to or control of the area for most purposes"— may consent to a search.  *Id.* (quoting *United States v. Matlock*, 415 U.S. 164, 171 (1974)).  Whether a person consented to a search is a question of fact "reviewed for clear error." *United States v. Watkins*, 760 F.3d 1271, 1279 (11th Cir. 2014).

As the district court found, Cohen had unrestricted access to the documents and willingly turned them over to the government of her own accord.  DE.408:18-25; *see* DE.384:12-20.  Tardon appears to challenge the validity of Cohen's authority to consent only on the ground that orders in the divorce proceeding restricted Cohen's access.  *See* Def.Br.41-42.  As just explained, Tardon cannot refute the district court's contrary finding.

Tardon argued below that Cohen was acting as a government agent in turning over the documents.  *See, e.g.*, DE.379:10-14.  But Tardon has not explained how that

79

status would vitiate Cohen's otherwise valid consent to a search of effects over which she maintained common authority and control. Regardless, Tardon does not directly contest the district court's pre-trial finding that Cohen was not acting as a government agent, *see* Def.Br.40-43, and thus has waived any claim of error, *McClain*, 138 F.3d at 1422.

In any event, the district court did not clearly err in finding that Cohen was not acting as a government agent. *See United States v. Ford*, 765 F.2d 1088, 1090 (11th Cir. 1985) (per curiam) (whether person acted as government agent is fact question reviewed for clear error). After a person's "expectation of privacy" has been "frustrated by a private individual, the Fourth Amendment does not prohibit law enforcement's subsequent use of that information." *United States v. Sparks*, 806 F.3d 1323, 1334 (11th Cir. 2015), *overruled on other grounds by United States v. Ross*, 963 F.3d 1056 (11th Cir. 2020) (en banc). To determine whether a person instead "acts as an instrument or agent of the government" this Court considers "two critical factors: (1) whether the government knew of and acquiesced in the intrusive conduct, and (2) whether the private actor's purpose was to assist law enforcement efforts rather than to further his own ends." *United States v. Steiger*, 318 F.3d 1039, 1045 (11th Cir. 2003).

The magistrate found "undisputed" the testimony that the government "did not direct, know of[,] or acquiesce in" Cohen's "gathering of documents at the Villa" and that Cohen gathered the documents "on her own initiative and without any prompting

from the FBI." DE.384:13-14; *see* DE.408:19-21. Those conclusions are well supported by the record, and Tardon has not shown otherwise.[11]

### 3. The Trial Evidence Did Not Support Tardon's Untimely Mid-Trial Motion To Suppress

Tardon argues (Def.Br.43-48) that certain trial testimony undermined the earlier suppression rulings. The district court correctly rejected those claims.

a. Tardon does not acknowledge—much less address—the district court's threshold ruling that his mid-trial motion was untimely and should be denied on that basis. DE.585:11-14. A motion to suppress evidence must be made before trial, Fed. R. Crim. P. 12(b)(3)(C), and a district court may set a deadline for such motions, Fed. R. Crim. P. 12(c). At the time the district court resolved the motion, Rule 12(e) further provided that "[a] party waives any Rule 12(b)(3) defense, objection, or request not raised by the deadline the court sets under Rule 12(c)," but "[f]or good cause, the court may grant relief from the waiver."[12] Fed. R. Crim. P. 12(e) (eff. Dec. 1, 2002). Denial

---

[11] Below, Tardon argued that a warrant was nevertheless required for the government to open and review the items in the garbage bag. The district court rejected that argument, finding "no evidence" Cohen used the bag "for any reason other than [as] a convenient place to store the documents." DE.384:16; *see* DE.408:22-29. Tardon has not developed, and thus waived, any challenge to that determination. To the extent he gestures at the issue, *see* Def.Br.48, the sole decision he cites involved circumstances in which a third party told officers property did not belong to him *and* he lacked access to and control over that property. *See United States v. Jaras*, 86 F.3d 383, 389 (5th Cir. 1996). Here, Cohen had access to and control over the documents and validly consented. *See Harris*, 526 F.3d at 1339.

[12] This Court applies the version in affect at trial. *Sperrazza*, 804 F.3d at 1118. The 2014 amendment to Rule 12 "retained the existing standard" for untimely claims but

of a motion to suppress on timeliness grounds is reviewed "for abuse of discretion." *United States v. Andres*, 960 F.3d 1310, 1315 (11th Cir. 2020).

The district court found Tardon's description of his post-evidence motion as a "renewed" motion "spurious and disingenuous," and concluded that Tardon described his motion as such to avoid Rule 12(e). DE.585:13. The court further observed that, "by its own admission, the defense was provided notice of Ms. Cohen's work with law enforcement in the Government's Jencks Act disclosures, prior to the jury being sworn." DE.585:13. Indeed, Tardon's counsel's knowledge of that work is confirmed by the fact that counsel raised those instances on cross-examination. DE.524:8-12. The district court explained that Tardon might have attempted to establish cause for his motion—or to extend the pretrial motion deadline—if he had moved to suppress upon receiving the disclosures or, "[a]t a minimum," "when th[e] issue was explored on cross-examination." DE.585:13-14. Instead, Tardon waited until after the close of evidence—"thirty-five days after" the disclosures "and twenty days" after cross-examination—to make the motion. DE.585:14 n.9. Even then, Tardon never explained how anything about Cohen's trial testimony, including her testimony about Tardon's occupancy of the Villa, qualified as "good cause" to warrant renewing his motion to suppress. *See United States v. Smith*, 918 F.2d 1501, 1509 (11th Cir. 1990) (affirming denial where defendant failed to argue good cause). Nor does Tardon

---

relocated it to paragraph (c)(3) and eliminated use of the term "waiver" to avoid confusion. Fed. R. Crim P. 12, advisory committee's note (2014 Amendments).

articulate any grounds for good cause on appeal. *See United States v. Miller*, No. 20-10194, 2023 WL 155212, at *2 (11th Cir. Jan. 11, 2023) (per curiam) (unpublished) (declining to consider untimely suppression motion where defendant "[o]n appeal … offers no argument that good cause exists").

To the extent he attempts to refute the district court's factual representations, those claims lack merit. He suggests (Def.Br.45) that the government had previously denied (at an evidentiary hearing) that reports of Cohen's cooperation existed. But that hearing testimony, and the government's representation that it had turned over all *Jencks* material "as to th[at] particular testimony," related to Cohen's cooperation *against Tardon*, DE.374:54, 67, not the entirely "separate investigation" in which Cohen assisted, DE.524:138 (Albrecht trial testimony). The district court acted well within its discretion in finding Tardon's mid-trial motion untimely. *See United States v. Jones*, 241 F. App'x 676, 678 (11th Cir. 2007) (per curiam) (affirming denial as untimely).

b.    Because Tardon failed to establish good cause, "the issue in the motion is not preserved" and this Court's "review is limited to a plain error analysis." *Andres*, 960 F.3d at 1315. The district court did not plainly err in determining that the trial evidence provided no reason to upset the court's "primary basis" for denying the motion to dismiss: that Tardon "did not enjoy a reasonable expectation of privacy in the documents." DE.585:16. Cohen testified on direct that Tardon was not living or sleeping at the Continuum well before the domestic incident, and her subsequent (at best ambiguous) statements that he continued to "reside" at and had not "moved out

of" the Villa before March 1 are consistent with her testimony that Tardon would visit the Villa and left some items there. DE.523:124-127; DE.524:81-82. Moreover, in finding Tardon lacked any expectation of privacy, the district court did not rely on Tardon's residency alone but also relied significantly on the fact that Tardon did not restrict Cohen's access to the documents or seek to retrieve them, even as he sought access to other items. DE.384:11-12.

Nor did the district court err in finding that Cohen's trial testimony about her cooperation involved "a separate ongoing[ ] investigation." DE.585:16, 19. Nothing about Cohen's efforts in that investigation demonstrate that she was acting at the FBI's behest or direction when providing the documents on July 7. Tardon twice invokes Cohen's pre-trial hearing testimony, but he takes that statement out of context. In full, Cohen maintained that she *did not* "believe" that turning over the materials was required by her "obligations under the April 7th [immunity] letter"; yet, she "felt it was necessary to give [the government] the documents that were still in the house" because the parties' discussion that day pertained to "the properties" the documents were about. DE.374:54.

### 4. Any Error Was Harmless

Even if the items Cohen turned over should have been suppressed, any error was harmless. *See United States v. Nicholson*, 24 F.4th 1341, 1354 (11th Cir. 2022). The sole item introduced at trial was the Mickey Mouse notebook, which helped substantiate Tardon's and Cameno's drug-trafficking relationship given the entries that matched

Cameno's ledger.[13]  While the government described the notebook well before trial as "arguably the single more important piece of evidence," DE.354:4-5, the full trial evidence overwhelming established that connection and Tardon's drug trafficking more generally: Pollack testified that a significant portion of the cocaine shipments were segregated for Cameno and her husband and that Cameno owed Tardon money as a result.  DE.519:107-108.  Additionally, money-transfer receipts, telephone numbers, addresses, and photographs found in Tardon's and Cameno's homes substantiated their relationship.  *Supra* at 14-15.  The "jury would have returned the same verdict even if [the] evidence had been excluded."  *Nicholson*, 24 F.4th at 1354.

## III.    The District Court Correctly Resolved Tardon's Evidentiary Objections

The district court acted within its discretion in rejecting Tardon's evidentiary objections.

### A.    The Spanish Wiretaps Were Properly Authenticated

At trial, the government introduced recordings and transcripts (including English translations) of telephone calls Spanish authorities recorded pursuant to Spanish wiretaps.  DE.518:103-106, 116.  Tardon renews (Def.Br.49-50) his objection that the recordings were not properly authenticated.  DE.518:109-110, 128-141.

---

[13] The government briefly displayed a page that contained a poem or song, written in Tardon's handwriting (in Spanish), entitled "Drug, Drug, Drug, Drug Dealer." DE.523:96-97, 123-124.  The government did not dwell or comment on that page and, contrary to Tardon's claim, did not treat it "as a form of confession."  Def.Br.43 n.5.

Evidence is properly authenticated where there is "evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). The "preferred practice" in this Circuit is to authenticate a sound recording "with evidence regarding the competence of the tape machine operator, the fidelity of the equipment, the absence of any alterations to the tape and the identity of the speakers." *United States v. Richardson*, 764 F.2d 1514, 1524 (11th Cir. 1985). But the district court retains "broad discretion" to admit a record "even if one or more of these requirements" is not met, so long as "there is independent evidence" of the recording's accuracy. *United States v. Reeves*, 742 F.3d 487, 501 (11th Cir. 2014) (quotations omitted). After the government makes a "prima facie" showing of authenticity, "the evidence may be admitted, and the ultimate question of authenticity is then decided by the jury." *United States v. Lebowitz*, 676 F.3d 1000, 1009 (11th Cir. 2012) (per curiam). This Court is "extremely reluctant to disturb" the district court's ruling, and will do so only if "there is no competent evidence in the record to support it." *Reeves*, 742 F.3d at 501 (quotations omitted).

The district court acted within its discretion in admitting the recorded conversations. The government introduced the tape recordings during the testimony of SNP Inspector Jorge Fernandez Gismero, who had worked for nine years for SITEL, the Spanish entity that conducts wiretaps. DE.518:89-90, 93. Gismero's role primarily was "technical" and involved ensuring "that the systems are operational." DE.518:95. He explained that after a court authorizes a wiretap, SITEL activates its system's ability to receive calls from the designated number. DE.518:96-99. In real time, the phone

86

carrier then sends calls, text messages, and associated data from the number through a "point-to-point" connection to SITEL. DE.518:99-101, 112-113. SITEL stores that data in an encrypted "central server" in a "read-only mode" that "can only be accessed by the investigative group" "authorized to" access it; the read-only mode precludes any "direct access" to the server or ability to "manipulate the contents of [a] call." DE.518:101-103. Gismero also testified that the system has a "health-monitoring mechanism" that reports whether the system is functioning. He represented that there "has never been a technical problem that would have led to the call being changed or altered in some way." DE.518:124, 126. When a technical issue arises, SITEL generally "do[es] not receive the call" at all. DE.518:124.

In preparation for his testimony, Gismero was given a list of recorded calls to locate in SITEL's server, and he saved "an exact copy" of each call onto a CD. DE.518:103-104, 115. Gismero compared those calls with a different CD the government presented him upon arriving in the U.S. (Government Exhibit 100), to confirm that all of the calls were contained on the CD Gismero prepared. DE.518:103-105, 113-114. Gismero also verified the data listed for each call on the relevant transcript, including the date, duration, and phone numbers involved. DE.518:106.

Given this testimony, the recordings were properly admitted. Gismero's testimony established the "competence" and "fidelity" of the SITEL system's equipment and "the absence of any alterations to the tape[s]." *Richardson*, 764 F.2d at 1524. During trial, Tardon's co-conspirators and other witnesses identified the voices

87

on the tapes.  *See, e.g.*, DE.519:129-131, DE.521:78-79.  Tardon did not make "the slightest hint" below—nor does he claim on appeal—that "any of the tapes ha[d] been altered."  *United States v. Shabazz*, 724 F.2d 1536, 1539 (11th Cir. 1984); *see United States v. Singleton*, 455 F. App'x 914, 917 (11th Cir. 2012) (per curiam) (affirming admission where defendant "has not alleged—and there is no evidence to support—that the recording was altered in any way").

Tardon's sole argument for reversal (Def.Br.49) is the fact that, as Gismero acknowledged at trial, he did not listen to the original file of each call as it was contained directly in SITEL's centralized system.  DE.518:115-116.  But Gismero's testimony about the system's operation and his method for locating the recordings dispelled any likelihood that they were inauthentic.  And this Court has expressly declined to disturb a district court's authentication ruling where the "only semblance of evidence adduced to challenge the admission" is a claim that the witness "had not listened to the original" recordings before testifying to the authenticity of a duplicate.  *United States v. Sarro*, 742 F.2d 1286, 1292 (11th Cir. 1984).  "Such evidence is not sufficient to dismantle the government's properly laid" foundation.[14]  *Id.*

---

[14] Without sufficiently developing any argument, Tardon cites (Def.Br.49-50) Federal Rule of Evidence 1002, which requires admission of an original recording "unless the[ ] rules … provide[ ] otherwise."  Rule 1003 provides otherwise, stating that "[a] duplicate is admissible to the same extent as the original unless a genuine question is raised about the original's authenticity."  Fed. R. Evid. 1003.  The district court found "no genuine question" was raised about the recordings' authenticity, DE.518:141, and Tardon articulates no argument to upset that finding.

88

**B.     Testimony of Spanish Police Officers Was Admissible**

Tardon next contests (Def.Br.50-53) the admission of testimony by several SNP officers.

1.     At trial, five SNP officers testified concerning their investigation of, and execution of search warrants on, Ana Cameno and her husband.  Inspector Juan Lujan Huerta, the chief of a group responsible for investigating drug trafficking, identified photographs of Cameno and her husband, and described the unit's investigation, including the use of wiretaps to surveil more than 100 telephone lines.  DE.521:9-14, 57-72, 77-82.  "Based on the fact that there were over 100 different lines" associated with Cameno and her husband, that they used "approximately 40 lines at a time," and that officers "found 276 kilos of cocaine in one of the properties," Huerta concluded that they "were involved in the distribution of large amounts of cocaine" and "were distributors [on] a large scale."  DE.521:15-16.  Four other officers, who assisted Huerta in executing the warrants at three locations, also testified and identified photographs and video of items seized during the searches.  DE.521:47-49, 104-118, 128-138, 144-157; DE.522:26-30, 36-47. Later, another SNP officer, Inspector Alvaro Ibanez Alfaro, testified to a search he assisted with of Tardon's home in Spain, including the discovery and counting of money found throughout the home.[15]  DE.526:98-99, 111-117.

---

[15] Tardon mischaracterizes that testimony in suggesting Ibanez had "no personal knowledge" about the amount.  Def.Br.52.  Ibanez testified to being present for much of the counting of the money, which was supervised by a Secretary of the Spanish Judiciary, and was informed of the amount, which matched an amount Artemio had

The district court rejected Tardon's objections and motion for a mistrial, finding that Huerta's testimony, in particular, provided an opinion that fell within the scope of his employment.  DE.521:16-29, 73.

2.    A witness may testify to a matter where there is sufficient evidence "to support a finding that the witness has personal knowledge of the matter."  Fed. R. Evid. 602.  An officer therefore can testify to "observations made and information obtained during" a search.  *United States v. Williams*, 643 F. App'x 933, 938 (11th Cir. 2016) (per curiam).  Under Rule 701, a witness also can offer an opinion if it is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or the determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."  Fed. R. Evid. 701.  A law enforcement agent may offer an opinion that is "rationally based on his perception" developed "[w]hile investigating [a] case," and may testify based on what he "learned during [a] particular investigation."  *United States v. Jayyousi*, 657 F.3d 1085, 1102-04 (11th Cir. 2011).  A district court's ruling "regarding the admissibility of [an] agent's lay testimony" is reviewed "for a clear abuse of discretion."  *Id.* at 1102.

Tardon first asserts—but did not contend at trial—that he lacked "prior notice" of the SNP investigators' likely testimony and was "unable to effectively cross-examine" them.  Def.Br.50.  Those complaints are baseless.  The government's witness list

---

disclosed.  DE.526:112, 116-117, 150-151.  The district court denied a motion to strike the testimony and found it properly authenticated.  DE.527:7-8.

90

identified the witnesses, DE.436-1, and the government produced in discovery materials obtained from the SNP, including all police reports, *see, e.g.*, DE.93; DE.206; DE.248; DE.327; *see also* DE.290:1 (government "provid[ed] early Jencks as well as items which would not ordinarily be provided such as Spanish and Italian police reports").

On the merits, the SNP officers' testimony was admitted consistent with the Rules of Evidence. The officers testified to their personal observations and knowledge about their investigative steps and what they learned about Cameno and her husband. For example, one officer discussed the documentary evidence he personally found during the search, which the district court determined was properly authenticated. DE.521:145-147. The testimony was not hearsay (and did not implicate the Confrontation Clause) because the officers did not repeat any out-of-court statements; they described their own observations or, at most, "simply asserted" their own "opinion." *United States v. Blasingame*, 219 F. App'x 934, 948-49 (11th Cir. 2007) (per curiam).

Inspector Huerta offered a conclusion about Cameno's and her husband's activities—but not *Tardon*'s activity, which was appropriately left to the jury, *see* DE.521:21 (recognizing same). His conclusion, based on his perceptions gleaned while investigating Cameno and her husband and, in substantial part, on the items recovered during the searches of their properties, was admissible under Rule 701. Inspector Huerta based his conclusion in part on certain items that were initially found when he

was not present. But those items were later handed over to him. DE.521:50, 59, 118. And this Court has "allowed a lay witness to base his opinion testimony on his examination of documents even when the witness was not involved in the activity about which he testified." *Jayyousi*, 657 F.3d at 1102. The officers who recovered those items in the first instance testified, and Tardon was able to cross-examine Huerta concerning his source of information. DE.521:83-84.

Tardon's contention that testimonial police reports were introduced is baseless. DE.521:28 (district court finding: "I'm not even sure [the objections are] made in good faith, quite frankly. There's no basis for them."). No witness disclosed or testified to the content of any report, DE.521:27, and Tardon's reference to the jury's own notes is frivolous. Jurors' contemporaneous notes of officers' in-court testimony are not the equivalent of introducing a written police report.

## C.    The Kilogram Of Cocaine Was Admissible

Finally, Tardon contests (Def.Br.53-54) the district court's admission of a physical kilogram of cocaine that SNP officers recovered during their search of Cameno's home. DE.521:54-55. The government acknowledged that it was not directly connecting that particular kilogram to Tardon. DE.521:35. Contrary to Tardon's claim, that did not render the kilogram irrelevant. As the district court found, the physical evidence substantiated that Cameno *herself* was trafficking cocaine. DE.521:45. And, given the substantial evidence of Tardon's connection to Cameno, it supported a showing that Tardon was involved in that trafficking as well. DE.521:45-

92

46; *see* Fed. R. Evid. 401(a) (evidence is relevant if "it has any tendency to make a fact more or less probable"). Nor was the evidence's probative value "substantially outweighed" by any unfair prejudice. Fed. R. Evid. 403; *see* DE.681:205 (rejecting argument). The government introduced a single kilogram from more than 276 found in Cameno's home, and otherwise relied on photographs depicting the total number of wrapped bundles and testimony of SNP officers who received them. *See, e.g.*, DE.521:110-111.

Tardon asserts in passing that the government introduced the evidence without "lawful authority." Def.Br.53. If intended to reprise his trial objection that it was a crime for the prosecutor and court personnel to handle the drugs, *see* DE.681:206-208; DE.521:30-33, that claim is waived for failure to develop it on appeal. Regardless, Tardon cites no authority establishing that prosecutors (or the court or jurors) commit a crime by handling properly admitted drug evidence. And even if such conduct *could* constitute a crime—one the government assuredly would decline to prosecute— Tardon fails to explain how that fact would give him grounds to contest the evidence's established admissibility *as to him*. *Cf. Rakas v. Illinois*, 439 U.S. 128, 134 (1978) (exclusionary rule limited to defendant whose own rights are violated).

In all events, any error was harmless because the cocaine's introduction "had no substantial influence on the outcome" of the trial, which featured "overwhelming evidence" of Tardon's guilt. *United States v. Harriston*, 329 F.3d 779, 789 (11th Cir. 2003) (per curiam) (quotations omitted). The government introduced a photograph of the

same physical kilogram, including in its unwrapped state, and Tardon stipulated that kilogram was cocaine.  DE.521:54-57.  More generally, a photograph of the 276 wrapped kilograms recovered from Cameno's home; the cash, cell phones, and the other evidence of her drug trafficking; Pollack's testimony concerning the connection between Tardon's and Cameno's activities; and the items recovered from Tardon's and Cameno's homes substantiating their relationship all overwhelmingly established that Tardon trafficked cocaine in coordination with Cameno.  *Supra* at 14-15.

## IV.    There Was No Cumulative Trial Error

Tardon also claims (Def.Br.54-67) that the trial was infected by cumulative errors, which he does not contend independently warrant reversal, *see* Def.Br.66-67. Each contention lacks merit.

### A.    The Jury Instructions Were Appropriate

Tardon's perfunctory claims of instructional error (Def.Br.54-56) fail.

His suggestion (Def.Br.54-55) that the instructions allowed the jury to convict him on a "jurisdictionally-invalid theory" simply repackages his claim that the money-laundering statutes do not reach his predicate foreign offenses.  As explained above, that argument fails.  *Supra* at 33-39.

Tardon otherwise contends that the district court erred in declining to give certain instructions.  Refusal to give a requested instruction is reviewed "for abuse of discretion," and is error "only if the requested instruction is correct, not adequately covered by the charge given, and involves a point so important that failure to give the

94

instruction seriously impaired the party's ability to present an effective case." *United States v. Svete*, 556 F.3d 1157, 1161 (11th Cir. 2009) (en banc) (quotations omitted). The court is not obligated to give instructions that "contain partisan and argumentative statements of law and fact." *United States v. Maxwell*, 579 F.3d 1282, 1304 (11th Cir. 2009).

The district court correctly rejected Tardon's request to instruct the jury that violations of Spanish tax or financial reporting laws were not specified unlawful activity. *See* DE.465:3 (requested instruction); DE.533:22-27 (charge conference discussion). That request was adequately covered by the given instructions, which stated that the term "specified unlawful activity" "in this case means *only*" drug trafficking. DE.538:46 (emphasis added). Indeed, the word "only" was added in response to Tardon's requested instruction, for clarity. DE.533:25-26. Tardon thus is wrong to suggest there was a risk "the jury would conflate the underlying criminal allegations," Def.Br.55, particularly because the government and defense both stressed during closing argument that Tardon was not charged with committing tax fraud. DE.504:45-46, 87.

The district court also correctly rejected Tardon's request for a heightened willfulness instruction, because that instruction misstated the law. *See* DE.465:11 (request); DE.530:122-132 (charge conference). Tardon requested that the jury be instructed under Eleventh Circuit Pattern Instruction 9.1B, which defines willfully to require the defendant have "the specific intent to violate a known legal duty, that is, with the intent to do something the law forbids," 11th Cir. Pattern Jury Instr. (Criminal

95

Cases), at 34 (2010 ed.) ("11th Cir. Pattern"), rather than the traditional definition (set forth in Instruction 9.1A) that is "used in most cases where willfulness is an element," *id.* at 31. Instruction 9.1B is appropriate only for crimes that require "a particularized knowledge of the law being violated." *Id.* at 34. The money-laundering statute, Section 1956(a), is not such an offense.

Consistent with the statutory text, the courts of appeals, including this Court, have uniformly observed that the money-laundering statute carries no willfulness requirement at all, *United States v. Cancelliere*, 69 F.3d 1116, 1121 (11th Cir. 1995) ("Willfulness is not a statutory element of money laundering"); *see also, e.g.*, *United States v. Santos*, 20 F.3d 280, 284 n.3 (7th Cir. 1994). The government does not have to prove that "the defendant knew that his money-laundering acts were illegal." *Golb*, 69 F.3d at 1428. Tardon identifies no case holding otherwise. And his invocation of *Ratzlaf v. United States*, is inapposite both because the statutes at issue there expressly included a willfulness element and because the "complex of provisions" within which those statutes were "embedded" all required proof that the defendant have violated a known legal duty. 510 U.S. 135, 140-42 (1994); *see, e.g.*, *Santos*, 20 F.3d at 284 n.3 (distinguishing *Ratzlaf* on same ground). As the district court observed, moreover, in this case the jury was instructed on the meaning of "willfully" solely for purposes of the conspiracy offense's requirement that Tardon have "willfully join[ed]" the conspiracy.

96

DE.530:122-123.  In that context, Instruction 9.1A's "general definition of 'willfully'" "usually appl[ies]."[16]  11th Cir. Pattern, at 422.

Finally, Tardon summarily lists (Def.Br.56) four other instructional requests he claims were denied in error.  He presents no developed argument and cites no relevant law to substantiate any error, and thus has waived those claims.  *McClain*, 138 F.3d at 1422.  Regardless, as the district court explained, the requests misstated the law, were adequately covered by the given instructions, or were plainly argumentative.  DE.533:31-38, 41-49, 52, 71.

## B.     The District Court's Other Evidentiary Rulings Were Correct

Tardon contests (Def.Br.56-61) several other evidentiary rulings.  Each claim fails.

1.     At trial, the government impeached Cohen's testimony that Ana Cameno did not sell anything that belonged to Tardon in Spain, DE.524:109-110, with Cohen's prior admission to investigators that two kilograms found in Cameno's home was something Cameno "was moving for him [Tardon], in Spain," DE.144-1:100.  The district court permitted the government to impeach Cohen by asking her whether she

---

[16] It would be particularly erroneous to accept Tardon's argument because—although the government did not object (and thus accepts the instruction for purposes of appeal)—the inclusion of any willfulness element erroneously elevated the government's burden.  Willfulness is not an element of a money-laundering conspiracy; the "appropriate mental state" under the statute "[is] merely 'knowing and voluntarily.'" *United States v. Dohan*, 508 F.3d 989, 994 (11th Cir. 2007) (per curiam).  The Court thus has cautioned that the pattern instruction in use at the time of Tardon's trial "place[d] a higher burden on the government" and "should not be used." *Id.*

had told police "that the cocaine that Ana Cameno was moving in Spain belonged to Mr. Tardon." DE.524:116-117. Cohen responded, "Yes." DE.524:117. The court gave a limiting instruction that the evidence was "not being offered for the truth of the matter asserted but, rather, to impeach the witness." DE.524:135.

The district court did not clearly err in allowing the impeachment. Cohen's categorical denial that Cameno was selling anything for Tardon was plainly inconsistent with her prior statement. And any prejudice was mitigated by the limiting instruction, which the jury is "presumed to have followed." *United States v. Grushko*, 50 F.4th 1, 15 (11th Cir. 2022).

To the extent Tardon now suggests that the prosecutor's reference to "the cocaine" (rather than to "two kilograms" of cocaine) was misleading, Tardon expressly withdrew—and thus waived—any objection to the question's wording. DE.524:117 ("Objection. It wasn't 'the.' It was -- I'll withdraw the objection."); DE.524:131 ("[W]hat I was withdrawing was an objection as to the form and the way Mr. Gonzalez had asked the question because he did not read it verbatim.").

Nor did the district court abuse its discretion in denying recross. *United States v. Ross*, 33 F.3d 1507, 1517 (11th Cir. 1994) ("Subject to the Sixth Amendment, the trial court has discretion to limit recross-examination."). Tardon fails to explain why he could not call Cohen in his case-in-chief as the district court suggested. And he likely declined to do so because, as the government explained, recalling Cohen would have opened the door to Cohen's significantly more inculpatory statements. DE.524:128-

98

131; *see supra* at 57-58 (describing same).  Any error is, in any event, harmless, given the overwhelming evidence establishing a connection between Tardon and Cameno, including Pollack's testimony that Cameno was moving Tardon's cocaine.  DE.519:107-108, 124.

2.　Tardon also invokes the marital-communications privilege.  That privilege "excludes information privately disclosed between husband and wife in the confidence of the marital relationship."  *Harrison v. United States*, 577 F. App'x 911, 913 (11th Cir. 2014) (per curiam) (citing *Trammel v. United States*, 445 U.S. 40, 51 (1980)).  It applies "only to statements, not acts," *id.*, and does not bar testimony about what the spouse "observed," *United States v. Abram*, 171 F. App'x 304, 310 (11th Cir. 2006) (per curiam).  Nor does the privilege "apply to conversations between husband and wife about crimes in which they are jointly participating," *id.*, including "conversations made in furtherance of a conspiracy," *United States v. Malekzadeh*, 855 F.2d 1492, 1496 (11th Cir. 1988).  The district court's ruling on a claim of evidentiary privilege is reviewed "only for abuse of discretion," and factual findings are reviewed "for clear error."  *United States v. Singleton*, 260 F.3d 1295, 1301 (11th Cir. 2001) (per curiam).

Before trial, the district court declined to exclude evidence based on the privilege, finding any conversations unprotected because, among other things, they involved the "money laundering conspiracy."  DE.301:4.  The court reserved Tardon's ability to "re-assert his claim" at trial as to any conversations the government sought to introduce that "were not made about crimes in which Cohen and Tardon were jointly

participating." DE.301:4 n.4.  At trial, Tardon reasserted only a generalized objection. DE.523:34.  And, on appeal, he fails to identify with particularity any specific testimony that was derived from Cohen's conversations with Tardon (rather than from her observations or description of her own acts).  For that reason alone, his argument fails. *McClain*, 138 F.3d at 1422; *cf. United States v. Langford*, 647 F.3d 1309, 1331 (11th Cir. 2011) (party "obliged to cite [this Court] to the specific portions of [the] testimony he sought to introduce").

Regardless, the district court did not err in finding that any relevant communications were made in furtherance of a conspiracy.  Cohen's extensive statements to the FBI (for which she received limited-use immunity) make that clear. DE.189-1:1-14.  Cohen was a co-conspirator (as the district court expressly found, DE.523:149); she testified to her involvement in the money laundering at trial, including acting as a courier of euros from Spain, DE.523:42-43; and the government introduced numerous recordings in which she and Tardon discussed transferring money to the U.S., *see, e.g.*, DE.523:48-51.

3.      Finally, Tardon disputes the introduction of Cohen's testimony that Tardon's mother told her that Tardon's father "said to a Spanish judge that [Tardon] was a narcotraficante" (a "[d]rug dealer").  DE.523:29-30, 164-166.  The district court admitted the testimony as the statement of a co-conspirator, under Federal Rule of Evidence 801(d)(2)(E), after finding that both Cohen and Tardon's mother were co-conspirators and accepting that the statement was in furtherance of the conspiracy

because, as the government explained, it communicated that "there are people out there that are warning law enforcement" about Tardon's activities.  DE.523:33-34, 148-149.  Because Tardon's *father* was not a co-conspirator, DE.523:31, the district court gave a cautionary instruction, informing the jury that "the statement made by [Tardon's] father is not coming in for the truth of the matter asserted."  DE.523:165.  During closing argument, the government referenced the statement as evidence that Cohen was a co-conspirator, but the prosecutor stressed that the father's claim "may be true" or "may not be true" and was not what the jury should "base [its] decision [i]n this case on."  DE.504:65-66.  Instead, the prosecutor said, "The purpose of that was to show you how the mother was warning Sharon Cohen, whether true or not, what the father said."  DE.504:65-66.

The district court did not clearly err in finding the statement was made in furtherance of the conspiracy.  Tardon is simply wrong that the government "added the conspiratorial theory only in closing."  Def.Br.60.  The government cited the conspiracy as the basis for the testimony's introduction, and the district court accepted that argument.  DE.523:30-34, 148-149.  The government's closing-argument contention that Tardon's mother was warning Cohen to be careful around Tardon's father was a fair inference from the testimony; Cohen testified that she had gone with Tardon's sister to a place Tardon's father was located, but did not go inside herself.  DE.524:85-86.  And because Tardon's father's statement was not introduced for its truth, there was no hearsay or Confrontation-Clause issue.  *United States v. Gutierrez*, 810 F. App'x 761, 766

101

(11th Cir. 2020) (per curiam) ("If a statement is not offered for its truth, however, it's not hearsay and does not violate the Confrontation Clause."); *see United States v. Jiminez*, 564 F.3d 1280, 1286-87 (11th Cir. 2009).  Finally, given the overwhelming evidence of Tardon's drug trafficking, and Cohen's participation, any error was harmless.[17]

## C.    The Government's Closing Was Proper

Last, Tardon claims (Def.Br.61-66) that the government presented improper closing argument.  There was no infirmity in the government's presentation.

1.    Closing remarks may be improper "if they materially misstate the facts shown by the evidence," *United States v. Goldstein*, 989 F.3d 1178, 1199 (11th Cir. 2021), or improperly vouch for a witness by "placing the prestige of the government behind the witness" or "indicating that information not before the jury supports the witness's credibility," *United States v. Sosa*, 777 F.3d 1279, 1295 (11th Cir. 2015) (quotations omitted).  A prosecutor's comments, however, "must be viewed in the context of the trial as a whole," and the prosecutor may "state conclusions drawn from the trial evidence," *Reeves*, 742 F.3d at 505, or suggest "what the jury should conclude from the evidence before it," *United States v. Rivera*, 780 F.3d 1084, 1100 (11th Cir. 2015).  He can

---

[17] Tardon's vague complaints about the government's use of Cohen's impeachment in closing, Def.Br.58, or testimony concerning Spanish police investigations and opinions, Def.Br.59-60, are addressed elsewhere.  *Supra* at 89-92; *infra* at 103-104.  Tardon also baldly asserts that the government failed to disclose whether a forfeiture-sharing agreement was reached with the Spanish government.  Def.Br.61.  As the government represented in response to a similar allusion in Tardon's motion for a new trial: "No such arrangement exists."  DE.542:8.

also "comment[ ] on a witness's credibility, which can be central to the government's case." *Sosa*, 777 F.3d at 1295 (quotations omitted). And a prosecutor "may comment on the strength of the Government's proof," so long as the comments do not constitute improper vouching. *United States v. Reliford*, 58 F.3d 247, 250-51 (6th Cir. 1995); *cf. United States v. Hunter*, 770 F.3d 740, 745 (8th Cir. 2014) ("[A] prosecutor may comment on the strength or credibility of the defense case.").

Even when statements exceed these bounds, a new trial is warranted only when the "defendant's substantial rights are prejudicially affected"—*i.e.*, where there is "a reasonable probability" that "but for the remarks" the trial's outcome "would have been different." *Reeves*, 742 F.3d at 505 (quotations omitted).

2.    Tardon first disputes (Def.Br.62) the permissibility of the government's closing-argument statements about Cohen's testimony. The government referenced Cohen's work as "an escort" to explain possible inconsistencies in her testimony and why she might have initially "turn[ed] the blind eye to what was going on" or shied away from revealing Tardon's activities. DE.504:49-50. That was a "permissible" means "to counter" the defense strategy of "undermin[ing] the credibility of the Government's case." *United States v. Bernal-Benitez*, 594 F.3d 1303, 1314 (11th Cir. 2010). The district court also correctly rejected Tardon's argument that the government improperly invoked impeachment evidence as substantive evidence. *See* DE.504:81. When placed in context, the representation that Cohen had "slipped" when she "told the FBI that the cocaine that Ana [Cameno] had been arrested with belonged to" Tardon, was

103

presented as a reason to discount Cohen's denial of such knowledge at trial. DE.504:50-51. The statement accurately reflected the limited impeachment evidence that came in at trial. DE.524:117.

Tardon cites additional statements from closing in summary fashion. *See* Def.Br.62-63. As an initial matter, in each instance Tardon identifies in which the prosecutor used the first-person (*e.g.*, "I think"), the defense's contemporaneous objection caused the prosecutor to rephrase his comment, *see* DE.504:39, 42-43, 74-75, as the prosecutor acknowledged at trial, DE.504:78-79. That "ameliorative step" was "enough to cure any unfair prejudice arising from the statement[s]." *See United States v. Papajohn*, 212 F.3d 1112, 1121 (8th Cir. 2000), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004).

More generally, none of Tardon's claims withstand scrutiny. Several statements were permissible comments on the strength of the government's proof, which did not cross the line into personal vouching. *See* DE.504:42, 74-75. Others permissibly reiterated the trial testimony or, at most, stated a conclusion readily drawn from the evidence. Ample evidence established that Tardon's Spanish car business was illegitimate. DE.504:39. The jury could permissibly infer that Tardon was a "big drug dealer" who wanted to create distance from his drugs but remain close to his money. DE.504:33-35. The prosecutor fairly described Pollack's testimony about Krentz's statements (which Pollack conceded concerned cocaine trafficking, DE.519:69-70), as representing that Tardon "deals in cocaine," DE.504:43. And Cohen herself testified

104

that she helped Tardon hide duffel bags full of euros in his house in Spain and later led authorities to nearly 19 million euros hidden in the same location.[18]  DE.504:51; *compare* DE.523:24-28, 155-156; DE.526:150.

Nor did the government misstate the law.  The government's representation that simply making a purchase with $10,000 in criminal proceeds violates Section 1957(a) counteracted Tardon's suggestion that he concealed nothing, and the government followed up by quoting the jury instructions precisely.  DE.504:53-55.  The prosecutor's discussion of the term "willfully" likewise quoted directly from the instructions. DE.504:157-158.  And the reference to the need to "start subtracting overhead"—made during the government's rebuttal to explain why the total amount of funds brought to the U.S. could not have come from The Collection even under the most generous view of the evidence, DE.504:148-151—merely invited the jury to deploy common sense. "Jurors are entitled—indeed, expected—to make inferences based on common sense." *United States v. Caldwell*, 81 F.4th 1160, 1176 (11th Cir. 2023).

3.    In any event, the "record contains sufficient"—indeed, overwhelming— "independent evidence of [Tardon]'s guilt" such that any problematic statements during closing were harmless.  *Reeves*, 742 F.3d at 506.  Tardon claims otherwise by citing

---

[18] Because Tardon did not contemporaneously object to this statement, *see* DE.504:51, any error would be reviewed only for plain error, *Goldstein*, 989 F.3d at 1199.  Tardon again invokes the government's statements concerning violations of U.S. law and Tardon's mother's remark to Cohen.  As explained, those claims mischaracterize the statements and their use in closing.  *Supra* at 32, 41 n.7, 100-102.

105

several instances in which objections were sustained during his own closing to suggest the district court "erroneously foreclosed defense closing argument."  Def.Br.65.  But the court sustained objections that Tardon was arguing facts not in evidence or misstating the law.  DE.504:95, 97-99, 110-111, 122, 135, 142.  Counsel was allowed to rephrase his contentions to conform to the evidence.  And Tardon never claimed that the court's rulings foreclosed him from presenting an effective closing.

## V.      Tardon's Sentence Should Be Affirmed

Finally, Tardon challenges (Def.Br.67-80) aspects of his sentence.  His sentence should be affirmed.

### A.      Background

1.      After finding Tardon guilty on each of the charged offenses, the jury heard additional evidence and returned a special verdict finding that certain real and personal property (but not others) was "involved in" or "traceable to" Tardon's money-laundering offenses.  *See* DE.487 (Special Verdict); *see* 18 U.S.C. § 982(a)(1) (requiring forfeiture of "any property, real or personal, involved in [a Section 1956 or 1957] offense, or any property traceable to such property").  Specifically, the jury found forfeitable the six vehicles and two properties (the Villa and the condominium at the Continuum) that were identified in the substantive money-laundering counts, as well as money in three bank accounts held in the names of Cohen, Tardon, Tardon's mother, and one of the LLCs (Miamark).  DE.487:1-19.  The jury did not find forfeitable two other vehicles (a Rolls-Royce Ghost and a Mercedes-Benz McLaren), four

condominiums (located at buildings called The Mark and The Murano), eight luxury watches, and other jewelry.  DE.487:1-19.

The district court entered a preliminary order of forfeiture for the property the jury found forfeitable.  DE.496.  The government subsequently sought a forfeiture money judgment in the amount of $14,358,639.64—representing the full amount of money that Tardon transported to the U.S. during the conspiracy by wire transfers through Western Union, MoneyGram, or to bank accounts, by bulk cash carried by couriers, and by direct transfers to third parties.  DE.550:9; *supra* at 7-10 (describing evidence relevant to each method).  The government also requested forfeiture of certain substitute assets under 21 U.S.C. § 853(p) in satisfaction of the money judgment. DE.550:10-13.  Section 853(p) permits the court to "order the forfeiture of any other property of the defendant" if, "as a result of any act or omission of the defendant," the directly forfeitable property (A) "cannot be located upon the exercise of due diligence"; (B) "has been transferred or sold to, or deposited with, a third party"; (C) "has been placed beyond the jurisdiction of the court"; (D) "has been substantially diminished in value"; or (E) "has been commingled with other property which cannot be divided without difficulty."  21 U.S.C. § 853(p)(1)-(2).

The district court found—based on the trial evidence and additional testimony elicited during the sentencing hearing, *see* DE.602:53-81—that the government had proven, by a preponderance of the evidence, that the requested amount was "the total amount of monies laundered by [Tardon]."  DE.602:86.  Consistent with that finding,

107

the court imposed a forfeiture money judgment, observed that the money judgement would be "credited or reduced" by the amount the government was able to secure by selling the property the jury found directly forfeitable, and ordered the forfeiture of the other identified property as substitute assets to satisfy the remaining amount of the judgment.  DE.601:14-15, 18-24; *see* DE.608:6.  The court did, however, order the release of certain property to allow Tardon to pay legal fees.  DE.601:24-26; DE.613:1-4.

2.  Before sentencing, the Probation Office recommended calculating Tardon's base-offense level by applying Sentencing Guidelines § 2S1.1(a)(1), which provides, for money-laundering offenses, that the base offense level is "[t]he offense level for the underlying offense from which the laundered funds were derived, if (A) the defendant committed the underlying offense (or would be accountable for the underlying offense under [the "Relevant Conduct" guideline]); and (B) the offense level for that offense can be determined."[19]  U.S.S.G. § 2S1.1(a)(1).  The Probation Office calculated the base offense level by reference to Guidelines Section 2D1.1(c)(1), which specifies the base-offense level for drug-trafficking offenses.  DE.497:16.  Tardon objected on the ground that "there is no intent under the guideline for a guideline base offense level to be attached to foreign criminal conduct."  DE.546-2:5.  He contended that because there is "no base offense level applicable to conduct that does not violate

---

[19] The district court applied the 2013 version of the Guidelines Manual.  The cited provisions (unless otherwise noted) were identical to those currently in force.

United States laws or which exceeds the scope of United States jurisdiction," Guidelines Section 2S1.1(a)(2) should apply. *Id.* That provision sets the base offense level at 8 and adds an additional number of offense levels corresponding to the value of the laundered funds. U.S.S.G. § 2S1.1(a)(2).

Following additional briefing on the question, DE.571; DE.573, the district court rejected Tardon's objection and determined that Section S21.1(a)(1) applied, with reference to Section 2D1.1's offense levels. DE.605:9-13. As the court explained, the guidelines instruct the court to consider all relevant conduct of the defendant, and the money-laundering statutes provide for certain extraterritorial jurisdiction. DE.605:9-13. The court therefore calculated a base offense level of 38, accounting for the fact that Tardon's offense involved more than 450 kilograms of cocaine. DE.605:16; *see* U.S.S.G. § 2D1.1(c) (2014 ed.). After applying additional enhancements and determining Tardon's criminal history score, the district court calculated a guidelines range of life imprisonment, which was reduced to 1,800 months (150 years), the total statutory maximum of the offenses, if run consecutively. DE.605:90-92; 18 U.S.C. § 1956(a)(1), (a)(2), (h) (providing for 20 years' imprisonment for conspiracy offense); *id.* § 1957(b) (providing for 10 years' imprisonment for substantive offenses).

3. The district court sentenced Tardon to 1,800 months of imprisonment. DE.608:13-14. In doing so, the court denied Tardon's request for a departure from the advisory guidelines range, noting that "[i]f anything, this might be a basis for an upward departure." DE.608:6. Indeed, the court observed that the drugs Tardon trafficked

"far exceed[ed] the top level" provided for in the relevant guidelines provision. DE.608:6.

As the court explained, the "evidence in th[is] case was extensive" and Tardon "utilized" "many people to assist him in the laundering of his drug proceeds." DE.608:8-9.  Acknowledging Tardon's argument that certain drug traffickers had received lower sentences, the court found that none of those individuals "are comparators," and emphasized that another defendant had received a similar, 180-year sentence on money-laundering counts.  DE.608:10-11.  The court rejected Tardon's claim that the guidelines "overstate the seriousness of [his] offense," explaining that his sentence reflects "just how serious these offenses are."  DE.608:11-12.  "Our country is built on hard work, honest work, accomplishment and free enterprise," and Tardon's conduct "violated all of those precepts."  DE.608:12.  His laundering of $14 million "affected Miami's economy" and "culture," DE.608:12.  As Tardon's counsel had acknowledged, Tardon's purchases affect the local economy by making it "more difficult" for people "to compete in the market," DE.606:47, and as the government explained, young men and women "want to be this Defendant"—the "guy living in the penthouse in South Beach, driving the Ferrari, driving the Bugatti, draped in Louis Vuitton and Gucci," DE.606:58-59.

Given the "extent and length of the money-laundering activities," "the large amount of funds and the different ways in which [Tardon] agreed to launder," and the "extravagant purchases utilizing drug-trafficking proceeds," the court found that

Tardon's requested sentence of 20 years would "not reflect the seriousness of the offense," "promote respect for the law," "provide just punishment," or "afford adequate deterrence." DE.608:12.

**B.    The District Court Correctly Calculated The Base Offense Level**

Tardon first argues (Def.Br.67-69) that the district court erred in applying Guidelines Section 2S1.1(a)(1) to determine his base offense level. Preserved claims concerning the Sentencing Guidelines' application or interpretation are reviewed *de novo*. *United States v. Graham*, 123 F.4th 1197, 1283 (11th Cir. 2024).

In *United States v. Spence*, 923 F.3d 929 (11th Cir. 2019), this Court held that conduct which occurred outside of the U.S. may be considered when determining a defendant's guidelines range. "[T]he presumption against the extraterritorial application of congressional legislation does not apply in the sentencing context of a court's consideration of relevant conduct that occurred outside the United States." *Id.* at 932. Moreover, 18 U.S.C. § 3661—which "expressly provides" that "'[n]o limitation shall be placed on the information'" a court "'may receive and consider for the purpose of imposing an appropriate sentence'"—"confirm[s]" that "there is no geographical limit on relevant conduct that a sentencing court may properly consider." *Id.* at 933 (quoting 18 U.S.C. § 3661).

Subsection (a)(1) of Guidelines Section 2S1.1—the guidelines provision relevant to money-laundering offenses—expressly directs the district court to consider the defendant's relevant conduct. That subsection instructs the court to apply the base

111

offense level "for the underlying offense from which the laundered funds were derived" if "the defendant committed the underlying offense" or "would be accountable for the underlying offense under" Guidelines Section 1B1.3(a)(1)(A) (which addresses "Relevant Conduct") and "the offense level for that offense can be determined." U.S.S.G. § 2S1.1(a)(1). Section 1B1.3(a)(1)(A), in turn, defines relevant conduct to include "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant." U.S.S.G. § 1B1.3(a)(1)(A).

Here, Tardon committed the underlying drug trafficking from which the laundered funds were derived, and he is accountable for it as relevant conduct (for the same reason). Consistent with *Spence*, the mere fact that such conduct occurred abroad is of no moment; "no language in the relevant Guidelines provisions … limits consideration of relevant conduct to conduct occurring in the United States." 923 F.3d at 933.

Tardon does not appear to dispute that the Guidelines, as a general matter, permit consideration of relevant foreign conduct. But he resists Section 2S1.1(a)(1)'s application solely on the view that, because the underlying foreign trafficking is not itself a *federal* crime, no "offense level for that offense can be determined." U.S.S.G. § 2S1.1(a)(1)(B). That claim fails for several reasons.

*First*, the term "offense" as used in Section 2S1.1(a)(1) and throughout the guidelines is not limited to a federal offense that is independently subject to a guidelines sentence. Instead, the Guidelines define the term to include both the "offense of

112

conviction" and "all relevant conduct"—thus sweeping in foreign conduct that (under *Spence*) qualifies as relevant conduct. U.S.S.G. § 1B1.1, comment. (n.1(I)). The definition makes clear that the term generally reaches broadly to include "an offense before another court" or a "prior or subsequent offense" (as distinct from the "instant" "offense of conviction"). *Id.* Even in Section 2S1.1, itself, the Guidelines refer specifically to a "federal or state offense" when necessary, suggesting an unadorned reference to an "offense" is not so limited, U.S.S.G. § 2S1.1, comment (n.4(B)(v)).

*Second*, Guidelines Section 2X5.1 expressly contemplates circumstances in which the sentencing guidelines have not "expressly … promulgated" a relevant guideline, and directs the court, in such circumstances, to "apply the most analogous offense guideline." U.S.S.G. § 2X5.1. Thus, while Tardon observes that Appendix A to the Guidelines "correlates guidelines to offenses," Def.Br.68, he is wrong that Section 2S1.1 necessarily directs "the use of Appendix A" or that the absence of a guideline from that Appendix applicable to foreign conduct would bar its application. Section 2X5.1 "applies … to felony offenses not referenced in Appendix A," U.S.S.G. § 2X5.1, comment. (n.3), and by employing Section 2X5.1 to identify the most analogous guideline, the applicable "offense level for [the underlying] offense can be determined." U.S.S.G. § 2S1.1(a)(1). Here, that guideline is undoubtedly the drug-trafficking guideline that the district court employed, Section 2D1.1. DE.605:13.

*Finally*, excluding underlying foreign offenses from Section 2S1.1(a)(1)'s reach would defeat the purpose of that subsection, and of the money-laundering statutes

113

more generally.  Subsection (a)(1) ensures that "all direct money launderers"—those who "commit or would be accountable … for the underlying offense which generated the criminal proceeds"—"receive additional punishment for committing both the money laundering offense and the underlying offense."  Sentencing Guidelines App. C, Amend. 634 (Nov. 1, 2001); *accord United States v. Menendez*, 600 F.3d 263, 268-69 (2d Cir. 2010).  Sections 1956 and 1957 are expressly designed to reach certain underlying foreign crimes.  There is no sound basis to conclude that direct money launderers who engage in foreign crimes, as opposed to those who engage in domestic crimes, should face significantly lower guidelines ranges.  The district court correctly applied Section 2S1.1(a)(1) to calculate Tardon's base offense level.

### C.    Tardon's Sentence Is Neither Substantively Unreasonable Nor Cruel and Unusual

Tardon next argues (Def.Br.69-73) that his sentence was substantively unreasonable and cruel and unusual.  Those claims fail.

1.    A sentence's substantive reasonableness is reviewed for abuse of discretion, and "[t]he appellant bears the burden of demonstrating that the sentence is unreasonable in light of the record and the 18 U.S.C. § 3553(a) sentencing factors." *United States v. Rogers*, 989 F.3d 1255, 1261 (11th Cir. 2021).  The "weight to be accorded to each § 3553(a) factor" is "commit[ted] to" the district court's "sound discretion," *Perkins*, 787 F.3d at 1342, and this Court will vacate a sentence "only if" it is "left with the definite and firm conviction that the district court committed a clear error of

114

judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case," *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (en banc) (quotations omitted). While not "automatically presume[d]" reasonable, the Court "ordinarily expect[s]" that "a sentence within the guidelines range" is "reasonable." *Perkins*, 787 F.3d at 1342.

Tardon's 1,800-month sentence unquestionably is severe. But that sentence falls within the guidelines range; indeed, that sentence *was* the guidelines range because the guidelines calculation (life imprisonment) exceeded the combined statutory maximum of each offense. DE.605:91. The district court, moreover, discussed each of the Section 3553(a) factors and explained in detail why it believed the chosen sentence reflected "just how serious these offenses are." DE.608:11-12. Tardon's underlying offenses involved the trafficking of thousands of kilograms of cocaine—an amount the court noted "far exceed[ed] the top level" under the relevant guideline and "might be a basis for an upward departure." DE.608:6. He "utilized many, many people to assist him" in laundering the resulting millions of dollars of proceeds into the U.S. during an at least ten-year period. DE.608:8-11. And his offenses affected Miami's economy and culture, violating "all of th[e] precepts" of "hard work, honest work, accomplishment[,] and free enterprise" our "country is built on." DE.608:12. The district court did not abuse its discretion in concluding that a guidelines sentence was appropriate, particularly to reflect the "seriousness of the offense," to "promote respect for the law," and to "afford adequate deterrence." DE.608:12.

Tardon's limited counterarguments mischaracterize the district court's determination. He is simply wrong that the district court justified its sentence solely based on Tardon's financial conduct, to the exclusion of his underlying drug conduct. Def.Br.69. The court expressly discussed those underlying offenses, and the quantity of drugs involved, in justifying its decision. DE.608:6-9. The district court also expressly considered the testimony of Tardon's stepdaughter, which he claims was mitigating. DE.608:9. And, despite Tardon's claim that the district court did not substantiate the conclusion that his conduct affected the local economy, his own counsel conceded during sentencing that there was "[n]o doubt" his offenses had an effect on Miami's economy. DE.606:47.

Tardon suggests there is no other reported sentence of similar severity for a "non-victim, non-willful conduct." Def.Br.70. But, as the district court pointed out, that is untrue: a similar defendant received a 180-year sentence on money-laundering counts. DE.608:11; *see United States v. Magluta*, 313 F. App'x 201, 206 (11th Cir. 2008) (per curiam). As the district court found, the drug-trafficking offenders Tardon suggests received lower sentences are not similar "comparators." DE.608:11. Regardless, other statutes, including 21 U.S.C. § 841, authorize a *life sentence* in appropriate circumstances, also without requiring any showing of willfulness. *See United States v. Green*, 296 F. App'x 811, 816 (11th Cir. 2008) (per curiam) (declining to "impos[e] *any* 'willfulness' element into the statute"). And Tardon is just wrong in claiming that Section 1957 is a strict liability offense. Def.Br.70. It is not; the statute

"requires that the defendant know that the property is 'criminally derived.'" *United States v. Baker*, 19 F.3d 605, 614 (11th Cir. 1994).

2.　　Nor did the district court err in rejecting Tardon's passing Eighth-Amendment objection. *See* DE.608:24. Because Tardon's brief makes just two cursory references to the "proportionality" of his sentence, without developing an Eighth-Amendment argument, any claim is waived. *McClain*, 138 F.3d at 1422.

Regardless, there is no Eighth-Amendment problem here. That amendment, "which forbids cruel and unusual punishments, contains a narrow proportionality principle that applies to noncapital sentences," which "forbids only extreme sentences that are grossly disproportionate to the crime." *Ewing v. California*, 538 U.S. 11, 20, 23 (2003) (plurality opinion) (quotations omitted). But "Supreme Court and Eleventh Circuit precedent have set a high bar for a sentence to be 'grossly disproportionate.'" *United States v. Bowers*, 811 F.3d 412, 432 (11th Cir. 2016). For example, the Supreme Court rejected an Eighth-Amendment challenge to a life sentence, without parole, for possessing 672 grams of cocaine. *Harmelin v. Michigan*, 501 U.S. 957, 961 (1991). "Generally, sentences within the statutory limits are neither excessive, nor cruel and unusual under the Eighth Amendment." *Bowers*, 811 F.3d at 432 (quotations omitted) (rejecting challenge to 182-year sentence for violations of 18 U.S.C. § 924(c)). Indeed, "this Court has never found a non-capital sentence of an adult to violate the Eighth Amendment." *Id.*

117

Tardon's case presents no reason to break new ground.  His sentence, which falls within the statutory limits (albeit at the maximum for each offense), is consistent with the severe nature of his offense.  It is not grossly disproportionate.

### D.    Tardon's Challenges To The Forfeiture Judgment Lack Merit

Finally, Tardon contests (Def.Br.73-80) the district court's forfeiture order.  The court appropriately entered a money judgment in the full amount that Tardon transferred to the U.S.

1.    Forfeiture is a mandatory component of a money-laundering sentence. *United States v. Waked Hatum*, 969 F.3d 1156, 1162 (11th Cir. 2020).  The forfeiture provision applicable here, 18 U.S.C. § 982(a)(1), broadly provides that, when a person is convicted of a money-laundering offense, the district court "shall order that the person forfeit to the United States any property, real or personal, *involved in* such offense, or any property traceable to such property."  (emphasis added).  By that language, the statute makes "eligible for forfeiture" both "money or property which was actually laundered ('the corpus')" and "any property used to facilitate the laundering offense." *United States v. Seher*, 562 F.3d 1344, 1368 (11th Cir. 2009) (quotations omitted).  The statute sweeps broadly because "money laundering largely depends upon the use of legitimate monies to advance or facilitate the scheme.  It is precisely the commingling of tainted funds with legitimate money that facilitates the laundering and enables it to continue." *United States v. Puche*, 350 F.3d 1137, 1153-54 (11th Cir. 2003) (quotations omitted).

Accordingly, "[f]orfeiture of commingled funds … is proper when the government demonstrates that the defendant pooled the funds to facilitate or disguise his illegal scheme"—including where the commingling represents "an arrangement through which tainted funds could be transferred overseas." *Id.* at 1153 (quotations omitted). Courts have long found that the statute "authoriz[es] the forfeiture of an entire bank account or business which was used to 'facilitate' the laundering of money." *United States v. Certain Funds on Deposit in Account No. 01-0-71417*, 769 F. Supp. 80, 84 (E.D.N.Y. 1991); *accord Seher*, 562 F.3d at 1369-70 (affirming forfeiture of bank account which "facilitat[ed] the laundering by disguising the source of th[e] tainted funds").

Consistent with the courts of appeals' uniform consensus, this Court has "condon[ed] forfeiture money judgments." *Waked Hatum*, 969 F.3d at 1163; *see United States v. Olguin*, 643 F.3d 384, 397 (5th Cir. 2011) (collecting cases). In addition, "[p]roperty that could have been forfeited as direct proceeds of criminal activity may nevertheless be forfeited later as substitute assets." *United States v. Kramer*, 25 F.4th 509, 512 n.6 (7th Cir. 2022).

2.    Tardon cannot show any clear error in the district court's determination that the government proved Tardon laundered $14,358,639.64—the full amount Tardon caused to be funneled into the U.S. DE.602:82, 86. As explained, the evidence permitted an inference that all of those funds represented the proceeds of Tardon's illegal drug trafficking, particularly given Tardon's lack of employment and the fact that his Spanish businesses conducted little to no business. *Supra* at 49-52.

At a minimum—to the extent any funds were not themselves proceeds—the district court did not clearly err in finding the funds fully forfeitable because any untainted funds were commingled with tainted funds in an effort to facilitate and provide cover for Tardon's money-laundering offenses. Where evidence shows that "both legitimate and illegitimate" funds were "moved into bank accounts in order to conceal the nature and source of the narcotics proceeds," the factfinder can infer that any "legitimate proceeds facilitated the illegal proceeds by acting as a 'cover' and hence reduced suspicion of the latter's source." *Puche*, 350 F.3d at 1154; *see also, e.g., United States v. Cessa*, 872 F.3d 267, 274 (5th Cir. 2017) (where "extensive evidence" that defendant "comingled … drug money in his otherwise legitimate accounts," and the government "demonstrated that the purpose of the comingling was to facilitate the money laundering offense," government could forfeit entire bank accounts).

3.    Tardon's various counterarguments fail. Tardon primarily contends (*e.g.*, Def.Br.74-75) that the government has not proven (or could not prove) that all of the funds or transfers independently constituted money-laundering offenses. That argument fundamentally misunderstands the relevant forfeiture provision, Section 982, which authorizes forfeiture not only of the funds that are "actually laundered," but also of any funds "more broadly 'involved in' money laundering."[20] *United States v. Bikundi*, 926 F.3d 761, 793 (D.C. Cir. 2019) (per curiam).

---

[20] Tardon reprises his claims that his offenses lacked "concealment or evasion," involved "open-and-obvious, fully reported transactions," or did not take place in the

Tardon also suggests (*e.g.*, Def.Br.76) that the forfeiture judgment conflicts with the jury's verdict finding that certain properties were not directly forfeitable. Tardon does not appear to dispute that those properties could be forfeited as substitute property under Section 853(p). Generously read, however, his brief appears to suggest that in declining to find the property forfeitable, the jury necessarily determined that the underlying money used to secure that property also was not "involved in" the offense. That argument fails, and the district court correctly rejected it. DE.607:62-63.

A jury's determination is given collateral estoppel effect only if, among other things, a fact was "*necessarily* established by an earlier final judgment." *United States v. Bennett*, 836 F.2d 1314, 1316 (11th Cir. 1988). If "the jury could have based its verdict on something other than the issue to be barred, then collateral estoppel would not apply." *Id.*; *see Ashe v. Swenson*, 397 U.S. 436, 444 (1970). At Tardon's trial, the jury was not asked to determine the antecedent involvement (or traceability) of any money used to secure property. Indeed, as the government explained below, DE.607:57-58, 62-63, Tardon's counsel had argued to the jury during the forfeiture stage that one cannot launder specific property, only money—*i.e.*, that the government was "seeking the forfeiture of the wrong corpus" and "should forfeit the money and then go from there," DE.536:105. If the jury accepted that argument, its verdict would not represent any

---

U.S. Def.Br.74-75. As explained above, Tardon is wrong that his offenses invariably required proof of concealment, that his conduct was not designed to conceal, or that his offenses did not take place in the U.S. *Supra* at 46-48, 54-55.

determination about the funds, themselves. The district court's conclusion that all funds transported to the U.S. facilitated the money-laundering offenses does not conflict with the jury's verdict.

Tardon presses (Def.Br.78) a claim that the district court's forfeiture order did not comply with Federal Rule of Criminal Procedure 32.2. That argument is meritless. Rule 32.2(b)(4)(B) requires the court to include a forfeiture order when orally announcing the sentence or "otherwise ensure that the defendant knows of the forfeiture at sentencing." Tardon did not object below to the forfeiture order on any of the procedural grounds he now presses. *See* DE.608:22 (objecting only on ground that the government did not move for forfeiture as soon as practicable); DE.601:8-14 (rejecting that objection). Accordingly, his arguments are reviewed for plain error.

And there was no error, plain or otherwise. The court orally announced the forfeiture judgment, DE.608:6, 30-31, and conducted lengthy hearings addressing the forfeiture issues, including the substitute property issues, DE.606:5-6, 90-116; DE.607:4-64; DE.608:31-38. Those hearings followed substantive briefing by the parties. *See* DE.550; DE.580; DE.581. Tardon was clearly on notice of the forfeiture at sentencing, and the court subsequently issued a written order, DE.601, which was incorporated in the judgment, DE.611:7. The proceedings complied with Rule 32.2 and did not "depriv[e] Tardon of procedural fairness."[21] Def.Br.78.

---

[21] If Tardon's passing reference to Rule 32.2(b)(2)(B) is meant to suggest that the district court erred by failing to include substitute property in its preliminary order of forfeiture,

Tardon also suggests that the money judgment resulted in "double counting." Not so, as the district court found. DE.601:19. Tardon's "forfeiture money judgment will be credited or reduced by an amount equal to the net proceeds generated from the sale" of the specified property that was forfeited, which "eliminates any concerns that [Tardon] will be required to pay a double forfeiture." DE.601:19.

Last, and invoking the Sixth Amendment, Tardon appears to suggest (Def.Br.76-77) that a jury finding was necessary to order a forfeiture money judgment. As he concedes, this Court has rejected that contention because the Supreme Court has held "that 'the right to a jury verdict on forfeitability does not fall within the Sixth Amendment's constitutional protection.'" *United States v. Elbeblawy*, 899 F.3d 925, 941 (11th Cir. 2018) (quoting *Libretti v. United States*, 516 U.S. 29, 49 (1995)). While Rule 32.2 permits the defendant to request that the jury determine the forfeitability of "specific property," that option is not constitutionally compelled. Fed. R. Crim. P. 32.2(b)(5); *see id.*, advisory committee's note (2000 Amendments). Tardon's section heading also references the Eighth Amendment, Def.Br.73, but he develops no substantive Eighth-Amendment argument, and thus has waived any. As the district court observed, Tardon did not press any Eighth-Amendment argument with respect to forfeiture below. DE.608:23

---

that argument is meritless. As the Supreme Court recently held, "the failure to enter a preliminary order does not bar a judge from ordering forfeiture at sentencing subject to harmless-error principles on appellate review." *McIntosh v. United States*, 601 U.S. 330, 333 (2024). The lengthy proceedings below render any error harmless.

**VI. The District Court Correctly Dismissed Petitioners' Ancillary-Forfeiture Petitions**

Petitioners—Tardon's mother and brother and four entities controlled by Tardon—challenge the dismissal of their respective ancillary-forfeiture petitions. Their claims lack merit.

**A.    Legal Background**

In a criminal case, after the government establishes "the requisite nexus between the property and the offense of conviction," the court must "promptly enter" a preliminary order of forfeiture "without regard to any third party's interest in the property." *United States v. Davenport*, 668 F.3d 1316, 1320 (11th Cir. 2012). After entering a preliminary order, "the court can determine whether any third parties have an interest in the forfeited property, but only if they file a timely petition in an ancillary proceeding." *Id.*

"Although it occurs in the context of criminal forfeiture, the ancillary proceeding is civil in nature." *United States v. Amodeo*, 916 F.3d 967, 972 (11th Cir. 2019). In the ancillary proceeding, third parties "cannot challenge or relitigate a preliminary order's finding of forfeitability"; the proceeding serves only to "determin[e] whether any third party has a legal interest in the forfeited property." *Davenport*, 668 F.3d at 1321 (quotations omitted). If the property "really belongs to the third party," the party can prevail in the proceeding regardless of "whether there were defects in the criminal trial or the forfeiture process." *Id.* (quotations omitted). But if the property does not belong

124

to her, any "defects in the finding of forfeitability are no concern of hers." *Id.* (brackets and quotations omitted).

Section 853(n) of Title 21 and Federal Rule of Criminal Procedure 32.2 "describe the procedures by which a non-party petitioner may assert its property interests in an ancillary proceeding." *United States v. Cone*, 627 F.3d 1356, 1358 (11th Cir. 2010) (per curiam). Section 853(n) permits "[a]ny person, other than the defendant" who "assert[s] a legal interest in property" to "petition the court for a hearing to adjudicate the validity of his alleged interest in the property." 21 U.S.C. § 853(n)(2). The petition "shall set forth the nature and extent of the petitioner's right, title, or interest in the property, the time and circumstances of the petitioner's acquisition of the right, title, or interest in the property, any additional facts supporting the petitioner's claim, and the relief sought." *Id.* § 853(n)(3). "Without the information required by § 853(n)(3), courts cannot assess whether a petitioner asserts a 'legal interest' in forfeited property"—as opposed to an equitable interest, which is not cognizable in an ancillary proceeding. *United States v. Caruthers*, 765 F.3d 843, 845 (8th Cir. 2014). And the "pleading standards are vital particularly in light of the substantial risk of false claims historically associated with forfeiture proceedings." *United States v. Hassan*, 411 F. Supp. 3d 1302, 1308 (M.D. Fla. 2019) (ellipsis and quotations omitted).

The district court may, on motion, dismiss the petition for lack of standing, for failure to state a claim, or for any other lawful reason. Fed. R. Crim. P. 32.2(c)(1)(A). A motion to dismiss is "treated like a motion to dismiss a civil complaint under Federal

125

Rule of Civil Procedure 12(b)." *United States v. Marion*, 562 F.3d 1330, 1342 (11th Cir. 2009) (per curiam) (quotations omitted); *see United States v. Daugerdas*, 892 F.3d 545, 552 (2d Cir. 2018) (petition is evaluated under "the same standard as a civil complaint on a motion under Rule 12(b)(6)").

The petitioner bears the burden of establishing, by a preponderance of the evidence, (1) that he "has a legal right, title, or interest in the property" that was "vested in the petitioner rather than the defendant or was superior" to the defendant's interest "at the time of the commission of the acts which gave rise to the forfeiture of the property," or (2) that he is a "bona fide purchaser for value" of the property who "was at the time of purchase reasonably without cause to believe that the property was subject to forfeiture." *Id.* § 853(n)(6); *see United States v. Gilbert*, 244 F.3d 888, 911 (11th Cir. 2001). At the ancillary hearing, the "petitioner may testify and present evidence and witnesses on his own behalf," as may the government. 21 U.S.C. § 853(n)(5). The court also "shall consider the relevant portions of the record of the criminal case which resulted in the order of forfeiture." *Id.*

To contest forfeiture, a petitioner must establish both "Article III standing and statutory standing." *United States v. $38,000.00 in U.S. Currency*, 816 F.2d 1538, 1543 (11th Cir. 1987); *see United States v. Timley*, 507 F.3d 1125, 1129 (8th Cir. 2007) ("Standing in forfeiture cases has both constitutional and statutory aspects." (quotations omitted)). A petitioner "first must demonstrate a sufficient interest in the property to give him Article III standing; otherwise, there is no 'case or controversy,' in the constitutional

sense." *§38,000.00*, 816 F.2d at 1543.  A petitioner then must "satisfy applicable statutory standing requirements." *Id.* at 1544.  "Statutory standing is simply a question of whether the particular plaintiff has a cause of action under the statute." *United States v. Swartz Family Trust*, 67 F.4th 505, 515 (2d Cir. 2023) (quotations omitted); *see United States v. Sanchez*, No. 22-11923, 2023 WL 5844958, at *4 (11th Cir. Sept. 11, 2023) (per curiam) (unpublished) (same).  For purposes of Section 853(n), statutory standing includes a showing that a party has a "legal interest in the property," *United States v. Lazare Kaplan Int'l Inc.*, 849 F. App'x 906, 907 (11th Cir. 2021) (per curiam), and is a person "other than the defendant," 21 U.S.C. § 853(n)(2).

### B.    Factual Background

1.    After the district court entered a preliminary order of forfeiture, some of Tardon's co-conspirators and corporate entities—specifically, The Collection (Tardon's Spanish car business), Kyte Schooll (Tardon's Spanish holding company), Miamark and Murano (two of Tardon's LLCs), and Tardon's brother and mother (Artemio and Maria)—filed ancillary petitions asserting an interest in certain property forfeited as substitute property.  DE.920:5-7.  Petitioners were initially represented by Tardon's defense counsel, but the district court dismissed the petitions, without prejudice, after counsel moved to withdraw due to a conflict of interest.  DE.745:6, 48-51.

Petitioners then filed amended petitions.  Miamark and Murano alleged an ownership interest in several of the condominium units.  DE.734.  Murano claimed to "hold[ ] ownership" of a unit (Unit 908) at 1000 South Pointe Drive in Miami Beach

127

("The Murano Unit"), while Miamark claimed to be "the record title owner" of three units (Units 202, 502, and 2703) at 1155 Brickell Bay Drive ("The Mark Units"). DE.734:1-2.  In a combined petition, the remaining Petitioners alleged that "Florida car title records and other transactional records show" that a 2010 Rolls-Royce Ghost was "owned by" Maria and Artemio, that a 2006 Mercedes-Benz SLR McLaren was "owned by" Maria, Artemio, and Kyte Schooll, and that eight Audemars Piguet watches were "owned by" The Collection.  DE.735:1-2.

2.     The government moved to dismiss The Collection's petition and Artemio's petition (with respect to the Mercedes), pursuant to Section 853(n)(3). DE.736; DE.737.

The district court granted both motions.  DE.761; DE.762.  The court found that The Collection's petition failed to "set forth … the time and circumstances" of its "acquisition of the right, title, or interest in the property."  DE.761:10 (quoting 21 U.S.C. § 853(n)(3)).  The allegations, the court determined, were "insufficient to satisfy the pleading requirements of Section 853(n)(3)."  DE.761:11.

With respect to Artemio's claim to the Mercedes, the district court found the allegations that "'car title records and other transactional records'" established an interest to be vague and conclusory and, regardless, demonstrably "false."  DE.762:9-10.  The government had attached to its motion records from the Florida Department of Highway Safety and Motor Vehicles showing that Artemio was not listed as a titled and registered owner of the Mercedes; instead, Tardon, Kyte Schooll, and Maria were.

128

DE.762:10-11; *see* DE.737-1 (records).  The court rejected as insufficient Artemio's vague claim, asserted in response to the motion (but not in the petition), that he has "'sufficient ties to ownership of the vehicle.'"  DE.762:11.

3.    The district court referred the outstanding motions relevant to the remaining petitions to a magistrate judge, DE.813 (paperless order), who held an evidentiary hearing.  At the hearing, Petitioners "presented no witnesses and submitted a total of nine exhibits (a handful of title records and company records) in support of their claims."  DE.906:4.  The government, by contrast, presented evidence from an FBI Special Agent and "submitted more than 100 exhibits in support of its defense."  DE.906:4.

The magistrate judge recommended that the district court dismiss the petitions, and that the outstanding motions be denied as moot.  DE.906:73-74.  Acknowledging Petitioners' possession of legal title to the condominium units and vehicles, the magistrate nevertheless found that Petitioners "hold bare legal title" and are "mere nominee owners" such that they "are *not* persons 'other than the defendant' under 21 U.S.C. § 853(n)(2)" and "lack Article III standing."  DE.906:56-57, 70-71, 73.  The district court adopted and supplemented the report and recommendation, overruled Petitioners' objections, agreed there was "overwhelming evidence" of Tardon's actual ownership of the properties, and dismissed the petitions for lack of standing.  DE.920:56, 60-62.

**C.    The District Court Correctly Dismissed The Collection's And Artemio's Petitions For Pleading Deficiencies**

Petitioners first challenge (Pet.Br.23-27) the dismissal of The Collection's petition.

**1.    The Collection Failed To Adequately Plead An Interest In The Watches**

The district court correctly found that The Collection's petition failed to adequately plead "the nature and extent of [its] right, title, or interest in" the eight forfeited watches or "the time and circumstances of [its] acquisition of" any interest in that property.  21 U.S.C. § 853(n)(3); *see* DE.761:10-12.

The watches were recovered from a safe inside Tardon's condo at the Continuum.  DE.522:92-96.  The Collection's petition asserted that "the watches were sold to The Collection on various dates, as reflected in part in relevant Redatex invoices and discussed in the deposition of Ulises Reyes, including in 2009."  DE.735:2.  The petition appears to reference invoices recovered from Tardon's email accounts and introduced by the government at trial (as Exhibit 97), *see* DE.519:14-17, and deposition testimony, which the government designated for use in anticipation of the ancillary-forfeiture hearing, from the owner of a company called Redatex who sold watches to Tardon, *see* DE.702-5:7-8, 12.

The petition's allegation is insufficient.  It vaguely refers to "various" (unspecified) "dates," which it claims are reflected only "in part" in documents that are not included with the petition.  The petition fails to disclose the date, circumstances, or

nature of The Collection's alleged acquisition of each watch, and on its face the petition "asserts only a conclusory legal interest" which "does not meet the requirements of § 853(n)(3)." *United States v. Fabian*, 764 F.3d 636, 638 (6th Cir. 2014); *see also Caruthers*, 765 F.3d at 845-46 (finding conclusory petition "statutorily insufficient"). Petitioners never sought to amend or otherwise cure that deficiency, nor do they suggest on appeal they should have been granted leave to do so.

Petitioners primarily contend (Pet.Br.23-24) that the referenced invoices and deposition testimony "identified" The Collection as the watches' owner and that those documents "formed part of the record in the case." But *the petition* must "set forth the nature and extent" of a petitioner's interest and "the time and circumstances of the petitioner's acquisition" of that interest. 21 U.S.C. § 853(n)(3). The Collection's petition does not. Petitioners attempt to distinguish (Pet.Br.25-27) certain non-binding decisions the district court cited on the ground that those cases involved additional deficiencies that independently warranted dismissal. But that is irrelevant; the dispositive point is that each petition was dismissed, at least in part, for failure to adequately plead the petitioner's interest.

Nor could Petitioners in any event satisfy their pleading burden in this case by incorporating by reference the (vaguely) identified invoices and deposition testimony. The "incorporation-by-reference doctrine" provides a limited exception to the general rule, when evaluating complaint's sufficiency under Federal Rule of Civil Procedure 12, that a court "may not consider matters outside of the pleadings without treating the

motion as a motion for summary judgment." *Johnson v. City of Atlanta*, 107 F.4th 1292, 1298 (11th Cir. 2024). The doctrine applies only when a document is "central to the plaintiff's claims" and is "undisputed, meaning that its authenticity is not challenged." *Id.* at 1300. Here, as Petitioners seemingly acknowledge (Pet.Br.24-25), the authenticity and accuracy of the invoices—including whether they in fact referred to the eight forfeited watches—were disputed.

For that same reason, even if the district court could have considered the invoices and deposition testimony, it is readily apparent that they do not supply the detail Section 853(n)(3) requires. Tellingly, Petitioners refer only generally (Pet.Br.24-25) to those sources, without providing specific citations or identifying where they disclose the required information.

At trial, the parties disputed whether the invoices encompassed all eight watches, and Tardon's counsel (Petitioners' prior counsel) elicited testimony that at least three of the watches may not have been identified on the invoices at all. DE.536:42-44, 57-58, 66. Reyes's deposition testimony was even less precise. He provided the government with 14 invoices for watches that he "sold to Alvaro." DE.702-5:20. Although the invoices listed "The Collection" and Artemio's name, Reyes explained that they "were made to Alvaro Lopez at first" but that Tardon asked Reyes "to change the name on the invoice to Artemio Lopez" while Tardon "was going through a divorce with his wife." DE.702-5:22-26. And asked during the deposition to match the invoices with the corresponding watches (which were displayed on the table), Reyes was able to

132

positively identify only one watch.  DE.702-5:28-30.  Reyes agreed that it was possible that "none of the[ ] watches," other than the single one he could identify, were watches he sold, and he acknowledged that Tardon had purchased other watches from someone else.  DE.702-5:30-33.  None of that testimony, moreover, identified anything about *The Collection*'s interest in the watches.

Accordingly, Petitioners' effort to rely on those sources (even if permissible), fails to substantiate their pleading burden.  Dismissal of The Collection's petition should be affirmed.[22]

### 2.    Petitioners Do Not Contest That Artemio Failed To Adequately Plead An Interest In The Mercedes

Petitioners acknowledge (Pet.Br.5-6) that the district court dismissed Artemio's claim to the Mercedes for failure to adequately plead an ownership interest.  Yet, Petitioners wholly fail to address that determination.  Their argument section does not mention or refute the district court's dismissal order.  *See* Pet.Br.57-61.  Petitioners thus have waived any challenge to the dismissal of Artemio's petition as to the Mercedes. *McClain*, 138 F.3d at 1422.  And that determination was correct for the reasons provided by the district court.  *See* DE.762:8-11.

---

[22] As the government detailed below, ample evidence in any event demonstrates that Tardon, and not The Collection, owned the watches, and that Tardon sought to obscure his ownership only following his domestic dispute with Cohen.  DE.725:19-20.

**D.      The District Court Committed No Clear Error In Dismissing The Remaining Petitions For Lack Of Standing**

The district court did not clearly err in dismissing the remaining petitions.

**1.      Bare Title To Property Is Not Conclusive Of A Petitioner's Article III Or Statutory Standing**

Petitioners' challenge to the dismissal of their remaining claims rests largely on their contention that their possession of legal title to property is conclusive of their ability to assert a third-party claim. Those arguments misunderstand the relevant analysis.

a.      Standing under both Article III and statute (here, Section 853(n)) is governed by federal law, and does not rest conclusively on a petitioner's possession of title to property under state law.

State law, as a threshold matter, "defines the property interests a defendant" or a third-party petitioner "has." *United States v. Fleet*, 498 F.3d 1225, 1231 (11th Cir. 2007); *see United States v. Shefton*, 548 F.3d 1360, 1364 (11th Cir. 2008) (per curiam). Once those interests are identified, however, federal law "determines whether those property interests are forfeitable." *Fleet*, 498 F.3d at 1231. Put otherwise, "[i]f a court determines the claimant has an interest in the property under the law of the jurisdiction that created the property right, then at the ancillary hearing, it must next look to federal law, *i.e.*, to 21 U.S.C. § 853(n)(6), to determine if the claimant will prevail in the ancillary proceeding." *Timley*, 507 F.3d at 1130. That inquiry is consistent both with Section 853's specific instruction that forfeiture is required "irrespective of any provision of

State law," 21 U.S.C. § 853(a), and with the general principle that, "in the absence of a plain indication of an intent to incorporate diverse state laws into a federal criminal statute, the meaning of the federal statute should not be dependent on state law," *United States v. Turley*, 352 U.S. 407, 411 (1957).

Because "the heart of Article III standing is the existence of an injury, not ownership," "[o]wnership of property that has been seized can be evidence of" an "injury that is direct enough to confer standing," but it is not conclusive. *Via Mat Int'l S. Am. Ltd. v. United States*, 446 F.3d 1258, 1262-63 & n.5 (11th Cir. 2006); *accord United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999) (explaining that while "ownership or possession" may "provide evidence of standing," "it is *injury* that is at the heart of the standing question"). Thus, as this Court has explained, "possession of bare legal title by one who does not exercise dominion and control over the property is insufficient even to establish standing to challenge a forfeiture."[23] *United States v. 900 Rio Vista Blvd.*, 803 F.2d 625, 630 (11th Cir. 1986). A court must "look behind the formal title to determine whether the record title owner is a 'strawman' set up to conceal the financial affairs or illegal dealings of someone else." *Id.* (quotations omitted); *accord United States v. Carrell*, 252 F.3d 1193, 1204 (11th Cir. 2001).

---

[23] Other circuits similarly refer to the inquiry as a "dominion and control" test. *In re Bryson*, 406 F.3d 284, 291 (4th Cir. 2005); *see, e.g., United States v. 526 Liscum Drive*, 866 F.2d 213, 217 (6th Cir. 1989).

State law, accordingly, is not conclusive of whether a petitioner can assert standing or prevail in a forfeiture proceeding.[24]  For example, in *United States v. Parenteau*, 647 F. App'x 593 (2016), the Sixth Circuit considered a district court's determination that a corporate entity was not a petitioner "other than the defendant" under Section 853(n)(2).  *Id.* at 595.  The district court had applied Ohio law to evaluate whether the corporate entity was the defendant's alter ego.  *Id.*  The Sixth Circuit agreed with the district court's determination that a corporate entity's petition should not be allowed to proceed "solely because that entity is legally distinct from a natural person," but it rejected the view that a court "must apply state law" or determine whether that law "would permit a court to hold that" the company and defendant "are alter egos."  *Id.* at 596, 598.  As the court explained: "State law does not govern this appeal."  *Id.* at 598.  Section 853(n)(2)'s "'other than the defendant' clause uses no words suggesting a link to state law," and the dispositive question is not whether the petitioner "held valid property interests in the first instance," but "*who* is eligible to petition for relief."  *Id.* at 598-99.

---

[24] As the magistrate observed, DE.906:32-33, some cases discuss the relevant inquiry in the context of threshold Article III or statutory standing, while others conduct the same inquiry as part of the ultimate merits determination, following an evidentiary hearing, of whether the petitioner is a person "other than the defendant," 21 U.S.C. § 853(n)(2), or has established a right "vested in the petitioner rather than the defendant," *id.* § 853(n)(6)(A). *See United States v. One 1990 Beechcraft*, 619 F.3d 1275, 1277 n.3 (11th Cir. 2010) (construing determination petitioner is a nominee as a merits question); *Timley*, 507 F.3d at 1130 n.2 (distinguishing subsections (n)(2) and (n)(6)).  Any distinction is academic in this case, however, because the district court's resolution of the petitions followed a full evidentiary hearing.

Looking beyond bare legal title to determine whether a petitioner is someone "other than the defendant" or that an interest is vested in him "rather than the defendant," 21 U.S.C. § 853(n)(2), (n)(6)(A), directly furthers the forfeiture statute's purpose. "Failing to look beyond bare legal title … would foster manipulation of ownership by persons engaged in criminal activity." *United States v. Morgan*, 224 F.3d 339, 343 (4th Cir. 2000); *see also United States v. Coffman*, 612 F. App'x 278, 286 (6th Cir. 2015) ("Bare legal title," in "the absence of assertions of dominion" or "control" is insufficient because "people engaged in illegal activities often attempt to disguise their interests in property by placing title in someone else's name" (quotations omitted)). And that conclusion is only "reinforced by § 853(*o*), which mandates that '[t]he provisions of this section shall be liberally construed to effectuate its remedial purposes.'" *Fleet*, 498 F.3d at 1230 (quoting 21 U.S.C. § 853(*o*)).

Accordingly, this Court has explained that "'straw owners'" of property "do not necessarily suffer an injury that is sufficient to demonstrate standing." *Via Mat Int'l*, 446 F.3d at 1262 n.5; *accord Cambio Exacto*, 166 F.3d at 527. Nor can a person "have a vested interest in property if he is found to be acting as a nominee"—*i.e.*, "in a representative or nominal capacity only"—"for persons whose property is subject to the forfeiture." *United States v. Weiss*, 467 F.3d 1300, 1303 n.1 (11th Cir. 2006) (quotations omitted); *accord Morgan*, 224 F.3d at 345.

b.      Given this settled law, Petitioners are incorrect that "[s]tate law regarding legal interests is ordinarily controlling in an ancillary petition" or that the district court

137

erred in considering Tardon's "dominion and control" over the property. Pet.Br.33, 40. The claim "that a petitioner with bare legal title has standing to challenge an order of forfeiture" does not address this Court's expressed "concern about strawmen and nominees challenging forfeiture orders." DE.920:48.

Petitioners cite (with little explanation) a non-binding district court decision that found the government's failure to satisfy the state-law standard to pierce the corporate veil definitive in establishing that a corporate entity was someone "other than" the defendant. *United States v. Silva*, No. 15-20727, 2018 WL 5847348, at *1 (S.D. Fla. Nov. 8, 2018). As the magistrate judge and district court both found, that decision is unpersuasive and incorrect. DE.906:23-24; DE.920:47-48. Adopting that rule would "permit criminals to act with impunity and protect their assets and substitute assets by simply taking the administrative step of incorporating." DE.906:24.

Petitioners also briefly cite the Ninth Circuit's decision in *United States v. Nava*, 404 F.3d 1119 (2005), where a divided panel declined to apply federal (rather than state) law to determine whether the petitioner established only "bare legal title" to the property. *Id.* at 1127-28. That out-of-circuit decision is at odds with this Court's precedent, *see Via Mat Int'l*, 446 F.3d at 1262 & n.5; *Weiss*, 467 F.3d at 1303 n.1, and the clear weight of circuit authority. Regardless, the analytical difference in the Ninth Circuit's approach is of limited functional importance because the panel noted that the relevant state law there itself "recognized that 'dominion and control' is the essence of ownership and not 'bare legal title.'" 404 F.3d at 1129-30. And, as explained below,

the facts here demonstrate that Tardon exercised far greater dominion and control than the "occasional tax payments, improvements, and illegal activities on the property" that the defendant in *Nava* had engaged in.  *Id.* at 1131.

The district court correctly rejected Petitioners' claim that their standing was established solely by the fact that they were "the lawful, record-title owners" of the property under Florida law.[25]  Pet.Br.28.

### 2.    Tardon Exercised Dominion And Control Over The Condominium Units

The district court appropriately found that Miamark and Murano had not met their burden to establish they are entities "other than the defendant."  DE.906:56.

a.    Although acknowledging that the parties raised "conflicting contentions," the magistrate judge determined that the LLCs "have, at best, nominal ownership [of] the real properties at issue."  DE.906:56-57.  The magistrate found that (despite not bearing the burden) "the United Staters' submission of specific *evidence* is substantial," while "Petitioners rely mostly on contentions and theories, as opposed to actual evidence."  DE.906:56; *see* DE.906:39-55 (detailing the government's evidence).

---

[25] In the district court, the government preserved the argument that even under state law, Tardon was the LLCs' alter ego and that the government could pierce the corporate veil.  *See, e.g.*, DE.825:10 n.3.  Given the governing legal analysis, the government did not ultimately rely on that theory in its proposed Report and Recommendation, *see* DE.885:12 n.5, and the district court accordingly found that such state law theories, "do not directly apply," DE.906:17 n.3.  The government did not waive those arguments, and were this Court to conclude, contrary to existing law, that state law is conclusive, the government would renew those contentions on remand.

Tardon acquired, or was substantially involved in acquiring, each of the relevant properties, and the LLCs paid no consideration for them, contrary to the petition's assertion that the units were acquired "via purchase" or "by virtue of purchase," DE.734:1-2. Tardon personally signed purchase agreements for two of The Mark Units (Units 202 and 2703) in June 2000, which listed himself, Artemio, "and or a company of his own" as the buyers. DE.825-1:3.[26] Krentz—with whom Tardon had acquired several properties, including those forfeited in his criminal trial—signed the agreement for Unit 502. DE.825-1:2-3. And after Miamark was formed in 2006, Krentz transferred title to each unit by quitclaim deed to Miamark. DE.885:25-26. Those transactions were not "sales"; the properties merely "changed names to Miamark." DE.885:26 (quotations omitted).

Murano entered an agreement in January 2006 to purchase The Murano Unit, subject to a first mortgage, in two installment payments. DE.885:31. The first, a $50,000 payment, was made from a Bank of America account held by Tardon and Krentz. The second, a $460,000 payment, was made from proceeds of a $1.2 million loan Krentz obtained by refinancing Tardon's Continuum condominium. DE.885:31; *see* DE.826-1:3-4. The remaining proceeds of that loan were then deposited in the Bank of America account held by Tardon and Krentz. DE.826-1:4. And Tardon then paid

---

[26] The government cites its proposed Report & Recommendation and summary judgment motions, which identify the relevant record evidence supporting each finding. *See* DE.885; DE.825; DE.826. The magistrate detailed that evidence and relied on it in issuing its order. *See* DE.906:39-60.

off the first mortgage through three payments from two bank accounts—one for which Tardon, individually, was the sole holder, and a second held jointly by Tardon, Artemio, and Maria (but that was not an LLC account, which was not opened until 2009). DE.885:32.

Tardon was designated as the LLCs' "managing member," but he did not follow corporate formalities.  DE.885:26-27, 32-34.  Miamark's and Murano's operating agreements required Tardon to segregate funds, but he did not open company bank accounts for several years.  DE.885:26-27, 32.  Both before and after the accounts were opened, Tardon used his personal and other accounts to receive rental income and satisfy company expenses.  DE.885:26-27, 32.  He used Miamark's bank account to pay for expenses related to other properties.  DE.885:27.  He left blank Murano checks with Cohen for her use, and approximately $15,000 from Murano's account was used for non-business expenses, including plastic surgery, dining, massage and spa services, and credit card debts.  DE.885:32-33.  Nor did Miamark or Murano file any tax returns. DE.885:27, 33.  And while The Murano Unit was rented out by Tardon's counsel from November 2013 to January 2015, $70,000 in rent was paid directly to counsel, and not to Murano's company account.  DE.885:34-35.  Indeed, Murano was administratively dissolved after not filing an annual report following Tardon's conviction.  DE.885:34.

Tardon's and others' representations supported finding that he had dominion and control over the properties.  Cohen testified at trial that Tardon owned The Mark Units and created the LLCs to hold his properties.  DE.523:77-79, 188.  Tardon and

141

Cohen personally claimed both The Mark and Murano Units on their jointly filed 2008 tax return. DE.885:27, 33-34. Tardon's attorney, pre-trial, argued that Tardon "concealed nothing" because the LLCs' business records listed him "as the owner and gave his address and identifying information." DE.75:6-7 (emphasis omitted). Indeed, Tardon had argued that "every single property as to which an LLC was the purchaser" was "identified by name with [Tardon]," and that "all of the LLCs and corporations go directly back to [Tardon] on the official Florida records sites." DE.75:6 (emphasis omitted). Before his conviction, Tardon represented himself to the condominium association as the "owner" of The Mark Units "through his various entities." DE.884-1:2. Tardon requested that the Murano be created "so that he could purchase [the] property." DE.826-14:7. And Tardon was designated as the LLCs' corporate representative for the entities' deposition in the ancillary-forfeiture proceedings—even though, by that time, Tardon was a convicted felon. DE.885:29, 34. Indeed, although Tardon was consistently identified as the entities' "managing member," *after* his conviction Tardon began to claim that he was only the LLCs' "authorized manager" or "manager." DE.885:27-29, 34.

b.      Petitioners cannot demonstrate any clear error in the district court's determination, which this Court will find only "if, after reviewing all the evidence, it is left with the definite and firm conviction that a mistake has been committed." *United States v. Gladden*, 78 F.4th 1232, 1242 (11th Cir. 2023) (brackets and quotations omitted).

i.      Petitioners appear to contend, as a legal matter, that the jury's verdict finding the units not directly forfeitable barred any challenge to "the LLCs' management, funding, and operation." Pet.Br.30-33. That is incorrect. The only question before the jury was whether specific property was "involved in" or "traceable to" the money-laundering offenses. *See* DE.487. But because *any property* (even non-traceable property) is subject to forfeiture as substitute property under Section 853(p), Petitioners are wrong to contend that the jury's verdict is "conclusive" of the units' forfeitability. Pet.Br.31. The relevant question in the ancillary proceedings is whether Petitioners can establish *they*, not Tardon, own the property. The jury's verdict was not conclusive of (or even relevant to) that question. *See Nava*, 404 F.3d at 1131 (observing jury "did not decide who owned the properties or held title to or interest in them").

Nor does the verdict represent any conclusion about the "impropriety or irregularity" of the LLCs' operation that would preclude a finding that those entities were nominees. And, contrary to Petitioners' claim, Pet.Br.31-32 & n.3, it is irrelevant that some of the standing decisions relied on below determined the ownership of property that was directly forfeitable, rather than forfeitable as substitute property; as the district court observed, Petitioners have not explained why "concerns regarding strawmen and nominees are any less relevant when the property subject to forfeiture is substitute property." DE.920:44.

ii.    Petitioners make several factual assertions, often without citing record evidence, that conflict with the evidence or fail to show that the district court's finding was clearly erroneous.

They claim that funding for the LLC property came entirely from the member-owners of the LLC, not Tardon. Pet.Br.28, 33. That is inconsistent with the record, which shows that Tardon or Krentz executed the initial agreements to purchase The Mark Units, that Tardon supplied the funds to acquire The Murano Unit, and that the later transfer of those units to the LLCs involved no consideration. *Supra* at 140-141. The mere fact that Artemio was among those who allegedly funded a portion of the escrow payments to purchase The Mark Units in 2001, *see* Pet.Br.15—years before Miamark was incorporated—does not show that Krentz was acting at the behest of the LLC. Nor does the fact that Maria and Artemio were joint holders (with Tardon) on one account used to pay off The Murano's mortgage—a *personal*, not an LLC account— show that the LLC funded the purchase. DE.826-1:5.

Petitioners are incorrect that Tardon, as the LLCs' managing member, preserved "the partners' and entities' interests."[27] Pet.Br.28. The evidence instead showed that

---

[27] Petitioners suggest (Pet.Br.45) the district court put controlling weight on the description of Tardon as a "managing member," arguing that phrase did not designate him as a member with an ownership interest. As the district court explained, the magistrate acknowledged Petitioners' claim that the term "managing member" was a misnomer, but nevertheless found that relevant evidence showed Tardon's *control* over the properties. DE.920:50-51. Petitioners also repeatedly claim that Murano had no operating agreement, Pet.Br.11, 17, 45, apparently on the view that the lack of signatures on Murano's agreement rendered it ineffective. *See* DE.826-16 (Operating Agreement).

144

Tardon regularly deposited rent and other funds into his personal accounts, failed to open LLC accounts for many years, and then used the LLC accounts for personal purchases. *Supra* at 141. They also claim that the LLCs' members engaged in international travel to protect the property, that they hired counsel and real estate professionals, that they temporarily stayed in the properties, and that they took necessary management actions while Tardon was incapacitated. Pet.Br.29, 33-34. They cite no specific evidence substantiating those claims. And, as the district court explained, "[t]he mere fact that some family members may have at times stayed at the apartments is woefully inadequate to establish that the corporate entities (and not [Tardon]) are the actual, real owners of the properties." DE.906:57. That the LLCs sometimes used lawyers or real estate agents does not refute Tardon's dominion and control; indeed, the evidence showed that rental income was sometimes deposited into Tardon's personal accounts or his attorney's account. *Supra* at 141. The fact that Tardon himself (while incarcerated) acted as the LLCs' designated representative for purposes of depositions during the ancillary proceedings is strong evidence that he was solely in control. Nor did the district court suggest that an LLC cannot substantiate its ownership "through actions of a designated manager or hired professionals." Pet.Br.33. The fact-specific record here simply showed that Tardon was in control.

---

But under Florida law, an LLC's operating agreement "need not be in writing," Fla. Stat. § 608.423(1) (eff. Oct. 1, 2002), and, in any event, Tardon testified, referencing the operating agreement, that he opened Murano's bank account "because the bylaws indicate that an account has to be opened," DE.702-2:66-67.

145

iii.　Petitioners also claim (Pet.Br.43-44) that the district court erroneously disregarded what they describe as an "alternative" theory that Tardon owned, at most, a 25% interest in the LLCs. Petitioners waived any such argument. They failed to clearly present any such theory in their objections to the report and recommendation, referring to a "partial" interest only in passing. DE.909:2, 17-18. Moreover, because they wholly failed to raise any partial-ownership theory before the magistrate judge, the district court could appropriately decline to consider any claim raised for the first time in Petitioners' objections. *See Lodge v. Kondaur Capital Corp.*, 750 F.3d 1263, 1274 (11th Cir. 2014). In all events, the district court correctly found that Tardon alone exercised dominion and control over the properties, such that any partial-ownership theory failed.

### 3.　Petitioners Served As Mere Nominees For The Vehicles

The district court also correctly determined that Kyte Schooll, Artemio, and Maria were nominal owners of the forfeited vehicles. DE.920:56; DE.906:73.

a.　Petitioners assert ownership of the Mercedes and Rolls-Royce based on their inclusion on the titles for those vehicles. At the time of their seizure, Artemio and Maria were the title owners of the Rolls-Royce, and Tardon, Maria, and Kyte Schooll were the titled owners of the Mercedes.[28] DE.874-9:1; DE.874-8:3; DE.776-7:4, 186. Despite their inclusion on the respective titles, the district court correctly found

---

[28] The government again cites its proposed Report & Recommendation and summary judgment motion, which identify the relevant record evidence. *See* DE.885; DE.776.

"overwhelming evidence" that Tardon, in fact, owned both vehicles and that Petitioners "are nominees" for Tardon. DE.920:56.

In 2007, Kyte Schooll executed a Retail Purchase Agreement for the Mercedes for $343,201, which was shipped directly to Spain. DE.885:16; DE.776-1:1-2. In 2009, however, the car was returned to the U.S., and Tardon paid more than $20,000 in sales tax. DE.776-1:2. On a typed invoice on Kyte Schooll letterhead, the company certified that the Mercedes "will be returned unsold in Spain to Mr. Alvaro Lopez Tardon," and Tardon represented on a handwritten, signed letter (also on Kyte Schooll letterhead) that the car "was unregistered in Madrid Spain to [its] owner, Alvaro Lopez [Tardon], who is also the owner of Kyte Schooll." DE.776-1:2-3; *see* DE.776-7:13-14. In April 2010, Florida issued a title for the vehicle to "Alvaro Lopez Tardon or Kyte School [sic] SL." DE.776-1:3. Tardon drove the Mercedes in the U.S., and Tardon and Cohen were the only two named insureds on a policy for the car. DE.776-1:3-4; DE.523:84.

Tardon purchased the Rolls-Royce in June 2010 for more than $330,000. DE.885:16. He was listed individually as the vehicle's "Buyer," he certified that he personally held insurance for the vehicle, he was issued a Certificate of Title for the vehicle, and he personally drove the vehicle. DE.776-1:4-5; DE.523:83.

In March 2011, after Cohen and Tardon were involved in the domestic dispute, Tardon told Pollack that he planned to ship seven vehicles to Spain, fearing Cohen might seek to obtain them in the divorce proceedings. DE.776-1:5; DE.520:38-39. After they were stuck in transport, however, Tardon spoke with an employee about

147

Artemio and Maria traveling to Miami to transfer title to their names.  DE.776-1:6; *see* DE.776-7:166-185.  Title to the Mercedes was transferred in July 2011 to Tardon, Kyte Schooll, or Maria, while title to the Rolls-Royce was transferred to Artemio or Maria. DE.776-1:6-7.  Both titles listed Tardon's address at the Continuum (where neither Artemio nor Maria lived, nor was Kyte Schooll registered).  DE.776-1:6-7.  No funds were exchanged as part of the title transfer.  DE.776-1:7; DE.776-3:7, 10.

As this course of events makes clear, both vehicles were owned and used exclusively by Tardon—even if, in the case of the Mercedes, the funds to purchase the vehicle initially came from the account of Kyte Schooll (of which Tardon was, in any event, an owner).  Tardon's representations after that vehicle was transported back to the U.S. make that clear.  As the magistrate observed, Petitioners otherwise "have not claimed that they paid for the vehicles, ever used the luxury vehicles," "ever drove the vehicles," or "have ever been in the vehicles."  DE.906:72.  The district court correctly found that Petitioners are mere "nominees" who hold "bare legal title."[29]  DE.906:73.

b.      Petitioners cannot show any clear error.  They nowhere address Maria's claimed interest in the cars and therefore have waived any such arguments.  *See* DE.920:60 (rejecting objections to dismissal of Maria's claim).

---

[29] Below, the government further argued that, even if Petitioners have standing, any interest in the Mercedes is not *superior* to Tardon's, as necessary for relief under Section 853(n)(6), because he is a joint owner on the title.  *See* DE.885:14-15.  Were this Court to remand, the government would renew its superior-interest argument.

Petitioners point out (Pet.Br.57-59) that Artemio was a co-owner of Kyte Schooll—seemingly to suggest that Artemio had an interest in the Mercedes. As explained, the district court dismissed Artemio's claim to the Mercedes (to which he did not even possess title). *Supra* at 128-129. And the record is otherwise devoid of any specific evidence that Artemio had an interest in the Mercedes or that the Mercedes was used for Kyte Schooll's business. Petitioners cite none. Tardon instead represented that *he* owned the Mercedes. DE.776-7:-14. The district court did not err in crediting the evidence showing that "Kyte Schooll had nominal ownership." DE.920:59.

Nor is there any evidence that the "other car business-related entities" Petitioners vaguely reference (Pet.Br.58, 60-61), which were listed as the originators of the wire payments when Tardon purchased the Rolls-Royce—Cars Collection Sports, SL, and Car Boats Madrid, SL, DE.713:47-49—were associated with Artemio (or Kyte Schooll, which was not listed on the Rolls-Royce title at all). Petitioners, who bear the burden, did not even substantiate the identity of those other businesses. Instead, the trial evidence disclosed an intercepted telephone call between the husband of one of the companies' owners and the Tardon brothers, which showed that entity was involved in drug activity. DE.713:56-58. As the district court explained in overruling the same objections to the magistrate's report, that evidence "does not show, or tend to show, that Petitioners have any ownership interest in the Rolls Royce." DE.920:57.

Petitioners also briefly assert that evidence of the titles' transfer in 2011 shows an effort to "preserve the existing ownership interest from any competing claim in the

149

divorce." Pet.Br.61. But that is precisely the point: the transfers were intended to preserve *Tardon*'s ownership interest, by placing the vehicles in the hands of nominees. As the district court found, the magistrate "correctly credited the evidence" showing that Tardon sought to shield the vehicles from his then-spouse. DE.920:57-58.

### E.    Petitioners' Remaining Contentions Were Waived And Lack Merit

Petitioners' remaining arguments are unavailing.

1.    Petitioners' constitutional objections are meritless. The district court found those objections "vague, general, and conclusory" and appropriately declined to consider them. DE.920:38, 41. Because Petitioners' claims were not preserved, they are reviewed, at most, for plain error. *Knezevich v. Ptomey*, 761 F. App'x 904, 906 (11th Cir. 2019) (per curiam).

Petitioners briefly contend (Pet.Br.49-50) that requiring them to prove "anything more than lawful existence under state law and record title ownership" to establish their superior right to the property violates due process. But Petitioners bear the burden under the statute, and they were afforded ample process—including discovery and the opportunity to present evidence and witnesses at an evidentiary hearing—to prove their claims. There was no due process violation. Nor does the rule of lenity have any application here. *See* Pet.Br.49-51. As this Court has held, application of that rule is squarely foreclosed in this context by Section 853(*o*)'s instruction that the statute "shall be liberally construed to effectuate its remedial purposes." 21 U.S.C. § 853(*o*). "The rule of lenity is merely a canon of statutory construction" and "it is inapplicable …

150

when, as here, a clear legislative directive to the contrary exists." *United States v. Rivera*, 884 F.2d 544, 546 (11th Cir. 1989).

Petitioners also invoke (Pet.Br.51) the Eighth Amendment's Excessive Fines Clause. Without Article III or statutory standing, however, Petitioners cannot raise such a claim. *Cf. United States v. $100,348.00 in U.S. Currency*, 354 F.3d 1110, 1119-21 (9th Cir. 2004) (claimant with statutory standing can raise Excessive-Fines-Clause argument). As the district court explained, "[i]n this case, the Court imposed forfeiture against [Tardon], not Petitioners." DE.920:39.

Petitioners further claim (Pet.Br.46-49) that the district court made an "unfounded" attack on counsel that created a Sixth-Amendment issue. As the district court found, however, "Petitioners do not explain," nor is it "otherwise apparent" how the magistrate judge's consideration of statements by and actions of Tardon's counsel implicate the Sixth Amendment. DE.920:41-42. Tardon and the LLCs were afforded counsel throughout the proceedings, and the district court did not suggest that the LLCs' use of attorneys, as a general matter, was untoward. The magistrate judge chastised Tardon's counsel for improper deposition conduct but did not conclude that counsel's impropriety was *substantive* evidence that he could consider. DE.906:44-51. Otherwise, as the district court explained, Tardon's counsel's representations throughout the criminal proceedings—including his exercise of power of attorney for Tardon during his incarceration and holding himself out as one who could control the properties (without ever mentioning any role for the LLCs' members), DE.906:55—is

151

relevant evidence of Tardon's dominion and control that the district court could consider. DE.920:40-41.

2.    Finally, Petitioners challenge (Pet.Br.52-57) the magistrate judge's authority to issue a report and recommendation resolving their ancillary-forfeiture petitions. As the district court found, Petitioners waived any objection to the referral by failing to raise any challenge before the magistrate judge. DE.920:33. The district court had discretion to decline to consider that argument when first raised in an objection to the report and recommendation, and acted within its discretion in declining. *See Lodge*, 750 F.3d at 1274. And Petitioners' failure to object to the referral until their objections to the report and recommendation, after participating in the proceedings before the magistrate for nearly two years, constitutes waiver of any objection. *See, e.g.*, *Clark v. Poulton*, 963 F.2d 1361, 1366-67 (10th Cir. 1992) ("assuming *arguendo* that there was no statutory authorization for the referral, the issue was waived by [the party's] failure to object below" and an improper referral "is not a jurisdictional defect").

In any event, the claim lacks merit. The district court referred "all pending motions and related pleadings" relevant to the ancillary-forfeiture proceeding to the magistrate judge, including the government's then-pending motions for an evidentiary hearing and for summary judgment, and Petitioners' amended petitions (which they designated as amended motions). DE.813 (paperless order). 28 U.S.C. § 636(b)(1)(B) expressly allows a magistrate to "conduct hearings, including evidentiary hearings, and

to submit" to a judge "proposed findings of fact and recommendations for the disposition" of "any motion" listed in subsection (b)(1)(A), including motions "for summary judgment" or "to dismiss for failure to state a claim." 28 U.S.C. § 636(b)(1)(A)-(B). That the magistrate's review of the motions caused it to conclude that dismissal of the petitions entirely was appropriate (which mooted the summary judgment motions), does not invalidate the referral. Nor does the fact that, in resolving those motions, the magistrate considered the entire record. Indeed, Petitioners had earlier *opposed* the government's motion to withdraw referral of their initial petitions to the magistrate judge, asserting that "[t]he Court's referral of this post-trial financial matter to the Magistrate Judge is consistent with the effective use of judicial resources." DE.694:2. The magistrate was permitted to recommend resolution of the pending motions in the ancillary proceedings.[30]

*　　*　　*

---

[30] To the extent the proceedings were governed by Section 636(c), and required Petitioners' consent, Petitioners' litigation of the issues before the magistrate for nearly two years without objection indicated their consent to the referral. *See Roell v. Withrow*, 538 U.S. 580, 586-87 (2003).

153

## CONCLUSION

For the foregoing reasons, the district court's judgment should be affirmed.

February 24, 2025

HAYDEN O'BYRNE
United States Attorney

DANIEL MATZKIN
Chief, Appellate Division

JUAN ANTONIO GONZALEZ, JR.
DAREN GROVE
Assistant United States Attorneys
Southern District of Florida

Respectfully submitted,

ANTOINETTE T. BACON
Supervisory Official
Criminal Division

/s/ Andrew C. Noll
ANDREW C. NOLL
Criminal Division, Appellate Section
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530
(202) 307-1982
Andrew.Noll@usdoj.gov

154

## CERTIFICATE OF SERVICE

I hereby certify that on February 24, 2025, I electronically filed the foregoing Consolidated Answering Brief for the United States with the Clerk of the Court of the U.S. Court of Appeals for the Eleventh Circuit using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

/s/ Andrew C. Noll
Andrew C. Noll

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B), as enlarged by the Court's February 10, 2025 Order, because this brief contains 37,938 words (excluding the parts of the brief exempted by Rule 32(f) and 11th Cir. R. 32-4).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Rule 32(a)(6) because this brief has been prepared in a proportionally spaced, 14-point serif typeface using Microsoft Word.

/s/ Andrew C. Noll
Andrew C. Noll