# No.  14-15140-C

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

**UNITED STATES OF AMERICA,**

*Plaintiff/appellee,*

**v.**

**ALVARO LOPEZ TARDON,**

*Defendant/appellant.*

**On Appeal from the United States District Court
for the Southern District of Florida**

**APPELLANT ALVARO LOPEZ TARDON'S REPLY BRIEF**

**RICHARD C. KLUGH, ESQ.**
**Counsel for Defendant-Appellant**
**40 N.W. 3rd Street, PH 1**
**Miami, Florida 33128**
**Tel.  (305) 536-1191**

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

### United States v. Alvaro Lopez Tardon
### Case No. 14-15140-C

Appellant files this Certificate of Interested Persons and Corporate Disclosure Statement as required by 11th Cir. R. 26.1.

Amster, Steven Edward

Brown, Hon. Stephen T.

Blumenfeld, Jack

Cardelle, Vincent

Collection Motor Sports of Madrid

Dube, Hon. Robert L.

Ecarius, Daniel

Frazier, Brian

Ferrer, Wifredo A.

Galler, Brandy Brentari

Golembe, Stephen J.

Gonzalez, Jr., Juan A.

Goodman, Hon. Jonathan

C-1 of 3

**Certificate of Interested Persons (cont'd)**
*United States v. Alvaro Lopez Tardon*
**Case No. 14-15140-C**

Grove, Daren

Kleiner, Ron M.

Klugh, Richard C.

Krentz, Fabiani

Lazarus, Paul D.

Lenard, Hon. Joan A.

Lopez Tardon, Alvaro

Lopez Tardon, Artemio

Matzkin, Daniel

Maxwell, Cristina

McAliley, Hon. Chris M.

MiaMark, LLC.

Moreno, Hon. Federico

Mullenhoff, Jeanne

Murano 908, LLC

Noll, Andrew

O'Sullivan, Hon. John J.

Pollack, David William

**Certificate of Interested Persons (cont'd)**
***United States v. Alvaro Lopez Tardon***
**Case No. 14-15140-C**

Raben, David

Rabin, Jr., Stephen J.

Salyer, Kathleen M.

Shapiro, Jacqueline E.

Sheehan, Evelyn

Srebnick, Howard

Smachetti, Emily M.

Sombunthan, Nalina

Spivak, Michael D.

Turnoff, Hon. William C.

Weisman, Kenneth

## STATEMENT REGARDING ORAL ARGUMENT

Appellant respectfully renews his request for oral argument. There are first impression and record-intensive issues in this appeal, including important constitutional and statutory interpretation issues, that strongly counsel in favor of oral argument, particularly in light of the voluminous and complex nature of the district court record.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS . . . . . . . . . . . . . . . . . . . . . . . . . . C-1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

REPLY ARGUMENT AND CITATIONS OF AUTHORITY . . . . . . . . . . . . . . . . 1

I.     THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE
       GOVERNMENT'S ERRONEOUSLY THEORIZED MONEY
       LAUNDERING CHARGES AGAINST TARDON . . . . . . . . . . . . . . . . . . 1

       A.    The government failed to prove the domestic crime proceeds
             theory it charged and presented to the jury, where the district court
             ruled the government was required to prove that charge . . . . . . . . . . 1

       B.    The district court's post-trial misinterpretation of 18 U.S.C. §
             1957 did not cure the failure of proof of U.S. drug proceeds, and
             the government's post-verdict constructive amendment of the
             indictment to remove domestic crime proceeds allegations
             compels dismissal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

       C.    The government failed to prove an underlying felony drug crime,
             the requisite proceeds sourcing and knowledge elements, and the
             charged money laundering design of international transfers . . . . . . . 8

II.    THE DISTRICT COURT ERRONEOUSLY DENIED SUPPRESSION
       MOTIONS AND HEARING REQUESTS . . . . . . . . . . . . . . . . . . . . . . . . 12

A.  Warrantless Search and Seizure (conducted July 7, 2011) . . . . . . . . 12

    (a)  Cohen's agency status made her actions attributable to the government . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    (b)  The government's meritless assertion that Tardon had voluntarily departed the premises, abandoned his property, or gave up his expectation of privacy in the personal effects he was litigating to make sure Cohen did not wrongly dispossess him of . . . . . . . . . . . . . . . . . . 14

    (c)  Tardon's exclusive right to access his property was clearly asserted and of record in the state court which had already partially ruled in Tardon's favor and set a hearing for full enforcement of Tardon's right to exclude Cohen and retain the property at issue . . . . . . . . 15

    (d)  Cohen never had or believed she had a right to review or dispose of Tardon's most personal papers, much less in violation of pending court proceedings . . . . . . . . . . . . . . 16

    (e)  The warrantless searches of the seized, containerized personal papers—searches not disclosed in later warrant applications—constituted an additional Fourth Amendment violation . . . . . . . . . . . . . . . . . . . . . . . . . . 16

    1.  Tardon's reasonable expectation of privacy in non-marital property seized from his home—recognized

by the state divorce court exercising jurisdiction over Tardon's property in the marital home . . . . . . . . . . . . . . . . . . 17

2.    Tardon's timely mid-trial renewal of the motion to suppress . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

B.    Search Warrants (executed July 14, 2011) . . . . . . . . . . . . . . . . . . . . 23

III & IV.    MULTIPLE TRIAL ERRORS—INCLUDING INADMISSIBLE FOREIGN POLICE HEARSAY EVIDENCE—DENIED THE DEFENDANT A FAIR TRIAL AND COMPEL REVERSAL . . . . . . . . . . . . . . . . . . . . . . . 29

1.    Admission of unauthenticated foreign recordings . . . . . . . . . 29

2.    Admission of foreign police hearsay and improper witness opinions premised on foreign police reports vouching for the government's case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

3.    Admission of foreign hearsay in violation of the Confrontation Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

4.    Admission of foreign contraband evidence . . . . . . . . . . . . . . 34

5.    Improper, false impeachment and use as substantive evidence of the defendant's then-wife's equivocal assertions regarding drug involvement by Tardon . . . . . . . . . 34

6.    Improper government vouching for its case . . . . . . . . . . . . . . 36

V.    TARDON'S 150-YEAR SENTENCE BASED ON THE FALSE PREMISE OF A BASE OFFENSE LEVEL FOR FOREIGN CRIMES SHOULD BE REVERSED FOR MISAPPLICATION OF THE

SENTENCING GUIDELINES AND THE UNNECESSARY, DISPARATE, AND UNREASONABLE SEVERITY OF THE SENTENCE. THE IMPRISONMENT AND FORFEITURE SENTENCES WERE EXCESSIVE AND UNFOUNDED . . . . . . . . . . . . 37

    A.    Erroneous base offense level premised on foreign conduct for which no guideline is applicable, contrary to express terms of the guideline applicable to money laundering offenses . . . . . . . . . . . . . 37

    B.    The 150-year sentence is substantively unreasonable and unconstitutionally cruel and unusual . . . . . . . . . . . . . . . . . . . . . . . . 44

    C.    The district court's calculation of a $14 million laundering amount and corresponding forfeitures, including direct "involved in" forfeiture, exceeded the scope of charged laundering offenses and relevant statutes, conflicted with jury findings on forfeiture claims, was procedurally improper, and violated Tardon's Fifth, Sixth, and Eighth Amendment and statutory rights and Fed. R. Crim. P. 32.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT . . . . . . . . 48

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

## TABLE OF AUTHORITIES

**Cases**

*Carroll v. United States*, 267 U.S. 132 (1925) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Cuellar v. United States*, 553 U.S. 550 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

*Estate of Amergi v. Palestinian Authority*, 611 F.3d 1350 (11th Cir. 2010) . . . . . . 6

*Franks v. Delaware,* 438 U.S. 154 (1978) . . . . . . . . . . . . . . . . . . . 23, 24, 25, 27

*Liparota v. United States*, 471 U.S. 419 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . 7

*NLRB v. McClain of Ga., Inc.,* 138 F.3d 1418 (11th Cir. 1998) . . . . . . . . . . . . . . 8

*RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325 (2016) . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Awan*, 966 F.2d 1415 (11th Cir. 1992) . . . . . . . . . . . . . . . . . . . . 9

*United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991) . . . . . . . . . . . . . . . . 38, 40, 41

*United States v. Chunza–Plazas*, 45 F.3d 51 (2d Cir.1995) . . . . . . . . . . . . . . . . 41

*United States v. Dawn*, 129 F.3d 878 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . . . 41

*United States v. Dove*, 247 F.3d 152 (4th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Elbaz,* 52 F.4th 593 (4th Cir. 2022) . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Elkins*, 885 F.2d 775 (11th Cir. 1989) . . . . . . . . . . . . . . . . . . . . 3

*United States v. Gamory*, 635 F.3d 480 (11th Cir. 2011) . . . . . . . . . . . . . . . . . . 8

*United States v. Jacques*, 266 F. App'x 824 (11th Cir. 2008) . . . . . . . . . . . . . . . 31

*United States v. Juarez*, 566 F.2d 511 (5th Cir. 1978) . . . . . . . . . . . . . . . . . . . . 8

*United States v. Kapordelis*, 569 F.3d 1291 (11th Cir. 2009) . . . . . . . . . . . . . . . 26

*United States v. Lopez-Vanegas*, 493 F.3d 1305 (11th Cir. 2007) . . . . . . . . . . . . 7

*United States v. MacIntosh*, 601 U.S. 330 (2024) . . . . . . . . . . . . . . . . . . . . . . . 47

*United States v. Magluta*, 313 F. App'x 201 (11th Cir. 2008) . . . . . . . . . . . . . . . 45

*United States v. Martin*, 297 F.3d 1308 (11th Cir. 2002) . . . . . . . . . . . . . . . . . . 26

*United States v. Martin*, 803 F.3d 581 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . 2, 7

*United States v. Martinelli*, 454 F.3d 1300 (11th Cir. 2006) . . . . . . . . . . . . . . . 10

*United States v. Masino*, No. 3:16cr17-MCR,

      2019 WL1045179 (N.D. Fla. Mar. 5, 2019) . . . . . . . . . . . . . . . . . . . . . . . . 11

*United States v. Munksgard*, 913 F.3d 1327 (11th Cir. 2019) . . . . . . . . . . . . . . . 9

*United States v. Murillo*, 443 F. App'x 472 (11th Cir. 2011) . . . . . . . . . . . . . . 3, 7

*United States v. Ross*, 131 F.3d 970 (11th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . 3

*United States v. Sarro*, 742 F.2d 1286 (11th Cir. 1984) . . . . . . . . . . . . . . . . 29, 30

*United States v. Seher*, 562 F.3d 1344 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . 46

*United States v. Small*, 544 U.S. 385 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*United States v. Spence*, 923 F.3d 929 (11th Cir. 2019) . . . . . . . . . . . 38, 40, 41, 43

*United States v. Spletzer*, 535 F.2d 950 (5th Cir. 1976) . . . . . . . . . . . . . . . . . . 2, 7

*United States v. Turner*, 624 F. Supp. 2d 206 (E.D.N.Y. 2009) . . . . . . . . . . . . . 41

*United States v. Willner*, 795 F.3d 1297 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . 3

*United States v. Yates*, 733 F.3d 1059 (11th Cir. 2013),

      rev'd and remanded, 574 U.S. 528 (2015), and op'n reinstated

      in part, 788 F.3d 1350 (11th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . 2, 7

**Other Authorities**

U.S. Const., amend. V (Due Process Clause) . . . . . . . . . . . . . . . . . . . . . . . . 34, 45

U.S. Const., amend. VI (Jury Trial Clause) . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

U.S. Const., amend. VI (Confrontation Clause) . . . . . . . . . . . . . . . . . . 31, 32, 33, 37

U.S. Const., amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

18 U.S.C. § 1014 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

18 U.S.C. § 1119 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

18 U.S.C. § 1956 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 4, 5, 7, 8, 12, 42, 45

18 U.S.C. § 1956(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 1956(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 1956(c)(7) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 3

18 U.S.C. § 1957 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4, 5, 7, 8

18 U.S.C. § 1957(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

21 U.S.C. § 885 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Fed. R. Crim. P. 32.2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Fed. R. Evid. 803(8) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

U.S.S.G. § 1B1.3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

U.S.S.G. § 2D1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39, 44

U.S.S.G. § 2G1.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

U.S.S.G. § 2S1.1(a)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

U.S.S.G. § 2S1.1(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

U.S.S.G. § 2S1.1(a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

U.S.S.G. § 2S1.1(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42, 43

U.S.S.G. § 2B1.1(b)(1)  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

U.S.S.G. § 2S1.1(b)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

U.S.S.G. § 2S1.1(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

U.S.S.G. Ch. 5, Pt. A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

## REPLY ARGUMENT AND CITATIONS OF AUTHORITY

### I.

### THE EVIDENCE WAS INSUFFICIENT TO SUSTAIN THE GOVERNMENT'S ERRONEOUSLY THEORIZED MONEY LAUNDERING CHARGES AGAINST TARDON.

**A.    The government failed to prove the domestic crime proceeds theory it charged and presented to the jury, where the district court ruled the government was required to prove that charge.**

Tardon's indictment charged laundering of *domestic* crime proceeds.  *See* DE:203:4 (alleging that the predicate drug crimes were "punishable under the laws of the United States" as well as the laws of Spain and Colombia); *see also* DE:3, 106. Tardon objected at the close of the evidence that the government, despite testimonial references to U.S. drug crimes, including by government witness David Pollack, had shown no laundered proceeds of U.S. crimes.  DE:533:57; DE:500.  The district court rejected the defense contention, adopted the government's position that evidence was offered of such domestic crime proceeds, and ruled that proof of the domestic crime element was essential to conviction, such that a conviction could not rest merely on a Spanish crime proceeds theory.  DE:533:57-58.

The government invited and accepted the district court's ruling that the government was required to prove that the criminal conduct that produced the laundered proceeds violated U.S. drug laws.  DE:533:58 ("THE COURT: It has to be punishable under the laws of the United States because that's how the statute reads. It has to be a violation of the Controlled Substance Act, and there's extraterritorial

1

jurisdiction."); DE:533:58 (government counsel argues that the statute requires, and "the evidence in this case" supports, the allegation of U.S. drug crime proceeds). The government's closing argument, vouching over defense objection that the proceeds-producing conduct was in "violation of the laws of the United States," DE:504:56, served to cover the requirement imposed by the district court and the indictment.

The government now argues on appeal that the government and the district court misunderstood terminology in 18 U.S.C. § 1956(c)(7), regarding the *types* of controlled substances for which foreign drug crimes can be relevant under § 1956 as requiring that the underlying drug conduct must violate U.S. drug laws. Govt-Br:37-38. But the post-hoc argument that the government's confusion about statutory requirements caused it repeatedly and consistently for three years from indictment to verdict to mischarge the case and to oppose defense arguments that there were no U.S. drug proceeds is inapt, untimely, and inconsistent with the trial court's governing ruling and the government's insistence that it proved the U.S. drug proceeds it charged. The government cites no authority for relieving the government of the burden it asked the district court to impose and which it argued at trial it had met.

Under this Court's well-established precedents, where the district court's rulings set the elemental parameters of the case, the government's failure to meet the burden that it invited, including in its indictment against Tardon, requires a judgment of acquittal. *See United States v. Martin*, 803 F.3d 581, 590 (11th Cir. 2015) (citing *United States v. Spletzer*, 535 F.2d 950, 954 (5th Cir. 1976)); *United States v. Yates*, 733 F.3d 1059, 1063 (11th Cir. 2013), rev'd and remanded, 574 U.S. 528 (2015), and

op'n reinstated in part, 788 F.3d 1350 (11th Cir. 2015); *United States v. Murillo*, 443 F. App'x 472, 474 (11th Cir. 2011). This unbroken line of authority holds that the offense elements as set by the district court control the government's proof burden on appellate review of sufficiency of the evidence. *See also* Tardon Initial Brief at 20 (citing *United States v. Ross*, 131 F.3d 970, 980 (11th Cir. 1997); *United States v. Elkins*, 885 F.2d 775, 782 (11th Cir. 1989); *United States v. Willner*, 795 F.3d 1297, 1310 (11th Cir. 2015)).

The government concedes on appeal that its U.S. drug proceeds theory failed. Govt-Br:26-27, 30, 41; *see also* DE:541:13 (government's post-trial concession that it failed to prove U.S. drug law violations). The district court likewise concluded after trial that the government failed to establish any U.S. crime proceeds. DE:586:32. A judgment of acquittal should therefore be granted.

**B.**     **The district court's post-trial misinterpretation of 18 U.S.C. § 1957 did not cure the failure of proof of U.S. drug proceeds, and the government's post-verdict constructive amendment of the indictment to remove domestic crime proceeds allegations compels dismissal.**

The government argues that the district court was not bound by its rulings at trial requiring proof of U.S. drug crime proceeds because, in the government's view, § 1957 is not limited to spending funds derived from *domestic* crimes. The government cites no authority for its unduly expansive interpretation of § 1957 where the limited exception in § 1956(c)(7)'s "specified unlawful activity" definition encompasses foreign crime proceeds only for "financial transaction" offenses—i.e.,

3

offenses under § 1956(a)(1)—and *not* offenses under §§ 1956(a)(2) and 1957, which are distinguished by their omission of any "financial transaction" element or even any reference to a "financial transaction." The government never alleged—in any version of Tardon's indictment—that a "financial transaction" was charged in Counts 2-14 (alleging substantive violations of § 1957's *money spending* provision) or in the transportation objects of Count 1's § 1956 conspiracy charge. Nor did the government ever request a jury instruction on the "financial transaction" concept as to § 1957 or a verdict form linking § 1957 to any financial transaction element. Nor did the government ever argue to the jury or the court prior to verdict that a financial transaction element applied to Counts 2-14. Nor has the government offered any precedential support for expanding the reach of either § 1956(a)(2) or § 1957 to reach foreign crime proceeds.

The government concedes that in *Cuellar v. United States*, 553 U.S. 550 (2008), the Supreme Court recognized that only a subset of money laundering prohibitions has as an element *financial transactions*. Govt-Br:38. The government, however, fails to acknowledge the importance the Supreme Court placed on the different elemental terms used in money laundering laws even with regard to different provisions of § 1956. *Id.* at 557 ("§ 1956 prohibits specified transfers of money derived from unlawful activities. Subsection (a)(1) makes it unlawful to engage in certain *financial transactions*, while subsection (a)(2) criminalizes certain kinds of *transportation*.") (emphasis added). The government suggests, without support, that the Supreme Court's explanation of the different elemental requirements was a mere aside, but that

4

view is inconsistent with the analysis employed in *Cuellar* to eliminate from culpability aspects of the defendant's conduct that could have been—but were not—charged as financial transactions. *Id.* at 563-64. The government's attempt to disregard the Supreme Court's focus on whether a financial transaction was charged, as opposed to a different provision of the money laundering statutes, is unreasonable and inconsistent with *Cuellar*. The elemental distinctions are even more important where the more expansive element, "financial transaction," is included only in the more serious (and consequently more severely punished) conduct of laundering under § 1956, not § 1957.

Importantly, the government avoids discussion of an additional elemental distinction between § 1956 and § 1957. Unlike § 1956's "some unlawful activity" definition, the § 1957(f)(2) "criminally derived property" definition *does not include foreign crimes*. *See United States v. Small*, 544 U.S. 385, 388-90 (2005) (statutory application presumed limited to domestic crimes absent express inclusion of foreign crimes); *RJR Nabisco, Inc. v. Eur. Cmty.*, 579 U.S. 325, 335 (2016) (same). In contrast to § 1956, the relevant provisions of § 1957 do not incorporate foreign crimes under *either* the "criminally derived property" (and related mens rea) or "specified unlawful activity" elements. Section 1957 quite simply has, and is meant to have, different elements in addressing money *spending* offenses.

The government's and the district court's recognition at trial of the indictment's jurisdictional prerequisite of domestic crime proceeds comports with the statute.

Upon the district court's post-trial ruling, DE:586, that effectively struck the indictment's allegations of domestic drug trafficking and reversed that court's prior ruling that the government was required to prove U.S. drug crime proceeds, Tardon properly moved for dismissal based on the absence of jurisdiction and failure of the constructively-amended indictment to state an offense. DE:589.

By analogy, if the government had alleged the defendant, holding dual U.S. and Spanish citizenship, murdered a U.S. citizen in Spain, and the government thereafter—only upon being confronted with a motion for acquittal—admitted it had not meant to allege, and had not sought to prove, that the defendant held U.S. citizenship, the indictment would then be beyond the jurisdiction of the federal courts because, under the limited jurisdictional reach of 18 U.S.C. § 1119, there is no federal jurisdiction over a foreign person's foreign murder offense. *See, e.g., Estate of Amergi v. Palestinian Authority*, 611 F.3d 1350 (11th Cir. 2010) (ruling that federal courts lacked subject matter jurisdiction to address lawsuit brought under Alien Tort Statute, 28 U.S.C. § 1350, where damages sought were for wholly foreign offenses—the murder of a foreign citizen in a foreign jurisdiction).[1]

---

[1] The government's post-hoc waiver arguments seeking to avoid consideration of the fundamental defects in the constructively-amended indictment and the dearth of proof of the statutory elements fail on the record of repeated on-point motions by Tardon in the district court. The government cites no authority for disregarding a dismissal motion filed after the government disclaimed a jurisdictionally-essential element of the indictment. Relief is required in any event given the evidentiary insufficiency as to the requisite domestic crime proceeds. The government cannot avoid the merits in this appeal.

6

For the government to claim now that Tardon was to understand that proof of the charged violation of U.S. drug laws was not required—even though the district court expressly ordered that such proof *was* required, and even though the government *assumed that burden* at trial—ignores that this Court, as the above-cited authorities (*Martin*, 803 F.3d at 590; *Spletzer*, 535 F.2d at 954; *Yates*, 733 F.3d at 1063; *Murillo*, 443 F. App'x at 474) dating back to the former Fifth Circuit show, has never permitted such a bait-and-switch by the government in criminal prosecutions.

While the government's opening statement disclaimed any evidence that *importations* of drugs into the U.S. were *successfully* effected by Tardon, that did not foreclose the government's reliance on conspiracy and non-importation theories of U.S. drug law violations, particularly where the government never sought to prove any *felony* offense in Spain.  Nor did the government otherwise follow the holding of *United States v. Lopez-Vanegas*, 493 F.3d 1305, 1313 (11th Cir. 2007)—that U.S. drug laws do not extend to conspiracy to possess controlled substances outside the United States, with intent to distribute those drugs outside the jurisdiction of the United States.

On the merits, the government's conflation of the scope of Sections 1956 and 1957 is textually unsustainable.  The elements of those statutes, including the "financial transaction" applicable to some subsections of § 1956, are distinct.  Further, the rule of lenity compels a defense-favorable interpretation where an untold expansion of the statutory language would otherwise result in an unexpected "broad range" of additional criminalized conduct.  *See, e.g., Liparota v. United States*, 471

7

U.S. 419, 426 (1985). The statutory differences, and the important distinctions between engaging in conduct that has a separate criminal component, such as concealment or promotion of crime as in § 1956, as compared with the money spending statute, § 1957, which applies even to otherwise wholly non-criminal dealings such as hiring counsel or charitable donations, show that there is no policy reason warranting the non-textual expansion of § 1957 that the government asks this Court, as a first impression matter, to endorse.

## C. The government failed to prove an underlying felony drug crime, the requisite proceeds sourcing and knowledge elements, and the charged money laundering design of international transfers.

Tardon's remaining arguments for judgment of acquittal based on insufficiency of evidence stand unrebutted by the government. *See, e.g.*, *United States v. Gamory*, 635 F.3d 480, 497 (11th Cir. 2011) (*de novo* review of preserved sufficiency arguments; substantial evidence must support verdict). The government's inapposite citation to *NLRB v. McClain of Ga., Inc.,* 138 F.3d 1418, 1422 (11th Cir. 1998), a civil appeal, does not lessen the need for a showing of substantial evidence of guilt under the *de novo* sufficiency review applicable to preserved Fed. R. Crim. P. 29 acquittal motions. *See, e.g., United States v. Juarez*, 566 F.2d 511, 512 (5th Cir. 1978).

1. The government concedes that despite calling six Spanish National Police witnesses at trial, no evidence was elicited regarding whether a predicate Spanish *felony* was at issue, much less had produced relevant proceeds; instead, the government apparently omitted proof for or reference to the felony element at trial.

8

Govt-Br:41-44.  The government misrepresents, and materially alters the language quoted in, *United States v. Awan*, 966 F.2d 1415, 1424 (11th Cir. 1992), regarding felony drug offenses.  Govt-Br:44.  *Awan*—which dealt solely with "state or federal" felony drug laws—did not address the proof required to establish whether individual drug crimes are felonies; the defense in *Awan* did not dispute such proof.  The *Awan* court instead rejected a "vagueness" challenge to the money laundering statute's requirement of a state or federal drug felony predicate.  *Id.* at 1424-25.  That the element is not vague does not mean the government no longer has to prove it.

The government's contention, Govt-Br:44 (citing DE:586:28), that it should be relieved in this case of its fundamental burden to prove and obtain a verdict as to every element of the charged offense (including felony proceeds) is an excusal this Court will not grant.  *See, e.g., United States v. Munksgard*, 913 F.3d 1327, 1331 (11th Cir. 2019) (rejecting argument that government can dispense with proof that FDIC is federally insured—an essential element of the offense in that case of knowingly making a false statement to obtain a loan from bank that is federally insured, in violation of 18 U.S.C. § 1014—simply because such federal insurance seems probable; reiterating government's unwavering burden to establish offense element, even where proof might be "'simple and straightforward'" and reiterating its repeated chiding of government for failing to adequately fulfill that burden in other cases) (internal citation omitted).

The government offered no evidence that the conduct attributed to Tardon constituted a felony offense in Spain, despite bringing a Spanish judge to court in

Miami for these proceedings. Nor was there evidence of *anyone's* prosecution for a felony drug offense in Spain. The government simply ignored the proof requirement and cannot now assume away that burden.

The government's strawman argument regarding an instructional challenge issue in *United States v. Martinelli*, 454 F.3d 1300, 1311-12 (11th Cir. 2006), confirms the government's failure to take any step to cover its burden here. In *Martinelli,* there was sufficient evidence offered to establish the underlying felony; and Martinelli failed to object in the district court to the failure of proof—unlike Tardon, who timely challenged evidentiary insufficiency on this point. Nor was the government-favorable instruction in *Martinelli* requested or given here. A judgment of acquittal is warranted based on the failure of proof of the felony proceeds element.

2.      Proof gaps in the government's case extend also to the government's discounting of money Tardon and his family made in their car dealerships and other businesses in Spain. In no version of the government's evidence was there proof that each of the purchases at issue in Counts 2-14—eight of which involved buying or repairing cars, with the rest involving bank transfers from accounts not linked to drug transactions—were sourced to qualifying proceeds. At trial, the government argued that money from some form of drug trafficking in years past—prior to Tardon ever meeting his wife—was used as capital in the start-up stage of the car business in Spain that would later produce millions of dollars in revenue. The government now seeks to ignore that extensive company revenue and speculates that some inventory was

10

purchased instead with criminal proceeds.  The government's fallback theory at trial, which it referred to as overhead laundering, *see, e.g.*, DE:536:74-75, was also sparsely and inadequately supported to cover each of the multiple transactions in Counts 2-14.

In other cases, the government has applied an accounting analysis such as 'first in-first out,' or 'lowest intermediate balance' to establish that business revenue containing both an illegal and legal source necessarily involved laundering in the requisite amount. *See, e.g., United States v. Masino*, 2019 WL1045179, at * 4 & n.10 (N.D. Fla. Mar. 5, 2019).  The government did not do that in this case, and its attempt now to refer to tax returns fails to account for its own presentation of bank records showing the proceeds of car sales by the Tardon family.  The government notes anecdotal instances of car sales that did not produce major profit, but the millions of dollars in sales revenue are not disputed and the overall gross profit and revenue was sufficient to account for the charged purchases.  The vehicle sales spreadsheet showed a high level of profit, which is why the government turned to its overhead-laundering theory at trial.

The government's case suffered from a further accounting problem where Spain had seized money from suspected drug transactions and failed to show that any further drug transaction proceeds were unaccounted for, much less that they had reached the United States.  The resulting speculative nature of the proof as to any of the substantive purchase charges warrants a judgment of acquittal.

11

3.    The government fails to offer any evidentiary basis for its single-conspiracy theory of a decade-long money laundering conspiracy—without a single § 1956 substantive offense charged. Govt-Br:55. Tardon moved to the United States. from Spain. He occasionally transferred money from Spain to this country and occasionally participated in purchases for himself or for his business in Spain. The single-conspiracy allegation lacked anything more than disconnected acts of sending Tardon money, the vast majority of which was in his own name, none of which promoted crime, and none of which made the funds more concealed.[2]

Tardon relies on his initial brief as to his remaining sufficiency arguments.

## II.

## THE DISTRICT COURT ERRONEOUSLY DENIED SUPPRESSION MOTIONS AND HEARING REQUESTS.

### A.   Warrantless Search and Seizure (conducted July 7, 2011).

The government's brief illustrates the district court's critical errors in denying suppression of the pre-arrest, pre-warrant search of Tardon's marital home after a state court judge had ruled that Tardon had a right to access the marital home to retrieve personal property, with a hearing set in state court to determine if his wife, Sharon Cohen, could oppose further retrievals of Tardon's property for which Cohen had no interest or right to dispossess Tardon. The court order directing her to turn over much

---

[2]    The district court's erroneous limitation on defense closing argument disputing a single, decade-long conspiracy allegation substantially prejudiced Tardon. DE:504:135.

of Tardon's property pending a hearing on Tardon's right of complete retrieval of personal effects from the marital home thoroughly undermines the government's claim of authorized third-party consent.

The government offers no viable response to this obvious defect in its successful effort in the district court to discount Tardon's privacy and property interests; to conceal the extent of Cohen's agency status with the government (including that she was working with the government to coordinate a massive upcoming warrant execution scheduled for the following week in two countries); to convert government-enforced exclusion of Tardon from the marital home into an abandonment; and to conflate Cohen's actions in granting agents access to the marital home for purposes of their seizing a *container* of Tardon's property with an excusal of the container-warrant requirement given all of the circumstances showing that the private papers had been preserved as private and containerized when seized.

(a)    *Cohen's agency status made her actions attributable to the government*.

Although the government hid from the defense until trial records and other evidence establishing that Tardon's wife *was*—contrary to the understanding given to the district court—acting as a government undercover cooperator/agent in investigations arising from the Tardon case, that evidence places in context the undisputed evidence that Cohen met at length with the agents and prosecutors on July 7, 2011 to offer myriad assistance in the government's upcoming search-and-arrest efforts, plainly showing that her actions in bagging up Tardon's private papers to

13

permit the agents, rather than Cohen herself, to violate the status quo set by the state court exercising jurisdiction over the property and Tardon's right of return of his effects, was part of her response to search assistance demands made on her by the government. Blinking that reality, the government fails to offer any other explanation for Cohen's consistent coordination with the government on the lead-up to and the actual execution of all of the searches in this case, including as to the warrants on July 14, 2011. Cohen's search role was of enormous significance to the U.S. and Spanish authorities, with their secret planning for the execution of multi-continent sealed search warrants taking place with her providing agents access to a container of Tardon's personal papers from Tardon's home.

(b)     *The government's meritless assertion that Tardon had voluntarily departed the premises, abandoned his property, or gave up his expectation of privacy in the personal effects he was litigating to make sure Cohen did not wrongly dispossess him of.* The government concealed until trial substantial evidence showing Tardon had not abandoned his home or any use of it in the weeks before his initial arrest and the imposition of a government-initiated stay-away order. Tardon continued not just using his home *every day* for his ongoing religious studies and practices as the government had indicated originally, but was also sleeping in his home within days of the altercation with his wife that led to a stay-away order; when not spending his nights there, he still made full use of it for all his personal affairs, including to access his personal property and papers. That the government, working

14

with local authorities, obtained a stay-away order that forced Tardon out of his house and compelled him to go to state court to seek an order to access his property and papers—for which an order granting relief, and setting a further hearing to separate out Cohen's property from Tardon's, was entered prior to the FBI seizure of the container of his papers—did not amount to an abandonment of anything by Tardon and, at a minimum, on July 7, 2021, he had a reasonable expectation that Cohen would not, in collaboration with the government, evade the protection of a state court order that preserved Tardon's privacy and property rights.

(c) *Tardon's exclusive right to access his property was clearly asserted and of record in the state court which had already partially ruled in Tardon's favor and set a hearing for full enforcement of Tardon's right to exclude Cohen and retain the property at issue*. The state court had already entered an order on the day of the warrantless seizure (which occurred in the nighttime after the state court order was of record) permitting Tardon to access the home to retrieve property he described as having a personal, religious connection; the state court had set a hearing on Tardon's right to access the home to obtain his other property and papers that belonged solely to him, not Cohen. The unequivocal import of the judicial orders (of which the government was aware) was that Cohen could not unilaterally dispose of Tardon's effects—which categorically forecloses the government's basis for the warrantless search and seizure.

15

(d)      *Cohen never had or believed she had a right to review or dispose of Tardon's most personal papers, much less in violation of pending court proceedings*. Cohen believed the papers were exclusively Tardon's and she had never accessed (read or inventoried in any way) the critical personal notebook that the government heavily relied on for conviction.  The notebook, which served a diary-like function, was purely a private item that Cohen had never attempted to invade prior to the search meeting-and-planning session with the government on July 7, 2011.  Cohen had never even seen a single page of her husband's diary notebook; and thus rather than handing the material to the FBI, she containerized it, left it on the property (in a gated compound), and did not stop the FBI from seizing the bagged papers belonging to Tardon.

(e)      *The warrantless searches of the seized, containerized personal papers—searches not disclosed in later warrant applications—constituted an additional Fourth Amendment violation*.  The nature of the closed container in which Cohen had placed Tardon's papers was such as to make clear to the agents that the contents were Tardon's personal papers alone, not Cohen's, thus calling for a warrant to search the container.  The government's quality-of-the-container argument lacks precedent and ignores that the function of the opaque bag was to make it private.

The facts are largely undisputed. The government's unprecedented, more-than-year-long delay in revealing that the warrantless search had occurred at all—including failing to acknowledge the search or seizure in warrant applications or, in fact, during

16

the entire pendency of litigation on Tardon's motion to suppress the fruits of the

warrants—was unheard of and became even more prejudicial when crucial facts about

Tardon's standing and Cohen's agency status were revealed only at trial fully *three*

*years after the warrantless search,* such that litigation of the issue was made even

more difficult for the defense, particularly where the district court denied requests to

reopen the suppression hearing.[3]  DE:585.

> **1.  Tardon's reasonable expectation of privacy in non-marital property seized from his home—recognized by the state divorce court exercising jurisdiction over Tardon's property in the marital home.**

Prior to the warrantless search, Tardon was granted an order from the divorce

court recognizing his ownership of and need for property in the home and allowing

---

[3]  The government downplays the overall *de novo* standard applicable to appellate review of constitutional violations raised in connection with the denial of Tardon's suppression motions, including as to legal questions of what constitutes a reasonable expectation of privacy; whether someone has abandoned an interest in property; whether the false assertion of probable cause for a drug offense invalidates a warrant, all or partially, in light of abundant misleading statements in the warrant application; whether someone has agent status when conducting search or seizure actions in coordination with the government; the scope of a defendant's property and privacy rights in litigating and seeking to expand a state court order giving him rights to access and remove his personal property from the marital home; whether having obtained a container full of the defendant's property through warrantless seizure, the government was required to seek a warrant before opening and reviewing the container's contents; and other critical factors regarding the warrantless seizure of the defendant's personal property from his home—where, as part of its understanding with its cooperating witness/agent here, Cohen, *the government chose not to execute a warrant on the home*.

him immediate access to certain essential property, including items having religious significance to him. The court order prevented Cohen from taking action with regard to Tardon's remaining property. DE:378-9:2 (July 7, 2011 state court order requiring Cohen to permit Tardon access). Pursuant to the divorce court order, all Tardon had to do was retrieve his personal belongings, consisting of clothing, including religious garments, and religious articles. Tardon's notebook, consisting of a personal diary focused on his beliefs, ideas, and concerns regarding religion, of which he was a longstanding adherent and aspiring priest, were not—despite the government's theorization—excluded from that category. But in any event, the state court further ordered an evidentiary hearing as to all additional papers and other items claimed by Tardon. DE:378-9:2. The government's reaction—to coordinate with Cohen to breach the state court order, taking a huge black bag of items from Tardon's home—simply cannot be justified under the joint marital-rights theory, much less the abandonment theory. Cohen lacked authority to do anything with Tardon's personal papers, and the government knew it when they saw the bagged papers at the home and warrantlessly took them, later to warrantlessly review the contents—in disregard of the state court order, without notice in the warrant process for other dwellings and property, and without notice to the defense until the warrant litigation had concluded.

The diary notebook at issue (which the government repeatedly belittled by referring to classic Walt Disney-created characters on the cover) was once, years previously, placed in Cohen's temporary custody by Tardon in Spain long before it

18

was secured by Tardon in his Miami home. The government claimed, without authority, that such a prior limited bailment divested Tardon of standing when the notebook—that was kept by Tardon in his Miami home years later—was seized. Instead, however, the *temporary* custodianship by Cohen proved merely that she knew the notebook was an important personal document of Tardon. Cohen thus never intruded into the handling or viewing of the diary's contents until the day of the government planning for execution of search warrants, and even then she did not look in the notebook, but placed it in a container and left it on the property for the FBI to make its own decisions and judgments about what to do with the container and its contents. The government's post-hoc speculation that there was no religious significance to the notebook is false and, in any event, merely circular. The government made no attempt to show that the diary contents were not included within the category of religion-related material the state court replevin order encompassed. The diary had, for example, songs, thoughts, and personal expressions of a religious and a philosophical nature.

Cohen did not have unrestricted access. She did not consider herself to be even authorized to open the notebook to look at it, nor did she. She had met with the agents earlier on the same day the orders were entered by the divorce court. Cohen, acting as an agent of the government, including making undercover telephone calls, and after assisting that day in the pre-search tactics meeting, coordinated with the government to take Tardon's papers prior to the search. Her access is not the issue. Pursuant to

19

the divorce court order, Cohen had access to the papers, but she did not have the right to dispose of them, any more than she would have had the right to cede the house to the government by way of bargaining for her undercover agent work. Clearly and unequivocally, Tardon manifested his continuing ownership of his property.

Cohen's gathering of the papers is irrelevant. She could gather them, place them in a shed outside, or in a closet. It is not the gathering—it is the warrantless taking and reading of the containerized papers by the government that was improper. Cohen did not share authority over the seized items. That is why she would not handle or look into them. And the divorce court order makes it clear: if she had disposed of these items and that had been brought to the attention of the court, she would have been in contempt of court. Cohen kept herself free of the divorce court issue by simply putting them in a container. The government took the container with the papers.

### 2.    Tardon's timely mid-trial renewal of the motion to suppress.

Tardon made an ore tenus motion to suppress as soon as possible during trial—upon the first-time revelation to the defense of critical supporting evidence. Thereafter, he filed a written motion at the district court's request. DE:474.

The government's assertion that the renewal of the motion to suppress the warrantless search was untimely is confounding. The motion was timely as soon as the testimony showed that the government had lied in stating that Cohen was not acting as an agent and that she was simply a third-party wife. *See, e.g.*, DE:523:13

20

(district court observes, two weeks after trial began, that Tardon had established Cohen was acting as an undercover government agent).  The evidence hidden from Tardon was that Cohen was actively acting as an undercover confidential informant of the government, including in the field working with the government to interdict crime.

What Tardon's defense team did not know—and what was concealed from both them and the magistrate judge—was that Cohen was an *active* undercover agent developing evidence for the government: in other words, that she was playing a *role* for which she was being rewarded in multiple ways by the government.  The important fact for reopening suppression, therefore, was when the evidence at trial proved this previously-undisclosed information.  Once Tardon had enough evidence to establish it, he moved to reopen—first verbally, and then, at the district court's request, by way of written motion.

The government's claim that Tardon could have made the motion before Cohen's testimony was concluded is mistaken, particularly in a case in which the government had concealed such fundamental evidence.  The government's repeated use of a 'we-got-away-with-it-and-you-didn't-catch-us-until-pretty-late' argument should be rejected. Tardon properly renewed the suppression motion before testimony about its contents was offered, DE:529:44, appropriately after witness Cohen had stepped down.  At trial, the district court ruled on the merits of the motion to reconsider: "THE COURT: I'll adopt my prior rulings. It's not changed." *Id*.  The

21

post-hoc argument that the motion—filed before the damage from the notebook witness occurred—was somehow untimely is inconsistent with the record. The Supreme Court, one hundred years ago, recognized the importance to the correct resolution of a suppression motion that "the whole matter was gone into at the trial, so no right of the defendants was infringed." *Carroll v. United States*, 267 U.S. 132, 162 (1925). The district court's ultimate decision to discount the trial record that undermined the government's suppression claims erroneously denied Tardon a remedy for the constitutional violation.

The government's description of Cohen's undercover work as extending beyond Tardon's case does not diminish its importance. The breadth and scope of her agency was fundamental to Tardon's claim, as was trial evidence showing Tardon maintained, went to, and used the marital home *daily*, including sleeping there on nights when Cohen was away, leaving Tardon to care for his stepdaughter there, until the government-initiated stay-away order. *See* Govt-Brief:78 (acknowledging Tardon owned and continued to use the home).

The motion to suppress was wrongly denied as was the request to take additional evidence establishing the constitutional violation, where that evidence had been previously concealed by the government. The government's remaining argument appears to be that if the husband is not sleeping in the home he solely owns where he maintains his clothing, papers, possessions, and religious items, and spends his days, including conducting primary daily activities there, then he has no expectation of

22

privacy in his papers.    By that measure, couples who sleep in separate quarters—including prominent public figures as well as many wealthy couples—would have no expectation of privacy in their homes.

The totality of the evidence shows a constitutional violation requiring suppression and at a minimum a reopening of the suppression hearing.

## B.  Search Warrants (executed July 14, 2011)

The government contends that this Court should overlook the district court's denial of a *Franks* hearing and a hearing on the overbreadth of the warrant-based searches even though the warrant to search for evidence of U.S. drug violations was premised on deliberate false statements.  The affiants knew there was no basis for such a search.  The affiants added numerous other misleading statements to the warrant applications and omitted that the warrant's sole confidential source could do nothing more than *speculate* about drug trafficking and knew of no other illegality, including no concealment or promotional laundering, no currency violations, no failure to file currency forms, no improper handling or property, no hiding of Tardon's involvement with assets, and no other indicia of money laundering.  The scope of execution of the warrants for material associated with U.S. drug offenses was very broad, and the premise for a finding of foreign drug trafficking at unknown times rested on misleading assertions regarding mere conclusions by Spanish police who had not charged Tardon with any drug activity.  There was no probable cause basis for the

23

warrants or their scope, particularly after exclusion of the false and misleading evidence.

The government concedes that the search warrant affidavit did not identify Tardon's then-wife Sharon Cohen as a confidential source (CS#1). Govt-Br:62. The failure to inform the issuing magistrate that the defendant's own wife, having turned against him, still could not say whether he was involved with drugs, was a critical omission from the sealed warrant application. The warrant application thereby also hid from the magistrate issues of violation of the marital privilege, as the affiants did not claim their source (the wife) was a criminal participant.

The affiants falsely claimed Fabiani Krentz, who participated with the Tardons in buying real estate, lacked lawful work and assets, when in fact she was married to a City of Miami police officer and owned her own residential interior design business. Krentz was, in that sense, engaged in the real estate industry. The government knew she had worked with a consortium of Spanish investors to purchase Miamark units, none of which purchase money was ever traced to drugs.

The government failed to tell the magistrate that it had already seized Tardon's personal papers in the days before filing the warrant applications and in that time had found nothing incriminating in any way and had not sought a warrant for what it had already taken.

Trial testimony by Cohen confirmed the validity of the defense's *Franks* hearing request. She was not aware of a single drug transaction by Tardon. Nor did Cohen say that she had ever seen any drugs in the United States or Spain. The

24

government posits that Cohen may have equivocated in an initial government interview. Govt-Brief:71. She equivocated only in the sense of *speculation* suggested by the undercover federal agents portraying themselves as counselors; she speculated solely because she had no knowledge of any drug activity by Tardon. Notably, at trial, the government elicited her testimony that she was not aware of any criminal activity in anything in which she was involved with Tardon.

The government's brief concedes that there was no basis at all for the FBI affiants to falsely claim probable cause to search for evidence of violations of U.S. drug laws. Nor does the government cite any decision by any court, state or federal, where a warrant falsely issued on the basis of a false claim of U.S. drug crimes was upheld even in part, much less without a *Franks* hearing. As to foreign crimes, the government offers no basis to refute that the affidavit's premise for the allegations was hearsay from foreign police sources.

The warrant's affiant gave the impression that the affiant was fully aware of a Spanish investigation of Tardon, yet documents established she merely read one Spanish report that did not cover anything more than *conclusions* of a foreign police agency; the affiant failed to evaluate any of the underlying evidence. The government therefore falsely conveyed a U.S. government finding of probable cause (about non-qualifying laundering predicates) when, instead, the government was seeking a warrant based on conclusions by foreign police officers. The government's false

25

claim of a basis for a warrant for U.S. drug crimes confirms the government wanted to place its own imprimatur on what was conclusory Spanish speculation.

Similarly, the warrant affiant's conclusory assertions regarding the Tardon car business established nothing more than further speculation. It was the affiant's failure to disclose abundant car dealership activity—which confidential source Cohen fully verified—that was pertinent to the affidavit's lack of veracity. The government knew that there was a thriving car business and that the amounts of money at issue could easily have come from a luxury car business.

*United States v. Kapordelis*, 569 F.3d 1291 (11th Cir. 2009), cited by the government, is distinguishable on many bases. Unlike in *Kapordelis*, the information here consisted of conclusory reports; nor was there in *Kapordelis* any false claim of U.S. drug crimes uniquely confected by the government, as here, or any related distortion of evidence provided by foreign authorities. The government speaks of tape recordings the affiant had not heard, but as the government's own brief shows, in arguing harmless error in the admission at trial of those tapes, nothing known to the affiant about those recordings supported probable cause. *Cf. United States v. Martin*, 297 F.3d 1308, 1314 (11th Cir. 2002) (search warrant affidavit must show it was not unreasonable for affiant to believe that "what he wrote in the affidavit would be sufficient to support a finding of probable cause"; in context of assertion of good faith exception to exclusionary rule). The government, despite having hundreds of hours of recordings, did not identify a single drug transaction or anything even related to

26

drug trafficking.  In fact, the government apparently had not listened to a single recording.

First, to obtain a *Franks* hearing, evidence of the deliberate nature of the material false statements need only be very slight.  Here, the totality of the misstatements, coupled with their extraordinary nature—i.e., the entirely bogus claims of U.S. drug trafficking—was enough to obtain a hearing.  The government's brief does not rebut the affiant's obvious reckless or deliberate misstatements about such crimes.

The government does not dispute Tardon's contentions that Cohen denied impropriety or concealment in certain financial dealings, that other transactions were stale because they occurred years earlier, and that filing currency transaction reports (CTRs) and using LLCs for transactions does not establish that they were conducted criminally.

The government's assertion that the affidavit contained indicia of non-innocent circumstances, such as that money launderers often try to give their transactions a veneer of legitimacy, Govt-Br:74-75, is internally inconsistent.  The whole premise on which the government based its assertion of probable cause was not just drug trafficking, but an overwhelming amount of drug trafficking—for which the government had no evidence.

Moreover, the affidavit falsely claimed the lack of legitimate employment by Tardon and his associates and speculated regarding unconcealed transactions.

Tardon's name was prominently associated with every single transaction, every single purchase identified in the warrants.

The government is wrong that, even if Tardon's motions to suppress were improperly denied, the error was harmless. Abundant evidence seized by way of the warrants was introduced for the government's use in disputing defense theories. And its assertion that the notebook's admission was inconsequential is patently untrue. The difference between a corroborated, rewarded witness and an uncorroborated rewarded witness, whose testimony was imprecise in the first place, is enormous. That is why the government argued at trial that the notebook was more important than Pollack's testimony. Again, the question in this case was not whether Tardon had ever been involved in drug trafficking, but whether he had obtained millions of dollars in profits from drug trafficking, and the notebook was the government's core premise for connecting the Spanish National Police claims of drug trafficking to that evidence. The prosecution's case hinged on its claim that the notebook proved vast amounts of drug trafficking profits from distinct Spanish drug transactions. The notebook was the prosecution's songbook for the trial; the prosecution commented repeatedly on the notebook, including as to every part of it that they introduced. And the remaining evidence obtained via the warrants made up much of the government's financial evidence and purported linkages to other persons attributed by the government to the conspiracy. *See*, *e.g.*, DE:504:52. Contrary to the government, the illegal searches

28

gave the government a foundation for prosecution and denial of hearings on the motions was error.

## III & IV.

## MULTIPLE TRIAL ERRORS—INCLUDING INADMISSIBLE FOREIGN POLICE HEARSAY EVIDENCE—DENIED THE DEFENDANT A FAIR TRIAL AND COMPEL REVERSAL.

1.    **Admission of unauthenticated foreign recordings**.  The government argues that no content-specific authentication is required for admitting foreign police recordings, which here involved discussions about transferring money from Spain to the United States.  The government concedes that no witness claimed to have first-hand or other knowledge of original foreign tape recordings that the government did not provide to the defense or the district court.  Nevertheless, the government claims, incorrectly, Govt-Br:88, that there is precedent for admitting such unauthenticated evidence even absent confirmation that either the original recording or the actual conversation is accurately reflected on the recording offered in evidence.  The government cites *United States v. Sarro*, 742 F.2d 1286, 1292 (11th Cir. 1984), but *Sarro* does not support the government's no-authentication-burden position.  In *Sarro*, this Court instead approved two ways to ensure that a recording is accurate.  One, as in *Sarro*, was for the authenticating witness to have heard the *actual conversation*. "Even if the government failed to carry its particularized burden of going forward, the fact that Agent Hanlon was actually present at both meetings evidences his competency to testify at trial that the audio cassettes played in court were accurate

29

reproductions of those meetings." 742 F.2d at 1293. In such a case, there is no need to listen to the original recording.

Here, however, no one listened to the underlying conversations, no one employed the alternate method of listening to the original, and nothing but a copy was made available to the defense. And the witness who brought the copy from Spain was not part of any investigation relating to the case.

The test the government advocates for under *Sarro* was simply not met here, and the tapes were improperly introduced. The government —despite three years of pretrial preparation—failed to meet its burden and the tapes, which the government characterized at trial as confirming the theory of conspiracy, were wrongly admitted.

**2.     Admission of foreign police hearsay and improper witness opinions premised on foreign police reports vouching for the government's case.** The government fails to justify the admission of multiple layers of hearsay by Spanish police officers, which the government used to show that Spanish drug deals were conducted and that Tardon might have received money from them. *See* DE:541. The hearsay report-sharing by **six (6)** testifying Spanish National Police (SNP) officers—who were working with a Spanish national judicial investigation and thousands of reports created in an effort to pin down suspicions of Spanish drug trafficking and local police corruption—was testimonially transferred to the jury, as Tardon has explained with citations in his initial brief. The government's brief offers little more than a convenience rationale for departing from the requirement to present

non-hearsay evidence. There is no fellow-officer exception to the hearsay rule, and the district court erred in permitting the government to merge its case with the inquisitorial opinion-and-report-based practice in Spain that, unsurprisingly, led to no drug charges against Tardon.

Each police report that each of the six SNP officers relied on to opine about the meaning of searches, recordings, theories, and suspicions was inadmissible hearsay, and violated the letter and purpose of Fed. R. Evid. 803(8)'s exclusion of police reports. Each was also a Confrontation Clause violation. Each resulting hearsay-based SNP opinion about the existence of a Spanish drug conspiracy, the amounts of drugs involved, and linkage to Tardon, was improper and irremediably prejudicial.

First, the government's notion that it is permissible to have foreign police witnesses simply opine about guilt on fundamental elements and conspiracy claims would turn U.S. trials into the inquisitorial system the officers operate under in their own country. This Court has permitted limited background testimony by police officers so long as it does not stray into incriminating testimony, i.e., so long as it is for "a non-hearsay purpose." *United States v. Jacques*, 266 F. App'x 824, 828 (11th Cir. 2008). But that is not what occurred here. SNP officers repeatedly testified to reports of the results of searches attributed conspiratorially to Tardon and the reports of conclusions drawn from searches. The officers made conclusory pronouncements as to property ownership by the persons (alleged Tardon conspirators) to whom guilt was ascribed, the distribution and manufacture of drugs (that the government never properly linked to Tardon), and ultimately opined not merely on the guilt of key

31

Spanish crime participants, but of the magnitude of the supposed ongoing Spanish crimes, speculation about prior crimes—effectively offering a testimonial verdict based on SNP police reports.

The government, Govt-Br:89, confirms that SNP reports were recapitulated to the jury, which then took their own notes of that hearsay into the jury room for the sole purpose of convicting Tardon of being involved in a major drug operation in Spain. One such SNP hearsay guilt-opinion witness would have been bad enough, but there were *six different Spanish national police officers offering hearsay and conclusions about the alleged Spanish drug trafficking*. The government admits the most damaging testimony was by agents who expressed what they were "informed of" by other police officers regarding the drug trafficking activity at issue. Govt-Br:89 n. 15. The government confirms further, Govt-Br:90, that the district court ruled the hearsay was admissible *because* SNP were offering *conclusory opinions* directly about the alleged drug activity and conspiracy of which Tardon was being connected through hearsay report compilations.

The government, Govt-Br:91, seeks to justify the use of these conclusory opinions, even though they summarize thousands of police reports, amounting to an impossible-to-defend-against, overwhelming Confrontation Clause violation. The government, Govt-Br:92, suggests that police can opine about the guilt of other alleged co-conspirators so long as they do not directly provide their written reports to the jury or provide specific hearsay directly about the defendant. It is no answer to say that the foreign police opined that hearsay proved the crime occurred and then

only proved through speculation that the defendant was linked criminally to the conspirators. This Court should reverse based on the use of SNP hearsay, opinions, and intrusion into the function of the jury.

**3.    Admission of foreign hearsay in violation of the Confrontation Clause.** The government introduced, in a further Confrontation Clause violation, hearsay evidence that Tardon's father once testified in a Spanish court that Tardon was a drug dealer. The government wrongly claims this evidence had nothing to with whether Tardon's father testified truthfully in Spain. Govt-Br:101 (no confrontation violation where prior testimony's truthfulness not purpose of its offering).

The government, in closing argument, claimed it was asking jurors to (wildly) speculate that Tardon's mother mentioned the father's testimony to Cohen to prevent Cohen from revealing Tardon's drug conduct—of which neither of them was shown to have knowledge. The government's post-hoc premise for the evidence was that facts revealed to the father would be truthfully conveyed to the Spanish government—*as he had done in his prior testimony*. The government offers no theory under which there could be relevance without the premise that the father would relay facts to the authorities *as he did when he testified*. The government was not arguing that the mother was telling Cohen the father is a liar, but instead that he would testify (truthfully) about it. The hearsay source of the information did not make it any less a Confrontation Clause violation, nor was there any co-conspirator hearsay exception analysis at trial or in the government's brief that would overcome this constitutional violation that gravely and indelibly prejudiced Tardon.

33

**4.     Admission of foreign contraband evidence.** The government does not dispute that its importation of a substantial amount of cocaine from Spain into the United States for the sole purpose of displaying and passing it around to Tardon's jury, DE:504:56; DE:521:57—even though the cocaine had nothing to do with Tardon—was *not lawful* and not protected under the limited immunity granted the government under 21 U.S.C. § 885. The wrongful use of such contraband unfairly prejudiced Tardon, confused the jury, and violated Tardon's right to a fair trial. The government insists it would decline to prosecute its agents, the jury, and the judge for handling the drugs and argues this prosecutorial declination makes its unlawful cocaine actions against Tardon admissible. Govt-Br:93. The government has it backwards. That the government would decline prosecution of its own wrongdoing is the primary reason for having an exclusionary rule, not a basis to permit the misconduct in court.

Exclusion of the evidence was also required because the illegal use of evidence to unfairly prejudice Tardon violates not only evidence rules, but due process. It was a clear abuse of discretion to permit the government's use of illegally-imported cocaine; misuse of the drug was unfairly prejudicial, confusing the distinction between U.S. and Spanish crimes and harms and serving to bolster the improper SNP hearsay and guilt-ascribing opinions. The cocaine was the last straw in the days-long misuse of the Spanish evidence, an abuse of the trial process compelling reversal.

**5.     Improper, false impeachment and use as substantive evidence of the defendant's then-wife's equivocal assertions regarding drug involvement by**

34

**Tardon.**  The government apparently admits that the prosecutor's closing argument falsely accused Tardon's wife of being a prostitute (a sex worker) in order to improperly use its improper impeachment of Cohen regarding her lack of knowledge of any drug dealing.  Govt-Br:103 ("The government referenced Cohen's work as 'an escort' to *explain* possible inconsistencies in her testimony and why she might have ... shied away from revealing Tardon's activities.") (emphasis added).  In other words, when Cohen's testimony did not help the government, the prosecutor slyly besmirched her and told the jury that the phony impeachment of Cohen was affirmative evidence of guilt.  *See* DE:504:77-78 (Tardon motion for mistrial).  It ill-serves the government to defend such conduct by the prosecutor who engaged in it.

The government fails to respond to Tardon's recitation of the factual and procedural predicate for the unfairly prejudicial impeachment of Cohen and instead speculates that the district court's erroneous denial of re-cross examination to correct the government's false and misleading mischaracterization of the evidence could have been addressed in the defense case rather than contemporaneously with the distortion of the evidence during presentation of the government's case.  But the option of waiting until the end of the government's case to rehash the details of out-of-court statements did not cure the error, particularly where the defense had no access to the hostile witness outside the courtroom and could not be put to the dilemma of opening up unknown matters by presenting the cooperating government agent as a defense witness.  Denying re-cross to show the context and ambiguity of the matter about which the impeachment was conducted, and the government's impermissible closing

35

argument which not only repeated the misstatement of the underlying facts of Cohen's statements, but—while disparaging Cohen as a sex worker (falsely)—used the impeachment as direct evidence that Tardon had done some kind of cocaine deal with the Spanish woman whom the foreign police witnesses had impugned, violated Tardon's fair trial rights.

The government's actions encapsulated the maximum prejudice in the improper misuse of (false) impeachment evidence. Rather than follow the law and rely on a statement for which there was only a manufactured impeachment value regarding a non-issue as to jewelry purchases, the government falsely vouched for Cohen's bad character and, with a wink and nod, told jurors the government knew its own witness was guilty of the charges that it had not filed against her and that her failure to incriminate her ex-husband was due to "what she is, okay?" DE:504:49.

**6.     Improper government vouching for its case.** The government discounts its remaining vouching as being repeatedly restated with different language in closing. *See* DE:504:33, 34-36 ("If you want to find a big drug dealer, you follow the money."; vouching that not finding a direct association with drugs, such as possession, proves Tardon was a big drug dealer). But the persistent vouching, particularly in light of the foreclosure of defense arguments for discrediting government evidence and theories, combined with other errors to deny Tardon a fair trial. The government, Govt-Br:106, offers no justification for the district court's restrictions on defense closing argument. The district court barred defense closing argument on the failures and lack of resolution in the Spanish police investigation, the

speculative Spanish hearsay and inadequate pursuit of evidence that left no substantial evidence against Tardon, DE:504:95, 97-99, the conclusory, inquisitorial system of investigation offered as evidence, DE:504:142, that Tardon acted openly in his financial dealings, DE:504:110-11, that money unspent or unused in Spain is not part of a laundering violation, DE:504:122, and that the single, decade-long conspiracy charge was inconsistent with the evidence.  DE:504:135.

Combined, the hearsay, double hearsay, Confrontation violations, improper argument, improper use of impeachment, improper character assassination, unfounded violation of the marital privilege, inexplicable restrictions on defense examination of witnesses and defense closing argument, and unfair use of foreign investigation conclusions to condemn Tardon to a life sentence (150 years) merit reversal.

## V.

**TARDON'S 150-YEAR SENTENCE BASED ON THE FALSE PREMISE OF A BASE OFFENSE LEVEL FOR FOREIGN CRIMES SHOULD BE REVERSED FOR MISAPPLICATION OF THE SENTENCING GUIDELINES AND THE UNNECESSARY, DISPARATE, AND UNREASONABLE SEVERITY OF THE SENTENCE.  THE IMPRISONMENT AND FORFEITURE SENTENCES WERE EXCESSIVE AND UNFOUNDED.**

A.     **Erroneous base offense level premised on foreign conduct for which no guideline is applicable, contrary to express terms of the guideline applicable to money laundering offenses.**

The government offers no interpretation of the sentencing guidelines that permits sentencing a defendant who committed no drug trafficking offenses within the

jurisdiction of U.S. authorities on the basis of drug trafficking guidelines, and the use of foreign criminal conduct to set the base offense level constituted error.  Tardon committed no drug trafficking crimes at all in this country, never introduced or distributed drugs or conspired to do so in this decade-long period of the indictment, and thus should not have been sentenced under the structure for one who had committed such conduct.

This Court's explanation in *United States v. Spence*, 923 F.3d 929, 933-34 (11th Cir. 2019), of the limited guideline utility of foreign criminal conduct, where a defendant's base offense level already encompasses the U.S. crime that the guideline is designed to address, is consistent with the analysis of other Circuits that distinguish between enhancement or characterization of the U.S. conduct by reference to the interrelated foreign conduct and the outright setting of a base offense level for conduct the commission of which, in whole or in part, does not violate U.S. law.  In *Spence*, for relevant conduct determinations, the difference between *aspects* of U.S. child sex abuse crimes committed abroad and those committed domestically did not warrant excluding from the relevant conduct calculus the interrelated foreign conduct for enhancement under the child sex abuse guideline provision (U.S.S.G. § 2G1.1, et seq.).  But this Court carefully explained why its ruling did not conflict with the fundamental principles of guideline adherence to U.S. crime focus in *United States v. Azeem*, 946 F.2d 13 (2d Cir. 1991).

Because Tardon was wrongly sentenced on the basis of a nonexistent base offense level for unspecified Spanish statutory violations—where the guidelines never

38

contemplated setting a base offense level based on a foreign offense—his case should be remanded for resentencing. The structure, history, commentary, and text of the guidelines do not permit composing a guideline for a foreign offense as a base offense level. The blend between real-offense and charged-offense concepts rests first on setting the base offense level on the basis of the federal criminal conduct, without regard to whether foreign crimes can play some other role in the sentencing process.

The PSI calculated Tardon's base offense level under U.S.S.G. § 2D1.1, which pertains to drug trafficking, but Tardon committed no drug trafficking offense for which § 2D1.1 applies. Apart from any statutory questions of extraterritorial jurisdiction, the setting of the base offense level is based only on U.S. offenses. The Sentencing Commission has not had the opportunity to evaluate appropriate sentences for drug trafficking offenses in Spain, nor is there any indication the Commission expected to punish defendants for purely foreign crimes without evaluating the factors relevant to disparity and equal punishment under the law. Hence, the unreasonableness of sentencing Tardon to 150 years for a drug offense for which no such sentence is possible in Spain illustrates why the Commission kept its hands off the setting of drug base offense levels for anything other than U.S. drug crimes. Nor has any court ever held to the contrary as to the setting of a base offense level, even where the defendant was convicted of U.S. drug crimes.

A different question might be posed if—as the government charged in the indictment—Tardon had laundered proceeds of both U.S. and Spanish drug

39

trafficking.  If that charge had been true (and it was not), then a base offense level for the drug conduct could more feasibly be set, and a separate question would be presented as to whether the Spanish drug conduct was somehow "relevant conduct" in relation to the base offense of U.S. drug trafficking.  The Second Circuit concluded such additional foreign drug crimes could *not* be counted.  *United States v. Azeem*, 946 F.2d at 16 (holding that drug trafficking in Egypt "should not have been included in the base offense level calculation because it was not a crime against the United States").

But Tardon's case involves no U.S. drug crimes ever even being attempted or contemplated, and whatever the Court's answer might be to the *Azeem* hypothetical relevant-conduct question, it is not applicable here because there is no capacity under the Sentencing Guidelines to set a base offense level for Spanish drug crimes—much less to use that unfounded principle to impose what amounts to a life sentence.  *See also United States v. Elbaz*, 52 F.4th 593, 609 (4th Cir. 2022)("'[R]elevant conduct under the Guidelines must be criminal conduct.'"; assuming error in counting "losses from purely foreign conduct when setting its initial sentencing range") (quoting *United States v. Dove*, 247 F.3d 152, 155 (4th Cir. 2001)).  In *Spence*, this Court did not conclude that the discrete issue in *Azeem* was wrongly decided.  Instead, this Court recognized that the circumstances in which foreign criminal conduct may enter the guideline analysis may have just such limits.  *See Azeem*, 946 F.2d at 67 ("We decline to find that Congress intended to require that foreign crimes be considered when

40

calculating *base offense levels* simply because Congress did assign foreign crimes a role in fixing upward departures, while remaining silent on their role in calculating base offense levels.") (emphasis added).

In *United States v. Dawn*, 129 F.3d 878, 885 (7th Cir. 1997), on which this Court relied in *Spence*, 923 F.3d at 934, the Seventh Circuit explained points of agreement with the analysis in *Azeem* and similar Second Circuit case law, stating "we do not think our holding today conflicts with this line of authority.... Our case would be closer to *Azeem* and [*United States v. Chunza–Plazas*, 45 F.3d 51, 57-58 (2d Cir. 1995)] if, for example, the district court had taken into consideration pornography that the defendant created and left in another country." *See also United States v. Turner*, 624 F. Supp. 2d 206, 222 (E.D.N.Y. 2009) (conduct causing harm only in foreign country not logically within the scope of guideline coverage).

Tardon also addressed in his initial brief the sole case cited by the government, *Spence*—which did not impose a base offense level calculation on foreign conduct. 923 F.3d at 931 ("Spence argues that the doctrine should be extended so as to apply not only to preclude construction of statutes as intending to criminalize such extraterritorial conduct but also to apply to preclude sentencing courts from considering such extraterritorial conduct as part of the 'relevant conduct' considered pursuant to U.S.S.G. § 1B1.3 in determining the appropriate sentence for conduct (occurring entirely within the United States) of which a defendant was convicted."). *Spence* speaks of the relevant criminal conduct committed contemporaneously in the

41

U.S. and the foreign country and the reasonableness in that instance of treating the related conduct as relevant, not to convert it into the offense of conviction for purposes of setting the base offense level. There is, therefore, no starting point in the U.S. for setting a base offense level based on alleged Spanish drug conduct in this case.

Contrary to the government, U.S.S.G. § 2S1.1(a)(1) is a cross-reference that subsumes the entirety of the base offense level determination. For money laundering of proceeds of offenses not covered by the federal sentencing guidelines, U.S.S.G. § 2S1.1(a)(2) determines the base offense level. For Tardon, that base level was 8 plus a 20-level increase (using the table in § 2B1.1(b)(1)) for the laundered amount of $14,358,639.64 found by the district court). The resulting base offense level is 28. With enhancements for the § 1956 conviction (2 levels: § 2S1.1(b)(2)(B)), sophisticated laundering (2 levels: § 2S1.1(b)(3)), and role-in-the-offense (4 levels: § 3B1.1(a)), the total offense level should have been set no higher than level 36. Because Tardon had no criminal history points, his guideline range would be 188-235 months. U.S.S.G. Ch. 5, Pt. A (sentencing table).

Instead, the district court treated Tardon as if he committed a prosecutable drug crime for which "the offense level for that offense can be determined," under § 2S1.1(a)(1)(B). The government effectively admits that no guideline can actually be *determined* because there is no guideline for the asserted foreign offenses. Gov't-Br:113. The government's suggestion of going beyond the guideline language to substitute a hypothetical guideline for foreign drug crimes, when the money

42

laundering guideline does not call for that form of analogy, is not a *determination* of a guideline, but the ad hoc *creation* of one that the Commission deliberately chose not to have as part of the Sentencing Guidelines Manual.  The district court erred.  Base offense levels—unlike relevant conduct and enhancements—are determined by a specific guideline methodology that rests on offenses of actual or potential prosecution and conviction, whether or not charted in Appendix A, as the Commission explains in Chapter 1 of the Manual.

Thus, entirely apart from whether the doctrine against extraterritorial application applies to "relevant conduct"—a separate consideration addressed only in § 2S1.1(a)(1)(A)—the absence of any guideline that the Commission has determined to be potentially applicable under § 2S1.1(a)(1)(B) so as to use entirely foreign conduct to set a base offense level bars application of § 2S1.1(a)(1) in Tardon's case and requires employing § 2S1.1(a)(2).  The government's attempt to turn relevant conduct in the *Spence* context into the entirely distinct circumstances of this case reveals the weakness of the government's argument.  Moreover, the premise, ordinarily, is that the money laundering facilitates the crime.  In this case, however, there was no such allegation.  Thus, even for policy reasons, stretching to reach this case would not be warranted.

There is a tremendously sound basis to conclude that the guidelines do not apply to foreign crimes, because the guidelines are concerned with American crime.  The guidelines are not and never have been designed to effect American criminal policy on foreign governments.  Whether it violates treaties to do so, we are unaware,

43

but there is nothing to suggest the guidelines were meant to do so. The sentencing court has the power to adjust the sentence based on its view of the defendant and the conduct, and the government has suggested that as an alternative in this case. Importantly, however, in none of the history cited is there any reference to increasing the money laundering sentence based on a foreign crime.

**B.    The 150-year sentence is substantively unreasonable and unconstitutionally cruel and unusual.**

The district court discussed the statutory sentencing criteria, as the government notes. However, none of those factors were relatively serious, where Tardon did not commit any promotional offenses. Instead, the alleged money laundering was entirely for spending money on lawful goods that were not employed in any way for drug trafficking or any other crime in the United States or any other country.

The district court's assertion that the underlying foreign conduct could support an upward departure on the basis that it involved drug amounts far in excess of the top guideline level is premised on an erroneous guideline analysis. That guideline, U.S.S.G. § 2D1.1, does not apply—and has never applied—to foreign drug crimes. The government even now does not argue that the remainder of § 2D1.1 can be applied to Tardon's sentencing because that is not included in the cross-reference.

The district court's view that a heavy imprisonment sentence would not be enough, and instead that a life sentence was necessary for the money laundering counts of conviction, lacks any reasonable basis. The district court's inapposite comparison of the instant case to *United States v. Magluta*, 313 F. App'x 201, 206

44

(11th Cir. 2008) (per curiam), all of whose convictions were for § 1956 (20-year counts) concealment laundering, combined with gross abuses of the court system by bribing multiple federal jurors and witnesses, further shows that the court in this case did not make any reasonable comparison.

Moreover, the district court discounted entirely the testimony by Tardon's stepdaughter, which was that Tardon—whom she lived with and was under his care up to the time of the stay-away order sought by the government—was a loving person who had taken good care of her.

Tardon acknowledged that his conduct affected the local economy, but the notion that this effect was negative or more than de minimis is entirely speculative. Generally, spending money on lawful items is deemed to be good for an economy. Also, the absence of knowledge of committing a crime by spending money makes the life sentence unjustly severe, where not everyone knew the government would take the unprecedented position that simply spending money that came from violating a foreign law is unlawful.

**C.**     **The district court's calculation of a $14 million laundering amount and corresponding forfeitures, including direct "involved in" forfeiture, exceeded the scope of charged laundering offenses and relevant statutes, conflicted with jury findings on forfeiture claims, was procedurally improper, and violated Tardon's Fifth, Sixth, and Eighth Amendment and statutory rights and Fed. R. Crim. P. 32.2.**

The government relies on a factually unsupported involved-in theory for forfeiture of money transfers that were not shown to violate any federal law. Govt-Br:120. But unlike the case the government cites, *United States v. Seher*, 562 F.3d

45

1344, 1368 (11th Cir. 2009), the government made no effort to, and did not, show how any of the non-criminal money transfers were involved in anything criminal.  Nor does the government offer such a theory in its brief.  The money judgment amount did not satisfy the *Seher* standard and should be reversed.

The government's argument for discounting the jury verdict as to non-traceability of property to money laundering rests on a non-sequitur notion that the jury did not resolve "antecedent involvement (or traceability) of any money used to secure property."  Govt-Br:121.  But that argument ignores the forfeiture phase instructions and government arguments to the jury, all of which turned on traceability.  Further, the government makes no effort to defend the direct forfeitures imposed under an involved-in theory—apparently because doing so would contradict its novel effort to redefine the scope of the acquittal portion of the forfeiture verdict.

The government wrongly claims the district court held hearings on disputed substitute-property forfeiture issues, but the record cites offered by the government, Govt-Br:122, refute that contention.  There was no such hearing.  The district court reached the forfeiture amount by adding up all money Tardon ever received, failed to account for the legality of the bulk of the money or acquitted property that the transfers related to (including as to mortgage payments), and imposed a substitute property order without affording the hearing required by Rule 32.2.

Tardon relies on his initial brief for his remaining forfeiture arguments.  Importantly, in terms of the district court's procedural errors, *United States v. MacIntosh*, 601 U.S. 330 (2024), did not involve a situation, as here, where the jury

46

had already acquitted half of the property the government sought to forfeit.  In that context, the district court's failure to enter a preliminary order of forfeiture was harmful, resulting in an unreliable determination as to which the government has struggled on appeal to articulate a facilitation theory to justify the forfeiture.

## CONCLUSION

WHEREFORE, Appellant requests that this Court vacate the judgment, remand for dismissal, acquittal, or alternatively, a new trial, resentencing, or other relief.

Respectfully submitted,

s/ Richard C. Klugh
RICHARD C. KLUGH, ESQ.
Attorney for Appellant
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Tel. (305) 536-1191
Fax: (305) 536-2170

47

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7) and this Court Order of October 10, 2025 granting the motion for excess words for this brief. According to the WordPerfect program on which it is written, the numbered pages of this brief contain 11,975 words.

 s/ Richard C. Klugh
Richard C. Klugh


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this  24th  day of October, 2025, the foregoing was filed electronically and thereby served upon counsel of record.

 s/ Richard C. Klugh
Richard C. Klugh

48